## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** *Plaintiff,* v. **ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,** *Defendants.* | Case No. 1:25cv1638 |

## <u>COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF</u>

Millions of Americans use online rentals marketplaces (Internet Listing Services or "ILSs") to search for and find their next rental home or apartment every year. Just a few well-known players dominate this space: Zillow, Redfin (whose flagship rentals site is Rent.com), and CoStar (whose flagship rentals site is Apartments.com). For years, these companies have competed fiercely to sell advertising to property managers looking to rent their available units. But Zillow has no interest in continuing to compete with Redfin on the merits of its rental advertising offering. Instead, on February 6, 2025, Zillow and Redfin executed an unlawful agreement to remove competition from this already highly concentrated market, starting with a $100 million payment to Redfin to exit the ILS advertising market.

Under this plan, Redfin agreed to stop selling multifamily advertising, to terminate its existing multifamily advertising contracts, and to transition those customers to Zillow. Just after

the announcement of the plan, Redfin promptly terminated hundreds of employees who had supported this business and agreed to help Zillow hire them. Redfin also turned over its most sensitive ███████████████ information to Zillow as it wound down its advertising sales business. Redfin's previously growing multifamily rentals business has ceased to operate, and, going forward, its websites will serve merely as one of several "syndicators" hosting a copy of Zillow's listings.

This agreement is nothing more than an end run around competition that insulates Zillow from head-to-head competition on the merits with Redfin for customers advertising multifamily buildings (that is, buildings with 25 or more units). Zillow and Redfin's unlawful agreement eliminates competition in violation of Section 1 of the Sherman Act. Considered as an acquisition, it is unlawful under Section 7 of the Clayton Act.

The practical outcome of the agreement is obvious: Redfin has terminated its existing multifamily advertising business operations and, for the duration of the agreement, has stopped competing to provide ILS advertising for multifamily properties. The wholesale elimination of critical competition in this highly concentrated space will harm rental advertisers and the Americans who rely on ILSs to find their next home.

Accordingly, Plaintiff Federal Trade Commission ("FTC"), by its designated attorneys, petitions this Court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, for a permanent injunction and other equitable relief, against Defendants Zillow Group, Inc., Zillow, Inc. (collectively, "Zillow"), and Redfin Corporation ("Redfin"), (collectively "Defendants") to redress and prevent violations of Section 5 of the FTC Act, 15 U.S.C. § 45 and Section 7 of the Clayton Act, 15 U.S.C. § 18.

2

**NATURE OF THE CASE**

1.      With nearly 49 million units, rentals make up over 30 percent of all housing in the United States.  ILSs are one of the most important tools for renters to search for available rentals. Landlords and property management companies ("PMCs") pay ILSs to advertise their vacant units to renters, and ILSs enable prospective renters to search for listings that meet their needs. When a renter identifies a property of interest, they can request more information about the property, which generates a lead for the PMC that includes information enabling the PMC to communicate directly with that potential renter.

2.      The market for ILS advertising is already highly concentrated.  Zillow and Redfin operate two of the three leading rental ILS networks in the United States.

3.      Zillow claims to be the #1 most-visited rentals network and the most searched rentals marketplace, touting its ability to help advertisers reach more high-intent renters.  In May 2024, Zillow estimated that it had "more than 50% of all rental listings – more than any other site[.]"  Zillow's network of rental listing sites operates under its own brand name and under the names of various other brands Zillow has acquired over the years, including Trulia, HotPads, Out East, and StreetEasy.  Zillow also syndicates its rental listings to Realtor.com.

4.      Redfin entered the rental ILS business in 2021 by purchasing RentPath.  RentPath had long been a key competitor in the ILS advertising market through its sites including Rent.com and ApartmentGuide.com.  Redfin added its own branded sites to the existing RentPath sites to create the Redfin Network.  In a 2024 earnings call, Redfin CEO Glenn Kelman explained where Redfin fits into the consolidated rental ILS market: "the big players are getting bigger and the small players are getting smaller, and [Redfin wants] to get on the right side of that . . . Zillow and CoStar have been trying to grab more customers at the expense of some of

3

the smaller players. . . We're glad to keep growing." Over the past year, Redfin has made good on Mr. Kelman's words, growing its rentals revenue for the remainder of 2024.

5.      Redfin set its sights on competing aggressively for market share. As Mr. Kelman explained in May 2024, "It's amazing that [Redfin] went from losing $10 million in [the rental segment] a year ago in Q1 to making money for the third straight quarter now. But the next stage in the Rent acquisition is to try to grab share, handover [sic] fist and really to grow the online marketplace."

6.      This "next stage" for Redfin ended almost as soon as it began. Rather than continue to fight for share on the merits, Zillow and Redfin entered into an unlawful agreement to stop competing for the sale of multifamily rental advertising. On February 6, 2025, they memorialized this agreement in two contracts that restrained competition between the companies in multiple ways.

7.      First, under the Partnership Agreement, Zillow paid Redfin $100 million to stop competing, facilitate the transition of the bulk of its multifamily rental advertising business to Zillow, and shut down the remainder. By ███████, Redfin was required to terminate all of its advertising contracts with managers of multifamily rental properties of 25 units or greater. Second, pursuant to the Content License Agreement, Redfin has agreed to stay out of the market for up to 9 years and to use its network to show only rental listings that are also displayed on Zillow's sites.

8.      Additionally, Redfin agreed to—and did—turn over an array of competitively sensitive ███████ information to Zillow, its direct horizontal competitor. Redfin has fired virtually its entire rentals salesforce, including those with key customer relationships, and agreed

4

to help Zillow hire its pick of these employees.  Zillow and the salespeople ████ from Redfin

have used ███████████████████████████████████████████—to

speedily transition Redfin's unique rental advertising customers to Zillow.  Redfin agreed to use

its "best efforts" to help Zillow accomplish this transition of customers and to use "commercially

reasonable efforts" to assist Zillow in hiring its former employees.

9.      Defendants' unlawful agreement—under which Zillow pays Redfin at least $100

million to stop competing, exit, and stay out of the ILS advertising market—violates Section 1 of

the Sherman Act.  The agreement is not ancillary to any actual partnership or joint venture

between these direct competitors.  This agreement to eliminate competition is obviously

anticompetitive.  It will result in reduced choice, higher prices, and reduced quality for

multifamily rental advertising customers and will provide no cognizable procompetitive benefits.

10.     While the agreement was not reported under the Hart-Scott-Rodino Act, 15

U.S.C. § 18a, the acquisition of assets associated with Redfin's multifamily rental advertising

business is unlawful under Section 7 of the Clayton Act.  The combination of two of the three

leading ILSs increases concentration in an already highly concentrated market, making it

presumptively illegal as it may substantially lessen competition.

11.     Whether viewed as an agreement to stop competing or as the acquisition of a

rival's assets, the effect remains the same: eliminating competition—and all of the benefits that

competition brings—in the sale of ILS advertising to rental property managers.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1337(a), and 1345.

5

13.     This Court has personal jurisdiction over Zillow because Zillow has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

14.     This Court has personal jurisdiction over Redfin because Redfin has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

15.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).  Each Defendant transacts business, committed an illegal or tortious act, resides, or is found in this district.  Currently, Zillow.com displays over 27,000 apartment listings in the Commonwealth of Virginia, and Redfin's Rent.com displays over 15,000 listings in the largest five cities in the Commonwealth of Virginia.  In the counties comprising the Alexandria Division, both Zillow.com and Rent.com display over 13,000 listings.

16.     Defendants' general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

17.     Zillow and Redfin are, and at all relevant times have been, "corporations," as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE PARTIES

18.     Plaintiff FTC is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in the District of Columbia.  The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

19.     The FTC is authorized to bring this case in federal court because Defendants are violating or are about to violate a provision of law enforced by the FTC, and this is a proper case for permanent injunctive relief within the meaning of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

20.     Defendant Zillow Group, Inc. is a publicly traded Washington company with its principal place of business at 1301 Second Avenue, Floor 36, Seattle, Washington 98101. Defendant Zillow, Inc. is a subsidiary of Defendant Zillow Group, Inc., and a Washington company, with its principal place of business at 1301 Second Avenue, Floor 36, Seattle, Washington 98101.

21.     Zillow operates a network of websites and apps under brands including Zillow, StreetEasy, HotPads, and Trulia (collectively, the "Zillow Network"), that allow customers to advertise and search for available rental housing.

22.     On July 1, 2025, Rocket Companies, Inc. ("Rocket") acquired Redfin.  Rocket is a publicly traded Delaware corporation with its principal place of business at 1050 Woodward Avenue, Detroit, Michigan 48226.  Rocket is a Detroit-based fintech company providing mortgage, real estate, and personal finance businesses: Rocket Mortgage, Rocket Homes, Rocket Close, Rocket Money, Rocket Loans, and now, Redfin.

23.     As of July 1, 2025, Defendant Redfin is a direct wholly-owned subsidiary of Rocket.  Redfin is incorporated in Delaware with its principal place of business at 1099 Stewart Street, Suite 600, Seattle, Washington 98101.  Redfin offers a network of digital marketplaces to allow prospective renters to discover available apartments and houses for rent.  Redfin operates Rent.com, its largest rental ILS, along with Redfin.com, Rentals.com, and ApartmentGuide.com

(collectively, the "Redfin Network"). Prior to its agreement with Zillow, Redfin offered complementary digital marketing solutions ("DMS") including RentRep, a social media advertising tool, and other products like RentSearch, RentSocial, RentTarget, RentEngage, and Property Sites. These solutions were separate from Redfin's ILS advertising offerings.

## INDUSTRY BACKGROUND

24.     Rentals form a crucial pillar of the housing industry. In 2024, approximately three times as many U.S. households moved to a new rental as purchased a home. Single family homes for rent and buildings with a few units often are managed by landlords. Larger multifamily rental properties are typically managed by PMCs. PMCs (and other types of property managers) manage portfolios of properties on behalf of owners and investors and oversee the day-to-day operation of the properties—including the advertising and leasing of available units.

25.     Prior to the rise of rental ILSs, advertisers primarily used local newspapers, apartment guides, and classified listings to advertise rental units. The internet facilitated the growth of ILSs, which digitized the search process for renters while offering new tools for advertising customers to manage their marketing efforts to better meet renters' needs, such as photo galleries, mapping functions, and targeted advertising. As internet usage expanded and customer expectations shifted, ILSs quickly became a dominant form of advertising for rental housing.

26.     Rental ILSs are a primary marketing channel that PMCs, landlords, and other types of property managers (together, "advertising customers" or "advertisers") use to advertise their properties. According to a Redfin report, renters use ILSs more than any other form of advertising to search for a place to rent. Unsurprisingly, another recent Redfin survey report

8

found that 88 percent of advertisers included ILS advertising in their budgets, and those advertisers allocated over half of their marketing budget to ILS advertising.

27.    Rental ILSs serve two distinct groups of customers: advertising customers like PMCs, who pay the ILS to advertise available rental units, and prospective renters, who use ILSs to search for housing.  On the advertising side, rental ILS providers compete for advertising customers' listings by offering broad exposure to and engagement from potential renters.  On the renter side, ILSs seek to provide prospective renters with a broad selection of listings that match their preferences and an experience that provides in-depth property insights, user-friendly tools, and ways to connect with and tour properties.  While some ILS providers offer add-on tools that help manage lease signing or rent payments, the core functionality of ILSs is connecting advertisers with potential renters, not intermediating the leasing transaction.

28.    Over the past decade, the rental ILS industry has undergone substantial consolidation.  The two leading firms, Zillow and CoStar, now have the vast majority of ILS rental listings across the United States.  Zillow, CoStar, and Redfin (shown as "Rent." in the figure below) also have been the clear market leaders in terms of rental ILS traffic since at least the start of 2021.  Further, CoStar, Zillow, and Redfin are the top three firms by revenue, accounting for over eighty five percent of revenue for rental ILSs with nationwide presence in 2024.



### Leading Rentals Traffic

Product-led Zillow Rentals platform and unique listings[1] drive market-leading renter audience with limited marketing spend

**Comscore Average Monthly Unique Visitors[2]**

1.  Zillow Group internal data and estimates as of March 31, 2024.
2.  Average monthly unique visitors on Zillow Rentals for September 2020-March 2024 estimated using Comscore data.

9    ZILLOWGROUP

29.     Zillow began operating a rental ILS in the 2010s.  It acquired HotPads in 2012 and Trulia in 2015, both of which had established user bases in the rentals space.  These acquisitions, among others, enabled Zillow to build a powerful rentals marketplace with significant reach among advertisers.  Zillow publicly touts that it has "the largest audience of renters on the market" and is "the most searched Rentals marketplace."

30.     Zillow achieved its market leader status in rental ILS advertising by focusing on growing listings and viewers.  Now, as Zillow recently told investors, it has shifted its focus to "scaling revenue across the marketplace."

31.     CoStar, the only other leading ILS besides Zillow and Redfin, also grew its market share through acquisitions, first of Apartments.com in 2014 and subsequently of ApartmentFinder.com in 2015 and ForRent.com in 2017.

32.     Redfin has competed aggressively with other rental ILSs since its entry into the rentals market via its acquisition of RentPath in 2021.  From 2023 to 2024, Redfin's rentals

10

revenue increased.  The Redfin Network has provided an alternative or supplemental option to advertising customers who want to advertise with a trusted, nationwide brand to gain greater visibility for their listings.

33.     Other than Zillow, Redfin, and CoStar, the only other meaningful providers of rental ILS advertising are Apartment List, RentCafe, and Zumper.  None of these three approaches the competitive significance of Zillow, Redfin, or CoStar.

34.     Redfin's acquisition of RentPath preserved the existence of an independent ILS alternative that competed with Zillow and CoStar for advertising customers—that is, until Zillow and Redfin signed their agreements on February 6, 2025.

## THE UNLAWFUL AGREEMENTS

35.     Zillow and Redfin entered into and are implementing their unlawful scheme through two agreements signed on February 6, 2025: the Partnership Agreement (Exhibit A attached hereto) and the Content License Agreement (Exhibit B attached hereto) (together, the "Agreements").  Under the Partnership Agreement, Zillow pays Redfin to get out of the multifamily ILS advertising market and help transition as much as possible of Redfin's multifamily business to Zillow.  Under the Content License Agreement, Redfin agrees to stay out of the multifamily ILS advertising market and use Zillow as its exclusive provider for multifamily rental listings.

36.     Defendants' press release characterizes the Agreements as forming a "partnership."  But the Agreements do not envision or require that Defendants pool capital or resources or share risks.  Each agreement includes the following language: "[n]either this Agreement nor the cooperation of the parties contemplated herein shall be deemed or construed

11

to create any partnership, joint venture, employment or agency relationship."[1]  And both Agreements state that the relationship between the Defendants is only that of "independent contractors."[2]

37.    Pursuant to ▮▮▮▮▮▮ the Partnership Agreement, Zillow agrees to pay Redfin $100 million.  The rest of the Partnership Agreement specifies Redfin's end of the bargain. Redfin agrees to shut down its multifamily advertiser-facing ILS business and turn over the keys to Zillow: Redfin's customer relationships, confidential customer information, and assistance in hiring its pick of Redfin's then soon-to-be-fired employees.  In its March 31, 2025, quarterly filing with the Securities and Exchange Commission, Zillow reported its $100 million payment to Redfin under the heading "Intangible Assets," with the label "Customer relationships."

38.    Under Section 2.3 of the Partnership Agreement, Redfin must use its "reasonable best efforts" to help Zillow sign contracts with Redfin's advertising customers that manage multifamily properties.[3]  As part of these best efforts, Redfin sales representatives were required to introduce relevant Zillow sales representatives to each multifamily advertising customer via email, and then "work closely with" Zillow's sales representative for each advertiser, promptly informing Zillow of any communication with the customer.[4]

39.    The Partnership Agreement also required Redfin to turn over to Zillow—its direct, horizontal competitor—an array of competitively sensitive ▮▮▮▮ information.[5]  This information includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] Partnership Agreement § 9.6; Content License Agreement § 14.6.
[2] Partnership Agreement § 9.6; Content License Agreement § 14.6.
[3] Partnership Agreement § 2.2.
[4] Partnership Agreement § 2.3(c).
[5] Partnership Agreement § 2.3(a).

██████████████████████████████████████████████

████████████████████████████████████████.[6]  Redfin also agreed

to provide █████████████████████████████████████.[7]  Redfin

further agreed to provide information for ████████████████████

███████████████████████.[8]

    40.    Redfin agreed to terminate all contracts with multifamily advertising customers

on or before █████████.[9]  If a Redfin customer did not sign up with Zillow, Redfin was

nonetheless obligated to cancel the customer's contract and remove its listings from the Redfin

Network to complete Redfin's paid exit from the market.  For those advertising customers who

signed up with Zillow, Redfin was obligated to cancel their contracts within thirty days after they

signed their Zillow contract.[10]

    41.    The Partnership Agreement further required Redfin to assist Zillow with its hiring

of any Redfin employees and contractors who "are terminated by Redfin in connection with the

[Agreements] and identified to Zillow."[11]  To facilitate Zillow's hiring of these employees,

Redfin has agreed not to enforce any employee non-compete agreements with respect to

Zillow.[12]

    42.    The second of the Agreements, the Content License Agreement, provides for the

syndication of Zillow listings to Redfin's websites for a term of up to 10 years.  For multifamily

properties of 25 units or more, Redfin agrees to display *only* Zillow listings on its Redfin

---

[6] Partnership Agreement, Exhibit C (i).
[7] Partnership Agreement, Exhibit C (iii).
[8] Partnership Agreement, Exhibit C (ii).
[9] Partnership Agreement § 2.4 (the "Hard Transition Date" is defined at Content License Agreement § 3(ii)).
[10] Partnership Agreement § 2.2.
[11] Partnership Agreement § 4.1.
[12] Partnership Agreement § 4.1.

Network.[13]  Zillow agreed to pay Redfin ████████████ per lead generated from the Zillow-syndicated listings on the Redfin Network, ████████████████████, with a minimum payment of $75 million to Redfin in the first year.[14]

43.    The Content License Agreement makes Zillow the exclusive provider of multifamily rental listings on the Redfin Network; Redfin has agreed not to display any third-party multifamily listings or to compete for advertising customers of its own.[15]  This exclusivity provision is an explicit agreement from Redfin that, after exiting the market pursuant to the terms of the Partnership Agreement, it will stay out.  Redfin will not compete with Zillow for the provision of advertising of multifamily rental properties for up to 9 years.[16]

44.    The Content License Agreement also obligates the parties to █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████.[17]

**REDFIN HAS CEASED COMPETING AND EXITED THE MARKET**

45.    Since executing the Agreements, Redfin has expeditiously dismantled its ILS multifamily advertising business.  Zillow has largely acquired the assets of that business.

46.    Redfin turned over to Zillow—its former rival for the provision of multifamily advertising—███████████████████████████████████████████████ ███████████████████████████████████████

---

[13] Content License Agreement § 6.
[14] ████████████████████████████████
[15] Content License Agreement § 3.
[16] The Content License Agreement includes a one-year Wind-Down Period (§ 1.3.1) during which the exclusivity requirements in Section 3 do not apply.
[17] Content License Agreement § 2.2.

14

████████████████████████████████████████████████████████████

████████████████████████████████████ Zillow insisted that Redfin agree to

provide this sensitive ███████ information to make it easier for Zillow to capture Redfin's

customers.

      47.     After executing the Agreements, Redfin sent ████████████████████

emails to its multifamily advertising customers ██████████████████████████████

████████████████████████ As of ████████████, Zillow had signed contracts with Redfin's

multifamily advertising customers covering ████████ out of an estimated ████████ potential properties

that were previously listed on Redfin but not Zillow.

      48.     Redfin has fired approximately 450 employees—████████████████████

████████████████████████—associated with the ILS advertising business.  Redfin provided

Zillow with ███████████████████████████████████████████████████ for

fired Redfin salespeople, as well as their ████████████████.  Zillow used that information to

████████████████████████████████████████████████████████████

███████████████████████████████.

      49.     Redfin also has provided Zillow with ███████████████████████████

████████████████████████████████, as well as information about ████████████████████

████████████████████.

      50.     On June 15, 2025, Redfin deactivated rental listings for multifamily advertising

customers that did not sign a contract with Zillow and sunset its "Digital Marketing Solutions"—

add-on marketing solutions including social media management and assistance with search term

optimization.  Redfin will no longer provide any of these Redfin DMS services.

51.     Prior to executing the Agreements, Redfin marketed and competed to sell ILS multifamily advertising.  The Agreements eliminate this competition on the merits and co-opt Redfin's distinctive offering to the detriment of advertising customers, in addition to resulting in harms to prospective renters.  Moreover, Redfin's termination of employees in connection with the Agreements provides additional insurance that Zillow (and CoStar) will not face substantial competition from Redfin in this market in the future.  In effect, Defendants have agreed to transform Redfin from an independent and vibrant competitor that markets and sells its own ILS multifamily advertising into one of several websites that provide nothing more than a copy of Zillow's ILS listings.

## RELEVANT MARKETS AND MARKET POWER

52.     Rental ILSs provide services to advertising customers that are distinct from the services they provide to prospective renters who use ILSs to search for available properties.

53.     To the extent that there is a requirement to plead a relevant market to establish the antitrust violations alleged herein, the relevant markets in which to evaluate Defendants' unlawful scheme are those involving the provision of services to advertising customers.  One relevant product market is the provision of ILS advertising for rental properties.  Another relevant product market is the provision of ILS advertising for rental properties to the class of customers targeted by Defendants' Agreements, namely those who manage rental properties of 25 units or greater.

### A.  A Relevant Product Market is ILS Advertising for Rental Properties

54.     The relevant product market in which to consider the anticompetitive effects and substantial lessening of competition caused by Defendants' unlawful agreement is no broader than the provision of ILS advertising for rental properties ("ILS advertising").

16

55.    There are no reasonably interchangeable substitutes for ILS advertising.  Redfin reports confirm that ILS advertising is essential for rental advertising, variously estimating that 88 percent or 95 percent of property marketers use ILSs to find qualified renters.  In many cases, advertisers feel compelled to be on at least one of the major ILSs.

56.    Receiving a large number of high-quality leads is a top priority for advertising customers.  According to a Redfin report, "Renters use ILS more than anything else during their search for a place[.]"  Advertising customers rely extensively on ILSs because for many rental properties, no other form of advertising can provide the quantity and quality of leads that an ILS can deliver.

57.    There is wide industry recognition of ILSs as a distinct form of rental advertising, a "tried-and-true" channel for marketing available rental units.  In communications with investors, Defendants routinely focus exclusively on other ILS providers as their competitors without mentioning other forms of rental advertising.

58.    ILS advertising has peculiar characteristics and uses that distinguish it from non-ILS advertising.  ILSs are specifically designed for advertising rental properties, and thus include user-friendly features and detailed information specifically designed to aid prospective tenants in finding an available rental.  ILSs enable advertising customers to reach prospective renters that choose to use online services in order to better identify available units that match their criteria by providing—in a centralized portal—a large number of rental listings, photos, floor plans, real-time vacancy information, up-to-date pricing information, building amenity information, and the ability to use filters and mapping tools to customize search results.  Because ILSs allow prospective renters to efficiently identify available units with their desired features, ILSs are in

17

turn able to provide advertising customers with high quality leads—in other words, they can connect these customers to prospective renters that are more likely to sign a lease. No other form of rental property advertising can replicate these capabilities at scale.

59.    Other forms of advertising, such as search engine and social media marketing, do not impose a meaningful competitive constraint on ILSs and more frequently act as complements rather than competitors. Unlike ILS advertising, search and social media advertising is generally less targeted and less specialized. And according to a Redfin report, even when prospective renters begin their search for a rental on a search engine, their next click is usually to an ILS, indicating the complementary nature of these advertising options. Further, for many advertising customers, advertising directly on search engines can be prohibitively expensive, in part because the ILSs themselves compete for relevant search terms. And both Redfin and Zillow have offered tools that use social media advertising to boost the efficacy of, rather than replace, advertising on an ILS.

60.    Only specialized vendors offer ILS advertising, which requires developing a large base of both listings and search customers. In order to assemble these networks, vendors must make investments over many years to cultivate relationships with advertising customers and build a user base of prospective renters. Recognizing the importance of these customer relationships, Zillow has acquired Redfin's ███████ data and negotiated for assistance in hiring Redfin's recently fired salespeople with existing relationships with the advertising customers that Zillow hopes to transition to its network.

61.    ILS advertising is also characterized by distinct prices. Advertising customers pay for ILS advertising in one of two ways—through tiered subscriptions or success-based

18

payments, typically pursuant to individually-negotiated contracts.  Under a subscription model, advertising customers pay a set price per building for their property to be listed on the ILS.  The tier, or subscription level, they pay for determines where on the ILS their property will show and the features of the listing.  For example, an advertising customer may pay for a higher tiered subscription level in order to appear on the first page of listings in a particular city.  Under a success-based model, payments are contingent on generating leads or leases.  Both pricing models are distinct from non-ILS advertising channels such as search engine marketing and social media advertising, which typically use pay-per-click or pay-per-impression models. Search engine optimization strategies, which aim to optimize the content on an advertising customer's website for local search results, and offline advertising like signage also have distinct pricing models.

62.    These practical indicia support a relevant product market of provision of ILS advertising for rental properties.  And, based on these indicia, a hypothetical monopolist of ILS advertising could profitably impose a small but significant non-transitory increase in price or worsening of terms ("SSNIPT").  Advertising customers are unlikely to switch from ILS advertising to other advertising methods in sufficient numbers to render a SSNIPT by a hypothetical monopolist unprofitable.

## B.  A Relevant Product Market is ILS Multifamily Advertising

63.    Defendants' Agreements single out and eliminate competition in the market for sales to a discrete segment of ILS advertising customers, namely, those who "manage[] multi-family rental properties of twenty-five (25) units or greater."[18]  The sale of ILS advertising to

---

[18] Partnership Agreement § 2.

these customers ("ILS multifamily advertising") thus constitutes a relevant product market.  This market makes up a large portion of the broader ILS advertising market.

64.     The Agreements target ILS multifamily advertising customers as a distinct portion of Redfin's rental ILS business that can be identified and treated as disparate from the remainder of Redfin's rental ILS customers.[19]  As the Agreements demonstrate, rental ILSs can set different terms for properties with 25 units or more, up to and including refusing to sell them ILS advertising.  These targeted customers cannot avoid a targeted change in terms through arbitrage because ILS advertising is inherently property-specific: each property has its own listing page.[20] For these reasons, it is feasible for ILS multifamily advertising customers to be profitably targeted for changes in prices or other terms, and ILS multifamily advertising is a relevant product market.

## C.  Relevant Geographic Market

65.     The appropriate geographic market in which to consider the effects of Defendants' unlawful agreement on ILS advertising and ILS multifamily advertising is no broader than the United States.

66.     Many advertising customers prefer ILSs with a nationwide presence and often negotiate with ILSs for national contracts.  These contracts frequently include a contract-wide minimum spend that advertisers can allocate across properties in multiple cities on a month-to-

---

[19] Partnership Agreement § 2.1 (defining a Redfin Property as a "managed multi-family rental property of twenty-five (25) units or greater.").

[20] Merger Guidelines § 4.3.D.1 ("If the merged firm could profitably target a subset of customers for changes in prices or other terms, the Agencies may identify relevant markets defined around those targeted customers … .  For targeting to be feasible, two conditions typically must be met[:] … [f]irst, the suppliers engaging in targeting must be able to set different terms for targeted customers than other customers[;] … [s]econd, the targeted customers must not be likely to defeat a targeted worsening of terms by arbitrage (e.g., by purchasing indirectly from or through other customers).").  *See also* 2010 Horizontal Merger Guidelines, § 3.

month basis based on the advertising needs of properties in their portfolio. Therefore, contracting with a national ILS gives the advertisers valuable flexibility in how they allocate their spend on a month-to-month basis.

67.     Recognizing the demand from advertisers for ILSs with a nationwide presence, Zillow engages in national brand marketing and publicly describes itself as building a "nationwide marketplace." Redfin's CEO, Glenn Kelman, has similarly expressed his desire to have the Redfin network of sites "covering every nook and cranny of the United States and Canada." The leading ILSs have a nationwide presence and name recognition that allow them to serve advertising customers that manage rental properties across the nation.

68.     The Agreements themselves apply nationwide, with no difference based on location of properties or advertising customers.

69.     For these reasons, a hypothetical monopolist of ILS advertising or ILS multifamily advertising in the United States could profitably impose a SSNIPT.

70.     There may also be smaller relevant geographic markets—for example, individual metropolitan areas—where Defendants' market shares are particularly high and thus anticompetitive harms will be especially acute.

**D. Defendants' Unlawful Agreement Will Significantly Increase Concentration in Already Highly Concentrated Markets**

71.     The 2023 U.S. Department of Justice and Federal Trade Commission Merger Guidelines ("Merger Guidelines") employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The Merger Guidelines explain that markets with an HHI over 1,800 are considered highly concentrated, and a change in market concentration of

more than 100 points is considered a significant increase. At these levels, acquisitions are presumed to substantially lessen competition.

72.    There are a variety of different market share metrics that are informative as to the competitive significance of ILSs, including, but not limited to, revenue, traffic, and listings. Using revenue, traffic, or listings, the relevant markets are highly concentrated.

73.    The nationwide market for ILS advertising has an HHI well over 1,800 and thus is highly concentrated. Smaller relevant geographic markets for ILS advertising are likely even more concentrated.

74.    Likewise, the nationwide market for ILS multifamily advertising has an HHI well over 1,800 and thus is highly concentrated. Smaller relevant geographic markets for ILS multifamily advertising are likely even more concentrated.

75.    Insofar as Defendants' Partnership Agreement and Content License Agreement constitute an acquisition, that acquisition would result in a change in market concentration well over 100 points in all relevant markets.

76.    Indeed, both the nationwide market for ILS advertising and the nationwide market for ILS multifamily advertising have HHIs well over 2,500, and the unlawful agreement will result in a change in market concentration well over 200 points in each relevant market.

77.    Under any relevant metric, Zillow holds a large share of these highly concentrated markets. Zillow has market power in the relevant markets.

## DEFENDANTS' UNLAWFUL AGREEMENT IS LIKELY TO RESULT IN ANTICOMPETITIVE EFFECTS AND SUBSTANTIAL HARM TO COMPETITION

78.    By significantly increasing concentration in the already highly concentrated relevant markets, Defendants' unlawful agreement substantially lessens competition on price and

22

quality.  Absent competition from Redfin, it is likely that prices for advertising will rise, and the quality offered to advertisers will fall.

79.    Zillow and Redfin's unlawful agreement eliminates substantial competition between two of the three leading providers of ILS advertising.  For targeted ILS multifamily advertising customers, Defendants' agreement destroys that competition entirely.  As a result, these advertising customers have fewer suppliers to choose from, reducing their leverage and the assortment of differentiated competitive offerings available to meet their marketing needs.  The loss of competition in both the ILS multifamily advertising market and the broader ILS advertising market will deny advertising customers the benefits of competition from Redfin and allow the remaining ILSs to further raise prices and harm advertising customers for years to come.

80.    Defendants' unlawful agreement deprives Redfin's customers of their demonstrably preferred option: a marketing approach that includes Redfin.  For the many advertisers that view ILS advertising as an essential component of their marketing strategy, Redfin's orchestrated and abrupt exit forces a switch to (or increased reliance on) Zillow or another rental ILS.

81.    Defendants seized on this vulnerability with the requirement that Redfin use "best efforts to assist and enable" Zillow to sign advertising contracts with Redfin's unique customers. These obligatory "best efforts" aimed to ensure the transition of that abandoned business to Zillow—as did the looming threat of contract cancellation at the start of peak leasing season. These circumstances provide Zillow with greater leverage to impose high prices and unfavorable terms on unique Redfin customers in need of additional ILS advertising, whether in the

23

immediate wake of the agreements or when contracts signed during this transition period come due for renewal.

82.    Advertising customers that listed on both Redfin and Zillow prior to the signing of the Agreements ("overlap customers") also may effectively face immediate price increases or worse quality service.  Overlap customers that paid for preferred placement on Redfin's sites may now require a more expensive subscription tier to gain comparable visibility amid Zillow's newly syndicated listings on the very same websites.  Zillow may also require these advertising customers to pay for that equivalent placement across the entire Zillow Network rather than on Redfin's or Zillow's sites separately, as they can today based on their properties' needs.  Similarly, current Zillow customers may have to pay more to achieve the same level of visibility in a more crowded marketplace, regardless of whether they ever advertised on Redfin.

83.    This outcome highlights that the purpose and effect of Defendants' unlawful agreement is to eliminate competition between Zillow and Redfin for ILS advertising customers.  The agreement destroys the differentiation that previously served market demand and co-opts Redfin's standalone offering to host one more duplicative rentals platform for Zillow's listings.

84.    ILS advertising customers—present and future—also will lose the benefit of Redfin's add-on DMS products, including RentRep, its social media and reputation management product.  Advertising customers viewed RentRep as a useful bonus to Redfin's ILS product because it removed the need for an internal social media strategy and attracted additional traffic to properties.  Redfin discontinued RentRep and the rest of its DMS products effective June 15, 2025.

85.     Defendants' unlawful agreement will also harm American renters by undermining Defendants' incentives to compete for traffic.  Although Redfin will remain available as a searchable ILS hosting copies of Zillow's rental listings for properties with 25 units or more, the agreement is likely to reduce Redfin's ability and incentive to compete for renters, including through investment and innovation to attract visitors and improve user experience.  Redfin also has confirmed it will not ██████████████████ support its rental ILS business.  These harms to renters may also manifest in ways that harm advertising customers in the relevant markets.

86.     Previously, Redfin was incentivized to compete aggressively for ILS search customers by the prospect of an improved value proposition for, and increased revenue from, advertising customers.  Defendants' unlawful agreement limits Redfin's revenue stream from multifamily rentals to ██████ compensation from Zillow for lead generation, ████████████ ██████████████████████████████████████.  Revenue from attracting new advertising customers will no longer serve as an incentive for Redfin to increase prospective renter traffic because Redfin will no longer be allowed or able to acquire new advertising customers.  The guaranteed minimum payment of $75 million for the first year of the Content License Agreement further limits Redfin's incentive to compete for renters in the near term, as ███████████████████████████████████████████████████ ████.  This reduced incentive to invest and the accompanying loss of competition for ILS search ultimately will harm prospective renters.

## THERE ARE NO COUNTERVAILING FACTORS

87.     There are no transaction-specific and cognizable efficiencies that outweigh the likely competitive harms of Defendants' unlawful agreement.  While Zillow may benefit by

taking over Redfin's business, that ill-gotten gain does not benefit competition or enhance output in any relevant market.

88.    Defendants' unlawful agreement merely duplicates existing listings across the Zillow and Redfin Networks.  Shuffling property listings from one ILS to another does not inherently increase output in the relevant markets.  Further, should Zillow fail to capture any of Redfin's unique customers despite Defendants' best efforts, the total number of listings across both networks may be lower than it would be, but for this anticompetitive agreement.

89.    Further, any purported procompetitive benefits from Defendants' unlawful agreement could be achieved by less anticompetitive means.  Zillow's agreement with and payment to Redfin to share customer information, facilitate key employee hiring, exit and stop competing, and Redfin's agreement to exclusively source listings from Zillow, are unnecessary to achieve any benefits to advertising customers or renters.  Advertising customers and renters alike would be much better served by continued competition to earn their business and engagement on the merits of Zillow's and Redfin's respective, independent offerings.

90.    New entry, or expansion by existing competitors, is unlikely and would not be timely or sufficient to prevent or remedy the unlawful agreement's likely anticompetitive effects. ILSs are characterized by network effects.  In order to attract renters, a new entrant must have a large number of listings, but to have value for an advertising customer, an ILS must also have a sufficiently large renter audience.  This obstacle, along with the importance of brand recognition and the need to cultivate relationships with advertising customers, create high entry barriers for new ILSs.  The experience of Zumper, the newest ILS, illustrates how difficult it is to overcome

these high entry barriers.  Zumper was founded in 2012 and to date has not gained a significant

foothold.

## **VIOLATIONS**

### **Count 1 – Illegal Agreement in Violation of Section 1 of the Sherman Act and Section 5 of the FTC Act**

91.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-

90 above.

92.    Defendants have entered into an unlawful agreement that eliminates head-to-head

competition between direct competitors and requires Redfin's best efforts to transition its

multifamily ILS business to Zillow.  That agreement is a contract, combination or conspiracy in

restraint of trade within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

93.    Defendants' agreement to eliminate competition is not subordinate or collateral to

a separate, legitimate transaction.

94.    To the extent that the Defendants are engaging in a separate transaction, their

agreement to eliminate competition does not make that transaction more effective in

accomplishing its purpose.

95.    Defendants' agreement to eliminate competition is unlawful both as inherently

suspect conduct and under a rule of reason analysis.  No elaborate analysis is required to

demonstrate the anticompetitive character of the agreement.  Because it is obvious that the

agreement likely impairs competition, it should be presumed unlawful.

96.    At all relevant times before and after the Agreements, Zillow had and continues to

have market power in all relevant markets.

97.     Defendants' agreement to eliminate competition has had and will continue to have anticompetitive effects, including:

      a.   Eliminating actual and future competition between Zillow and Redfin in all relevant markets;

      b.   Increasing Zillow's market power in all relevant markets;

      c.   Reducing customer choice by depriving Redfin customers of a preferred advertising source; and

      d.   Raising prices and reducing quality for ILS advertising services.

98.     If there are any procompetitive benefits of Defendants' agreement to eliminate competition, they are not transaction-specific and cognizable.  Any claimed procompetitive benefits could be reasonably achieved through less anticompetitive means and do not outweigh the agreement's likely anticompetitive effects.

99.     Zillow and Redfin's unlawful agreement violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

**Count 2 – Illegal Acquisition in Violation of Section 7 of the Clayton Act**

100.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-90 above.

101.     Pursuant to Defendants' unlawful agreement, Zillow has acquired assets, including Redfin's customer relationships, key employees, business information, and a commitment by Redfin to terminate a class of customer contracts by a date certain.

102.     The unlawful agreement therefore constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.  It accomplishes the transfer of a sufficient part of the bundle

28

of rights and privileges from Redfin to Zillow such that the transfer has economic significance and an anticompetitive effect.

103.    Zillow's acquisition of Redfin's assets is presumptively unlawful and may substantially lessen competition in the relevant markets for ILS advertising services and ILS advertising services for multifamily rental properties throughout the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### Count 3 – Unfair Method of Competition

104.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-90 above.

105.    The Agreements are an unfair method of competition that violates Section 5 of the FTC Act, 15 U.S.C. § 45.

### PRAYER FOR RELIEF

WHEREFORE, to remedy these illegal acts, the FTC requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and pursuant to its own equitable powers:

A. Adjudge and decree that Defendants' course of conduct, as alleged herein, violates Section 1 of the Sherman Act, and thus constitutes an unfair method of competition in violation of Section 5 of the FTC Act;

B. Adjudge and decree that Defendants' course of conduct, as alleged herein, violates Section 7 of the Clayton Act;

C. Adjudge and decree that Defendants' course of conduct, as alleged herein, violates Section 5 of the FTC Act;

D.  Enter structural relief as needed to cure any anticompetitive harm, prevent any future harm, and undo the continuing effects of past harm, including but not limited to, divestiture of assets, divestiture or reconstruction of businesses, and such other relief sufficient to restore the competition that would exist absent the anticompetitive conduct alleged herein;

E.  Enjoin Defendants from continuing to engage in the anticompetitive conduct described herein and from engaging in any other conduct with the same purpose and effect as the challenged conduct;

F.  Enter any other preliminary or permanent equitable relief necessary to restore competition, remedy the harm to competition caused by Defendants' anticompetitive conduct, and prevent any future harm from the anticompetitive conduct described herein;

G.  Enter an order requiring Defendants to file periodic compliance reports with the FTC, and to submit to such reporting and monitoring obligations as may be reasonable and appropriate; and

H.  Enter any additional relief the Court finds just and proper.

Dated: September 30, 2025

Respectfully submitted,

LINDSEY HALLIGAN
UNITED STATES ATTORNEY

*/s/ Dennis C. Barghaan, Jr.*

DENNIS C. BARGHAAN, JR.
Chief, Civil Division
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

*Local Counsel for Plaintiff Federal Trade Commission*

Of Counsel:

DANIEL GUARNERA
Director
Bureau of Competition

DAVID SHAW
Principal Deputy Director
Bureau of Competition

PETER RICHMAN
Assistant Director
Mergers III Division

*/s/ Allyson M. Maltas*

ALLYSON M. MALTAS
Senior Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3646
Email: amaltas@ftc.gov

JESSICA S. DRAKE
Deputy Assistant Director
Mergers III Division

GRETA BURKHOLDER
DANIEL ALDRICH
NICHOLAS BUSH
ELEANOR CALLAWAY
CAITLIN CIPICCHIO
KEITHA CLOPPER
FRED DERITIS
SARA DIVETT
MEGAN HENRY
ARMANDO IRIZARRY
ALYSSA KARFINKEL

31

ERIC PARDO
LAUREN SILLMAN
LE'ORA TYREE
TAYLOR WEAVER

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-2617

*Attorneys for Plaintiff Federal Trade
Commission*