**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> *Plaintiff*, <br><br> v. <br><br> ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION, <br><br> *Defendants*. | Case No. 1:25-cv-1638 (AJT-WBP) |
| COMMONWEALTH OF VIRGINIA, STATE OF ARIZONA, STATE OF CONNECTICUT, STATE OF NEW YORK, and STATE OF WASHINGTON, <br><br> *Plaintiffs*, <br><br> v. <br><br> ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION, <br><br> *Defendants*. | Case No. 1:25-cv-01647 (AJT-WBP) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

Introduction ............................................................................................................................... 1

Background ............................................................................................................................... 3

   I.   The Rental Listings Industry ........................................................................................ 3

   II.  The Zillow-Redfin Partnership .................................................................................... 5

   III. This Litigation ............................................................................................................. 6

Legal Standard ......................................................................................................................... 6

Argument .................................................................................................................................. 7

   I.   The Complaints Fail To Plead a Two-Sided Market That Accounts for Renters and
       Advertisers. ................................................................................................................. 8

       A.  Zillow and Redfin compete in a two-sided market characterized by strong indirect
            network effects. ................................................................................................... 8

       B.  The Complaints fail to plead a two-sided market and do not plausibly allege harm to
            the entire market in which Zillow and Redfin compete. ............................................ 11

       C.  Plaintiffs cannot rely on the "quick look" standard to avoid pleading a two-sided
            market. .............................................................................................................. 13

   II.  The Complaints Fail to Plead a Relevant Advertising-Only Market. ............................... 16

       A.  Plaintiffs' geographic market is not properly defined and contradicts the FTC's own
            allegations. ....................................................................................................... 17

       B.  Plaintiffs' ILS-only product market ignores market realities. ..................................... 21

   III. The Complaints Fail to Plead Market Power. ................................................................. 23

Conclusion .............................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Chiropractic Ass'n v. Trigon Healthcare*,
  367 F.3d 212 (4th Cir. 2004) ...............................................................10

*Am. Online, Inc. v. GreatDeals.Net*,
  49 F. Supp. 2d 851 (E.D. Va. 1999) .....................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................6, 25

*Berlyn, Inc. v. The Gazette Newspaper, Inc.*,
  157 F. Supp. 2d 609 (D. Md. 2001) .......................................................21

*Blankenship v. Manchin*,
  471 F.3d 523(4th Cir. 2006) .................................................................10

*Bryant v. Byron Udell & Assocs. Inc.*,
  No. 1:23-cv-00414, 2023 WL 5180351 (E.D. Va. Aug. 11, 2023) .........7

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999).............................................................................14

*Concord Assocs., L.P. v. Ent. Props. Tr., EPT*,
  817 F.3d 46 (2d Cir. 2016).............................................................. 21-22

*Consul, Ltd. v. Transco Energy Co.*,
  805 F.2d 490 (4th Cir. 1986) ................................................................20

*Coolmath.com, LLC v. Coolmathgames.com*,
  No. 1:14-cv-1185, 2015 WL 12570901 (E.D. Va. Apr. 10, 2015)........22

*Coronavirus Rep.* v. *Apple Inc.*,
  2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .................................9, 11

*DataCell ehf. v. Visa, Inc.*,
  No. 1:14- CV-1658 GBL/TCB, 2015 WL 4624714 (E.D. Va. July 30, 2015).................23, 26

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ..................................................................8

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ................................................. 16-17, 20

*Eastman Kodak Co v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ..........................................................................23

*FTC v. Cmty. Health Sys., Inc.*,
736 F. Supp. 3d 335 (W.D.N.C. 2024) ...........................................24

*FTC v. Facebook, Inc.*,
560 F.Supp. 3d 1 (D.D.C. 2021) ............................................... 24-26

*FTC v. Food Town Stores, Inc.*,
539 F.2d 1339 (4th Cir. 1976) ..........................................................8

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025) .........................8

*FTC v. Syngenta Crop Prot. AG*,
711 F. Supp. 3d 545, 565 (M.D.N.C. 2024) .....................................16

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ..............................................18

*FTC v. Thomas Jefferson Univ.*,
505 F. Supp. 3d 522 (E.D. Pa. 2020) ...............................................19

*Hanger v. Berkley Grp., Inc.*,
No. 5:13-CV-113, 2015 WL 3439255 (W.D. Va. May 28, 2015)...........................16

*In re Manufactured Home Lot Rents Antitrust Litig.*,
No. 1:23-cv-06715, 2025 WL 3485693 (N.D. Ill. Dec. 4, 2025) .....................18, 20

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .......................................................3, 18

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995)...............................................................23

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne LLC*,
No. 1:11-cv-872 AJT/TCB, 2011 WL 5872885 (E.D. Va. Nov. 22, 2011)..............................7

*MSP Recovery Claims, Series, LLC v. Lundbeck LLC*,
130 F.4th 91 (4th Cir. 2025) ............................................................23

*N.C. State Bd. of Dental Examiners v. FTC*,
   717 F.3d 359 (4th Cir. 2013), *aff'd*, 574 U.S. 494 (2015) ......................................14

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021) ..................................................................................... 14-15

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
   562 F. Supp. 3d 1073 (E.D. Cal. 2021)...............................................................20

*Ohio v. American Express*,
   585 U.S. 529 (2018) ............................................................................... *passim*

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)..............................................................................22

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ...................................................................... 23-25

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
   850 F. Supp. 470 (E.D. Va. 1994), *aff'd*, 57 F.3d 1317 (4th Cir. 1995)................15

*Turner v. Virginia Dep't of Med. Assistance Servs.*,
   301 F. Supp. 3d 637 (E.D. Va. 2018) ...................................................................7

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023) .....................................................................13, 15

*United States v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. 2024)........................................................................14

*United States v. Google LLC*,
   No. 1:20-cv-3010 (APM), 2025 WL 2523010 (D.D.C. Sept. 2, 2025) .................15

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963)..........................................................................................17

*United States v. UnitedHealth Group Inc.*,
   630 F. Supp. 3d 118 (D.D.C. 2022)....................................................................23

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)...............................................................................9, 21

*Whalen v. Albertsons Cos.*,
   No. 23-cv-00459-VC, 2023 WL 8812882 (N.D. Cal. Dec. 20, 2023)...................26

## Federal Statutes

15 U.S.C. § 1 ...............................................................................................................6

15 U.S.C. § 18 .............................................................................................................6

15 U.S.C. § 45 .............................................................................................................6

## Other Authorities

Compl., *FTC v. HCA Healthcare*, No. 2:22-cv-00375 (D. Utah June 3, 2022) ............................24

Compl., *FTC v. Int'l Exchange Inc.*, No. 3:23-cv-01710 (N.D. Cal. Apr. 10, 2023)....................24

Compl., *FTC v. Novant Health, Inc.*, No. 5:24-cv-00028 (W.D.N.C. Jan. 25, 2024) .................24

Compl., *FTC v. Tempur Sealy Int'l, Inc.*, No. 4:24-cv-02508 (S.D. Tex. July 2, 2024)...............24

Compl., *FTC v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-03560 (S.D. Tex. Sep. 21, 2023) ..................................................................................................................................24

Compl., *In re CoStar Grp., Inc. & RentPath Holdings, Inc.*, Dkt. No. 9398 (FTC Dec. 2, 2020) ...................................................................................................... 16, 19-20

Compl., *United States v. Am. Airlines Grp.*, No. 1:21-cv-11558 (D. Mass. Sep. 21, 2021)..........24

Delegation of the U.S. to the Competition Committee, *Roundtable on Two-Sided Markets: Note by the Delegation of the United States*, OECD No. DAF/COMP/WD(2009)68 (2009), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2000-2009/roundtabletwosided.pdf. ........................................................10

FTC & DOJ Merger Guidelines § 4.4........................................................................24

Joint Proposed Findings of Fact & Conclusions of Law, *FTC v. Tempur Sealy Int'l, Inc.*, No. 4:24-cv-02508 (S.D. Tex. Dec. 13, 2024), Dkt. No. 455-2 ............................................10

Pl.'s Proposed Findings of Fact & Conslusions of Law, *FTC v. IQVIA Holdings, Inc.*, No. 1:23-cv-06188-ER (S.D.N.Y. Dec. 18, 2023), Dkt. No. 306..................................................10

## INTRODUCTION

This case challenges a collaboration between Zillow and Redfin that makes renters and property managers better off and the rental advertising business more competitive.

Renters need to find apartments, and apartment owners need to find renters. Advertising is often the way that renters and apartments are matched. Zillow and Redfin are two of several companies that provide digital advertising services matching prospective renters with suitable apartments. Like most "two-sided platforms," each side makes the other better off: More rental listings are better for renters, and more prospective renters are better for the apartment owners seeking to fill vacancies. FTC Compl. ¶ 90; States Compl. ¶ 92.

Over the last few years, Redfin struggled to grow its rental listings. Zillow, on the other hand, had a good supply of rental listings, but was always striving to provide a better platform for renters and deliver stronger performance to advertisers. To address these issues, in February 2025, Zillow and Redfin announced a "Partnership" centered on a syndication agreement. Syndication agreements—where one party provides content for use on another's website—are common in this industry. *See* FTC Compl. ¶ 3; States Compl. ¶ 3. Through their Partnership, Zillow agreed to syndicate its listings on Redfin and to become Redfin's exclusive multifamily listings provider, and Redfin agreed to provide Zillow with requests for more information about a property, referred to as "leads," for those listings from renters using Redfin. FTC Compl. ¶ 42; States Compl. ¶ 44.

Both renters and property managers benefit from the Partnership. Prospective renters who prefer Redfin's listing service now can view Zillow's broad inventory of listings on Redfin's website, *see* FTC Compl. ¶ 28; States Compl. ¶ 30, and Redfin is able to use the money it was spending on its underperforming rental advertising business to compete against Zillow and others for even more renters—including by adding content to make Zillow's listings more attractive and by using Zillow's listings to optimize its own search engine. *See, e.g.*, FTC Dkt. No. 2-2, §§ 6, 7.3;

Virginia Dkt. No. 1-2 §§ 6, 7.3 (same). Property managers advertising with Zillow now automatically have access to a second listing service and thus more prospective renters who may generate leads. And by offering a more attractive package, the Partnership enables Zillow to compete more effectively with the many other firms that fight for property managers' advertising dollars.

Although Plaintiffs call the Partnership an "agreement to remove competition," FTC Compl. at 1; States Compl. at 1, they do not plead facts showing the Partnership has in fact harmed competition. Nor do the Complaints allege how unwinding the Partnership—*i.e.*, removing Zillow's listings from Redfin—could possibly benefit competition. Plaintiffs instead ask the Court to condemn the Partnership based on threadbare allegations that ignore both the renters who use Zillow and Redfin and the many competitors that offer advertising services to property managers.

Plaintiffs' Complaints do not come close to stating a violation of the antitrust laws for three independent reasons:

*First*, the Complaints ignore the core teaching of *Ohio v. American Express*, 585 U.S. 529 (2018) (*Amex*): Antitrust plaintiffs alleging harm to a two-sided platform exhibiting strong indirect "network effects"—where "the value of the two-sided platform to one group of participants depends on how many members of a different group participate," *id.* at 535–36—must account for the platform as a whole when pleading their claims. Although Plaintiffs' allegations demonstrate that Zillow and Redfin are exactly the kinds of two-sided platforms that exhibit strong network effects, *e.g.*, FTC Compl. ¶ 90; States Compl. ¶ 92, the Complaints define their purported market solely around advertisers, ignoring the renter side of the platforms. Because Plaintiffs do not allege a two-sided market, they cannot (and do not) plausibly allege harm to the platforms' customers "as a whole." *Amex,* 585 U.S. at 547.

*Second*, even if it were appropriate to ignore the effects of the Partnership on prospective renters and instead consider only advertisers, Plaintiffs have not plausibly alleged a one-sided relevant market. Plaintiffs assert that Zillow and Redfin compete in a single "national" market limited to other large rental marketplaces. FTC Compl. ¶ 54, 57, 65; States Compl. ¶ 45, 59, 67. But in the Fourth Circuit, a relevant antitrust market is defined by the options available to consumers, not the scope of the defendant's business. *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016). Plaintiffs' allegations demonstrate that advertisers compete for customers in local markets, which include many ways to advertise rental properties (such as targeted internet advertising). Plaintiffs cannot "gerrymander [their] way to an antitrust victory without due regard for market realities." *Id.* at 683. Because no alleged facts support their national advertising market limited to internet listing services, the Complaints must be dismissed.

*Third*, Plaintiffs fail to allege that Zillow and Redfin have sufficient market power to harm competition. To state a claim under Section 1 of the Sherman Act or Section 7 of the Clayton Act, Plaintiffs must plead specific facts showing Defendants' strength in the rental advertising market. But Plaintiffs simply assert that Defendants possess "market power" and that their Partnership will cause "undue concentration"—without alleging any market shares for Zillow, Redfin, or other competitors to support those legal conclusions. That is not enough. Plaintiffs cannot overcome a motion to dismiss by merely reciting the elements of their claims.

## BACKGROUND

### I.     The Rental Listings Industry

The rental listings industry is made up of renters, landlords, property management companies (PMCs), and other property owners and managers seeking to rent out their properties, as well as the intermediaries that connect these two groups. FTC Compl. ¶¶ 1, 24–25, 59, States Compl. ¶¶ 1, 26–27, 61. PMCs and other property managers pay "to advertise their vacant units

to renters" through these intermediaries, FTC Compl. ¶¶ 1, 26, 59; States Compl. ¶¶ 1, 28, 61, which include search engines, social media marketing, and internet listing services (ILSs), FTC Compl. ¶ 59; States Compl. ¶ 61.

ILSs add value by matching renters and advertisers: They attract renters by delivering a large inventory of property listings. FTC Compl. ¶ 90; States Compl. ¶ 92. And they attract advertisers by delivering a large network of prospective renters and ideally a large number of "leads." FTC Compl. ¶ 56; States Compl. ¶ 58. A "lead" reflects a prospective renters' "request [for] more information" about a property. FTC Compl. ¶ 1; States Compl. ¶ 1. As a result, ILSs, like many advertising services, are characterized by indirect "network effects," meaning the value of the listing service to customers on one side of the platform increases as the number of customers (the size of the network) on the other side expands. FTC Compl. ¶ 90; States Compl. ¶ 92; *see Amex*, 585 U.S. at 535–36.

To take advantage of those indirect network effects, ILSs compete for both advertisers and renters. On the advertiser side of the platform, ILS operators offer various subscription levels that offer features such as the ability to position listings higher in the search results for a particular city. *See* FTC Compl. ¶ 61; States Compl. ¶ 63. And on the renter side of the platform, ILS operators compete to attract high-intent prospective renters that are likely to rent an apartment listed on the platform. *See, e.g.*, FTC Compl. ¶¶ 58, 60; States Compl. ¶¶ 60, 62.

Zillow and Redfin both operate ILSs, as do CoStar, Realtor.com, Apartment List, Zumper, and others. FTC Compl. ¶¶ 3–4, 28; States Compl. ¶¶ 3–4, 30. The Complaints allege that Zillow and CoStar "have the vast majority of ILS rental listings across the United States" and over 20 million monthly unique visitors. FTC Compl. ¶ 28; States Compl. ¶ 30. On the other hand, Redfin, Realtor.com, Apartment List, and Zumper each have fewer than 10 million monthly unique

visitors—with Redfin's traffic steadily declining over time. FTC Compl. ¶ 28. (chart labelling Redfin's ILS network as "Rent."); States Compl. ¶ 30 (same).

## II.    The Zillow-Redfin Partnership

To capitalize on the fact that more listings attract more renters, and more renters attract more listings, Zillow and Redfin entered into the Partnership on February 6, 2025. The Partnership was modeled on a 2024 distribution agreement between Zillow and Realtor.com (which was not challenged by any Plaintiff here). *See* FTC Compl. ¶ 3 (referencing Zillow's syndication relationship with Realtor.com); States Compl. ¶ 3 (same). Redfin agreed to display exclusively Zillow's multifamily rental listings (properties with at least 25 units) on its website and to send the leads generated from those listings to Zillow. FTC Compl. ¶¶ 42–43; States Compl. ¶¶ 44–45. In exchange, Zillow agreed to compensate Redfin for those leads through both a one-time upfront payment of $100 million and a payment for each lead Redfin delivered to Zillow, with a minimum payment of $75 million in the first year. FTC Compl. ¶¶ 37, 42–43; States Compl. ¶¶ 39, 44–45.

As Redfin's exclusive multifamily rental listing provider, Zillow would be the only source of multifamily rental listings on Redfin. FTC Compl. ¶¶ 40, 43; States Compl. ¶¶ 42, 45. And Redfin would use "best efforts" to refer its multifamily advertisers to Zillow such that Zillow could compete for those advertisers' property listings. FTC Compl. ¶¶ 38–39; States Compl. ¶¶ 40–41. These exclusivity terms (like those in many other distribution agreements) ensure that Zillow, which is exposing its proprietary inventory to Redfin, gets the benefit of the bargain without free-riding.[1]

---

[1] For example, without these terms, Redfin could use the new listings it receives from Zillow to improve the Redfin platform and then recruit property managers to advertise directly through Redfin, thus avoiding paying Zillow for the value Zillow creates.

Because of the Partnership, renters who prefer the Redfin listing service can now see Zillow's large inventory of listings on that site (including tens of thousands of listings that were not previously available to them). *See* FTC Compl. ¶ 28; States Compl. ¶ 30. And, renters who prefer Zillow can now see thousands of properties that were previously advertised on Redfin but not Zillow. FTC Compl. ¶ 47; States Compl. ¶ 49. Zillow's and Redfin's advertisers have also gained access to each services' unique audiences, *see* FTC Compl. ¶ 28 (chart showing average monthly unique visitors for Zillow and Redfin's ILS Network, Rent.); States Compl. ¶ 30 (same), without having to enter into separate agreements with—or having to pay—both listing services.

## III.    This Litigation

Almost eight months after the Partnership was announced, the Federal Trade Commission (FTC) and States Plaintiffs filed essentially identical lawsuits challenging the Partnership.[2] Both Complaints allege the Partnership violates Section 1 of the Sherman Act, which prohibits any "contract . . . in restraint of trade," 15 U.S.C. § 1, and Section 7 of the Clayton Act, which prohibits acquisitions that may "substantially . . . lessen competition, or [] tend to create a monopoly," *id.* § 18. *See* FTC Compl. ¶¶ 91–103, States Compl. ¶¶ 93–105. The FTC further alleges that the Partnership is an "unfair method of competition" that violates Section 5 of the FTC Act, 15 U.S.C. § 45." FTC Compl. ¶ 104–05.

## LEGAL STANDARD

To survive a motion to dismiss, the Complaints must plausibly allege a violation of the antitrust laws. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although "the Court must construe the [allegations] in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true," a complaint must "state facts that make

---

[2] On November 26, 2025, the Court granted the Plaintiff States' unopposed motion to consolidate their case with the FTC's. No. 1:25-cv-1647, Dkt. No. 66.

[Plaintiffs'] claims plausible and not merely possible." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne LLC*, No. 1:11-cv-872 AJT/TCB, 2011 WL 5872885, at *1, *3 (E.D. Va. Nov. 22, 2011)[3]; *see also Bryant v. Byron Udell & Assocs. Inc.*, No. 1:23-cv-00414 (AJT/LRV), 2023 WL 5180351, at *2 (E.D. Va. Aug. 11, 2023) ("The complaint must contain sufficient factual allegations that, taken as true, raise a right to relief above the speculative level and across the line from conceivable to plausible"). The Court "need not accept the legal conclusions drawn from the facts, nor must the court accept as true unwarranted inferences, unreasonable conclusions or arguments." *Turner v. Virginia Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 642 (E.D. Va. 2018).

## ARGUMENT

Plaintiffs' Complaints should be dismissed for three separate reasons. *First*, Plaintiffs do not account for both advertisers *and renters* when pleading both a relevant market and harm to competition, as they were required to do under the Supreme Court's decision in *Ohio* v. *American Express*. *Second*, even if it were proper to focus on only harm to advertisers, the Complaints' implausible "national ILSs-only" market is inconsistent with Plaintiffs' own allegations and industry reality and contradicts the FTC's own allegations in a recent case involving the same industry. *Third*, the Complaints have not alleged specific facts showing that Zillow and Redfin have a large enough share of the market to harm competition. Without those allegations, Plaintiffs cannot plead the prima facie elements of their claims.

---

[3] Unless otherwise noted, internal quotation marks, citations, and alterations are omitted from quotations throughout.

I.      **The Complaints Fail To Plead a Two-Sided Market That Accounts for Renters and Advertisers.**

Plaintiffs must plead a well-defined relevant market as an element for each of their claims. *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (Section 1); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344 (4th Cir. 1976) (Section 7); *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1085 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025) (Section 5). Without a well-defined market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Amex*, 585 U.S. at 543. The Complaints do not clear that hurdle. Although they indicate that ILSs should be considered two-sided antitrust markets because they exhibit strong indirect network effects, they fail to plead that two-sided market. Nor do they plausibly plead that the Partnership will harm renters and advertisers "as a whole." *See id.* at 547. Finally, Plaintiffs cannot avoid their burden to plead a two-sided market and harm "as a whole" by invoking the "quick look" standard of review that is used only in extreme situations not present here.

A. **Zillow and Redfin compete in a two-sided market characterized by strong indirect network effects.**

A "two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex*, 585 U.S. at 534. Because those platforms connect two different groups of customers, they "often exhibit . . . indirect network effects," meaning that "the value of the . . . platform to one group of participants depends on how many members of a different group participate." *Id.* at 535. Those "indirect network effects" are critical when assessing antitrust claims because they limit the platform's ability to raise prices: "Raising the price on side A risks losing participation on that side, which decreases the value of the platform to side B." *Id.* at 536 ("Two-sided platforms therefore must take these indirect network effects into account before making a change in price on either side"). As a result, an antitrust plaintiff pursuing a claim concerning a two-sided platform must account for both groups

of customers when defining the relevant market and must plead specific facts demonstrating harm across that entire platform, not just on one side of it. *Id*. at 545–47.

That requirement matters at the pleading stage. "[I]n many or most cases" involving two-sided platforms, the "indirect network effects" are sufficiently strong that a plaintiff must address both sides of the platform in its complaint; otherwise, it would be impossible to evaluate the competitive impact of the challenged conduct on the "market as a whole." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56, 58 (2d Cir. 2019) (quoting *Amex*, 585 U.S. at 544–47); *see Coronavirus Rep.* v. *Apple Inc.*, 2021 WL 5936910, at *12–13 (N.D. Cal. Nov. 30, 2021) (granting motion to dismiss because plaintiffs' failure to allege a two-sided market "renders their market definitions insufficient as a matter of law").[4]

The Complaints demonstrate that Zillow and Redfin operate paradigmatic two-sided rental platforms "characterized by network effects" for both advertisers and renters. FTC Compl. ¶ 90; States Compl. ¶ 92. According to Plaintiffs, Defendants' ILSs attract advertisers by offering "broad exposure to and engagement from potential renters" and attract renters by offering "a broad selection of listings[.]" FTC Compl. ¶ 27; States Compl. ¶ 29. And because the "core functionality of ILSs is connecting advertisers with potential renters," FTC Compl. ¶ 27; States Compl. ¶ 29, those platforms must have both "a large number of listings" in order to attract renters *and* "a sufficiently large renter audience" to "have value for an advertising customer." FTC Compl. ¶ 90; States Compl. ¶ 92.

---

[4] One circumstance where it is necessary to address both sides of a two-sided market is when the market involves a "transaction" platform because those platforms "exhibit more pronounced indirect network effects and interconnected pricing and demand." *See Amex*, 585 U.S. at 545. *Amex*'s holding is not limited to that context, however, and applies to any platform characterized by strong indirect network effects. *See US Airways, Inc.*, 938 F.3d at 56–57.

Indeed, a Zillow investor presentation relied upon by Plaintiffs in their Complaints explains that Zillow operates a "two-sided marketplace." FTC Compl. ¶ 28[5]; States Compl. ¶ 30. As the FTC regularly argues, "[c]ontemporaneous business documents" like investor presentations "are among the strongest evidence" when defining a relevant market. Dkt. No. 455-2 ¶ 644, *FTC v. Tempur Sealy Int'l, Inc.*, No. 4:24-cv-02508 (S.D. Tex. Dec. 13, 2024); *see also* Dkt. No. 306 at 6, *FTC v. IQVIA Holdings, Inc.*, No. 1:23-cv-06188-ER (S.D.N.Y. Dec. 18, 2023) (explaining that "courts often pay close attention to the defendant's ordinary course of business documents" when "determining the relevant product market"). Even the federal government itself has recognized that "[i]n real estate markets . . . there are very strong network externalities associated with listing services." Delegation of the U.S. to the Competition Committee, *Roundtable on Two-Sided Markets: Note by the Delegation of the United States* at 8, OECD No. DAF/COMP/WD(2009)68 (2009), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2000-2009/roundtabletwosided.pdf.

Given Plaintiffs' own allegations, *Amex* clearly applies to this case. Accordingly, Plaintiffs cannot simply allege harm to renters or to advertisers alone to state their claims. Instead, Plaintiffs can overcome a motion to dismiss only by alleging a two-sided market and by including specific facts showing that the Partnership caused anticompetitive harm to that market "as a whole." *Amex*,

---

[5] *See* Decl. of Ryan A. Shores In Support of Defendants' Motion to Dismiss, Ex. A, Zillow Group, Investor Presentation – Rentals (May 2024) ("Zillow Investor Presentation"), pp. 2, 5, https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q1/presentation/Zillow-1Q24-Investor-Presentation.pdf. Because Plaintiffs have "relied upon [this] document[] in framing the complaint," the Court may consider this investor presentation in evaluating Defendants' motion to dismiss. *Am. Chiropractic Ass'n v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004); *see also Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006) (taking judicial notice of a newspaper article that was attached to Defendant's motion to dismiss, and "integral to" and "relied upon" in the Complaint).

585 U.S. at 544, 547; *Coronavirus Rep.*, 2021 WL 5936910, at *12–13. Plaintiffs have done neither.

**B. The Complaints fail to plead a two-sided market and do not plausibly allege harm to the entire market in which Zillow and Redfin compete.**

According to Plaintiffs, the relevant markets in which to assess the Partnership are limited to advertisers—one proposed market limited to "ILS advertising" and a second, even narrower, market limited to "ILS *multifamily* advertising." FTC Compl. ¶¶ 53–54, 63 (emphasis added); States Compl. ¶¶ 55–56, 65 (same). Consistent with that one-sided approach, Plaintiffs' allegations of anticompetitive effects focus almost entirely on advertisers who pay to list properties on the Zillow or Redfin listing services. Specifically, Plaintiffs allege that advertisers will be "depriv[ed]" of their "preferred *advertising* choice" and will face increased prices or worse quality "for ILS *advertising* services" as a result of the Partnership. *See* FTC Compl. ¶ 97 (emphasis added); States Compl. ¶ 99 (same); *see also* FTC Compl. ¶¶ 78–86, 103; States Compl. ¶¶ 80–88, 105.

To start, Plaintiffs' allegations fail because they have only alleged half of the relevant market. By proposing markets that are limited to advertisers, Plaintiffs are attempting to plead a claim without accounting for renters or alleging facts showing that the Partnership harms competition across the entire Zillow and Redfin listing services—for instance, by causing higher prices or decreased quality for all consumers using the service. That is precisely what *Amex* forbids, and this Court should dismiss Plaintiffs' claims on that basis alone. *See* 585 U.S. at 546–47 (explaining that failure to define "only one market" could "lead to mistaken inferences of the kind that could chill the very conduct the antitrust laws are designed to protect"); *Coronavirus Rep.*, 2021 WL 5936910, at *12–13.

But even if this Court overlooks that failure, nothing in the Complaint suggests that Plaintiffs *could* plausibly allege anticompetitive effects in a properly defined two-sided market. As an initial matter, Plaintiffs' allegations of harm to advertisers rest on speculation and do not include any facts about the price or quality of Zillow's advertising in the eight months between the announcement of the Partnership and Plaintiffs' Complaints. Nor do the Complaints make any attempt to show that advertisers and renters will, as a whole, be worse off as a result of the Partnership.

Plaintiffs' few allegations mentioning renters do not plausibly allege harm to those consumers. According to the Complaints, the Partnership will somehow "reduce Redfin's ability and incentive to compete for renters" because (1) of particular terms in the Partnership's Content License Agreement, FTC Compl. ¶ 86; States Compl. ¶ 88, and (2) Redfin is guaranteed to receive $75 million for the first year of the Partnership. FTC Compl. ¶ 85–86; States Compl. ¶ 87–88. But in order for those allegations to be legally relevant, Plaintiffs must establish that Redfin would have generated more leads and more revenue in a world without the Partnership—otherwise, they cannot plausibly allege that the Partnership itself harmed competition. The Complaints do not even try to demonstrate that.

In fact, Plaintiffs' allegations show that renters stand to benefit from the Partnership. The Complaints show that Redfin's ILS experienced a declining number of unique visitors and searches in the last decade—with recent figures that are roughly equivalent to Zumper, an ILS that, according to Plaintiffs, "has not gained a significant foothold." FTC Compl. ¶ 90; States Compl. ¶ 92; *see also* FTC Compl. ¶ 28; States Compl. ¶ 30; Zillow Investor Presentation, p. 8. Plaintiffs cannot and do not dispute that, as a result of the Partnership, renters that use the Redfin rental network now see more listings than they did before. FTC Compl. ¶ 88 (explaining that the

Partnership "duplicat[es] existing listings across the Zillow and Redfin Networks"); States Compl. ¶ 90 (same). Moreover, because Redfin's service exhibits indirect network effects, *e.g.*, FTC Compl. ¶¶ 27, 90; States Compl. ¶¶ 29, 92, with more listings Redfin is incentivized to reallocate the costs of serving and attracting advertising customers to competing for more renters and, therefore, more leads on which it can earn a payment. *See* FTC Compl. ¶ 60; States Compl. ¶ 62. All of that is good for renters, who benefit from more firms competing to attract renters by building a better user experience. All of that is good for advertisers, too, as better experiences for renters increase the frequency and quality of leads the advertisers receive. *See* FTC Compl. ¶ 90; States Compl. ¶ 92.

Because Plaintiffs fail to allege a proper two-sided market and that the Partnership will harm customers—renters and advertisers—across Zillow's and Redfin's services as a whole, their claims must be dismissed.

### C. Plaintiffs cannot rely on the "quick look" standard to avoid pleading a two-sided market.

Plaintiffs cannot avoid their failure to plead a viable two-sided market and overall harm by relying on the "quick look" approach to antitrust liability. For alleged violations of Section 1, "[t]he rule of reason is the default." *United States v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023). And because "the rule of reason requires courts to conduct a fact-specific assessment of market power and market structure . . . to assess the restraint's actual effect on competition," a plaintiff must plausibly allege a relevant market to state a claim under that standard. *Amex*, 585 U.S. at 541.

Exceptions to the rule of reason are narrow. A very small class of agreements—like agreements to fix prices—"have been held *per se* unreasonable. " *Brewbaker*, 87 F.4th at 573. And, "[i]n some instances, an examination short of the rule of reason can be substituted . . . when

a quick look indicates the anticompetitive effect of the conduct but procompetitive justifications . . . also exist." *N.C. State Bd. of Dental Examiners v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013), *aff'd*, 574 U.S. 494 (2015). A "quick look" review is appropriate only after courts "have amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 89 (2021).

Plaintiffs do not allege that the Partnership is a *per se* violation of the law. But they nonetheless ask this Court to assess their Section 1 claim under the "quick look" standard because "[n]o elaborate analysis is required to demonstrate the anticompetitive character of the agreement." FTC Compl. ¶ 95; States Compl. ¶ 97. That argument is incorrect for three reasons.

*First*, there are many plausible procompetitive effects of the Partnership—as a whole, to renters, and to advertisers. As explained above, Plaintiffs do not dispute that renters and advertisers are better off when their ILSs have more listings, nor do they dispute that Redfin continues to operate a thriving ILS that competes directly with Zillow. Accordingly, the allegations in the Complaints demonstrate that the Partnership "might plausibly be thought to have a net procompetitive effect." *California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999). And that alone prevents Plaintiffs from proving a violation under a "quick look" standard. *Id*.

*Second*, syndication agreements like the Zillow-Redfin Partnership are commonplace in the internet industry. *See, e.g.*, FTC Compl. ¶ 3 (describing Zillow's syndication agreement with Realtor.com); States Compl. ¶ 3 (same). Courts do not condemn them as anticompetitive, but routinely recognize their procompetitive benefits—including by ordering them as a *remedy* to cure an antitrust violation. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 36 (D.D.C. 2024) (describing Microsoft's agreements to syndicate search results to DuckDuckGo and from Yahoo);

*United States v. Google LLC*, No. 1:20-cv-3010 (APM), 2025 WL 2523010, at *3, *80–88 (D.D.C. Sept. 2, 2025) (ordering Google to offer competitors "search and search text ads syndication services to enable those firms to deliver high-quality search results and ads to compete with Google while they develop their own search technologies and capacity"). Accordingly, antitrust law lacks the "experience with the type of restraint at issue" to "predict with confidence" the Partnership will result in anticompetitive effects, *Alston*, 594 U.S. at 89, thus rendering "quick look" review improper.

*Third*, the "quick look" standard is unavailable here because the Partnership has both vertical and horizontal components. "A horizontal restraint is one between competitors, while a vertical restraint is one between firms at different levels of distribution." *Brewbaker*, 87 F.4th at 571. In *Brewbaker*, the Fourth Circuit explained that, because vertical restraints are often procompetitive, any "determination" about the competitive effects of an agreement with horizontal and vertical components should be made "only after applying the rule of reason." *Id.* at 580 n.13; *see also id.* at 576–79, 583 n.14 ("While sometimes applying different analyses, this Court and nearly all other lower courts have adjudged hybrid restraints with vertical and horizontal aspects under the rule of reason"); *see also Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 850 F. Supp. 470, 480–81 (E.D. Va. 1994) (stating that exclusive distribution agreements are most often analyzed under the rule of reason), *aff'd*, 57 F.3d 1317 (4th Cir. 1995). That holding applies here because, under the Partnership, Zillow is paying Redfin to distribute its listings, meaning the two firms are operating as vertical partners "at different levels of distribution" (even if they also are horizontal competitors). *Brewbaker*, 87 F.4th at 571; *see* FTC Compl. ¶ 43; States Compl. ¶ 45.

Plaintiffs understandably would prefer to pursue a Section 1 claim without the burden of pleading a relevant market that includes both renters and advertisers, and without proving harm to

the Zillow and Redfin services as a whole. But they have not alleged any facts that would support that shortcut in this case. Accordingly, their Section 1 claim should be evaluated (and dismissed) under the rule of reason. And even if this Court allows that claim to move forward, it should clarify that Plaintiffs' allegations will not be assessed under the "quick look" standard of review. *See Hanger v. Berkley Grp., Inc.*, No. 5:13-CV-113, 2015 WL 3439255, at *7 n.11 (W.D. Va. May 28, 2015) (granting partial motion to dismiss plaintiffs' per se and quick look claims).

## II.     The Complaints Fail to Plead a Relevant Advertising-Only Market.

Even if Plaintiffs could proceed without acknowledging the impact of the Partnership on the market as a whole (*i.e.*, including renters), the Complaints still must be dismissed. To survive a motion to dismiss for claims based solely on advertisers, Plaintiffs must plausibly allege both (1) a well-defined *geographic* market, *i.e.*, the "area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise prices," *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011); and (2) a well-defined *product* market, which includes both the product at issue and the "substitutes for it," *FTC v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 565 (M.D.N.C. 2024).

Plaintiffs have not met either requirement. Plaintiffs allege a single, nationwide geographic market such that property managers in Alexandria will consider only national advertising options—even if that option has little or no reach in Alexandria. FTC Compl. ¶ 65, 67, 69; States Compl. ¶ 67, 69, 71. Not only do those allegations not make sense, they also directly contradict the FTC's own allegations in a recent enforcement action involving the very same industry. *See* Compl. ¶¶ 31–33, *In re CoStar Grp., Inc. & RentPath Holdings, Inc.*, Dkt. No. 9398 (FTC Dec. 2, 2020) ("CoStar RentPath Compl."). In addition, Plaintiffs allege a product market limited only to other ILSs. FTC Compl. ¶¶ 54, 57–58; States Compl. ¶¶ 56, 59–60. But that narrow product

market is at odds with Plaintiffs' own allegations, which confirm that property managers already use other advertising options (such as paid searches on Google) and that many property managers *do not use ILSs at all*. FTC Compl. ¶ 26 (alleging that "88 percent of advertisers included ILS advertising in their budgets, and those advertisers allocated over half of their marketing budget to ILS advertising"), ¶ 59; States Compl. ¶ 28 (same), ¶ 61.

### A. Plaintiffs' geographic market is not properly defined and contradicts the FTC's own allegations.

The scope of Plaintiffs' alleged geographic market is unclear: at one point, Plaintiffs allege a national geographic market that is "no broader than the United States," FTC Compl. ¶ 65; States Compl. ¶ 67, but then allege in passing that "[t]here may also be smaller relevant geographic markets—for example, *individual metropolitan areas*—where Defendants' market shares are particularly high and thus anticompetitive harms will be especially acute," FTC Compl. ¶ 70 (emphasis added); States Compl. ¶ 72 (same). Either way, their geographic market is not properly pled. Plaintiffs' national geographic market fails because it is defined around Defendants and ignores other customer options, as required by Fourth Circuit precedent, and it contradicts the FTC's own prior pleading. And Plaintiffs have not even tried to identify the local markets that may have been affected by the Partnership.

***Nationwide market allegations.*** The Fourth Circuit has explained that the geographic market "inquiry focuses on th[e] geographic area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices or restrict its output." *Kolon Indus.*, 637 F.3d at 441. Put differently, the market must be defined by considering the options available to *customers*; it is not based on "where the [defendants] do business or even where they compete." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963).

Plaintiffs thus cannot gerrymander a market to exclude competitors simply because Defendants are two of the companies that offer their services nationwide. The Fourth Circuit's decision in *It's My Party, Inc.* illustrates the point. There, the Fourth Circuit rejected plaintiffs' alleged nationwide market for concert-promotion services. "[F]ocus[ing] on the area within which artists can find alternative promoters," the court found that "demand for concerts is local, [so] promoters need to target their advertising to the area surrounding a particular venue." 811 F.3d at 682. Although large national concert promoters differed from their local competitors, that did "not change the fact that they provide services and compete for business on a local basis." *Id.*; *see also FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 829 (S.D. Tex. 2025) (rejecting alleged national market for premium mattresses; while competitors operated nationally, competition for consumers was local); *In re Manufactured Home Lot Rents Antitrust Litig.*, No. 1:23-cv-06715, 2025 WL 3485693, at *15–16 (N.D. Ill. Dec. 4, 2025) (dismissing a complaint alleging that renters in manufactured home communities would consider nationwide rental options).

Plaintiffs' alleged nationwide geographic market also ignores local competitors. As in *It's My Party*, Plaintiffs attempt to plead a single national market for rental advertising by focusing only on Zillow's and Redfin's business models. *Cf.* 811 F.3d at 682. Specifically, Plaintiffs allege that a nationwide geographic market is appropriate because Zillow and Redfin engage in national brand marketing, seek to serve customers throughout the United States, and executed a Partnership that was national in scope. FTC Compl. ¶¶ 67–68; States Compl. ¶¶ 69–70. But none of that addresses the options available to Zillow's or Redfin's customers or shows that customers require advertisers with national reach. For Plaintiffs' national market to be plausible, they must allege facts establishing that a property manager looking to fill its vacancies in Washington, D.C. cares whether Zillow, Redfin, or another competitor can reach potential renters looking for an apartment

on the other side of the country. Allegations about Zillow or Redfin's "national brand marketing" are not remotely relevant to that question.

With those allegations set aside, only one paragraph in the Complaint even attempts to address the geographic area where customers may turn in response to higher prices from Zillow and Redfin. That paragraph states that "[m]any advertising customers prefer ILSs with a nationwide presence and often negotiate with ILSs for national contracts" that allow them to direct resources to different local markets. FTC Compl. ¶ 66; States Compl. ¶ 68. But even taking that allegation as true, it does not establish that any single property manager would consider *only* national advertising options in response to higher prices from Zillow or Redfin—let alone that enough property managers would do so to make a national market plausible. *See FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 541 (E.D. Pa. 2020) ("A proposed geographic market is too narrow if consumers would respond to a [price increase] by purchasing the product from outside the market, thereby making the [price increase] unprofitable"). The allegation that some property managers prefer national advertising options does not support an inference that ILSs can impose price increases without losing share to local competitors. None of Plaintiffs' allegations grapple with that basic problem.

Plaintiffs' proposed nationwide market is also contradicted by the FTC's own allegations in its recent challenge to the merger of CoStar and RentPath, two firms that operated national ILSs. *See generally* CoStar RentPath Compl. That lawsuit raised similar issues to this one,[6] and even involved an ILS that was later acquired by Redfin. *See* FTC Compl. ¶ 4; States Compl. ¶ 4. But despite those similarities, the FTC in that case alleged that "[t]he relevant geographic markets . . .

---

[6] *See* CoStar RentPath Compl. ¶ 1 ("If consummated, the acquisition will eliminate price and quality competition that benefits renters and property managers today, resulting in higher prices for the internet listing services relied upon by managers of large apartment buildings").

are *individual metropolitan areas* within the United States." CoStar RentPath Compl. ¶ 19 (emphasis added). And the FTC supported its proposed market definition with a detailed explanation of why local, rather than national, markets are appropriate in this industry: "[A] PMC with properties in Tampa, Florida, must attract renters . . . in or around Tampa," and "would have no use for an ILS that is successful at generating leads from renters interested in living in Los Angeles." *Id.* ¶ 31. Similarly, "a PMC with properties in one metropolitan area could not substitute away from its current ILS to an ILS that only operates effectively in a different metropolitan area." *Id.* ¶ 32. Nothing in the Complaints explains why local markets were appropriate in 2020 but are not in 2025.

*Local market allegations.* Perhaps recognizing the weakness of their nationwide market allegations, Plaintiffs also indicate local markets could exist. FTC Compl. ¶ 70; States Compl. ¶ 72. But Plaintiffs do not identify any local markets where the alleged "harms" exist, or any information on competition in these local markets at all.

Although a geographic market "may not be measurable in metes and bounds," *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 496 (4th Cir. 1986), a plaintiff still needs to plead a market with enough "certainty" to "ensure the [allegations] provid[e] enough notice to be able to proceed." *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1085 (E.D. Cal. 2021). Plaintiffs' allegations of local markets do not meet that standard.

Taken together, Plaintiffs have alleged a national market that rests on legally irrelevant allegations and local markets that rest on no specific allegations at all. Given these "glaring deficiencies," the Complaints must be dismissed. *Kolon Indus.*, 637 F.3d at 444; *see, e.g.*, *In re Manufactured Home Lot Rents Antitrust Litig.*, 2025 WL 3485693, at *15–16.

**B.      Plaintiffs' ILS-only product market ignores market realities.**

Plaintiffs' alleged product markets are also flawed.  A relevant product market "identifies the products that compete with each other."  *Berlyn, Inc. v. The Gazette Newspaper, Inc.*, 157 F. Supp. 2d 609, 616 (D. Md. 2001).  A product market is not limited to the products or services offered by the defendants, but rather encompasses "the area of effective competition, which is typically the arena within which significant substitution in consumption or production occurs." *US Airways*, 938 F.3d at 55.

According to the Complaints, Zillow and Redfin compete with only other ILSs, rather than the many alternative advertising options available to property managers.  But that proposed market is at odds with Plaintiffs' own allegations, which state that ILSs are *not* the only option available to property managers and some property managers do not use ILSs at all.  FTC Compl. ¶ 26 (alleging that "88 percent of advertisers included ILS advertising in their budgets, and those advertisers allocated over half of their marketing budget to ILS advertising"); States Compl. ¶ 28 (same).  The Complaints also identify specific alternatives to ILSs, including "search engine and social media marketing."  FTC Compl. ¶ 59; States Compl. ¶ 61.  Given these allegations, it is clear that ILSs are not the only firms that compete to advertise vacant apartments.

Although Plaintiffs acknowledge these alternatives, they assert that none of these options "impose a meaningful competitive constraint on ILSs" because "ILS advertising has peculiar characteristics and uses that distinguish it from non-ILS advertising."  FTC Compl. ¶ 58–59; States Compl. ¶ 60–61.  But "merely asserting that a commodity is in some way unique is insufficient to plead a relevant market."  *Concord Assocs., L.P. v. Ent. Props. Tr., EPT*, 817 F.3d 46, 54 (2d Cir. 2016) (granting dismissal for failure to plead product market) (quoting *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995)).  And although Plaintiffs assert that "ILS advertising is essential" and that "many . . . advertisers feel compelled to be on at

least one of the major ILSs," those allegations do not establish that property managers would be unwilling to turn to other options if ILSs raised prices. FTC Compl. ¶ 55; States Compl. ¶ 57 (same). Accordingly, Plaintiffs have not sufficiently alleged a product market limited to ILSs. *See, e.g.*, *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (dismissing complaint alleging an e-mail advertising market that improperly excluded "numerous" interchangeable substitutes); *Coolmath.com, LLC v. Coolmathgames.com*, No. 1:14-cv-1185, 2015 WL 12570901, at *2 (E.D. Va. Apr. 10, 2015) (granting dismissal where plaintiff did not attempt to show the market was "composed of products that have reasonable interchangeability").[7]

* * *

Plaintiffs' strategy is clear: Define a geographic market so broad that it papers over the significant regional differences in Zillow's and Redfin's rental businesses and define a product market so narrow that many advertising competitors are excluded altogether. Because Plaintiffs' market definition is implausible, the Complaints should be dismissed in full. *See Concord Assocs.*, 817 F.3d at 53 ("[I]n order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (no "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)").

---

[7] Plaintiffs do even less with the "ILS Multifamily Advertising" product market, which is alleged to consist of "sales to a discrete segment of advertising customers, namely, those who manage multi-family rental properties of twenty-five (25) units or greater." FTC Compl. ¶ 63; States Compl. ¶ 65. Plaintiffs justify this market solely by pointing to the Zillow-Redfin Partnership Agreement. FTC Compl. ¶¶ 63–64; States Compl. ¶¶ 65–66. But this Court has explained that it is "improper to define a market simply by identifying a group of consumers who have purchased a given product." *GreatDeals.net*, 49 F. Supp. 2d at 858. And Plaintiffs do not offer any explanation why properties with 25 units have more limited options than properties with 24 units.

### III. The Complaints Fail to Plead Market Power.

Finally, this Court should dismiss Plaintiffs' claims because they do not allege that Zillow and Redfin control a sufficient share of the market. To state a claim under Section 1 of the Sherman Act or Section 7 of the Clayton Act, a plaintiff must plausibly allege that the defendants have enough strength in the market for their conduct to harm competition. But rather than make plausible allegations demonstrating, for instance, specific market shares for each Defendant, the Complaints simply assert legal conclusions about "market power" or increased "market concentration." FTC Compl. ¶¶ 76–77; States Compl. ¶¶ 78–79. But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice to survive a motion to dismiss." *MSP Recovery Claims, Series, LLC v. Lundbeck LLC*, 130 F.4th 91, 112 (4th Cir. 2025); *see also DataCell ehf. v. Visa, Inc.*, No. 1:14- CV-1658 GBL/TCB, 2015 WL 4624714, at *3 (E.D. Va. July 30, 2015) ("Naked assertions, without factual support, are not enough to carry the plausibility standard").

Market power is an essential element of Plaintiffs' claims. Under Section 1, they must allege that Defendants have "the ability to raise price significantly above the competitive level without losing all of one's business," *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (affirming summary judgment for defendants)—a showing that "is often inferred from market share." *Eastman Kodak Co v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.15 (1992). And to state a Section 7 claim, they must similarly show that Zillow and Redfin control "an undue percentage share of the relevant market." *United States v. UnitedHealth Group Inc.*, 630 F. Supp. 3d 118, 130 (D.D.C. 2022); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021) (the first step of the burden-shifting analysis under Section 7 is

to "compare[] the market's concentration before and after the" challenged transaction). They do neither.

Antitrust enforcers, including the FTC, generally plead factual allegations about market concentration, which include a valid metric to measure each party's share (*e.g.*, revenue, profit, etc.) and specific market shares for each party. *See, e.g.*, Compl. ¶ 49, Appendices A–C, *United States v. Am. Airlines Grp.*, No. 1:21-cv-11558 (D. Mass. Sep. 21, 2021). And in Section 7 cases, antitrust complaints regularly include a measurement of market concentration based on those shares[8]—typically presented using the Herfindahl-Hirschmann Index ("HHI").[9]

The one notable exception that proves the rule is *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021). In that case, the FTC alleged Facebook possessed market power in the "personal social networking" market by claiming "only that Facebook has 'maintained a dominant share of the U.S. personal social networking market (in excess of 60%)' since 2011 . . . and that 'no other social network of comparable scale exists in the United States.'" *Id.* at 18 (quoting Redacted Compl. ¶¶ 3, 64, No. 1:20-cv-03590 (Dec. 9, 2020), Dkt. No. 3). The FTC did not, however, endorse any specific metric to measure Facebook's market share or attempt to measure the shares of any market participants. Faced with those minimal allegations, the district court dismissed the

---

[8] *See, e.g.*, Compl. ¶¶ 264–66 & Table 1, 277–278 & Table 3, 289–90 & Table 5, *FTC v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-03560 (S.D. Tex. Sep. 21, 2023); Compl. ¶¶ 41–46, *FTC v. Tempur Sealy Int'l, Inc.*, No. 4:24-cv-02508 (S.D. Tex. July 2, 2024); Compl. ¶¶ 69–75, *FTC v. Int'l Exchange Inc.*, No. 3:23-cv-01710 (N.D. Cal. Apr. 10, 2023); Compl. ¶¶ 40–45, *FTC v. HCA Healthcare*, No. 2:22-cv-00375 (D. Utah June 3, 2022); Compl. ¶¶ 46–51, *FTC v. Novant Health, Inc.*, No. 5:24-cv-00028 (W.D.N.C. Jan. 25, 2024). The FTC's own merger guidelines describe in detail the importance of selecting a proper measure of market share and defining each party's existing share as part of Section 7 analysis. *See* FTC & DOJ Merger Guidelines § 4.4 ("Calculating Market Shares and Concentration").

[9] An HHI is "a common measure of market concentration that is calculated by summing the squares of each firm's share of the relevant market." *Steves & Sons, Inc*, 988 F.3d at 704; *see also FTC v. Cmty. Health Sys., Inc.*, 736 F. Supp. 3d 335, 369 (W.D.N.C. 2024) ("Market concentration is typically measured by the Herfindahl-Hirschman Index ('HHI')").

FTC's case at the pleading stage, holding that the FTC's "bare assertions" were "too conclusory" to allow its case to proceed to discovery. *Id.* at 18–20.

Plaintiffs' allegations in this case suffer from the same deficiencies and, as a result, should suffer the same fate. Plaintiffs have not even tried to allege market shares for Zillow, Redfin, or other competitors—in fact, the Complaints do not even identify which competitors are supposedly in the market. Worse still, the Complaints do not endorse a metric that should be used to measure those shares. Instead, Plaintiffs identify "different market share metrics" that *could* be used to measure market concentration, without defending any of them as suited to the facts of this case. FTC Compl. ¶ 72 (asserting that "different market share metrics . . . including, but not limited to, revenue, traffic, and listings" show that the alleged ILS advertising markets are highly concentrated); States Compl. ¶ 74 (same). As a result, Plaintiffs have not "give[n] the [D]efendant[s] fair notice" of how they plan to establish the evidence of market power and concentration required under both Sections 1 and 7. *See Twombly*, 550 U.S. at 555.

To plead the increased market concentration required for a Section 7 claim, the Complaints simply assert that the "[t]he nationwide market[s]" for both "ILS advertising" and "ILS multifamily advertising" have "HHI[s] *well over 1,800*"—only to allege three paragraphs later that those same markets "have HHIs *well over 2,500*." FTC Compl. ¶¶ 73, 76 (emphasis added); States Compl. ¶¶ 75, 78 (same). The Complaints never explain how those conclusory figures were calculated. And the specific figures referenced in the Complaints suggest that Plaintiffs may not have calculated market shares at all: HHIs of 1,800 and 2,500 are thresholds used in the 2023 and 2010 merger guidelines to identify "highly concentrated" markets and "presumptively anticompetitive" mergers. FTC Compl. ¶ 71; States Compl. ¶ 73; *see Steves & Sons*, 988 F.3d at 704 (citing 2010 Merger Guidelines). In other words, Plaintiffs have alleged nothing more than a

violation of their own Guidelines, without identifying any facts that support those bare assertions. *See Whalen v. Albertsons Cos.*, No. 23-cv-00459-VC, 2023 WL 8812882, at *1 (N.D. Cal. Dec. 20, 2023) (dismissing Section 7 claim in part because Plaintiffs' market concentration statistics "[did not] explain where or how they got their numbers"); *DataCell*, 2015 WL 4624714, at *3.

Plaintiffs' allegations of "market power" are similarly flawed. To support their Section 1 claims, the Complaints make passing references to market share figures that include the Defendants and CoStar, alleging that (1) Zillow and CoStar "now have the vast majority of ILS rental listings across the United States," FTC Compl. ¶¶ 3, 28, States Compl. ¶¶ 3, 30, (2) "Zillow, CoStar, and Redfin . . . have been the clear market leaders in terms of rental ILS traffic since at least the start of 2021," and (3) "CoStar, Zillow, and Redfin are the top three firms by revenue, accounting for over eighty five percent of revenue for rental ILSs with nationwide presence in 2024." FTC Compl. ¶ 28; States Compl. ¶ 30. But these allegations do not identify the combined shares for Zillow and Redfin—the two firms actually implicated by the Partnership. Nor do they explain how the "rental listings" or "revenues" that underlie these figures were calculated. For example, Plaintiffs acknowledge that advertisers may list their properties on multiple ILSs, FTC Compl. ¶ 82; States Compl. ¶ 84, but they do not explain whether their listings-based share estimates account for this "multi-homing." *See Facebook*, 560 F. Supp. 3d at 19 (finding market share allegations inadequate where metrics did not adjust for users who visited multiple social networking platforms). Plaintiffs can only advance allegations of increased market concentration by lumping CoStar together with the Defendants—even though the Partnership enables both Zillow and Redfin to challenge CoStar's dominance in the rental advertising industry.

*    *    *

Plaintiffs have not alleged any harm to renters using the Zillow and Redfin listing services, have not pled markets that capture the full breadth of competition for rental advertising, and have not even tried to allege that Defendants have sufficient market power to harm competition. Each of those pleading failures warrants dismissal in its own right. This Court should reject Plaintiffs' attempt to pursue an antitrust challenge that is divorced from the facts on the ground.

**CONCLUSION**

For the foregoing reasons, Defendants request that the Plaintiffs' Complaints be dismissed.

Dated: January 13, 2026

*/s/ Ryan A. Shores*
Ryan A. Shores (VA 65934)
D. Bruce Hoffman (*pro hac vice*)
Blair W. Matthews (*pro hac vice*)
Rathna J. Ramamurthi (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1876
Email: rshores@cgsh.com
Email: bhoffman@cgsh.com
Email: bmatthews@cgsh.com
Email: rramamurthi@cgsh.com

Heather Nyong'o (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
Email: hnyongo@cgsh.com

Beau W. Buffier (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019

Telephone: (917) 412-6461
Email: bbuffier@wsgr.com

*Counsel for Defendants Zillow Group, Inc, and Zillow, Inc.*

/s/ Daniel J. Richardson
Daniel J. Richardson (VSB 94961)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7024
Facsimile: (202) 293-6330
Email: richardsond@sullcrom.com

Sharon L. Nelles (*pro hac vice*)
Jeffrey T. Scott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: nelless@sullcrom.com
Email: scottj@sullcrom.com

Kyle W. Mach (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700
Email: machk@sullcrom.com

*Counsel for Defendant Redfin Corporation*

**CERTIFICATE OF SERVICE**

I, Ryan A. Shores, certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated:  January 13, 2026                */s/ Ryan A. Shores*
                                                 Ryan A. Shores (VA 65934)