**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   *Plaintiff*,<br><br>   v.<br><br>ZILLOW GROUP, INC., ZILLOW, INC., and<br>REDFIN CORPORATION,<br><br>   *Defendants*. | Case No. 1:25-cv-1638 (AJT-WBP) |
| COMMONWEALTH OF VIRGINIA,<br>STATE OF ARIZONA,<br>STATE OF CONNECTICUT,<br>STATE OF NEW YORK, and<br>STATE OF WASHINGTON,<br><br>   *Plaintiffs*,<br><br>   v.<br><br>ZILLOW GROUP, INC., ZILLOW, INC., and<br>REDFIN CORPORATION,<br><br>   *Defendants*. | Case No. 1:25-cv-01647 (AJT-WBP) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO
DISMISS**

## TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Argument ........................................................................................................................... 2

   I.   The Complaints Fail to Plausibly Allege Effects on the Whole Two-Sided Market. ......... 2

   II.  Plaintiffs Are Not Entitled to a Shortcut Under the Quick Look. ...................................... 8

   III.  The Complaints Fail to Plead an Advertising-Only Relevant Market. ............................. 12

   IV.  The Complaints Fail to Plead Market Power. ................................................................. 16

Conclusion ........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    683 F.3d 328 (7th Cir. 2012) ................................................................................9

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962)...........................................................................................16

*Bryant v. Byron Udell & Assocs. Inc.*,
    No. 1:23-cv-00414, 2023 WL 5180351 (E.D. Va. Aug. 11, 2023) .........................................8

*Cal. Dental Ass'n v. FTC,*
    526 U.S. 756 (1999).........................................................................................2, 9

*Compass, Inc. v. Zillow, Inc.,*
    No 1:25-cv-5201 (JAV), 2026 WL 321084 (S.D.N.Y. Feb. 6, 2026) ..............................14, 19

*Concord Assocs., L.P. v. Ent. Props. Tr., EPT,*
    817 F.3d 46 (2d Cir. 2016)..................................................................................16

*Cont'l Airlines, Inc. v. United Airlines, Inc.,*
    277 F.3d 499 (4th Cir. 2002) ................................................................................9

*Coronavirus Rep. v. Apple Inc.,*
    No. 21-cv-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021), *aff'd*, 85 F.4th
    948 (9th Cir. 2023)............................................................................................6

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...............................................................................20

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ...............................................................................12

*Eastman Kodak Co v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)..........................................................................................16

*Enhanced US LLC v. World Aquatics,*
    No. 25-cv-7096 (JMF), 2025 WL 3206662 (S.D.N.Y. Nov. 17, 2025)...................................7

*FTC v. Edwards Lifesciences Corp.*,
No. 1:25-cv-02569-RC, 2026 WL 228723 (D.D.C. Jan. 28, 2026)....................................17-18

*FTC* v. *Facebook*,
581 F. Supp. 3d 34 (D.D.C. 2022) .............................................................................................20

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) ........................................................................................ 19-20

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ....................................................................................................17

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) ...........................................................................................18

*FTC* v. *Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ........................................................................................14

*Greystone Mortgage, Inc. v. Equifax Workforce Solutions LLC*,
No. 2:24-cv-2260-JFM, 2025 WL 540012 (E.D. Pa. Feb. 18, 2025) ...........................................4

*Impax Lab'ys, Inc. v. FTC*,
994 F.3d 484 (5th Cir. 2021) ......................................................................................................12

*In re Nat'l. Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ....................................................................................................11

*In re Realpage, Inc. Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023).....................................................................................13

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ............................................................................................. 2, 13-15

*Jien* v. *Perdue Farms, Inc.*,
No. 1:19-cv-2521-SAG, 2020 WL 5544183 (D. Md. Sept. 16, 2020) ......................................14

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995).........................................................................................................16

*Khashoggi v. NSO Grp. Techs. Ltd.*,
138 F.4th 152 (4th Cir. 2025) ......................................................................................................6

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)............................................................................................................. 1, 9-11

*Nat'l. Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)...........................................................................................10

*North Carolina State Board of Dental Examiners v. FTC*,
    717 F.3d 359 (4th Cir. 2013), *aff'd*, 574 U.S. 494 (2015) .....................................12

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................... *passim*

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990).......................................................................................12

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ............................................................................6

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979).......................................................................................1

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)...........................................................................17

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ..........................................................................17

*Turner v. Va. Dep't of Med. Assistance Servs.*,
    301 F. Supp. 3d 637 (E.D. Va. 2018) ..............................................................7-8

*United States v. Booz Allen Hamilton Inc.*,
    No. 1:22-cv- 1603, 2022 WL 9976035 (D. Md. Oct. 17, 2022)...............................9

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023) .....................................................................1, 9-11

*United States v. Google LLC*,
    778 F. Supp. 3d 797 (E.D. Va. 2025) .................................................................4

*United States v. Google LLC*,
    803 F. Supp. 3d 18 (D.D.C. 2025).....................................................................10

*United States v. UnitedHealth Grp. Inc.*,
    630 F. Supp. 3d 118 (D.D.C. 2022)...................................................................16

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)...........................................................................4-5

*Volvo Trademark Holding AB v. Volvospares.com*,
   703 F. Supp. 2d 563 (E.D. Va. 2010) ..........................................................................6

**Federal Statutes**

Section 1 of the Sherman Act, 15 U.S.C. § 1 ..................................................................10

Section 7 of the Clayton Act, 15 U.S.C. § 18 ..................................................................16

## INTRODUCTION

Unable to allege that the Zillow-Redfin rentals partnership harms competition under traditional antitrust standards, Plaintiffs try to avoid dismissal by advancing various arguments about why those standards need not apply in this case. Plaintiffs' arguments are meritless.

*First*, Plaintiffs' own Complaints show that renters and advertisers are inextricably intertwined such that actions to one create a "feedback loop" impacting the other. *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 536 (2018). These strong indirect "network effects" mean that Plaintiffs must plead a relevant antitrust market including both renters and advertisers and plead harm to that market "as a whole." *Id.* at 545, 547.[1] Plaintiffs try to narrow *Amex* to its facts, arguing that it applies only to platforms that facilitate simultaneous transactions. But neither the text nor logic of the Supreme Court's decision supports that cramped reading, which emphasized that market definition must be defined by "commercial realities." *Id.* at 544 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)); *see also Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 93 (2021) ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities"). Moreover, ignoring the Partnership's impact on renters undermines the very purpose of the antitrust laws, which aim to protect consumers—including the renters who benefit from increased listings from the Partnership. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) ("Congress designed the Sherman Act as a consumer welfare prescription").

*Second*, Plaintiffs seek to sidestep *Amex* and basic pleading standards by invoking the truncated "quick look" antitrust standard. But the rule of reason, which requires plaintiffs to allege an antitrust market and substantial harm in that market at the threshold, is the "default." *United*

---

[1] Unless otherwise noted, internal quotation marks, citations, and alterations are omitted from quotations throughout.

*States v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023).  The rarely-used "quick look" standard has no place where, as here, the Partnership has plausible net procompetitive effects.  *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770–71 (1999).  Plaintiffs have not identified any court that has invoked "quick look" in a case involving a two-sided market, and their reliance on that standard only reveals the weaknesses of their claims when judged against ordinary antitrust principles.

*Third*, Plaintiffs try to plead a nationwide market limited only to paid ILS advertising.  But even if it were proper to assess only one side of the market, the Fourth Circuit explained in *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), that a market must be defined based on the options available to customers, not the characteristics of a defendant's business.  Plaintiffs have no meaningful response to that precedent and barely discuss the Fourth Circuit's decision at all.

*Finally*, Plaintiffs argue that they can plead Zillow and Redfin's market power by simply asserting that the Partnership will reduce the number of competitors in the market and by offering unsupported assertions regarding their combined market shares.  But Plaintiffs have not cited a single decision holding that such allegations are sufficient to overcome a motion to dismiss.

## ARGUMENT

### I.    The Complaints Fail to Plausibly Allege Effects on the Whole Two-Sided Market.

The Complaints make the commercial realities clear:  listing services deliver value to advertisers and renters at the same time, and in an inextricably intertwined way.  Advertisers, as the Complaints allege, want to reach as many high-intent renters as possible, and renters want to see a large and comprehensive set of property listings.  FTC Compl. ¶¶ 27, 90; States Compl. ¶¶ 29, 92.  Sites that make both of these things possible benefit consumers on both sides.

But despite acknowledging those realities, Plaintiffs do not even try to allege a two-sided market and do not plausibly demonstrate that the Partnership will harm renters and advertisers "as a whole."  Def's Memo. in Support of Mot. to Dismiss 8–13 ("Mem.").  Those defects are fatal.

***Plaintiffs fail to allege a two-sided market.***  Plaintiffs concede that ILSs are two-sided platforms, and the Supreme Court's controlling decision in *Amex* specifically addressed such platforms.  Pls' Opp. to Defs' Mot. to Dismiss 17 ("Opp.").  But they nonetheless ask this Court to ignore both sides of the platform at the pleading stage on the grounds that (according to Plaintiffs) *Amex* applies only to one type of two-sided platform:  a two-sided *transaction* platform.  *Id.*  In Plaintiffs' view, *Amex*'s command to consider an agreement's total effect on both sides of a two-sided platform applies only when that platform facilitates a single simultaneous transaction between both sides—*i.e.,* in the narrow fact pattern at issue in *Amex* itself.  585 U.S. at 545.[2]

To the contrary, the Supreme Court focused on the strength of the indirect network effects in two-sided platforms generally, not just whether a platform qualifies as a two-sided *transaction* platform.  These indirect network effects, as the Supreme Court explained, occur when a reduction in the value of the product or service to customers on one side results in a "feedback loop" that "decreases the value of the platform to" the other side, or vice versa.  *Amex,* 585 U.S. at 536; *id.* at 535 (The "value . . . increases as the number of participants on both sides of the platform increases").  Contrasted with newspapers, which "should be analyzed" as one-sided markets

---

[2] Plaintiffs state that Defendants "appear to concede [that] ILSs are not two-sided transaction platforms."  Opp. 18.  To be clear, Defendants' position is that a two-sided transaction platform is just one form of the two-sided platforms for which competitive effects must be assessed as a whole.  But—while not essential to this motion—as the Complaints allege, ILSs set prices by way of a "success-based model, [with] payments . . . contingent on generating leads or leases."  FTC Compl. ¶ 61; States Compl. ¶ 63.  That is, an advertiser may not pay a listing service unless and until a renter matches with a property by generating a lead or signing a lease.  That event is a per-interaction fee similar to a "transaction."  *Amex*, 585 U.S. at 545.

because "the indirect network effects operate in only one direction," *id.* at 544, "[t]wo-sided transaction platforms . . . are different" because they "exhibit more pronounced indirect network effects and interconnected pricing and demand." *Id.* at 545.

To be sure, two-sided transaction platforms are a "subset of two-sided platforms that must *always* receive two-sided treatment." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019). But the Supreme Court *did not* say in *Amex* that the simultaneous-transaction context is the *only* one in which two-sided market treatment should apply. In fact, "in many or most cases involving two-sided platforms, courts must include both sides of the platform in . . . the relevant market."[3] *US Airways,* 938 F.3d at 56. That makes sense. Antitrust law disfavors "formalistic distinctions"—like the one Plaintiffs propose between transaction and non-transaction platforms—and, instead, focuses on "commercial realities." *Amex*, 585 U.S. at 542–44. Where there are strong indirect network effects, those commercial realities necessarily require a holistic assessment to achieve antitrust law's ultimate "goal": distinguishing between restraints "harmful to the consumer" and those in the "consumer's best interest." *Id.* at 541.

Under a proper reading of *Amex*, Plaintiffs are required to plead both sides of the market in this case. They have not done so. Although Plaintiffs argue that Defendants rely on an "unpled

---

[3] Plaintiffs are thus wrong to suggest that *US Airways* held that the relevant market should include both sides of a platform "only" in the case of two-sided transaction platforms. Opp. 19. Plaintiffs' citation to *Greystone Mortgage, Inc. v. Equifax Workforce Solutions LLC*, No. 2:24-cv-2260-JFM, 2025 WL 540012, at *3 (E.D. Pa. Feb. 18, 2025), is equally off base. Opp. 18–19. That court simply held Equifax does not operate a two-sided transaction market because it essentially compiles data and sells it as "a materially different product," rather than acting as an intermediary between two groups of consumers. 2025 WL 540012, at *3. And in *United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025), the court rejected Google's argument that multiple products within the "ad tech stack" could be compiled into a two-sided transaction market because the discrete products on each side of the stack served "only" consumers on one side, rather than matching two groups together. *Id.* at 820, 844–47. In contrast, the entire purpose of ILSs—as the Complaints emphasize—is to match advertisers and renters. *See* FTC Compl. ¶¶ 27, 58, States Compl. ¶¶ 29, 60.

narrative" to establish indirect network effects here, Opp. 2, Plaintiffs' Complaints make clear that ILSs are "characterized by network effects" and that the "core functionality of ILSs is connecting advertisers with potential renters."  FTC Compl. ¶¶ 27, 90; States Compl. ¶¶ 29, 92; Mem. 9.  Consistent with the Complaints' allegations, a Zillow investor presentation referenced in the Complaints reinforces the power of those network effects and the feedback loop underlying them.  Mem. 10; Ex. A at 3 ("Clear opportunity to increase marketing efforts and accelerate two-sided marketplace growth"), 5 (graphic showing feedback loop).  And, even in their opposition, Plaintiffs continue to ground their alleged "entry barriers" on the strength of the network effects, alleging that an ILS cannot have "value for an advertising customer" without also having "a sufficiently large renter audience," and vice versa.  FTC Compl. ¶ 90; States Compl. ¶ 92; Opp. 4.  Plaintiffs cannot have it both ways by claiming both that the indirect network effects here are too weak to require a two-sided antitrust market but are so strong that they erect significant barriers to entry.

Indeed, the situation here is the *opposite* of a newspaper—*Amex*'s example of when two-sided treatment is inapplicable.  There, the network effects "run primarily in one direction: advertisers care how many readers there are, but readers do not ordinarily care how much advertising there is."  *US Airways*, 938 F.3d at 56–57 (discussing *Amex*).  Here, Plaintiffs admit the opposite is true:  to "attract renters," ILSs must include a "large number of listings" that would meet those renters' needs.  FTC Compl. ¶ 90; States Compl. ¶ 92.  These "commercial realties" should control the market definition analysis.  *Amex*, 585 U.S. at 544; *US Airways*, 938 F.3d at 55.

Finally, it is notable what the Complaints *do not* allege.  Plaintiffs could have attempted to plead that network effects are immaterial in this case, but there is no allegation to that effect;

instead, their allegations suggest the opposite.[4]  Nor can Plaintiffs avoid that problem by claiming that "*Amex* does not create a pleading standard," and, thus, that *Amex*'s rules around market definition and net harm should be considered later in the case.  Opp. at 19.  *Amex* creates a rule of law for finding harm to competition in two-sided markets, and that rule does not change from one stage of a case to another.  Like any plaintiff in any civil case, Plaintiffs must plausibly plead the elements of their claims, including at the outset "a substantial anticompetitive effect that harms consumers in the relevant market."  *Amex*, 585 U.S. at 541.  And because Plaintiffs plead an invalid one-sided market that is *legally* improper under *Amex*, the Complaints should be dismissed.  *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 837 (9th Cir. 2022) (holding "*Amex* can apply at the pleading stage in some circumstances"); *Coronavirus Rep. v. Apple Inc.*, No. 21-cv-05567-EMC, 2021 WL 5936910, at *12–13 (N.D. Cal. Nov. 30, 2021) (granting motion to dismiss because plaintiffs' failure to allege a two-sided market "renders their market definitions insufficient as a matter of law"), *aff'd*, 85 F.4th 948 (9th Cir. 2023).[5]

     ***Plaintiffs fail to allege harms across the two-sided market.***  Plaintiffs' alternative, last-gasp assertion that they "did allege harm to both" renters and advertisers sufficient to satisfy *Amex*'s test is equally misguided.  Opp. 20.

     The Complaints in this case allege only markets limited to "*advertising customers*" and

---

[4] Tellingly, Plaintiffs try to downplay their own admissions of network effects in their opposition with the watered-down concession that "ILSs exhibit *some* degree of network effects," Opp. 4 (emphasis added), even though the word "some" is not in their Complaint and they hinge their allegations of entry barriers on the power of those network effects.

[5] Contrary to Plaintiffs' argument, Opp. 19 n.7, *Coronavirus* is persuasive authority.  To the extent the Ninth Circuit affirmed the district court's dismissal on other grounds, that does not remove the persuasive authority of the district court's decision.  *See, e.g.*, *Khashoggi v. NSO Grp. Techs. Ltd.*, 138 F.4th 152, 163 (4th Cir. 2025) (relying on a district court case that was affirmed on other grounds by a court of appeal); *Volvo Trademark Holding AB v. Volvospares.com*, 703 F. Supp. 2d 563, 567 (E.D. Va. 2010) (same).

rely on allegations of harms to customers in those markets. FTC Compl. ¶¶ 9 (emphasis added), 54 (claiming the market is "no broader" than "ILS advertising"); States Compl. ¶¶ 9, 56. The implications of that strategy are clear: Plaintiffs are hoping to prove their claims without having to show harm to the market "as a whole" and without having to grapple with the interaction between the two sides—*e.g.*, the fact (recognized in *Amex*) that a price increase on one side of a two-sided market can lead to better products and higher output as a whole. *Amex*, 555 U.S. at 548; *see also id.* at 552 (noting that Amex's business model of higher merchant fees "has spurred robust interbrand competition and has increased the quality and quantity of credit-card transactions").

Given that strategic choice, Plaintiffs now cannot save their one-sided, advertiser-focused Complaints by pointing to conclusory allegations that the Partnership is likely to "reduce Redfin's ability and incentive to compete for renters." FTC Compl. ¶¶ 85–86; States Compl. ¶¶ 87–88. That assertion is not supported by any well-plead facts, only speculation, and it ignores entirely Redfin's incentives *in the absence of the Partnership*—which is the relevant question here. *See Turner v. Va. Dep't of Med. Assistance Servs.*, 301 F. Supp. 3d 637, 642 (E.D. Va. 2018) (the Court "need not accept . . . unwarranted inferences, unreasonable conclusions or arguments"); *see also Enhanced US LLC v. World Aquatics*, No. 25-cv-7096 (JMF), 2025 WL 3206662, at *14 (S.D.N.Y. Nov. 17, 2025) (rejecting allegations of harm in the form of decreased wages where the complaint failed to "establish an appropriate baseline against which to measure . . . compensation").

In any event, Plaintiffs' meager allegations concerning Redfin's "incentives" fail to address the Partnership's *total effect* on renters. The Complaints acknowledge that renters value the ability to see more listings on their preferred platform and that the Partnership enables renters visiting Zillow's or Redfin's websites to see more listings on the ILS they prefer. Mem. 9, 12–13. This is particularly valuable for those prospective renters who like the Redfin platform, which previously

lagged in property listings.  FTC Compl. ¶ 28 (alleging "Zillow and CoStar," but not Redfin, have "the vast majority of ILS rental listings"); States Compl. ¶ 30.  It also benefits advertisers—for the obvious reason that advertisers using ILSs directly benefit when those ILSs deliver more prospective renters and leads.  Mem. 12–13.  Yet even looking just at the advertisers' side, Plaintiffs' Complaints fail to take any of this into account.  Nor do they plead anything about what actually has happened to renters or advertisers while the Partnership has been in place.[6]  *See Amex*, 585 U.S. at 549 (rejecting harm as a whole in part because "while these agreements have been in place, the credit-market experienced expanding output and improved quality").

At bottom, Plaintiffs' suggestion that the "Agreements will harm American renters," Opp. 11, is a conclusory, incomplete assertion that does not pass "from conceivable to plausible" and does not satisfy *Amex*'s "as a whole" test.  *Bryant v. Byron Udell & Assocs. Inc.*, No. 1:23-cv-00414 (AJT/LRV), 2023 WL 5180351, at *2 (E.D. Va. Aug. 11, 2023); *see Turner*, 301 F. Supp. 3d at 642.  Even if the Court credits the few renter-based assertions in the Complaints, the problem with Plaintiffs' one-sided market definition is left unsolved:  it does not capture effects on renters. Plaintiffs cannot proceed on a theory of harm in a market that is inconsistent with the theory set forth in the Complaints.  *See* FTC Compl. ¶ 9; States Compl. ¶ 9.

## II.    Plaintiffs Are Not Entitled to a Shortcut Under the Quick Look.

Perhaps recognizing that they failed to allege a valid relevant market or adequate harm as a whole, Plaintiffs try to sidestep their obligation to do so by claiming the Partnership violates Section 1 under a "quick look."  Opp. 7–12.  In so doing, not only do they seek to depart from the

---

[6] This is despite the fact that the FTC and States, using their broad investigatory powers, conducted pre-Complaint investigations after the Partnership went into effect and before filing suit.  *See* Dkt. Nos. 56 at 4–5; 60 at 6.

standard mode of antitrust analysis—as "[t]he rule of reason is the default," *Brewbaker*, 87 F.4th at 573—they also seek to avoid defining an antitrust market altogether. Opp. 8 n.3.[7]

"Few situations justify a quick look review; none like this case." *United States v. Booz Allen Hamilton Inc.*, No. 1:22-cv- 1603, 2022 WL 9976035, at *4 (D. Md. Oct. 17, 2022). The "quick look" is an exceptional shortcut applied only where "an observer with even a rudimentary understanding of economics could conclude that the agreements in question would have an anticompetitive effect on consumers and markets." *Cal. Dental Ass'n*, 526 U.S. at 770. The limited cases in which quick look is applied involve "considerable experience with the type of restraint at issue" such that the Court "can predict with confidence that [the agreement] would be invalidated in all or almost all instances." *Alston,* 594 U.S. at 89; Mem. 14. The quick look does not apply to agreements that "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition." *Cal. Dental Ass'n*, 526 U.S. at 771; *see also Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 510–11 (4th Cir. 2002) (rejecting an abbreviated review where "plausible procompetitive justifications" are present); *Booz Allen*, 2022 WL 9976035, at *4 & n.13. Plaintiffs' attempt to apply the quick look falls short on every front.

As discussed above, it is far from "rudimentary" to conclude that the Partnership has an anticompetitive effect—to the contrary, there are compelling reasons to conclude that its effects are procompetitive. *See* Mem. 14. These include, among others, maintaining both Redfin's and Zillow's ILSs for renters while expanding the listings renters can see on their preferred ILS and expanding the pool of likely renters viewing advertisers' listings—in other words, benefits to both

---

[7] Plaintiffs claim that "market definition and market power are immaterial," Opp. 8 n.3, under a quick look, but even if "[t]he quick-look doctrine permits plaintiffs to forgo . . . a specific definition of the relevant market," "the existence of a relevant market cannot be dispensed with altogether" because "[i]t is the existence of a commercial market that implicates the Sherman Act in the first instance." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012).

renters and advertisers.[8]  *See* FTC Compl. ¶ 27, 47, 81, 88, 90; States Compl. ¶ 29, 49, 83, 90, 92. Courts likewise lack long experience with syndication agreements—exclusive or not—in real estate or other digital platforms, and they certainly do not have sufficient experience to conclude that such agreements "would be invalidated in all or almost all instances." *Alston*, 594 U.S. at 89. Rather, the experience is otherwise—not only are syndication agreements common and rarely condemned, Mem. 14–15, but they have been used as court-ordered remedies in antitrust cases. *See United States v. Google LLC*, 803 F. Supp. 3d 18, 38, 130–38 (D.D.C. 2025).

Syndication agreements, like the one here, also involve a "vertical" element—namely, the provision of listings.  FTC Compl. ¶ 35; 42–43; States Compl. ¶ 37, 44–45.  Plaintiffs do not appear to dispute this, *see* Opp. 12 (claiming "[u]ntil the Agreements" the parties had "no vertical relationship"), and Fourth Circuit law makes clear that even "hybrid" agreements (*i.e.*, agreements with horizontal and vertical elements) require rule-of-reason treatment.  *Brewbaker*, 87 F.4th at 583 n.14 ("While sometimes applying different analyses, this Court and nearly all other lower courts have adjudged hybrid restraints with vertical and horizontal aspects under the rule of reason"); *see also id.* at 580 n.13, 576–79; Mem. 15.

Finally and importantly, no case has ever applied the quick look standard in a two-sided context; Plaintiffs certainly do not cite one.  That is not surprising:  the Supreme Court's seminal decision on two-sided antitrust markets (*Amex*) occurred just eight years ago, over a century after the Sherman Act was enacted, and courts lack the sort of "considerable experience" that would be

---

[8] Plaintiffs assert that property listings across the Zillow and Redfin cites are "duplicative" or a "copycat" under the Partnership.  Opp. 6, 11.  If Plaintiffs mean that renters going to Redfin—which lags in listings, *see* FTC Compl. ¶ 28; States Compl. ¶ 30—will now have the benefit of Zillow's superior number of listings too, that is right and clearly procompetitive.  *See Nat'l. Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101–02 (1984) (recognizing actions that "widen consumer choice" are procompetitive).

required to condemn agreements in such markets on nothing more than a quick look. *Alston*, 594 U.S. at 89. This is simply not the sort of case on which a quick look can be based.

Nor can Plaintiffs carve the Partnership up into its parts and ask this Court to condemn those pieces on a mere quick look. For example, Plaintiffs characterize Zillow's $100 million upfront payment to Redfin—as set out in the Partnership Agreement—as an agreement not to compete separate from the Content License Agreement ("CLA"). Opp. 10. They also say it is not the CLA, but rather the alleged requirement that Redfin "exit the market and refrain from competing" that justifies application of the "quick look" method. Opp. 11. But that is not how Plaintiffs plead their case—they instead allege a unified scheme working through two agreements. *E.g.*, FTC Compl. ¶¶ 6, 35 ("Zillow and Redfin entered into and are implementing their unlawful scheme through two agreements"); States Compl. ¶¶ 6, 37 (same). Nor is it how the Partnership works—the Partnership Agreement makes clear that both agreements are intertwined. *See, e.g.*, Ex. 2-1 §§ 1.2, 2.1, 2.2 ("For the avoidance of doubt, this Section 2.2 is supplemental to Section 3 of the Content License Agreement"); Mem. 5.

Moreover, Redfin remains a competitor for renters, Mem. 1–2, 5–6, 12–13, and the upfront payment must be understood in that context. *See, e.g.*, *In re Nat'l. Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019); *see also Brewbaker*, 87 F.4th at 576–79 ("We do not normally artificially split a business entity into pieces in order to conclude that only one part of the entity—for example, the part that acted as the other party's competitor—was the actual party to the agreement"); Mem. 15. It would be a strange and unwarranted use of the quick look for the Court, confronted by an alleged overarching agreement with which courts lack familiarity and which at the very least has plausible procompetitive effects, to break out the carving knife and condemn specific terms sliced out of context without a fulsome analysis.

Plaintiffs' other cases are simply off point.  The Partnership is unlike the agreement deemed illegal *per se* in *Palmer v. BRG of Georgia, Inc.*, where the defendants agreed not to compete with each other in any respect.  498 U.S. 46, 47 (1990) ("The parties agreed that HBJ would not compete with BRG in Georgia and that BRG would not compete with HBJ outside of Georgia").  Nor is it similar to *North Carolina State Board of Dental Examiners v. FTC*, which contemplates the quick look standard applying to a different class of conduct:  a restraint akin to a group boycott that *fully* prevented competition between market participants.  *See* 717 F.3d 359, 374 (4th Cir. 2013) (affirming quick look approach where dental licensing board prevented non-dentist providers from accessing the teeth-whitening market in its entirety), *aff'd*, 574 U.S. 494 (2015); *see also Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) (applying the rule of reason approach where an agreement might "produce both anticompetitive and procompetitive effects").

Because of the Partnership's plausible procompetitive benefits, Plaintiffs' claims must proceed, if at all, only under the rule of reason.

## III.    The Complaints Fail to Plead an Advertising-Only Relevant Market.

Plaintiffs' Complaints allege that Zillow and Redfin compete in a nationwide market to provide ILS advertising services to property managers.  Even putting aside the failure to allege a two-sided market, Plaintiffs' proposed market suffers from two basic problems, both of which require dismissal:  *first*, Plaintiffs' nationwide geographic market is not supported by any specific allegations about the options available to Zillow and Redfin's customers and therefore ignores the relevant legal standard; and *second*, Plaintiffs ignore other forms of advertising used by customers, including the alternatives identified in the Complaints.  None of Plaintiffs' arguments overcome these "glaring deficiencies" in their case.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011).

*Geographic market.*  The Fourth Circuit has explained that a nationwide market definition is improper when a firm "provide[s] services and compete[s] for business on a local basis," even if the firm operates throughout the United States.  *It's My Party, Inc.*, 811 F.3d at 682; Mem. 17–18.  That rule forecloses Plaintiffs' attempt to define a market by pointing to aspects of Zillow's and Redfin's businesses that operate nationally.  None of Plaintiffs' arguments undermine that straightforward conclusion.

Plaintiffs first argue that this case is distinct from others involving "individual consumers" because "advertising customers are generally large entities who manage portfolios of properties in multiple states and routinely enter contracts covering multiple rental properties."  Opp. 23–24.  To support that assertion, however, Plaintiffs cite only one paragraph from their Complaints, which states that "[m]any" advertising customers "often" negotiate national contracts that "frequently" allow them to allocate advertising spending across multiple cities.  Opp. 5, 22–23 (citing FTC Compl. ¶ 66; States Compl. ¶ 68).  That vague assertion does not support an inference that advertisers require ILSs with nationwide reach—on the contrary, Plaintiffs' use of "[m]any" and "often" all but confirms they do not.  *See In re Realpage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 530 (M.D. Tenn. 2023) (rejecting a geographic market of "large cities containing multiple universities" because it did not account for "the region . . . to which the purchaser can practicably turn for housing").  Nor have Plaintiffs even attempted to show that enough of Zillow's and Redfin's customers require "national contracts" to make their proposed market plausible.  As in *It's My Party*, "[b]ecause the demand for [properties] is local, [advertisers] need to target their advertising to the area surrounding a particular [property]."  811 F.3d at 682.

To get around that deficiency, Plaintiffs also double down on their defendant-focused approach, arguing that their reliance on Zillow and Redfin's "nationwide brand" and "nationwide

presence" is consistent with a pair of district court decisions accepting nationwide market allegations. Opp. 22 (citing *Davitashvili* v. *Grubhub, Inc.*, No. 1:20-cv-3000 (LAK), 2022 WL 958051, at *9 (S.D.N.Y. Mar. 30, 2022) & *Jien* v. *Perdue Farms, Inc.*, No. 1:19-cv-2521-SAG, 2020 WL 5544183, at *11 (D. Md. Sept. 16, 2020)); *see also Compass, Inc. v. Zillow, Inc.*, No 1:25-cv-5201 (JAV), 2026 WL 321084, at *15 (S.D.N.Y. Feb. 6, 2026) (citing *Davitashvili* to uphold a national home sales search market).

These cases do not change the outcome here. *It's My Party* held that a plaintiff cannot prove a national market solely by alleging that defendants "compete nationally" or operate national networks. 811 F.3d at 682. That precedent is binding on this Court. It is also consistent with *Jien*, which found a nationwide labor market plausible because Plaintiffs' "alleged specific facts" that the defendants "made compensation decisions in a centralized fashion, and . . . set compensation at largely the same levels across the country regardless of region." 2020 WL 5544183, at *11. The Complaints do not support the same conclusion here, as they are based on generic allegations that could apply to any national brand, FTC Compl. ¶¶ 66–68; States Compl. ¶¶ 68–70, and, if anything, indicate local pricing. *See* FTC Compl. ¶ 61; States Compl. ¶ 63 (alleging an advertiser may pay for a "higher tiered subscription level in order to appear on the first page of listings in a particular city"); *see also It's My Party*, 811 F.3d at 681–82; *FTC* v. *Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 828–29 (S.D. Tex. 2025) (rejecting national market for premium mattresses).

Plaintiffs also have no meaningful explanation for why their geographic-market allegations here differ from the FTC's allegations in the 2021 *CoStar* complaint. As Defendants previously explained, Mem. 19–20, the differences are stark: in *CoStar*, the FTC alleged specific facts to support its proposed local markets, which turned on detailed allegations about CoStar's customers—exactly as *It's My Party* requires. But rather than try to explain the about-face,

Plaintiffs recite the maxim that "antitrust disputes must be considered on a case-by-case basis." Opp. 25. That does not explain what about this case warrants a different approach, apart from Plaintiffs' interest in gerrymandering the relevant market.

As a final effort to save their geographic-market allegations, Plaintiffs also fall back on their allegations concerning the "*possibility* of other more localized markets." Opp. 21 (emphasis added); *see id*. at 24–25. According to Plaintiffs, their passing reference to "smaller relevant geographic markets" is enough to avoid dismissal because, as a general matter, it is possible for both a nationwide market and regional markets to be plausible in a single case. But the question here is not whether local markets are theoretically possible; it is whether Plaintiffs have plausibly alleged the specific local markets relevant to this case. As Defendants previously explained, they have not. Mem. 20. Plaintiffs' opposition provides no response.

***Product market.*** Plaintiffs also cannot defend their attempt to plead a product market limited to paid ILS advertising. FTC Compl. ¶¶ 1 (property managers "pay ILSs to advertise their vacant units"), 54; States Compl. ¶¶ 1, 56. Plaintiffs' own allegations confirm that property managers regularly advertise through other channels, such as "social media marketing," and that some advertisers do not use ILSs at all. FTC Compl. ¶ 59; States Compl. ¶ 61; Mem. 21–22. The Complaints provide no plausible basis for excluding those options from the market. Mem. 21–22.

In suggesting otherwise, Plaintiffs first argue that the "Defendants themselves view ILSs as distinct." Opp. 14. But to support that assertion, Plaintiffs cite only reports showing that many property managers use ILSs and a conclusory assertion about "communications with investors," which says nothing about the options available to advertisers. FTC Compl. ¶¶ 55–57; States Compl. ¶¶ 57–59. None of those allegations speak to whether advertisers would consider alternative options in response to higher prices from ILSs. *See It's My Party*, 811 F.3d at 683.

15

Plaintiffs also point to portions of the Complaints that discuss "the practical indicia set out in" *Brown Shoe*, 370 U.S. at 325, such as "industry or public recognition" or "specialized vendors." Opp. 14–15. Those passages, however, simply discuss the differences between ILS advertising and other forms of advertising and use those differences to make a conclusory assertion that the hypothetical monopolist test supports this narrow market. FTC Compl. ¶¶ 58–62; States Compl. ¶¶ 60–64. They do not include any well-pled allegations suggesting those differences would prevent property managers from switching some of their advertising to non-ILS options. *See Concord Assocs., L.P. v. Ent. Props. Tr., EPT*, 817 F.3d 46, 54 (2d Cir. 2016) (asserting that a commodity is "unique" is "insufficient to plead a relevant market").

Plaintiffs have also failed to plausibly allege an even narrower market of "ILS *multifamily* advertising." Plaintiffs' only argument in support is that the Partnership applies to properties with over 25 units. Opp. 16–17. Both Zillow and Redfin support rental listings for properties with fewer than 25 units. *See* Mem. Ex. A at 4–5; FTC Compl. ¶ 64; States Compl. ¶ 66. Plaintiffs cite no authority for defining a market by reference to the terms of a single contract. And the mere fact that Defendants negotiated a partnership with a cutoff of 25+ units does not support an inference that buildings with 24 units compete in a separate market than those with 26. Mem. 22 n.7.

## IV.    The Complaints Fail to Plead Market Power.

To move forward on either their Section 1 or Section 7 claims, Plaintiffs need to plead that Zillow and Redfin command a substantial share of the relevant market. For the Section 1 claim, they must plausibly allege that Defendants have the "ability to raise price," *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995), which "is often inferred from market share," *Eastman Kodak Co v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.15 (1992). Under Section 7, Plaintiffs can meet their prima facie burden by pleading that Zillow and Redfin together command "an undue percentage share of the relevant market." *United States v.*

16

*UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 130 (D.D.C. 2022); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001).  Plaintiffs have not done either.  Mem. 23–26.

Plaintiffs' first attempt to sidestep those pleading requirements, stating they need not plead market power or undue market concentration because the Complaints "adequately allege that Defendants' Agreements have harmed and will continue to harm competition and consumers." Opp. 26; *see id.* at 27 (arguing that they can "succeed on their Section 7 claim by showing direct evidence of anticompetitive effects").  But to successfully do so, Plaintiffs must plead specific facts showing "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market."  *Amex*, 585 U.S. at 542; *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (finding allegations of increased prices implausible where plaintiff "cite[d] no examples, data, or other facts to support their assertion").  Plaintiffs fail to meet that requirement, citing the portion of their Complaints alleging that harm to competition is "likely to result" in the future, Opp. 26, which consists of conclusory assertions about Defendants' supposed motives to enter the Partnership.  *See* FTC Compl. ¶¶ 78–86; States Compl. ¶¶ 80–88.  Those allegations do not plead actual, ongoing harm to competition.

Plaintiffs' arguments for their Section 7 claim are even weaker.  In arguing that "direct evidence of anticompetitive effects" are sufficient to state a Section 7 claim, Opp. 27, Plaintiffs cite to a single decision, *FTC v. Edwards Lifesciences Corp.*, No. 1:25-cv-02569-RC, 2026 WL 228723, at *23, 29 (D.D.C. Jan. 28, 2026).  But *Edwards Lifesciences* involved a merger of what the court concluded were the only two firms in an innovation market (*i.e.*, a market for the

development of products yet to be released).[9]  That decision has nothing to do with whether Plaintiffs have plausibly alleged direct evidence of anticompetitive effects, where even Plaintiffs admit that many competitors remain in the market, FTC Compl. ¶ 33; States Compl. ¶ 35, and where Plaintiffs have not alleged any actual effects of the Partnership despite it being announced nearly eight months prior to the filing of the Complaints.  Mem. 12.

Seemingly recognizing that they have scant facts to demonstrate anticompetitive effects of the Partnership, Plaintiffs also argue that the Complaints "plausibly plead that Zillow and Redfin have a sufficient share" of the nationwide ILS advertising market.  Opp. 27–28.  Plaintiffs' allegations do not support that contention.

Plaintiffs argue they have carried their burden by alleging that the Partnership reduced the number of ILSs in the market from six to five.  Opp. 27 (listing Zillow, Redfin, CoStar, Apartment List, RentCafe, and Zumper as the competitors).  Unsurprisingly, Plaintiffs have not cited a single decision suggesting that a plaintiff can plead market power or market concentration simply by alleging that the number of competitors has fallen by one.  *Cf. FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 310 (D.D.C. 2020) ("The Court is unaware of a single case in which a court has enjoined a merger, even at this preliminary stage, where the Government failed to show undue concentration in a relevant market as its prima facie case requires, almost always through an HHI or similar metric").  That makes sense—otherwise, any merger of competitors would be presumptively unlawful, no matter their market shares.  And Plaintiffs do not allege facts showing that Redfin had a high market share; rather, Plaintiffs' allegations show Redfin's declining significance and size.  FTC Compl. ¶ 28 (chart); States Compl. ¶ 30; Mem. Ex. A, 8–9.

---

[9] Even in *Edwards Lifesciences* the court, despite concluding that the case was a merger to monopoly, rejected the FTC's argument that there should be a presumption of anticompetitive effects.  2026 WL 228723, at *23.

Plaintiffs also cite Zillow's statement about its high share of "rental listings" and its "large[] audience of renters." Opp. 28. Plaintiffs have not established that these statements are relevant to their alleged market: although, as explained above, Plaintiffs have alleged product markets for *paid* internet advertising, the statements Plaintiffs cite do not distinguish between paid and free advertising on the Zillow platform. Nor are Plaintiffs' statements about Zillow's share of listings relevant because, as Plaintiffs do not contest, advertisers may list the same property on multiple ILSs. FTC Compl. ¶ 82; States Compl. ¶ 84; *see FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 19 (D.D.C. 2021) (finding market-share allegations inadequate where metrics did not adjust for users of multiple social networks); *Compass*, 2026 WL 321084, at *18–19 (rejecting a traffic-based market share because it "does not account for . . . users visiting more than one real estate website").

Furthermore, Plaintiffs do not cite any authority suggesting that vague statements about rental presence are sufficient to overcome a motion to dismiss—particularly absent sufficient allegations of market share. Despite arguing that "Zillow holds a large share of concentrated markets and has market power" "[u]nder any relevant metric," Opp. 28, Plaintiffs do not assign specific shares to Zillow, Redfin, or other competitors. Without individualized shares, they cannot explain why Defendants' shares exceed the thresholds set by the Merger Guidelines. Accordingly, Plaintiffs' allegations are on all fours with *Facebook*, 560 F. Supp. 3d at 4, 18, which recognized that it is not enough to simply assert high shares without any plausible allegations as support.

None of Plaintiffs' attempts to distinguish *Facebook* are persuasive. *First*, Plaintiffs try to narrow that decision to its facts, arguing that the FTC's allegations of market power were insufficient only because that case did not involve "a typical 'goods' market measured in revenue or units." Opp. 29–30 (citing *Facebook*, 560 F. Supp. 3d at 4, 18). Not so. The *Facebook* court dismissed the FTC's complaint because it offered nothing more than "unsupported assertion[s]" to

establish Facebook's 60% market share.  560 F. Supp. 3d at 4.  The Complaints here are even thinner:  Plaintiffs have not alleged *any* estimate of either Zillow or Redfin's market share, let alone sufficient facts to support that assertion.

*Second*, Plaintiffs argue that the *Facebook* complaint "did not identify any of the competitor firms," whereas the Complaints here "provide[d] three metrics for analyzing concentration and identif[ied] Defendants' competitors with specificity."  Opp. 30.  That argument overstates Plaintiffs' allegations and ignores *Facebook's* reasoning.  To start, Plaintiffs' Complaints include no allegations showing that "revenue, traffic, and listings" are appropriate metrics in this case.  FTC Compl. ¶ 72; States Compl. ¶ 74.  And in any event, the FTC's failure to identify competitors was not the problem in *Facebook*.  Instead, the complaint was dismissed because it did not plausibly allege "*how* it calculated its noncommittal market-share number."  *Facebook*, 560 F. Supp. 3d at 20 (emphasis added).  That is the exact problem here.  Mem. 25.[10]

*Third*, Plaintiffs suggest that *Facebook* is distinguishable because it required a showing of "monopoly power," which is a more demanding standard than "market power."  Opp. 29 n.15.  But regardless of whether plaintiffs are pleading monopoly power or market power, they must offer plausible allegations to support the market shares asserted in the complaint.  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213, 216 (4th Cir. 2002) (dismissing Section 1 and Section 2 claims).

## CONCLUSION

For the foregoing reasons, Defendants request that the Plaintiffs' Complaints be dismissed.

---

[10] Plaintiffs' allegations are not "consistent" with the amended complaint in *Facebook*.  Opp. at 30. That complaint used Comscore data to allege specific market shares with respect to daily average users, monthly average users, and time spent on the platform.  *FTC* v. *Facebook*, 581 F. Supp. 3d 34, 46 (D.D.C. 2022).  The Complaints here do not include similar allegations.

Dated:  February 12, 2026

*/s/ Ryan A. Shores*
Ryan A. Shores (VA 65934)
D. Bruce Hoffman (*pro hac vice*)
Blair W. Matthews (*pro hac vice*)
Rathna J. Ramamurthi (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1876
Email: rshores@cgsh.com
Email: bhoffman@cgsh.com
Email: bmatthews@cgsh.com
Email: rramamurthi@cgsh.com

Heather Nyong'o (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
Email: hnyongo@cgsh.com

Beau W. Buffier (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (917) 412-6461
Email: bbuffier@wsgr.com

*Counsel for Defendants Zillow Group, Inc, and Zillow, Inc.*

*/s/ Daniel J. Richardson*
Daniel J. Richardson (VSB 94961)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7024
Facsimile: (202) 293-6330
Email: richardsond@sullcrom.com

Sharon L. Nelles (*pro hac vice*)
Jeffrey T. Scott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street

New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: nelless@sullcrom.com
Email: scottj@sullcrom.com

Kyle W. Mach (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700
Email: machk@sullcrom.com

*Counsel for Defendant*
*Redfin Corporation*

**CERTIFICATE OF SERVICE**

I, Ryan A. Shores, certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated:  February 12, 2026                    */s/ Ryan A. Shores*
                                              Ryan A. Shores (VA 65934)