UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** *Plaintiff*, v. **ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,** *Defendants*. | Case No. 1:25-cv-1638 (AJT-WBP) |
| **COMMONWEALTH OF VIRGINIA, STATE OF ARIZONA, STATE OF CONNECTICUT, STATE OF NEW YORK, and STATE OF WASHINGTON,** *Plaintiffs*, v. **ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,** *Defendants*. | **PUBLIC REDACTED** Case No. 1:25-cv-1647 (AJT-WBP) |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

**Table of Contents**

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................................. 3

ANTITRUST LEGAL FRAMEWORK ................................................................................. 13

SUMMARY JUDGMENT STANDARD ............................................................................... 16

ARGUMENT ......................................................................................................................... 17

I.    THERE IS NO GENUINE DISPUTE AS TO THE RELEVANT MARKETS ................... 17

  A.    ILS Advertising and ILS Advertising for Multifamily Properties Are Relevant Product Markets in Which to Analyze Plaintiffs' Section 7 Claims ....................................................... 17

    1.    ILS Advertising for Rental Properties Is a Relevant Product Market .......................... 20

    2.    ILS Advertising for Multifamily Rental Properties Is a Relevant Product Market ...... 22

    3.    Quantitative Analysis Supports the Proposed Relevant Markets ................................. 23

    4.    ILS Advertising Is Not a Two-Sided Transaction Market ........................................... 25

  B.    The United States Is a Relevant Geographic Market ......................................................... 26

II.   PLAINTIFFS HAVE ESTABLISHED A PRIMA FACIE SECTION 7 CASE ............. 27

  A.    The Agreements Constitute an Acquisition of Assets Under Section 7 ........................... 27

  B.    The Agreements Are Presumptively Illegal Under Section 7 ........................................... 29

CONCLUSION ...................................................................................................................... 30

**Table of Authorities**

**Cases**

*2311 Racing LLC v. NASCAR*,
 809 F. Supp. 3d 371 (W.D.N.C. 2025).................................................................................. 17, 26

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ...................................................................................................................... 16

*Bell Microprods., Inc. v. Global-Insync, Inc.*,
 20 F. Supp. 2d 938 (E.D. Va. 1998)........................................................................................... 16

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ......................................................................................................... 17, 20, 26

*Compass, Inc. v. Zillow, Inc.*,
 No. 25-CV-05201, 2026 WL 321084 (S.D.N.Y. Feb. 6, 2026)................................................ 27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
 637 F.3d 435 (4th Cir. 2011)....................................................................................................... 26

*Emmett v. Johnson*,
 532 F.3d 291 (4th Cir. 2008)....................................................................................................... 16

*FTC v. Edwards Lifesciences Corp.*,
 No. CV 25-2569 (RC), 2026 WL 228723 (D.D.C. Jan. 28, 2026) ........................................... 15

*FTC v. Indiana Fed'n of Dentists*,
 476 U.S. 447 (1986) ...................................................................................................................... 14

*FTC v. IQVIA Holdings Inc.*,
 710 F. Supp. 3d 329 (S.D.N.Y. 2024)........................................................................................ 20

*FTC v. Kroger Co.*,
 No. 3:24-CV-00347, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ....................................... 19, 24

*FTC v. Peabody Energy Corp.*,
 492 F. Supp. 3d 865 (E.D. Mo. 2020)................................................................................... 19, 22

*FTC v. Phoebe Putney Health Sys., Inc.*,
 793 F. Supp. 2d 1356 (M.D. Ga. 2011)...................................................................................... 28

*FTC v. Surescripts, LLC*,
 665 F. Supp. 3d 14 (D.D.C. 2023) ..................................................................................... 17, 20, 24

*FTC v. Sysco Corp.*,
 113 F. Supp. 3d 1 (D.D.C. 2015) ......................................................................................... 19, 24

*FTC v. Tapestry, Inc.*,
 755 F. Supp. 3d 386 (S.D.N.Y. 2024)................................................................................... 15, 30

*FTC v. Wilhelm Wilhelmsen Holding ASA*,
 341 F.Supp.3d 27 (D.D.C. 2018) ......................................................................................... 23, 24

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   587 F. Supp. 3d 356 (E.D. Va. 2022) ....................................................................... 17

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) ................................................................................ 14

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
   415 F. Supp. 3d 703 (E.D. Va. 2019) ....................................................................... 14

*N. Tex. Specialty Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) .................................................................................... 14

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
   468 U.S. 85 (1984) .................................................................................................... 14

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ...................................................................................... 14, 18, 25

*Polygram Holding, Inc. v. FTC*,
   416 F.3d 29 (D.C. Cir. 2005) ................................................................................... 13

*Robinson v. NCAA*,
   172 F.4th 271 (4th Cir. 2026) .................................................................................. 14

*Times-Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953) ............................................................................................ 18, 20

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ....................................................................................... 25

*United States v. Aetna Inc.*,
   240 F. Supp. 3d 1 (D.D.C. 2017) ....................................................................... 18, 20

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ................................................................................. 15

*United States v. Archer-Daniels-Midland Co.*,
   584 F. Supp. 1134 (S.D. Iowa 1984) ........................................................................ 28

*United States v. Bertelsmann SE & Co. KGaA*,
   646 F. Supp. 3d 1 (D.D.C. 2022) ............................................................................. 17

*United States v. Columbia Pictures Corp*,
   189 F. Supp. 153 (S.D.N.Y. 1960) ..................................................................... 27, 28

*United States v. E. I. du Pont de Nemours & Co*,
   351 U.S. 377 (1956) .................................................................................................. 18

*United States v. Google LLC* (“*Google Ad Tech*”),
   778 F. Supp. 3d 797 (E.D. Va. 2025) ......................................................... 20, 22, 25

*United States v. Google LLC* (“*Google Search*”),
   747 F. Supp. 3d 1 (D.D.C. 2024) ....................................................................... 20, 24

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................................... 24

*United States v. ITT Cont'l Baking Co.*,
    485 F.2d 16 (10th Cir. 1973).............................................................................. 28

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963) ....................................................................................... 15

*United States v. U.S. Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023)............................................................................. 14

*Unites States v. Grinnell Corp.*,
    384 U.S 563 (1966) ....................................................................................... 26

**Statutes and Rules**

15 U.S.C. § 1.................................................................................................... 13

15 U.S.C. § 18.......................................................................................... 14, 27

Fed R. Civ. P. 56............................................................................................. 16

**Other Authorities**

2010 Merger Guidelines ............................................................................ 15, 29

2023 Merger Guidelines .................................................................................. 17

**INTRODUCTION**

Plaintiffs challenge two facially anticompetitive agreements: the Partnership Agreement and the Content License Agreement (collectively, the "Agreements"). Pursuant to the Agreements, Zillow paid its competitor Redfin at least $100 million to exit the market, stop competing for multifamily advertising customers, and transfer assets associated with its Internet Listing Service ("ILS") advertising business to Zillow.

This Court has already determined that the Agreements should be assessed under the "quick look" framework to determine whether they violate Section 1 of the Sherman Act. Applying quick look simplifies the Court's Section 1 analysis because the Court may presume that the Agreements caused and will continue to cause anticompetitive harm; the Court thus need not engage in a cumbersome evaluation of market definition and power to decide the issue of Section 1 liability.

It is appropriate now for the Court to similarly limit the triable issues under Section 7 of the Clayton Act because the undisputed facts establish Plaintiffs' alleged relevant markets and that the Agreements constitute a presumptively harmful acquisition. Such a conclusion would significantly streamline the scheduled trial in this matter.

*First*, both nationwide ILS advertising for rental properties and nationwide ILS advertising for multifamily rental properties are properly defined antitrust markets in which to assess Plaintiffs' Section 7 claims. The undisputed facts—elicited from nearly a dozen Property Management Companies ("PMCs") and every major ILS provider, including Defendants—demonstrate that ILS advertising is a unique and differentiated advertising product that provides specialized services to rental advertising customers, including multifamily rental property managers. Defendants have tried in vain to demonstrate that other forms of advertising, including

Search Engine Marketing ("SEM"), social media advertising, "and more," are reasonably interchangeable with ILS advertising, but the undisputed evidence proves that they are not. Defendants' attempts to require a two-sided market definition also fail. ILS advertising is not a two-sided transaction market because the undisputed evidence shows that ILS advertising does not facilitate a single, simultaneous transaction between prospective renters and advertising customers. Finally, Defendants cannot dispute that the United States is a relevant geographic market because Defendants and their competitors operate on a nationwide scale, advertising customers specifically choose ILSs with a nationwide presence, and advertising customers cannot turn to local ILS providers to replace national suppliers.

*Second,* the Agreements effectuate an acquisition of assets under Section 7 of the Clayton Act, a broad and flexible statute that prohibits harm to competition from many different types of transactions. Under the Agreements, Zillow not only acquired assets including Redfin's customer relationships and confidential information, but also secured Redfin's exit from the market and the right to be the exclusive source of multifamily listings on Redfin's websites.

*Finally*, Plaintiffs are entitled to a presumption that the Agreements are likely to substantially lessen competition because the relevant markets were highly concentrated prior to the Agreements, and the removal of Redfin from the market and the transfer of its customer relationships and other assets to Zillow resulted in a significant increase in concentration. Experts for both sides calculated market concentration using a variety of metrics, and their work establishes that the presumption of illegality applies here.

This trial need not be complicated. Defendants have entered into facially anticompetitive Agreements that, whether viewed as an agreement or an acquisition, are presumed to harm competition for ILS advertising. In addition to this presumption, the facts will prove that

2

Redfin's exit from the market will result in higher prices, decreased quality, and decreased innovation for ILS advertising, harming advertising customers and renters alike. The only real question for trial is whether Defendants' unsubstantiated and amorphous claims of "benefits" can justify the clear and obvious harm to competition that has already occurred and will continue to arise from the Agreements. Plaintiffs are confident that the Court will reject those claims, which are the only issues that need to be decided at trial.

## STATEMENT OF UNDISPUTED FACTS

1.      On February 6, 2025, Zillow and Redfin signed the Agreements. Ex. 1; Ex. 2.

2.      The Agreements apply nationwide. Def. Redfin Ans. to FTC Compl. ("Redfin Ans.") ¶ 68; Def. Redfin Ans. to Pl. States Compl. ("Redfin State Ans.") ¶ 70.

3.      Prior to the Agreements, Redfin competed with Zillow and others to provide ILS advertising for multifamily rental properties. Redfin Ans. ¶ 51; Redfin State Ans. ¶ 53.

4.      Pursuant to Section 3 of the CLA, Redfin cannot display (and has not displayed) any non-Zillow multifamily listings and thus cannot compete (and has not competed) for multifamily advertising customers. Ex. 2, at -006; Ex. 3, No. 5. This prohibition on competition will last for at least five and up to nine years. Ex. 2, at -001.

5.      On February 19, 2025, pursuant to ▬▬▬▬▬ of the Partnership Agreement, Zillow paid $100 million dollars to Redfin. Ex. 4, No. 1.

6.      Zillow's ▬▬▬▬▬▬▬▬▬▬ and securities filings treated the $100 million as payment for intangible assets; namely, Redfin's customer relationships. Ex. 5, at -018; Ex. 6, 129:11–130:21.

7.      In the Partnership Agreement, Redfin agreed to use its "reasonable best efforts" to help Zillow sign contracts with Redfin's multifamily advertising customers, including by

3

introducing Redfin's customers to Zillow sales representatives via email and providing updates to Zillow sales representatives on all correspondence with each customer. Ex. 1, at -002. Redfin complied with these obligations. Ex. 3, No. 3.

8.    On June 15, 2025, Redfin removed all remaining non-Zillow multifamily property listings from its ILSs. Pl. FTC Compl. ¶ 50 ("FTC Compl."); Pl. States Compl. ("State Compl.") ¶ 52; Redfin Ans. ¶ 50; Redfin State Ans. ¶ 52.

9.    Pursuant to the Agreements, Redfin agreed to terminate all contracts with its multifamily advertising customers by the Hard Transition Date: July 31, 2025. Ex. 1, at -002–03; Ex. 2, at -006. Redfin complied with this requirement. Ex. 3, No. 4.

10.    As of August 12, 2025, Zillow had signed contracts with Redfin's multifamily advertising customers covering ███████ out of an estimated ███████ properties that were previously listed on Redfin but not Zillow. FTC Compl. ¶ 47; State Compl. ¶ 49; Def. Zillow Ans. to FTC Compl. ("Zillow Ans.") ¶ 47; Def. Zillow Ans. to Pl. States Compl. ("Zillow State Ans.") ¶ 49.

11.    As required by the Partnership Agreement, Redfin provided competitively sensitive information to Zillow about ███████████████████████████████, including ████ ████████████████████████████████████████████████████████████ ███████████ FTC Compl. ¶ 46; State Compl. ¶ 48; Zillow Ans. ¶ 46; Zillow State Ans. ¶ 48; Redfin Ans. ¶ 46; Redfin State Ans. ¶ 48. Redfin also provided Zillow with data on ███████ ██████████████████████ as well as information about ████████████████ ███████████ FTC Compl. ¶ 49; State Compl. ¶ 51; Zillow Ans. ¶ 49; Zillow State Ans. ¶ 51; Redfin Ans. ¶ 49; Redfin State Ans. ¶ 51.

12.    In connection with the Agreements, Redfin terminated approximately 450 employees, ███████████████████████████████████████████ FTC Compl. ¶ 48;

4

State Compl. ¶ 50; Redfin Ans. ¶ 48; Redfin State Ans. ¶ 50; Ex. 7, 64:15–18, 65:19–23; Ex. 8, 69:22–70:15. Then, pursuant to Section 4.1 of the Partnership Agreement, Redfin provided Zillow with confidential employee information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Ex. 1, at -003; Ex. 3, No. 2; FTC Compl. ¶ 48; State Compl. ¶ 50; Redfin Ans. ¶ 48; Redfin State Ans. ¶ 50; Zillow Ans. ¶ 48; Zillow State Ans. ¶ 50. Zillow hired ▮▮▮▮▮▮ former Redfin sales employees. FTC Compl. ¶ 48; State Compl. ¶ 50; Zillow Ans. ¶ 48; Zillow State Ans. ¶ 50.

13.    Rental ILSs serve two distinct groups of customers. FTC Compl. ¶ 27; State Compl. ¶ 29; Redfin Ans. ¶ 27; Redfin State Ans. ¶ 29; Ex. 9, 13:1–8, 13:13–15, 14:5–7. PMCs, landlords, and other types of property managers (together, "advertising customers") use rental ILSs to advertise their properties to prospective renters. Ex. 9, 14:5–7; Ex. 10, at -006. Prospective renters use ILSs to search for housing. Ex. 9, 139:14–139:18.

14.    The term "ILS" is recognized and widely used in the rental industry to refer to providers of advertising services, including Zillow and Redfin. Ex. 11, 147:20–148:1; Ex. 12, 21:19–23; Ex. 13, 23:7–10; Ex. 14, 82:10–14. ILSs are ▮▮▮▮▮▮▮▮▮ for advertising rental properties and include user-friendly features and detailed property information specifically designed to aid prospective tenants in finding an available rental. Ex. 9, 12:14–13:8. This information includes floor plans, photographs, real-time availability information, and building amenity information, organized to accommodate prospective renters and facilitate consumer engagement with the rental listing. Ex. 9, 13:1–8; Ex. 15, 145:23–147:19.

15.    ILSs provide advertising customers with exposure to a large audience of potential renters. Ex. 16, 47:3–49:3. ILS advertising products determine how much exposure a customer's

listing receives, as well as its placement within search results on the ILS. Ex. 17, 50:16–51:2; Ex. 18, 41:12–42:4.

16.     ILSs offer prospective renters a large inventory of available properties and the ability to use filters and mapping tools to customize search results. Ex. 15, 145:10–22; Ex. 18, 17:24–18:6. These features help high-intent renters find advertising customers' properties and ultimately provide value to advertising customers in the form of leads and leases for their available units. Ex. 19, 135:24–136:2; Ex. 20, 62:2–9, 102:22–103:10; Ex. 6, 173:4–174:12.

17.     Prospective renters use an ILS to identify a property for rent, but the resulting leasing transactions for multifamily rental properties take place off of the ILS, typically through the PMC's website. Ex. 12, 82:14–17; Ex. 6, 229:23–230:5. First, renters may choose to submit "leads" (i.e., requests for more information about listings) through the ILS, which are sent to the PMC associated with each listing. Ex. 17, 18:22–19:2. Then, the PMC may contact the renter, sometimes multiple times and through different non-ILS communication channels, to encourage them to tour the property or speak with a leasing agent. Ex. 15, 136:16–138:16; Ex. 17, 30:20– 31:11. ILSs and PMCs use tracking systems to assess lead conversion and ILS performance, and to try to determine which leases resulted from a listing on a specific ILS. Ex. 18, 65:3–13; Ex. 17, 19:22–20:6; Ex. 16, 38:25–42:12.

18.     There is no evidence in the record that ILS advertising facilitates a single, simultaneous transaction between advertising customers and prospective renters.

19.     The industry recognizes multifamily properties as a distinct ███████████ ███████████████████ Ex. 9, 18:22–19:13; *see also* Ex. 11, 83:5–16. ██████ defines multifamily properties as those with 25 units or more. Ex. 6, 85:16–86:9. The term "longtail" is commonly

used in the industry to refer to non-multifamily properties. Ex. 21, 26:24–27:2; Ex. 22, 140:22–25; Ex. 11, 82:23–83:16.

20.    ILSs employ different business strategies for their multifamily and longtail advertising services. *Compare* Ex. 23, *and* Ex. 24, *with* Ex. 25. ILSs offer distinct products and differential pricing to multifamily and longtail advertising customers. *See* Ex. 26, at -016; Ex. 9, 20:8–21:14, 21:25–22:3 (explaining that ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████). ██████████████████████ offered specific advertising options and prices to multifamily customers prior to the Agreements. *See* Ex. 26, at -016; Ex. 24, at -002-03. Only property managers or owners of buildings with 25 units or more can obtain multifamily advertising products ████████. Ex. 27, at -003; Ex. 28, at -004.

21.    Multifamily advertising customers pay for ILS advertising in one of two ways: through tiered subscriptions or pay-per-lease. FTC Compl. ¶ 61; State Compl. ¶ 63; Zillow Ans. ¶ 61; Zillow State Ans. ¶ 63. ILS advertising contracts for multifamily customers are typically individually negotiated. *See* Ex. 18, 18:22–20:2; Ex. 29, 19:24–22:13.

22.    Multifamily and longtail advertising customers have different advertising budgets and advertising needs. Ex. 30, 37:5–13, 38:20–39:19, 40:13–41:3; Ex. 31, 150:20–151:7. Multifamily advertising customers require large numbers of leads and leases to meet the vacancy requirements of large multiunit buildings. *E.g.* Ex. 32, 242:14–21 (██████████████████ ███████████████████████████████████████████████████████████ ██████████████████████); Ex. 31, 18:4–9 (██████████████████████ ██████████████████████████████████████████████████.

7

23.    Advertising customers may also use Artificial Intelligence ("AI") tools, SEM, Search Engine Optimization ("SEO"), and social media advertising. But AI tools, SEM, SEO, and social media advertising do not offer the comprehensive listing information, search and filtering features, or integrated property comparison tools that ILSs offer. *See* Ex. 15, 146:6–19; Ex. 19, 135:5–136:2 (

); Ex. 33, 117:2–11. ILS providers acknowledge that other forms of rental advertising are fundamentally different from the rental advertising provided by ILSs. Ex. 6, 34:11–35:8 (

; Ex. 34, 18:17–19:6 (

; Ex. 35, 204:25–207:16, 232:10–234:19; Ex. 36, at -024–36; Ex. 37, at -051–57. ILSs themselves offer tools that use social media and search advertising to boost the efficacy of, rather than replace, advertising on their ILSs. Ex. 38, at -001; Ex. 39, at -003; Ex. 33, 46:2–17, 49:15–25, 54:6–55:7.

24.    PMCs testified that other advertising channels reach different audiences and accomplish different goals because they reach potential renters at different points in their apartment search. Ex. 15, 51:13–53:1, 151:20–152:15; Ex. 18, 61:18–19. PMCs also testified that they cannot replace ILS advertising because other forms of advertising for multifamily properties do not provide the same quantity and quality of leads that ILSs do. Ex. 33, 22:3–10, 117:2–22, 194:19–197:8

); Ex. 32, 241:8–243:4

██████████████████████████████████████████

████ ; Ex. 17, 32:12–17; Ex. 18, 26:18–27:21, 32:1–33:3.

25.     Multifamily advertising customers use AI tools and ILS advertising for different purposes; for example, PMCs may use AI tools to follow up on leads provided by ILSs. Ex. 18, 141:11–21; Ex. 17, 144:9–24. Like general search engines, AI search queries often direct users to an ILS platform to find rental listings. Ex. 40, at -012.

26.     SEM is a form of advertising whereby customers pay general-purpose search engines such as Google and Bing to display advertisements in response to certain queries. Ex. 41. Advertisers using SEM participate in keyword auctions and bid on specific search terms, paying a price-per-click (that is, they pay the auction-based fee only if a person clicks on their advertisement that appears alongside the search results for their chosen keywords). Ex. 20, 33:7–22. Anyone can use SEM to advertise any type of product or service—it is not limited or tailored in any way to rental advertising.

27.     ILSs are themselves advertising customers of general-purpose search engines: ILSs participate in SEM auctions for rental-related keywords and ██████████████████████ to market their advertising portals to prospective renters. *See* Ex. 34, 14:17–15:8; Ex. 35, 203:20–204:3; Ex. 22, 139:3–25.

28.     SEO describes efforts to improve the visibility of a website within organic (i.e., non-paid) search results on a general-purpose search engine. Ex. 15, 155:5–12, 155:24–158:24; Ex. 29, 203:1–16; Ex. 42, at -002. Anyone with a website can use SEO—it is not limited or tailored in any way to rental advertising. As with SEM, ILSs use SEO to attract renters to their platforms from search engines. Ex. 43, at -002; Ex. 37, at -010.

29.     Social media advertising refers to advertising on platforms like Facebook, Instagram, and TikTok. These advertisements are typically priced on a cost-per-impression, cost-per-click, or cost-per-action basis, each of which triggers a fee when a user on the social media platform takes a given action. *See* Ex. 44, at -002–004; Ex. 45, at -002. Social media platforms typically rely on auction-based systems whereby advertisers bid for placements. *See* Ex. 46, at -005. Anyone can use social media advertising—it is not limited or tailored in any way to rental advertising.

30.     Ordinary course documents show that ▮▮▮▮▮▮▮ distinguish between competition from ILS and non-ILS advertising and consider those sets of competitors differently. In 2023, ▮▮▮ noted in internal documents that it ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 47, at -005. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ *See* Ex. 48, at -006, -008–009, -011, -019–025; Ex. 49, at -026–034. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *See* Ex. 50, at -003; Ex. 51, at -003, -011–012, -030. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Ex. 52, at -004–012; Ex. 53, at -002–003.

31.     Apartments.com, Apartment List, Redfin, and Zillow all have a national presence, which increases their brand awareness. Ex. 18, 77:15–23; Ex. 11, 167:8–13; Ex. 12, 49:15–50:16; Ex. 14, 127:5–9; Ex. 15, 181:7–14; Ex. 17, 105:22–106:13. A national presence is important for ILSs to compete for advertising customers. Ex. 35, 167:6–168:2; Ex. 7, 113:11–14.

32.     While PMCs were readily able to identify one or more national ILSs that they use, PMC representatives could not identify any regional or local ILS that they use apart from

10

StreetEasy, which is owned by Zillow. Ex. 18, 77:7–10; Ex. 14, 129:8–10; Ex. 15, 92:21–24. Similarly, ILSs were unable to identify any regional or local ILS that they consider to be a competitor. *See* Ex. 7, 202:1–6; Ex. 12, 50:17–21; Ex. 35, 167:14–168:2.

33.      PMCs prefer and often sign nationwide contracts with ILSs, which centralize pricing across multiple properties in multiple states, as opposed to contracts on a property-by-property or region-by-region basis. *See* Ex. 17, 103:17–104:21; Ex. 15, 179:2–11, 181:16–182:6; Ex. 54, 37:1–13.

34.      ILSs implement national policies and user interfaces. Ex. 55, at -008, -009. ILSs measure their market share using national metrics. Ex. 55, at -009–10; Ex. 26, at -004 (citing U.S. audience metrics). ILSs offer access to their platforms from anywhere in the United States. Ex. 7, 200:8–202:6.

35.      Prior to the Agreements at issue here, the firms that were competitively relevant in the markets for ILS advertising for rental properties and multifamily rental properties were CoStar, Zillow, Redfin, Apartment List, and Zumper. Ex. 56, ¶ 306, Ex. 34 ███████████ ████████████████████████████████████████████████████████ ██████████████████).

36.      Zillow publicly touts that it has "the largest audience of renters on the market" and is "the most searched Rentals marketplace." Ex. 57, at -007–08.

37.      Before the Agreements at issue here, Redfin considered itself the ██████████ ██████████████████████████████ Ex. 7, 180:14–18.

38.      By any metric used by either side's expert to calculate market share and market concentration in the nationwide markets for ILS rental advertising and ILS rental advertising for

11

multifamily rental properties, Zillow is one of the two leading providers of ILS advertising. Ex. 58, ¶¶ 169, 178, 184, Tables 7, 9–10; Ex. 56, ¶ 306, Ex. 34.

39.    By any metric used by either side's expert to calculate market share in the nationwide markets for ILS rental advertising and ILS rental advertising for multifamily rental properties, Redfin is the third or fourth most significant provider of ILS advertising. Ex. 58, ¶¶ 169, 178, 184, Tables 7, 9–10; Ex. 56, ¶ 306, Ex. 34.

40.    Plaintiffs' economic expert, Dr. Jeremy Verlinda, calculates market shares and Herfindahl-Hirschman indexes ("HHIs"), for nationwide ILS advertising for rental properties and nationwide ILS advertising for multifamily rental properties based on several different metrics: revenue, leads, and traffic. Ex. 58, ¶¶ 23, 190, 193, Table 1.

41.    For each metric used and relevant market examined by Dr. Verlinda, the HHIs were greater than 2,500 before the Agreements, and the post-Agreements HHIs show a change of more than 200 points. Ex. 58, ¶¶ 23, 190, 193, Tables 1, 11, 13. ███████████████████ ██████████████████████████████. Ex. 56, ¶¶ 303–04.

42.    ██████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████ Ex. 56, ¶¶ 305–06, Ex. 34; Ex. 59, 274:18–275:5, 278:6–279:20. The HHIs calculated based on revenue, leads, and traffic by Dr. Verlinda and ██████████████████████████ are re-produced in the following table. Ex. 58, Tables 11, 13; Ex. 56, ¶ 306, Ex. 34.

**Table 1: HHIs**

| | Revenue (ILS) | Leads (ILS) | Revenue (multifamily) | Leads (multifamily) | Traffic (ILS) | |
|---|---|---|---|---|---|---|
| **Pre-Agreements** | 4499 | 3410 | 4675 | 2853 | 3761 | ███ |
| **Post-Agreements** | 4854 | 4088 | 5003 | 3521 | 4696 | ██ |
| **Change in HHI** | 355 | 678 | 329 | 669 | 935 | ██ |

## ANTITRUST LEGAL FRAMEWORK

Plaintiffs challenge Defendants' unlawful Agreements under two separate provisions of the federal antitrust laws, Section 1 of the Sherman Act and Section 7 of the Clayton Act. Under both statutes, courts can simplify their analysis of illegality when certain factors support a *presumption* that the challenged conduct is harmful to competition. Here, the Court already determined that such a presumption is appropriate with respect to the Section 1 claim through the application of the quick look framework. The undisputed facts establish that Plaintiffs are entitled to a similar presumption under Section 7.

**Sherman Act, Section 1:** Section 1 prohibits "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce or among the several States." 15 U.S.C. § 1. As this Court recently concluded, "quick look is the appropriate framework" for evaluating the legality of the Agreements under Section 1. Mot. to Dismiss Order (Doc. 154) ("MTD Order") at 3–4 n.4. The quick look analysis presumes anticompetitive harm, which defendants can then rebut with evidence that the restraint serves a legitimate procompetitive objective. *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36 (D.C. Cir. 2005); *see also Lumber*

13

*Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 712 n.9 (E.D. Va. 2019) (where "an anticompetitive effect seems evident, the burden shifts to the defendant to show that the restraint in fact serves a legitimate procompetitive objective"). Unlike the full rule of reason analysis, which "requires a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition," *Robinson v. NCAA*, 172 F.4th 271, 290 (4th Cir. 2026) (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018), internal quotations omitted), quick look does not require the Court to find either a relevant market or the existence of market power within that relevant market. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109 (1984); *see also Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998) (applying quick look and upholding grant of plaintiffs' summary judgment motion on their Section 1 claims); *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 362–63, 370 (5th Cir. 2008) (affirming the FTC's condemnation of restraint deemed "inherently suspect" even though FTC did not define relevant markets).

**Clayton Act, Section 7**: Section 7 of the Clayton Act prohibits acquisitions of assets where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Courts employ a three-step burden-shifting framework to assess whether an acquisition violates Section 7, where plaintiffs must first "establish a prima facie case" by proposing a proper relevant market and showing that the acquisition's effect "in that market is likely to be anticompetitive." *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 203 (3d Cir. 2023); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021). The burden then shifts to the defendant to rebut the prima facie case by either "discrediting [plaintiff's] market-concentration evidence" or showing that the evidence "inaccurately predicts the merger's probable effect on competition." *Steves & Sons*, 988 F.3d at

14

703–04. If the defendant successfully rebuts the prima facie case, "the burden of producing additional evidence of anticompetitive effect shifts to the plaintiff, and merges with the ultimate burden of persuasion, which remains with the plaintiff at all times." *United States v. Anthem, Inc.*, 855 F.3d 345, 350 (D.C. Cir. 2017) (quotations omitted).

The typical way to determine whether an acquisition is likely to have anticompetitive effects is by assessing concentration in the relevant market through the "Herfindahl-Hirschman Index." *Steves & Sons*, 988 F.3d at 703–04. This calculation accounts for both "the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases." *FTC v. Edwards Lifesciences Corp.*, No. CV 25-2569 (RC), 2026 WL 228723, at *22 (D.D.C. Jan. 28, 2026) (quotations omitted). Where, as here, an acquisition "produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market," it is presumed to be anticompetitive and unlawful. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963). "A merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly." *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 459 (S.D.N.Y. 2024) (quoting 2023 Merger Guidelines § 2.1 and applying structural presumption). "[M]arkets with an HHI greater than 1,800 are considered 'highly concentrated.'" *Id.* at 458-59 (quoting 2023 Merger Guidelines § 2.1); *see also Edwards*, 2026 WL 228723, at *22 (same).[1]

---

[1] Under the prior 2010 Merger Guidelines, "a market with [an HHI] above 2,500 is highly concentrated, and a merger that increases such a market's [HHI] by more than 200 points is presumptively anticompetitive." *Steves & Sons*, 988 F.3d at 704 (citing 2010 Merger Guidelines § 5.3).

15

Because quick look is the "applicable . . . framework of review" for Plaintiffs' Section 1 claims, MTD Order at 3, the issues of market definition, concentration, and power are relevant only to Plaintiffs' Section 7 claims. But these issues can be resolved before trial because undisputed evidence establishes that (a) these Agreements constitute an acquisition under the law, (b) Plaintiffs' relevant markets are proper, and (c) the pre-Agreements HHIs in the relevant markets and the changes in HHI caused by the Agreements establish a presumption of likely anticompetitive effects. As a result, the Court can significantly streamline the trial by holding as a matter of law that Plaintiffs are entitled to a presumption of harm under both claims.

## SUMMARY JUDGMENT STANDARD

A party may move for summary judgment on "each claim or defense—or the part of each claim or defense" as to which "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Bell Microprods., Inc. v. Global-Insync, Inc.*, 20 F. Supp. 2d 938, 941 (E.D. Va. 1998) ("[S]ummary judgment may be granted as to any part of a claim.").

A dispute is "genuine" only if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it "might affect the outcome . . . under the governing law." *Id.* A mere "scintilla" of evidence for the non-moving party does not preclude summary judgment. *Id.* at 252. "Nor can the nonmoving party 'create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (*quoting Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

Courts routinely grant partial summary judgment in antitrust cases as to market definition and other elements of an antitrust claim, narrowing the remaining issues to be resolved at trial. *In*

16

*re Zetia (Ezetimibe) Antitrust Litig.*, 587 F. Supp. 3d 356, 366 (E.D. Va. 2022) (granting partial summary judgment on market definition); *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 49 (D.D.C. 2023) (granting partial summary judgment on market power and monopoly power, leaving "anticompetitive effects" as the "only remaining issue" for trial); *2311 Racing LLC v. NASCAR*, 809 F. Supp. 3d 371, 379 (W.D.N.C. 2025) (granting partial summary judgment on product and geographic market definition and market power).

## ARGUMENT

### I.  THERE IS NO GENUINE DISPUTE AS TO THE RELEVANT MARKETS

#### A.  ILS Advertising and ILS Advertising for Multifamily Properties Are Relevant Product Markets in Which to Analyze Plaintiffs' Section 7 Claims

A relevant product market is "the area of effective competition" between products or services. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The object of defining a relevant product market in cases arising under Section 7 of the Clayton Act is to identify whether there is "any line of commerce" in which the acquisition "may substantially lessen competition." *Id.* at 325; *see also* 2023 Merger Guidelines, § 4.3. The potential harm from an acquisition may occur in multiple markets, or within a broad market and additional narrower markets. *See, e.g.*, *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022) ("[E]ven if alternative submarkets exist […], or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable."); *Brown Shoe*, 370 U.S. at 325 (noting that submarkets within a broader market may be relevant product markets for antitrust purposes).

The undisputed facts show that both ILS advertising and ILS advertising for multifamily

17

properties are relevant antitrust product markets in this case.[2] ILS advertising is a unique and differentiated advertising product that provides specialized services to rental advertising customers, including multifamily rental properties. There are, of course, many forms of advertising that rental advertising customers can use to advertise their units, from search engines to social media, to newspapers and magazines, to signage outside of apartment buildings. But the existence of these other forms of advertising—all of which can be used to advertise any product and are not unique or tailored for rental advertising—says nothing about whether ILS advertising and ILS multifamily advertising are relevant product markets in this case. When defining a relevant antitrust product market, "[n]ot every competitor—not even every competitor with a functionally interchangeable product—must be included in the product market." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 23 (D.D.C. 2017). Instead, the relevant market should include only those products that are "*reasonably* interchangeable," *United States v. E. I. du Pont de Nemours & Co*, 351 U.S. 377, 395 (1956) (emphasis added), and should "*exclude* any other product to which, within reasonable variations in price, only a limited number of buyers will turn," *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) (emphasis added).

A product may be sufficiently distinct and constitute a relevant antitrust product market even where it serves the same general purpose and is purchased by the same customers as products *excluded* from the market. In *FTC v. Peabody Energy Corp.*, for example, the court enjoined a joint venture combining certain assets of the two largest coal producers in the United

---

[2] Because the quick look framework applies to Plaintiffs' Section 1 claims, the Agreements may be deemed anticompetitive and unlawful under Section 1 without a defined market. *See infra* at 2. To the extent that Plaintiffs must establish a relevant market to prove their Section 1 claim, the analysis herein applies equally to relevant markets under Section 1. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (in a Section 1 case, "the relevant market is defined as the area of effective competition. Typically this is the arena within which significant substitution in consumption or production occurs.") (quotations omitted).

States because it was likely to harm competition in the market for "SPRB" coal, even though"[i]t is indisputable […] that coal competes with natural gas and renewables in a broader energy market." 492 F. Supp. 3d 865, 886 (E.D. Mo. 2020). The discrete market for SPRB coal was appropriate even though the same customers routinely bought other fuels, because there was a "distinct competitive market among [the] coal producers" and SPRB coal satisfied customer needs and preferences that could not be satisfied by other fuels. *Id.* at 886, 899.

Evidence that customers "cross-shop" or spread their budgets around various options does not mean that all of those options must be in the same antitrust market. In *FTC v. Kroger Co.*, the court enjoined a merger between two of the largest grocers in the United States that would harm competition in the "supermarket" market, even though customers "cross-shop" among supermarkets and other types of stores like natural and gourmet stores, club stores, and limited assortment stores. No. 3:24-CV-00347, 2024 WL 5053016, at *9–10, 30, 39 (D. Or. Dec. 10, 2024). While customers may allocate their grocery spending across different types of stores, "this does not necessarily show that those retailers are reasonably interchangeable substitutes for a consumer's particular needs." *Id.* at *10; *accord FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 31 (D.D.C. 2015) (holding that "broadline food distribution" was a relevant product market even though customers cross-shopped across broadline and other channels of food distribution and were able to move large amounts of their business between channels).

Courts have drawn these distinctions in advertising markets, holding that forms of advertising that are not close substitutes need not be included in the same product market. In the seminal product market case *Times-Picayune Pub. Co. v. United States*, the Supreme Court upheld newspaper advertising as a product market in part because "[t]he advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in

19

other mass media." 345 U.S. at 612 n.31; *see also FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024) (concluding that healthcare professional programmatic advertising is a relevant antitrust product market and excluding social media, Google, and other websites from the product market); *United States v. Google LLC* ("*Google Search*"), 747 F. Supp. 3d 1, 129–30 (D.D.C. 2024) ("The fact that advertisers may move money between [different advertising products] to achieve varying goals does not make them substitutes.").

### 1.    ILS Advertising for Rental Properties Is a Relevant Product Market

In *Brown Shoe*, the Supreme Court identified "practical indicia" based on real-world evidence to help courts determine the boundaries of a product market for antitrust purposes. 370 U.S. at 325. These practical indicia are "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* Not all of these indicia must be present to demonstrate the existence of a relevant product market, even at summary judgment. *See United States v. Google LLC* ("*Google Ad Tech*"), 778 F. Supp. 3d 797, 833–40 (E.D. Va. 2025) (relying on certain *Brown Shoe* "practical indicia" to find relevant advertising product markets); *Surescripts*, 665 F. Supp. 3d at 41 (granting partial summary judgment for the plaintiff on product market when "the *Brown Shoe* factors viewed in totality support" the proffered product market—even if "there is a factual dispute as to the application of [one] factor"). Applying the relevant *Brown Shoe* indicia to the undisputed facts in this case shows that ILS advertising for rental properties and ILS advertising for multifamily rental properties are distinct antitrust product markets.

*Industry recognition.* Courts pay particular attention to evidence from industry participants and a defendant's ordinary-course documents when assessing the product market. *Aetna*, 240 F. Supp. 3d at 21; *see Google Ad Tech*, 778 F. Supp. 3d**Error! Bookmark not**

**defined.** at 834–35, 838 (evidence from industry participants and defendant's ordinary-course documents indicate recognition of distinct advertising products). Advertising customers testified that they view ILS advertising as providing features, capabilities, and results that other forms of advertising do not. SUF ¶¶ 23, 24. PMCs believe ILSs and other forms of advertising reach different audiences, and they do not consider ILS advertising and non-ILS advertising interchangeable. SUF ¶ 24. One PMC testified that while they do not ███████████████ █████████████████████████████████████████ SUF ¶ 24. Both Defendants' ordinary course documents show that they ███████████████████████████████████ ███████████████████████████████████ SUF ¶ 30. Other ILSs similarly ██████ █████████████████████████████ SUF ¶ 30.

*Specialized vendors.* ILSs are ███████████ for advertising and searching for rental properties. SUF ¶ 14. ILSs provide a centralized portal through which advertising customers can list information about their vacant properties, including floor plans, photographs, real-time vacancy information, and building amenity information. SUF ¶ 14. ILSs offer a large inventory of available properties for rent and the ability for prospective renters to use filters and mapping tools to customize search results. SUF ¶ 16. These features make it easier for high-intent renters to find advertising customers' properties and ultimately enable ILSs to provide advertising products that deliver value to advertising customers in the form of leads and leases from high-intent renters. SUF ¶ 16. Organic and paid search results and social media marketing do not offer the same comprehensive listing information, search and filtering features, or integrated property comparison tools of ILSs that allow renters to easily search for and compare relevant rental properties. SUF ¶ 23.

*Distinct customers.* Rental ILSs serve advertising customers, including PMCs, who

21

contract with the ILSs to advertise their available rental units. SUF ¶ 13. Only entities that own or manage rental units can use ILS advertising, and only entities that own or manage multifamily apartment buildings can use ILS multifamily advertising products. SUF ¶ 20. *See Peabody*, 492 F. Supp. 3d at 898–99. Other forms of advertising are not designed for rental advertising and serve a broader customer set. SUF ¶¶ 23–29. For example, ILSs acknowledge that they ███ ██████████████ to market their advertising portals to prospective renters and compete in SEM auctions for rental-related keywords. SUF ¶ 27.

*Peculiar characteristics.* ILSs provide advertising customers with exposure to a large audience of potential renters and the ability to share detailed, easily searched information about available units for rent. SUF ¶¶ 14, 15. ILS advertising products determine a given listing's placement within search results on the ILS, and in turn how much exposure a customer's listing will receive to prospective renters based on their search criteria. SUF ¶ 15.

*Distinct prices.* ILSs offer distinct prices and pricing structures that differ from other forms of advertising. *See Google Ad Tech*, 778 F. Supp. 3d at 834, 838 (relying on "distinct pricing structure" as evidence for existence of relevant advertising product markets). ILSs offer advertising under subscription or pay-per-lease models, which differ substantially from the pricing models for other advertising channels. SUF ¶¶ 21, 26–29. For example, SEM and social media advertising typically rely on auction-based systems where advertisers bid on specific search terms or placements and pay a price per click, impression, or action. SUF ¶¶ 26, 29.

### 2.    ILS Advertising for Multifamily Rental Properties Is a Relevant Product Market

The *Brown Shoe* practical indicia further support a market for ILS advertising for multifamily rental properties. Industry participants, including Defendants themselves, consider multifamily advertising to be a distinct ██████████████████████████████ SUF ¶ 19.

22

ILSs offer distinct multifamily and longtail advertising products and set distinct prices for those products. SUF ¶ 20.

Courts have also identified antitrust markets around targeted customers where those customers have specific needs, typically negotiate with sellers on an individual basis, and where defendants have contemplated differential pricing for that customer group. *See, e.g.*, *FTC v. Wilhelm Wilhelmsen Holding ASA*, 341 F.Supp.3d 27, 46, 56 (D.D.C. 2018). These characteristics make the targeted customers susceptible to price discrimination, since customers have limited ability to arbitrage. *Wilhelmsen*, 341 F.Supp.3d at 51.

Here, the undisputed facts support a targeted customer market of ILS advertising for multifamily rental properties. Prior to the Agreements, ███████████████████████████ ██████████████████████████████████. SUF ¶ 20. Multifamily advertising customers have unique advertising needs: due to the potentially large number of available units in an individual multifamily property, multifamily advertising customers have greater lead, lease, and exposure requirements than longtail customers, who have fewer rental units to fill per property. SUF ¶ 22. Multifamily advertising customers typically negotiate contracts with ILSs on an individual basis. SUF ¶ 21. And the Defendants directly and successfully targeted multifamily advertising customers for disparate treatment in the Agreements, explicitly requiring Redfin to terminate its contracts with multifamily advertising customers and use "reasonable best efforts" to help Zillow sign contracts with Redfin's former multifamily advertising customers. SUF ¶¶ 7, 9. Multifamily advertising customers cannot avoid this disparate treatment, indicating that the provision of ILS advertising to multifamily rental properties is a distinct product market.

### 3.     Quantitative Analysis Supports the Proposed Relevant Markets

Quantitative evidence also supports the robust and undisputed real-world market evidence in this case. As Defendants admit, quantitative evidence is not required to prove a

relevant product market. Ex. 59, 9:3–11:13; *see also Google Search*, 747 F. Supp. 3d at 109

("There is no legal requirement that a plaintiff supply quantitative proof to define a relevant

market."); *Surescripts*, 665 F. Supp. 3d at 39–44 (granting partial summary judgment for the

plaintiff on relevant product market based solely on qualitative evidence). But courts frequently

credit economic analysis such as the Hypothetical Monopolist Test ("HMT"), a common

analytical tool that measures whether a small but significant and non-transitory price increase

would be profitable for a hypothetical monopolist, to substantiate real-world evidence of relevant

product markets in antitrust cases. *See Wilhelmsen,* 341 F. Supp. 3d at 57; *United States v. H&R*

*Block, Inc.*, 833 F. Supp. 2d 36, 63 (D.D.C. 2011); *Sysco Corp.*, 133 F. Supp. 3d at 339.

Here, Plaintiffs' expert, Dr. Verlinda, has put forward HMT calculations that show that

ILS advertising and ILS advertising for multifamily properties are relevant antitrust markets. Ex.

58, ¶¶ 126, 147. Using critical loss analysis, Dr. Verlinda calculated that a hypothetical

monopolist would find a small but significant non-transitory increase in price profitable, both for

ILS services for rental properties generally and for ILS services for multifamily rental properties.

Ex. 58, ¶¶ 129, 151. At most, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ This criticism of the HMT is insufficient to undermine the product market given

the clear weight of evidence supporting it. *See Kroger*, 2024 WL 5053016, at *14–15

(confirming the plaintiffs' proposed market definition "survives qualitative and quantitative

scrutiny" where defendants asserted that the plaintiffs' HMT "uses incorrect inputs" and

correcting them caused the HMT to fail in most markets, noting that "Defendants criticize the

limitations of [plaintiff's expert's] methods but do not offer a meaningful alternative.").

24

## 4.    ILS Advertising Is Not a Two-Sided Transaction Market

Defendants have challenged whether the proposed markets for ILS advertising are properly defined because they claim that ILSs must be analyzed by considering competition on both sides of the platform. *See Ohio v. Am. Express Co.* ("*AmEx*") 585 U.S. 529, 544 (2018) (holding that competition must be analyzed on both sides of two-sided *transaction* platforms). Defendants' contention is wrong as a matter of law because the undisputed facts prove that ILSs are not "two-sided transaction platforms;" they thus fall outside the scope of the *AmEx* holding. Two-sided transaction platforms "facilitate a single, simultaneous transaction between participants" on each side of the platform. *AmEx*, 585 U.S. at 545. The Court drew a critical distinction between "two-sided platforms," which can be analyzed as one-sided markets, and two-sided *transaction* platforms, which should be analyzed as two-sided markets, noting that "[t]he key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id*. at 535; *see also Google Ad Tech*, 778 F. Supp. 3d at 844 (describing "*AmEx*'s explicit limitation of its holding to two-sided *transaction* platforms, as opposed to two-sided platforms more broadly"); *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019).

Defendants do not and cannot identify any *simultaneous* rental transaction that occurs through ILS advertising. ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████—two distinct services that do not require a simultaneous transaction between the advertising customer and the prospective renter. Ex. 56, ¶ 56. Indeed, prospective renters may use ILSs to search for rental properties without ever contacting a property via the ILS, generating a lead for the property listing, or submitting a lease application. SUF ¶¶ 16, 17. At most, Defendants assert that pay-per-lease is "similar to a transaction." Def. Reply Mem. in Supp. of

25

Mot. to Dismiss (Doc. 93) at 3, n.2. But pay-per-lease ILS products do not facilitate simultaneous transactions as required to fall under *AmEx*. To the extent a lease transaction eventually arises from a renter's ILS-based apartment search, the transaction occurs outside of the ILS and as a result of a multi-step process that also occurs off the ILS. SUF ¶ 17. Because ILSs are not two-sided transaction platforms, it is appropriate to define the relevant markets as ILS advertising products that do not include the renter side of the ILS platform.

## B.    The United States Is a Relevant Geographic Market

The undisputed evidence shows that the United States is a proper relevant geographic market in which to analyze the effects of the Agreements on competition for ILS advertising for rental properties and multifamily rental properties. A relevant geographic market is the "area within which the [defendants'] customers . . . can practicably turn to alternative supplies if the defendant[s] were to raise [their] prices." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). A properly defined geographic market should correspond with the commercial realities of the market and competition. *Unites States v. Grinnell Corp.*, 384 U.S 563, 575–76 (1966); *Brown Shoe*, 370 U.S. at 336–37.

All of the relevant facts support Plaintiffs' proposed geographic market, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ *See NASCAR*, 809 F. Supp. 3d at 379 (finding no genuine dispute as to the geographic market in part because defendants' expert "did not raise any issue with the geographic scope of the relevant market in his lengthy critique of Plaintiffs' market").

Zillow and Redfin recognize that they operate nationally since it is undisputed that the Partnership Agreement and Content License Agreement are national in scope. SUF ¶ 2. Indeed, it is undisputed that the four largest ILSs operate nationwide. SUF ¶¶ 31, 35. Apart from Zillow's New York-specific StreetEasy, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ could identify a significant

local or regional ILS. SUF ¶ 32.[3]

These national ILSs implement national policies and user interfaces, measure their market share using national metrics, and offer access to their platforms from anywhere in the United States. SUF ¶ 34; *Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201, 2026 WL 321084, at *45 (S.D.N.Y. Feb. 6, 2026) (concluding that "online home search platforms operate on a national basis"). And the undisputed facts show that ILSs benefit from having a national footprint because a national presence builds brand awareness to attract renters and advertising customers. SUF ¶ 31. Many PMCs prefer to enter into national advertising contracts rather than contracting on a property-by-property basis. SUF ¶ 33. Because PMCs could not identify any significant regional or local ILS that they use, and PMCs are familiar with and use national ILSs, if a PMC's chosen ILS were to increase advertising prices, the only workable alternative would be another ILS with a nationwide presence.

## II.  PLAINTIFFS HAVE ESTABLISHED A PRIMA FACIE SECTION 7 CASE

### A.  The Agreements Constitute an Acquisition of Assets Under Section 7

Section 7 of the Clayton Act prohibits acquisitions of "the whole or any part of the assets of another person" the effect of which "may be substantially to lessen competition." 15 U.S.C. § 18. The terms "acquire" and "assets" are "generic, imprecise terms encompassing a broad spectrum of transactions," including "purchase, assignment, lease, license, or otherwise." *United States v. Columbia Pictures Corp*, 189 F. Supp. 153, 182 (S.D.N.Y. 1960). An "acquisition" is any transaction that is the "end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic

---

[3] To the extent that there are local relevant markets, the competitive entities to evaluate are no different than those evaluated in a United States market because there are no local competitors to the nationwide ILSs.

27

significance and the proscribed adverse 'effect.'" *Id*.; *FTC v. Phoebe Putney Health Sys., Inc.*, 793 F. Supp. 2d 1356, 1366 (M.D. Ga. 2011) (holding that a management agreement constituted acquisition of an asset because it "represent[ed] the transfer of a sufficient part of the bundle of legal rights and privileges" from the lessor to the lessee) (quotations omitted), *rev'd on other grounds*, 568 U.S. 216 (2013); *United States v. Archer-Daniels-Midland Co.*, 584 F. Supp. 1134, 1135 (S.D. Iowa 1984) (finding 13-year "operating lease" should be considered an acquisition because "[a] lessee of an operating lease . . . certainly acquires property rights in the assets leased").

The Agreements constitute an acquisition of assets under Section 7. Zillow recognized the $100 million upfront payment as payment for "intangible assets" in its quarterly filing with the Securities and Exchange Commission. SUF ¶ 6. And rightly so. The Agreements transferred Redfin's customer relationships, key employees, business information, and the exclusive right to display multifamily property listings on Redfin's sites to Zillow. SUF ¶¶ 7–12. The Agreements also required Redfin to provide information about key Redfin sales employees in order to facilitate the transfer of Redfin's ▮▮▮▮▮▮ multifamily customer contracts. SUF ¶¶ 7, 11–12. These assets are a sufficient part of the bundle of rights and privileges associated with Redfin's ILS multifamily advertising business such that the transfer has economic significance and an anticompetitive effect.

The exit and exclusivity requirements of the Agreements are also an "acquisition" of "assets." *See, e.g.*, *Columbia Pictures Corp.*, 189 F. Supp. at 183 (analyzing license-distribution agreement that made television studio the "exclusive distributor" of certain studio films under Section 7); *United States v. ITT Cont'l Baking Co.*, 485 F.2d 16, 18–20 (10th Cir. 1973), (agreements causing defendants to "cease production of" their own bread were acquisitions of

28

assets), *rev'd on other grounds*, 420 U.S. 223 (1975). The Agreements granted Zillow exclusive rights to display multifamily listings on Redfin sites for at least the next five years. SUF ¶ 4.

## B.    The Agreements Are Presumptively Illegal Under Section 7

It is undisputed that, pre-Agreements, there were five competitively relevant providers of nationwide ILS advertising for rental properties or multifamily rental properties. SUF ¶ 35. It is also undisputed that Zillow was a leading ILS in both markets, and that Redfin considered itself the ██████████ ILS. SUF ¶¶ 36–38. And it is undisputed that Redfin no longer competes in the market for nationwide ILS advertising for multifamily rental properties. SUF ¶¶ 4, 8–9.

The market concentration analyses from both sides' experts reflect this reality and show that the Agreements increased concentration in highly concentrated markets. SUF ¶¶ 38–42. Dr. Verlinda found high market concentration across three dimensions of competitive significance: revenue, lead generation, and site visits. Looking at multiple dimensions of competition to confirm his results, Dr. Verlinda found that for each of these metrics and in each relevant market, the pre-Agreements HHIs were well over the 1,800-point threshold for a highly concentrated market and the changes in HHIs were well over the 100-point threshold for a significant increase in concentration.[4] SUF ¶¶ 40–41. ██████████████████████████████████ ████████████████████ SUF ¶ 41.

Defendants' expert's alternate metric supports the presumption of illegality. Dr. Gowrisankaran calculated market shares and HHIs based on his interpretation of ██████████ ████████████████████████████████████████████████████ SUF ¶ 42. Setting aside the limitations of this analysis, it still shows that, pre-Agreements, Zillow and Redfin were ████████████████████████████████████████████████████████████

---

[4] The HHI figures that Dr. Verlinda calculated would also trigger the structural presumption under the 2010 Merger Guidelines' thresholds. SUF ¶¶ 41–42.

███████████████████████████████████ SUF ¶¶ 38–39, 42; Ex. 59, 274:18–275:5. █

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ SUF

¶ 42. These undisputed market concentrations establish a presumption of illegality under Section

7. *Tapestry*, 755 F. Supp. 3d at 458–59.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs'

Motion and enter summary judgment that (1) nationwide ILS advertising for rental properties

and for multifamily rental properties are relevant markets in which to analyze the Agreements;

(2) the Agreements effectuate an acquisition of assets under Section 7 of the Clayton Act; and (3)

the Agreements are presumptively unlawful under Section 7 of the Clayton Act.

Dated: June 10, 2026

TODD BLANCHE
ACTING ATTORNEY GENERAL


 /s/ *Dennis C. Barghaan, Jr.*
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

*Local Counsel for Plaintiff Federal Trade Commission*

**FOR PLAINTIFF FEDERAL TRADE COMMISSION:**

/s/ *Allyson M. Maltas*
ALLYSON M. MALTAS
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3646
Email: amaltas@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

**FOR PLAINTIFF**
**COMMONWEALTH OF VIRGINIA:**

JAY JONES
Attorney General of Virginia

/s/ *Tyler T. Henry*
TYLER T. HENRY (Virginia Bar No. 87621)
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Email: thenry@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia and Local Counsel for Plaintiffs Arizona, Connecticut, New York, and Washington*

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES
Attorney General of Arizona

SARAH PELTON (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Email: Sarah.Pelton@azag.gov

*Counsel for Plaintiff State of Arizona*

31

**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General

JULIÁN A. QUIÑONES REYES (admitted *pro hac vice*)
FRANKLIN KANIN (admitted *pro hac vice*)
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Email: Franklin.Kanin@ct.gov

*Counsel for Plaintiff State of Connecticut*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General of New York

ELINOR R. HOFFMANN (admitted *pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (admitted *pro hac vice*)
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ (admitted *pro hac vice*)
Senior Enforcement Counsel
MARIA LUISA DI LAURO (admitted *pro hac vice*)
Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Counsel for Plaintiff State of New York*

**FOR PLAINTIFF STATE OF WASHINGTON:**

NICHOLAS W. BROWN

32

Attorney General of Washington

AMY N. L. HANSON (admitted *pro hac vice*)
Senior Managing Assistant Attorney General
TYLER W. ARNOLD (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division

Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419 (Hanson)
Telephone: (206) 464-7030 (Arnold)
Email: amy.hanson@atg.wa.gov
Email: tyler.arnold@atg.wa.gov

*Counsel for Plaintiff State of Washington*

33

**Certificate of Service**

I, Dennis C. Barghaan, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: June 10, 2026.

  /s/ *Dennis C. Barghaan, Jr.*
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

*Local Counsel for Plaintiff Federal Trade Commission*

34