**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>*Plaintiff*,<br><br>v.<br><br>ZILLOW GROUP, INC., ZILLOW INC., AND REDFIN CORPORATION,<br><br>*Defendant*s. | Civil Action No. 1:25-cv-1638 |
| COMMONWEALTH OF VIRGINIA,<br>STATE OF ARIZONA,<br>STATE OF CONNECTICUT,<br>STATE OF NEW YORK, and<br>STATE OF WASHINGTON,<br><br>*Plaintiffs*,<br><br>v.<br><br>ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,<br><br>*Defendants*. | Civil Action No. 1:25-cv-1647 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................................. 3

    A.  Response to Plaintiffs' Statement of Undisputed Facts (RSUF) ....................................... 3

    B.  Statement of Additional Material Facts (SAMF) .............................................................. 7

III. LEGAL STANDARD ........................................................................................................ 14

IV. ARGUMENT ...................................................................................................................... 15

    A.  Plaintiffs Incorrectly Presume the Quick-look Standard Applies at Trial. ...................... 15

         i.   This Court's motion-to-dismiss decision did not resolve the factual dispute over the applicability of the quick-look standard. ................................................................. 15

        ii.  The evidence shows that quick-look review is improper in this case. ......................... 16

    B.  There Is an Extensive Factual Dispute as to the Scope of the Relevant Market. ............. 20

         i.   Plaintiffs' "ILS-only market" contradicts the factual record. ................................... 20

        ii.  The relevance of the Partnership's effects on renters is a trial question. ................... 24

       iii. Material disputes exist as to Plaintiffs' proposed geographic market. ...................... 27

    C.  The Partnership Is Not Presumptively Illegal Under Section 7 of the Clayton Act. ........ 27

         i.   A structural presumption based on market shares is not available. ........................... 28

        ii.  Moving for partial summary judgment as to a rebuttable structural presumption is improper under Federal Rule of Civil Procedure 56(a). ........................................... 29

V.  CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2311 Racing LLC v. NASCAR,*
  809 F. Supp. 3d 371 (W.D.N.C. 2025) ...................................................................................23

*Am. Needle, Inc. v. NFL,*
  560 U.S. 183 (2010) ..............................................................................................................19

*Berlyn Inc. v. The Gazette Newspapers, Inc.,*
  73 F. App'x. 576 (4th Cir. 2003) ...............................................................................20, 21, 23

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.,*
  651 F.2d 122 (2d Cir. 1981) ..................................................................................................30

*Cal. Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ..............................................................................................................16

*CSX Transp., Inc. v. Norfolk S. Ry. Co.,*
  648 F. Supp. 3d 679 (E.D. Va. 2023), *aff'd*, 114 F.4th 280 (4th Cir. 2024) ..........................20

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) .................................................................................................26

*Eshelman v. Puma Biotech., Inc.,*
  2018 WL 11411207 (E.D.N.C. Oct. 29, 2018) .......................................................................30

*FTC v. Arch Coal, Inc.,*
  329 F. Supp. 2d 109 (D.D.C. 2004) .......................................................................................30

*FTC v. IQVIA Holdings Inc.,*
  710 F. Supp. 3d 329 (S.D.N.Y. 2024) ....................................................................................23

*FTC v. Kroger Co.,*
  2024 WL 5053016 (D. Or. Dec. 10, 2024) .............................................................................23

*FTC v. Meta Platforms, Inc. (Meta I),*
  775 F. Supp. 3d 16 (D.D.C. 2024) .........................................................................................23

*FTC v. Meta Platforms, Inc. (Meta II),*
  811 F. Supp. 3d 67 (D.D.C. 2025) ...................................................................................20, 22

*FTC v. Peabody Energy Corp.,*
  492 F. Supp. 3d 865 (E.D. Mo. 2020) ....................................................................................23

*FTC v. Surescripts, LLC,*
  665 F. Supp. 3d 14 (D.D.C. 2023) .........................................................................................24

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ..........................................................................................23

*FTC v. Tempur Sealy*,
  768 F. Supp. 3d 787 (S.D. Tex. 2025) ..................................................................................23

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006) .................................................................................................27

*In re HIV Antitrust Litig.*,
  656 F. Supp. 3d 963 (N.D. Cal. 2023) ..................................................................................18

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ...........................................................................................20, 27

*Jones v. Chandrasuwan*,
  820 F.3d 685 (4th Cir. 2016) ...............................................................................................15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..............................................................................................................26

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
  415 F. Supp. 3d 703 (E.D. Va. 2019) ...................................................................................18

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)................................................................................................................19

*Ohio v. Am. Express Co.* (*Amex*),
  585 U.S. 529 (2018)....................................................................................................... *passim*

*Robinson v. NCAA*,
  172 F.4th 271 (4th Cir. 2026) .....................................................................................16, 17, 26

*Sedar v. Reston Town Ctr. Prop., LLC*,
  988 F.3d 756 (4th Cir. 2021) ................................................................................................14

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ......................................................................................1, 27, 30

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ..............................................................................................18

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994)..................................................................................................27

*Texas v. BlackRock, Inc.*,
  2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) ........................................................................28

*Times-Picayune Publishing Co. v. U.S.*,
  345 U.S. 594 (1953)..............................................................................................................21

*U.S. v. Archer-Daniels-Midland Co.*,
  584 F. Supp. 1134 (S.D. Iowa 1984) ....................................................................................29

iii

*U.S. v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) .................................................................................28

*U.S. v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) .........................................................................2, 28, 30

*U.S. v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023) .....................................................................................16

*U.S. v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. 2024) ...............................................................................23

*U.S. v. Google LLC*,
   778 F. Supp. 3d 797 (E.D. Va. 2025) .........................................................................23

*U.S. v. Penn-Olin Chem. Co.*,
   378 U.S. 158 (1964)....................................................................................................28

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)....................................................................................25, 26

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   587 F. Supp. 3d 356 (E.D. Va. 2022) .........................................................................24

**Statutes**

Clayton Act § 7 ..................................................................................................... *passim*

**Court Rules**

*Federal Rule of Civil Procedure 56(a)* ...........................................................................29

Rule 56 ......................................................................................................................28, 29

## I.    INTRODUCTION

The Zillow-Redfin Partnership has been in effect for 16 months.  Discovery has shown—and trial will confirm—that the Partnership is procompetitive:  American renters enjoy more choice and, as a result, property managers and owners (PMCs) get more leads and leases at lower cost.  These "real-world effects" are the lodestar of the antitrust inquiry and show that invalidating the Partnership would harm consumers.[1]  Rather than engage with that record, Plaintiffs ask this Court to arbitrarily limit the scope of evidence at trial and to disregard the interests of the same renters they purportedly filed this case to protect.[2]  Mem. 1–2, Dkt. No. 171; MTD Opp. 11, Dkt. No. 87.  Plaintiffs make these requests based on so-called "undisputed facts" that are really a one-sided rendition of a record that, as a whole, refutes their characterizations.

At the outset, Plaintiffs presume the quick-look standard applies, but that standard is limited to clearly anticompetitive agreements where courts have extensive judicial experience condemning them as such.  Here, contrary to Plaintiffs' allegations, the record shows that exclusive syndication agreements are commonplace in the industry, with six such agreements in the last ten years alone.  These agreements have fueled smaller rental internet listing services' (ILSs) ability to compete, giving them access to more listings and giving renters more choice.  Until now, no one has ever questioned exclusivity, and no judicial understanding condemns it.  Against that backdrop, and with a record showing procompetitive impacts from this Partnership, the Court

---

[1] *Ohio v. Am. Express Co.* (*Amex*), 585 U.S. 529, 541 (2018) (the Sherman Act is focused on a restraint's "actual effect on competition"); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 715–16 (4th Cir. 2021) (a presumption of illegality under Section 7 of the Clayton Act may be rebutted by showing "benign" "real-world effects" for consumers).

[2] Tr. 7:23–8:16, Dkt No. 112; FTC Press Release (Sep. 30, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-sues-zillow-redfin-over-illegal-agreement-suppress-rental-advertising-competition ("The FTC will do our part to ensure that Americans who are looking for safe, affordable rentals receive all the benefits of robust competition between internet listing services like Zillow and Redfin.").

should reject Plaintiffs' claim that the motion-to-dismiss ruling established that quick-look will govern the trial.

Next, Plaintiffs ask this Court to predetermine multiple, fact-intensive questions underlying their proposed ILS-only markets. Plaintiffs claim that ILSs and non-ILSs (like Google and social media) cannot be in the same market, but the overwhelming evidence omitted from Plaintiffs' motion shows that all these advertising sources compete for PMCs' limited advertising dollars, placing them in the same market. And Plaintiffs' request to exclude renters from the "market" makes no sense in light of their own recognition that renters are critical to this case and the record showing that the interests of PMCs and renters are inextricably intertwined.

Finally, Plaintiffs ask the Court to hold they have "established a prima facie" case under Section 7 of the Clayton Act. But the Court need not reach this if it rejects summary judgment on market definition, and a request for summary judgment on a "presumption" is improper regardless. A factual dispute also exists as to whether the "structural presumption" even applies to this Partnership, which is not a horizontal merger.

In addition to being wrong on the merits, Plaintiffs' motion serves no useful purpose. This is a bench trial, and even with alleged "presumptions," Mem. 1–2, the Court would still need to conduct a "totality of the circumstances" examination of the industry, competitors, their relative strength, and how all these factors (and more) inform the Agreements' real-world effects.[3] Nothing would be "streamline[d]" by this motion. Mem. 1. Instead, granting the motion would only spur unnecessary and wasteful squabbles about evidentiary questions at this bench trial.

---

[3] A market share-based presumption is merely a starting point in the Section 7 analysis, after which the Court must evaluate the "totality of the circumstances . . ., weighing a variety of factors to determine the effects of particular transactions on competition." *U.S. v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990).

2

## II.    STATEMENT OF FACTS

### A.    Response to Plaintiffs' Statement of Undisputed Facts (RSUF)

Response to Statements 1, 2, 3, 5, 7, 8, 9, 10, 12, 16, 17, 34, and 36.  *Undisputed.*  These Statements are undisputed only for the limited purpose of resolving this motion.  Defendants do not concede these Statements are material.

Response to Statement 4.  *Disputed in part.*  Defendants dispute the characterization of the Partnership as a "prohibition on competition."   Redfin still operates its rentals websites and vigorously competes for renters and revenue under the Agreements.  Defendants further object to the Statement as requiring a conclusion of law.  Statement of Additional Material Facts (SAMF) ¶ 15; Ex. BA at -385–88; Ex. BB at -270; Ex. A at -791–93.

Response to Statement 6.  *Disputed in part.*  Defendants do not dispute the accounting treatment of the $100 million as an intangible asset but deny Plaintiffs' implication that it was simply for customer relationships.  That payment cannot be viewed in isolation: Defendants modeled it with ongoing per-lead payments as part of the total deal economics, and it allowed Redfin to re-invest in its business and compete for renters.  SAMF ¶ 17.

Response to Statement 11.  *Disputed in part.*  Defendants dispute that information necessary to facilitate the Partnership transition was "competitively sensitive" and object to this statement as requiring a conclusion of law.

Response to Statement 13.  *Disputed in part.*  Defendants dispute that PMCs and renters are "two distinct groups of customers" to the extent that implies ILS platforms do not match PMCs and renters or exhibit indirect network effects.  RSUF ¶ 18; SAMF ¶ 1.

3

Response to Statement 14.  *Disputed in part*.  The term "ILS" lacks a single, settled definition.  Ex. B at -794 (███████████████████████████ ████████ ).

Response to Statement 15.  *Disputed in part*.  Defendants dispute that ILS advertising products "determine" how much "exposure" a customer listing receives.  Listing exposure depends on numerous factors (e.g., listing quality and completeness, availability, property price and location, renters' past engagement with the listing, etc.).  Ex. C at -194; Ex. D at -058–59; Ex. E at -100.

Response to Statement 18.  *Disputed*.  Defendants object to this Statement as requiring a conclusion of law.  Defendants also dispute the implication that ILSs do not "facilitate" a leasing transaction and that a "transaction" must be commercial.  Plaintiffs themselves identify a single, simultaneous match between renters and PMCs when a lead is submitted, which may result in a lease.  SUF ¶ 17.  A single, simultaneous match also occurs when a renter requests a tour or applies for a lease.  Ex. F at -413, -415–16.  These are two-sided marketplaces.  Ex. G at 9:11–15; Ex. BC at -081; Ex. H at 42:24–25 ████████████████████████████████; Ex. I at 76:22–77:1 █████████████████████████████████████████ █████████████████████ ; Ex. J at 11:21–12:1 █████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████ .

Response to Statement 19.  *Disputed in part.*  Defendants dispute the generalized characterization of how the "industry" views multifamily and longtail properties.  Furthermore, the term "longtail" lacks a single, settled definition in the industry.  Ex. K at 56:4–58:18.

Response to Statement 20.    *Disputed in part.*    Defendants dispute the generalized characterization of the Defendants' ILS business strategies.  Defendants further incorporate their response to Statement 19.  Ex. K at 56:4–58:2; 272:4–272:9.

Response to Statement 21.  *Disputed in part*.  Payment for rental advertising is not limited to two methods.  PMCs can maintain a mixed portfolio: tiered subscriptions for some properties and pay-per-lease for others.  Ex. L at 57:1–3; Ex. M at 148:3–10.

Response to Statement 22.  *Disputed in part*.  Defendants object to Plaintiffs' citation to ████████████ deposition because it does not support the stated fact.  SUF Ex. 32, 242:14–21.

Response to Statement 23.  *Disputed in part*.  Defendants dispute the purported distinction between ILSs and non-ILS "features" because Google, AI, and others also draw on listing information to respond to searches.  Defendants further dispute that ILSs are "fundamentally different" from non-ILS sources and do not "replace" ILSs.  PMCs testified they shift spend between ILS and non-ILS sources alike based on effectiveness and cost.  SAMF ¶ 5.

Response to Statement 24.  *Disputed in part*.  Plaintiffs cherrypicked a handful of what some "PMCs have testified" to when the majority of PMCs testified that advertising on ILS and non-ILS advertising sources serve the same purpose of generating more leads and leases.  *See* SAMF ¶ 7; Ex. N at 74:23–75:6 ████████████████████.  PMCs also testified that if an advertising source (whether ILS or non-ILS) underperformed, they would shift their spend.  RSUF ¶ 23; SAMF ¶ 5.

Response to Statement 25.  *Disputed in part*.  Plaintiffs conflate AI tools that PMCs use for leasing operations with AI platforms that PMCs advertise through to generate leads and leases.  PMCs and ILS providers have testified that AI platforms can serve as advertising sources that

5

generate leads and leases, independently of ILSs.  Ex. L at 178:9–22; Ex. O at 85:2–17; Ex. H at 18:16–20.

Response to Statements 26–29.  *Disputed in part*.  Rental-specific campaigns using SEM, SEO, and social media are effective alternatives to ILSs.  *See* SAMF ¶¶ 9, 11.

Response to Statement 30.  *Disputed*.  Plaintiffs' claims about what "ordinary course documents show" is incomplete and wrong.  ████████████████████████████ ████████████████████████████████████ Ex. P at -925 (████████████ ████████████).  CoStar's documents identify Google, Bing, and Facebook Marketplace as competitors.  *See e.g.,* Ex. Q at -876; Ex. B at -794.

Response to Statement 31.  *Disputed in part.*  Defendants dispute that a national presence is "important" for an ILS to compete for advertising customers.  PMCs allocate advertising spend on a property level and specific ILSs can perform differently depending on local market dynamics. SAMF ¶ 4.  ████████████████████████.  Ex. R at -432; *cf.* Ex. BD at -751–65.

Response to Statement 32.  *Disputed in part.*  To the extent that Plaintiffs are implying local or regional ILSs do not exist, Defendants dispute that statement.  Ex. M at 97:1–14; Ex. O at 35:20–36:4.

Response to Statement 33.  *Disputed in part.*  PMCs have testified that some owners prefer pay-per-lease contracts, which are contracts executed on a property-by-property or region-by-region basis.  Ex. S at 36:17–37:12.

Response to Statements 35.  *Disputed in part.*  Defendants dispute Plaintiffs' characterization of certain ILSs as being "competitively relevant" versus others.  Ex. H at 68:2–69:2.

Response to Statement 37. *Disputed in part.* Defendants dispute the implication that Redfin being "Number 3" meant Redfin was a meaningful competitor to CoStar and Zillow. ███████████████████████████████████████████████████████████████ ███████████████████████████████████. Ex. T at Tables 8–9. Redfin's inventory and traffic were far behind Costar's and Zillow's and continued to decline before the Partnership. SAMF ¶ 14; Ex. T at ¶ 23, Table 1; *cf.* Ex. T at Table 14.

Response to Statements 38–40. *Disputed.* The market shares, rankings, and concentration measures reflect a limited number of the competitors included in Plaintiffs' contested ILS-only market. Ex. G at 190:15-21; Ex. U at ¶ 303.

Response to Statement 41. *Disputed in part.* Dr. Gowrisankaran did not dispute the arithmetic, but explained Dr. Verlinda's HHI calculations reflected concentrations only within a disputed ILS-only market and furthermore were inappropriate because they did not reflect ILSs' two-sided nature. Ex. U at ¶¶ 303–04.

Response to Statement 42. *Disputed in part.* When properly including non-ILS sources as part of the market, Defendants' expert found Zillow and Redfin's combined share at only ████ across all lease sources (████ excluding PMCs' own websites), with post-Partnership HHIs of 1,755 and 1,601—below any structural-presumption threshold. The figures rise to a ████ share and 3,377 HHI only within Dr. Verlinda's contested market. Ex. U at ¶¶ 305–06, Ex. 34.

## B.    Statement of Additional Material Facts (SAMF)

1.    An ILS is a two-sided platform connecting PMCs advertising rentals with renters searching for homes. Ex. G at 9:11–15; Ex. BC at -081; Ex. H at 42:10–25; Ex. I at 76:22–77:1; Ex. J at 11:21–12:1.

2.    ILSs exhibit strong indirect network effects—more renters attract more advertisers, and vice versa.  An ILS must achieve a critical mass of listings to attract renters, and a critical mass of renters to attract PMC advertisers.  Ex. T at ¶ 24; Ex. U at ¶ 62; Ex. I at 70:8–12 ██████

████████████████████████████████████████████████████████

████████████████████████████; SUF Ex. 23 at -001.  ILSs testified those network effects are ███████  *See, e.g.*, Ex. J at 178:21–23.  Indeed, Zillow determines the prices it charges to PMCs based on a return on advertising spend calculation that accounts for renters' engagement with the Zillow site.  Ex. R at -433.

3.    In seeking to attract renters to their platforms, PMCs choose from multiple advertising sources (both ILS and non-ILS) based on the quality and quantity of leads and leases a source can generate and the associated cost (often measured as "cost per lead" and "cost per lease").  Ex. N at 17:4–12; Ex. V at 52:15–53:1; Ex. L at 103:18–25; Ex. S at 121:1–13; Ex. W at 34:5–14 ██████

████████████████████████████; Ex. X at 12:14–25; Ex. O at 90:5–12; Ex. BE at -336, -341–50; Ex. Y at -119–21, 124.

4.    These decisions are often made at a property level, rather than at a portfolio level, and the effectiveness of an advertising source can vary by local market based on local factors.  Ex. Z at 91:2–6; Ex. L at 92:4–15; Ex. S at 107:8–18, 120:18–25; Ex. N at 38:14–16; Ex. O at 77:2–18; Ex. W at 93:20–94:17; Ex. X at 57:13–58:8; Ex. BF at -491–92; Ex. Y at -101, 115–18.

5.    When an advertising source underperforms—e.g., delivering fewer leads and leases or doing so at high cost—PMCs shift spend toward more cost-efficient alternatives.  Ex. O at 143:8–12 ████████████████████████████████████

████████████████████████████████████████████████████████

██████; Ex. V at 212:9–18; Ex. AA 26:20–27:5; Ex. L at 105:8–106:14; Ex. S at 224:3–9; Ex. W

at 50:23–51:10.  That reallocation occurs in both directions: PMCs shift from ILS to non-ILS sources, and vice-versa.  Ex. AB ██████████████████████████████ ; Ex. AC at -181; Ex. N at 68:13–22; Ex. U at ¶ 300, Ex. 33.

6.    PMCs testified that they want to diversify their advertising sources and become ████ ████████████████████  Ex. L at 147:22–148:2.  *See also* Ex. N at 143:5–10; Ex. W at 37:5–18. ██████████████████████████████████████ ██████████████.  SUF Ex. 10 at -006.

7.    PMCs do not place more value on a lease generated by an ILS source than one generated by a non-ILS source—████████████████  Ex. L at 238:22–24; Ex. S at 231:1–8.  *See also* Ex. X at 198:17–20 ████████████████████████ ██████████ ; Ex. W at 36:25–37:4 ████████████████████ ██████████████████████████

8.    Among the ILS providers, CoStar is the largest multifamily rentals platform (Apartments.com).  PMCs view CoStar as ████████ and the ████████ and ██████ of the industry.  Ex. Z at 90:11–13; Ex. W at 88:4–11, 160:17–25.  Its multifamily-listing revenue was approximately three times larger than Zillow's in 2024, at approximately $1 billion.  Ex. T at Table 2.  ████████████████████████████████████████████  Ex. AD 27:19–22; Ex. U at Ex. 1.  ████████████████████████████████████ . Ex. G at 194:4–13.

9.    PMCs allocate approximately half of their marketing budgets to non-ILS sources, such as Google, social media, and the property management companies' own websites.  Ex. T at Table 4; Ex. U at ¶ 294; SUF Ex. 10 at -006.

10.  ILSs view themselves as competing against Google.  Ex. P at -925; Ex. AE at -116, 121–22, 140–41, 148, 150, 156; Ex. AF at  45:1–6, 50:17–25.  ███████████████████████ ████████████████████████████, Ex. I at 49:4–16 (discussing Ex. B at -795), ███████ ███████Ex. BG at -577.  *See also* Ex. J at 240:19–241:1.

11.  PMCs also allocate advertising spend to paid social media advertising, including on platforms such as Meta and TikTok.  Ex. AG; Ex. AH; Ex. AI; Ex. AJ at -015–16; Ex. AE at -121–22, 124.  Some property management companies even have in-house social media experts.  Ex. L at 173:16–22; Ex. S at 66:19–22; Ex. W at 23:10–17.

12.  PMCs view their own company and individual property websites as lead and lease generators.  SUF Ex. 39 ("Property management often finds that their most quality/qualified leads come from their website."); Ex. N at 18:11–21; Ex. V. at 83:4–9; Ex. S at 73:5–10; Ex. L at 72:9–13.  Recognizing the importance of these websites, PMCs include "mini-ILS" features where renters can search for properties in a given local geography.  Ex. X at 31:8–19; Ex. V at 82:8–15.

13.  Redfin entered the apartment advertising business in 2021 when it acquired RentPath out of bankruptcy for $608 million.  Ex. AK at 63.  At the time, RentPath (later called Rent.) had its own sales force selling advertising packages to PMCs.  Redfin recognized these websites needed a larger inventory of listings to drive traffic to the company's websites, increase Redfin's value proposition for PMCs, and put the business on a path to long-term profitability.  Ex. BL at 32:7–20, 48:16–49:14.

14.  Redfin failed to achieve that goal.  From 2021 to 2024, Redfin invested tens of millions of dollars in marketing Rent., pursued new growth strategies, and reorganized senior leadership.  Ex. BM at 282:16–25, 292:3–24.  Despite those efforts, the business lost more than $200 million in four years, and paid listings remained stagnant.  Ex. AL at 42–44; Ex. AM at 45; Ex. U at Ex. 1.

Because Redfin could not grow its inventory to make its websites more attractive, renter web traffic continued to drop. Ex. BH at -438–39; Ex. BL at 97:21–98:12; Ex. U at Ex. 22; Ex. AN at -246 (███████████████████████████████). By the end of 2024, Redfin's leadership informed its Board that without fundamental changes, the rentals business had no viable path to long-term sustainability. Ex. BL at 168:23–169:16, 264:6–265:1.

15. The Partnership was pursued to resolve Redfin's "Achilles heel"—its lack of growth in listings—while allowing Redfin to continue competing for renters. Ex. BC at -081.

16. As part of the Partnership, Zillow received access to Redfin's ██████████████ but could not assume Redfin's customer contracts. Ex. AD at 49:4–11, 84:8–11. Each customer independently chose whether to advertise with Zillow, forcing Zillow to compete for their business. Ex. AD at 92:10–13; Ex. K at 67:17–25. Approximately ██████ properties never signed with Zillow, and others signed with Apartments.com instead. SUF ¶ 10; Ex. AO at -490; Ex. AD at 55:23–56:9.

17. Zillow and Redfin modeled the Partnership as a single economic package whose total value reflected multiple factors, ███████████████████████████████████. The $100 million payment was a prepaid component of that value. ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████. Ex. AP at -511; Ex. AQ, Tab "COR," Cell EK250; Ex. U at ¶¶ 91, 94. The advance payment allowed Redfin to pay down debt and reinvest in its consumer sites. Ex. BI at -806.

18. ILS providers invest significantly in building their listings inventory, as listings form the basis of their ██████████████ Ex. I at 22:4–15. *See also* Ex. F. at -409–10. Syndication

agreements help smaller ILSs obtain the inventory necessary to compete with larger platforms such as CoStar.  Ex. J at 38:12–23.

19.  Given the extensive resources expended in building listings and their importance, syndication partners are strongly disincentivized from sharing listings without an assurance the receiving partners will not use those same listings to compete against them for customer contracts. Ex. AR at 60:2–61:1;  Ex. I at 242:13-243:1;  Ex. U at ¶¶ 100–02.   Syndication also reduces customer confusion.  Ex. I at 110:8–11 █████████████████████████

████████████████████████████████████████████

████████ ; Ex. AR at 70:1–71:22.  As such, exclusivity structures make syndication agreements commercially reasonable.  Ex. H at 181:12–14 ██████████████████████

██████████████████████ ; Ex. AR at 60:2–61:1.

20.  Exclusivity provisions have been a standard feature of rental syndication agreements for many years.  In 2015, CoStar (Apartments.com) agreed to "exclusively power the apartment community listings" on Realtor.com.  *See* Ex. AS. ████████████████████████

████████████████████████████████ .  Ex. AR at 36:14–23.  In 2017, Realtor.com replaced that arrangement with an exclusive syndication with Apartment List.  Ex. AT.  That same year, Apartment List entered its own exclusive syndication with Homes.com.  *See* Ex. AU.  In 2018, Realtor.com returned to an exclusive syndication with Apartments.com (CoStar).  Ex. AV at -793, -796; Ex. AR at 69:9–70:18. That same year, ████████ entered into a syndication agreement with RentPath ████████████████████████████████

████████████████████████████████ .  Ex. BJ at -795, -798–99.  In 2024, Realtor.com entered an exclusive syndication with Zillow ████████████████████

████████████████████ .  Ex. AR at 108:6–20. ████████████████████

██████████████████████████████████████████. Ex. AR at 161:15–162:14.

Around that same time, ████████████████████████████████████████

████████████████████████████████. Ex. BK at -705 ████████████████

██████████████████████████

21.   Like those earlier exclusive syndications, the Partnership benefited both sides of the Zillow and Redfin platforms.  Since the Partnership expanded PMCs' access to renters, PMCs saw increased leads and leases.  Ex. W at 122:21–123:3 (████████████████████████████

████████████████████████); Ex. U at Ex. 10.  Properties listed only on Zillow before the Partnership received, on average, an additional ██████ leads per property per month—a ████ increase—while properties listed only on Redfin received, on average, an additional ██████ leads per property per month.  Ex. U at ¶¶ 137–38, 146, Ex. 10.

22.   The Partnership also generated more leases.  Ex. AW at -171; EX. BB at -270; Ex. U at ¶¶ 149–50; Ex. W at 124:24–125:11.  ████████████████████████████

████████████████████████████████████████████████. Ex. AX at Table 11.

23.   The increase in leads cut cost per lead by ████ to ████  Ex. U at ¶ 146, Ex. 10; *see* Ex. AD at 146:17–22 (testifying the cost per lead reduced from $██ to $██ to $██ after the Partnership). For many PMCs, that translated into direct savings.  Ex. U at ¶¶ 12–14; *see also* Ex. W at 120:24– 121:8 ████████████████████████████████████

24.   The Partnership also strengthened Zillow's competitiveness against CoStar, which is considered more expensive.  Ex. X at 213:5–9 ██████████████████████████

████████████████████████████████████████

████████████████; Ex. Z at 106:20–22 ██████████████████████

████████████████████████████. The Partnership narrowed Zillow's multifamily listings gap with CoStar from approximately ████ to approximately ████ fewer listings. Ex. U at ¶¶ 171–72.

25. CoStar responded to the Partnership by offering discounts and promotional pricing—including matching competitors' rates and offering free months—that it had rarely offered before, strengthening competition and benefiting PMCs. Ex. AA at 177:3–20; Ex. W at 127:1–23; Ex. AY at -404 ("[P]artners have shared that Apartments.com have begun price matching, offering free months, and discounting in an effort to sell more properties."); Ex. AN at -248 ████████████ ████████████████████████████ In fact, ████████████████████████ Partnership ████████████████████████████████. Ex. U at Ex. 20, ¶¶ 179–80.

26. The Partnership benefited renters as well. Because rentals are fragmented across competing sites, renters face costs searching multiple platforms. Ex. F at -407–08, 414; Ex. U at ¶¶ 58–59; Ex. T at ¶ 38. The Partnership gave renters on Redfin's sites access to roughly three times more multifamily listings and gave renters on Zillow's sites a more complete set of available units. Ex. K at 36:24–37:8; Ex. U at ¶¶ 159–60. Defendants' expert found that the Partnership benefited every group of renters, whether they previously used multiple sites or just one, across a large portion of U.S. geographic regions. Ex. AZ at 79:7–14; Ex. U at ¶¶ 164–66, 168. Renters obtain these benefits at no cost. Ex. U at ¶¶ 58–60.

## III.    LEGAL STANDARD

"The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761

(4th Cir. 2021).[4]  A court must "view the facts and all justifiable inferences . . . in the light most favorable to the nonmoving party[.]" *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016).

## IV.    ARGUMENT

### A.    Plaintiffs Incorrectly Presume the Quick-look Standard Applies at Trial.

Plaintiffs presume the Court determined that "quick-look" applies at trial based solely on Plaintiffs' allegations.  Mem. 16.  Defendants do not understand the Court to have taken that unusual step without the benefit of a factual record.  Indeed, the facts refute Plaintiffs' allegations and show:  (1) the central feature of Plaintiffs' case—exclusivity—is a common and reasonable ancillary restraint, and (2) the real-world effects of the Partnership are procompetitive.  The quick-look framework is therefore inappropriate.

### i.    *This Court's motion-to-dismiss decision did not resolve the factual dispute over the applicability of the quick-look standard.*

At the motion-to-dismiss phase, Plaintiffs did not suggest, nor did the Court hold, that the quick-look framework applies at trial.  Instead, Plaintiffs argued they "sufficiently pled that the 'quick-look' framework should be applied," MTD Opp. 1, and that Defendants' contentions against that framework raised factual issues for later stages, *id.* at 10–11.  Plaintiffs even warned the Court that it would be "procedurally improper and contrary to the law" to clarify the standard to be applied at the motion-to-dismiss phase. *Id.* at 7.

Consistent with Plaintiffs' arguments, the Court held it was "obligat[ed] . . . to consider the allegations of the Complaint in the light most favorable to the Plaintiffs," and that Plaintiffs "state[d] a claim" for quick-look review "with all reasonable inferences drawn in their favor." MTD Order 3–4, Dkt. No. 154.  The Court also rejected Defendants' suggestion that defects in the

---

[4] Unless otherwise noted, internal quotation marks, citations, and alterations are omitted from quotations throughout.

"market definition and market power-related allegations require dismissal," concluding those questions are "fact-intensive" and could not be resolved "at this procedural stage." *Id.* at 4.

Against this backdrop, Defendants do not read a one-sentence footnote in the Court's order to pre-determine that the quick-look framework applies at trial, easing Plaintiffs' burden. Mem. 1. Such a ruling would be highly unusual and in tension with Fourth Circuit law. In *Continental Airlines, Inc. v. United Airlines, Inc*, the Fourth Circuit overturned a lower court's decision granting summary judgment based on the quick-look standard. 277 F.3d 499, 511 (4th Cir. 2002). The Fourth Circuit recognized that "courts have been wary of summary judgment in the context of quick-look analysis," explaining it had "not found[] a single case in which the Supreme Court has approved a quick-look analysis in which the parties received less than a full evidentiary hearing." *Id.* That admonition is even more pronounced here, where Plaintiffs claim the Court held quick-look applies without any record whatsoever.

### ii.   The evidence shows that quick-look review is improper in this case.

The quick-look analysis should be "rarely applied" and is reserved for extreme situations. *Robinson v. NCAA*, 172 F.4th 271, 291 (4th Cir. 2026); *see also U.S. v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023) ("[T]he rule of reason is the default"). To use it, a court must find that (1) courts "have amassed considerable experience with the type of restraint at issue, and can predict with confidence that it would be invalidated in all or almost all instances," *Robinson*, 172 F.4th at 291, and (2) the agreement cannot "plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999); *see also Cont'l Airlines*, 277 F.3d at 514 ("Given this record, we cannot conclude that these justifications are indisputably implausible"). The record—as opposed to Plaintiffs' faulty allegations—shows neither circumstance is present here.

16

***Judicial experience with exclusive syndications.*** The heart of Plaintiffs' quick-look argument is that, because of exclusivity, the Partnership prevented Redfin from selling its own advertising services to PMCs. MTD Opp. 10–12. [5] In Plaintiffs' words: The Partnership agreements are "inherently suspect and obviously anticompetitive not because of the syndication, but rather because they required Zillow's competitor—Redfin—to exit the market and refrain from competing going forward." *Id.* at 11.

In arguing for a quick-look at the motion-to-dismiss phase, Plaintiffs told the Court that this type of exclusivity is "not commonplace." *Id.* In fact, since 2015, ILSs have negotiated six other syndication partnerships that limited or prevented the party receiving syndicated properties from making its own direct sales to PMCs or syndicating listings from another ILS. SAMF ¶ 20. Two of those involved CoStar, the largest ILS. *Id.* In fact, ███████████████████ ██████████████████████████████████████████████████. *Id.*

No one has ever challenged exclusivity provisions in any ILS syndication agreement or, as far as Defendants can tell, even questioned them. Accordingly, courts lack the "considerable experience" that would allow them to "predict with confidence" that exclusivity "would be invalidated in all or almost all instances," *Robinson*, 172 F.4th at 291. The absence of any challenge to exclusivity is hardly surprising. Companies like Zillow and CoStar have spent years and immense resources building a large inventory of listings and, thus, a significant competitive advantage. SAMF ¶ 18. Industry participants testified it is reasonable that, before sharing that

---

[5] Exclusivity is the source of Plaintiffs' central allegation that Redfin was paid to "exit the market"—i.e., to only use Zillow's syndicated listings instead of using a salesforce to get listings on its own. The other aspects of the Partnership that Plaintiffs identify ███████████████ ████████████████████ flow from exclusivity. To the extent that Plaintiffs argue other exclusive syndication agreements vary in some way from the Partnership here, that just highlights the need for a fulsome, fact-based trial—contrary to Plaintiffs' motion.

17

inventory with a competitor, they would seek assurance the syndication partner will not turn around and use those listings to compete against it.  SAMF ¶ 19.

Without exclusivity, consumers would be confused and companies like Zillow and CoStar would be severely discouraged from syndicating due to the risk of free-riding.  That would be bad for competition, as smaller ILSs depend on syndication to compete.  SAMF ¶ 18.  Courts recognize that restrictions aimed at preventing free-riding benefit competition.  *See, e.g.*, *Amex*, 585 U.S. at 551 (describing anti-steering restrictions that prevented free-riding and protected Amex's network).  That is true even when they limit competition among horizontal rivals.  *See, e.g.*, *Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 713 (E.D. Va. 2019) (restraints benefit competition when they "contribute to the success of a cooperative venture that promises greater productivity and output"); *see also, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012) ("If the coordination is . . . supportive of[] the legitimate business purpose of the venture, it may be permissible—a rule of reason question"); *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 990, 995–96 (N.D. Cal. 2023) (refusing quick-look at summary judgment because the restraint plausibly "contribute[d] to the success of a cooperative venture").

***Effects are Positive.***  Under the case law, *Amex*, 585 U.S. at 541, and as Plaintiffs' expert agrees,[6] the Partnership must be judged by its "actual effects on competition" on consumers.  Those real-world effects include:  (1) PMCs are receiving more leads and leases after the Partnership at a lower cost, SAMF ¶¶ 21–23; (2) CoStar—roundly recognized as the dominant, highest-priced ILS—has responded to the Partnership by offering discounts and promotional prices to PMCs, SAMF ¶¶ 8, 24–25; and (3) renters—who prefer browsing a comprehensive inventory

---

[6] Plaintiffs' expert agreed that he extensively analyzed evidence on how the Partnership has played out in the real world.  *See* Ex. G at 56:20–58:5, 226:4–12, 297:5-17.

18

of listings in one place—are able to view more multifamily properties on their platform of choice. SAMF ¶ 26; *see NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 102 (1984) (actions that "widen consumer choice" are procompetitive).

These real-world benefits must be compared against the world without the Partnership, where Redfin would have continued to struggle. *E.g.*, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203 n.10 (2010) (the "condition before and after the restraint is imposed" is relevant to understanding effects). Here, too, the Complaints are wrong: Far from being a "clear market leader[]" and "key" competitor on the "rise," *see* MTD Order 2 nn.2–3, the evidence shows Redfin was a small and— ██████████████████████ ILS under a serious debt burden. SAMF ¶¶ 14, 17. As Redfin's CEO told its board, Redfin's "Achilles heel" was its inability to grow its multifamily inventory. SAMF ¶ 15. The Partnership, however, enabled Redfin to solve that problem, pay down its debt, invest in its business, and compete fiercely for renters. SAMF ¶ 17; RSUF ¶ 4.

To be sure, Plaintiffs will have their own counter-narrative at trial about how the Partnership has played out—good or bad—for PMCs and renters. But as the hundreds of pages of economic expert reports and testimony in this matter demonstrate, Plaintiffs' claims cannot be resolved through a "rudimentary understanding of economics" alone, MTD Order 3 n.4, and instead require ███████████████████████ Ex. G at 21:5–15. Accordingly, it would be an error to apply a quick-look standard that would simply "presume that the Agreements caused and will continue to cause anticompetitive harm." Mem. 1.[7]

---

[7] It is unclear what this would mean in practice anyway. Plaintiffs agree the Court should hear evidence of procompetitive effects, like lower prices and more output. Mem. 3. The alleged anticompetitive effects are just the flip side of the same coin, so the same evidence will go to both.

### B.    There Is an Extensive Factual Dispute as to the Scope of the Relevant Market.

Plaintiffs ask for summary judgment on three issues related to their proposed market, all of which implicate disputed factual issues. *See CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679, 726 (E.D. Va. 2023) (characterizing market definition as a "highly fact-intensive inquiry"), *aff'd*, 114 F.4th 280 (4th Cir. 2024).

*First*, Plaintiffs say the product market must be limited to only ILSs because they have different features than other forms of advertising.  But the relevant question is whether PMCs treat ILSs and non-ILSs as reasonable substitutes.  The record shows they clearly do.  *Second*, Plaintiffs ask the Court to ignore the Partnership's effects on renters by arguing that Zillow and Redfin do not facilitate "simultaneous transactions" and thus do not compete in a two-sided market under *Amex*.  That argument is wrong and ignores that renters and PMCs are inextricably intertwined.  *Third*, Plaintiffs argue that the geographic market in this case is nationwide but overlook evidence showing that ILSs compete at the local level.

#### i.    *Plaintiffs' "ILS-only market" contradicts the factual record.*

"A product market is the set of all alternatives that are reasonably interchangeable by consumers for the same purposes."  *FTC v. Meta Platforms, Inc.* (*Meta II*), 811 F. Supp. 3d 67, 95–96 (D.D.C. 2025).  "An alternative need not be identical to be reasonably interchangeable." *Id.* at 96.  Evidence that "consumers generally prefer one [product] or the other" is not enough to show they are "in different markets."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

The Fourth Circuit's decision in *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x. 576 (4th Cir. 2003), applies this analysis to advertising.  There, the court rejected an alleged market limited to advertising in "weekly community newspapers and the Post Company's Extra,"

20

excluding other "print advertising, such as direct mail and fliers, along with non-print media advertising on radio or local cable television." *Id.* at 582–83. Despite differences among these options as to features, form, and pricing, the court held "all of these media outlets are within the same product market, to the extent that they are competing for the same limited pool of advertisers' dollars." *Id.* at 583; *see id.* (relying on evidence about how a defendant tried to convince "businesses to spend their limited advertising resources on print ads, not on radio or TV ads"). [8]

The same rationale applies here. PMCs include ILSs and non-ILSs in the same advertising budgets, allocating and shifting spend among them based on effectiveness and cost. SAMF ¶¶ 3, 5. PMCs wish to become *less* reliant on ILSs and some avoid ILS advertising entirely. SAMF ¶ 6. ███████████████████ all treat non-ILS services as competitors. RSUF ¶ 30; SAMF ¶ 10. In fact, ILSs directly target non-ILS advertising in sales materials aimed at PMCs. *Id.*; *see Berlyn*, 73 Fed. App'x. at 583 (citing a "flier [that] goes to great lengths to show how much better print media is than radio or TV" as evidence of competition between the advertising sources). In fact, ████████████████████████████████████████

████████████████████████████████████████

*See* **Figure 1**. ████████████████████████████

████████████████████████████████████ *See* **Figure 2**.

---

[8] Plaintiffs claim that mere "cross-shop[ping]" among ILSs and non-ILSs is not sufficient to show those products are in the same market. Mem. 19–20. But the facts here involve much more than cross-shopping; they show *substitution* of advertising dollars. And the cases relied on by Plaintiffs came after an evidentiary hearing or trial, *see infra* at 23, including the Supreme Court's 73-year old decision in *Times-Picayune Publishing Co. v. U.S.*, 345 U.S. 594, 613 n.31 (1953).

21

**Figure 1**[9]



**Figure 2**[10]



Rather than engage with this evidence, Plaintiffs map their one-sided characterization of the facts onto the *Brown Shoe* factors. Mem. 20–23. But those factors are merely "evidentiary proxies for whether consumers would in fact substitute between products," *Meta II*, 811 F. Supp. 3d at 109, and the evidence shows advertisers do substitute between ILSs and non-ILSs. Plaintiffs'

---

[9] Ex. B at -794.

[10] Ex. AE at -116.

application of the *Brown Shoe* factors also presents obvious factual disputes and, in many cases, misses the point. The facts show that PMCs obtain the services of both ILSs and non-ILSs, so these PMCs are not "distinct customers." SAMF ¶¶ 3, 9, 11. And regardless of differences in "features" or "capabilities" between ILSs and non-ILSs, *see* Mem. 20–21 (citing these for "[i]ndustry recognition"), the relevant question is whether they compete for the same advertising dollars. *E.g.*, *Berlyn*, 73 F. App'x. at 583. They do, and the industry recognizes as much.

Plaintiffs also ask the Court to declare their expert's market testimony as beyond reproach without any cross-examination or counter testimony from Defendants' expert.[11] But "a motion for summary judgment [is] not the appropriate place to weigh competing expert testimony." *FTC v. Meta Platforms, Inc.* (*Meta I*), 775 F. Supp. 3d 16, 46–47 (D.D.C. 2024).

Notably, the vast majority of cases Plaintiffs cite were decided after the court heard the evidence. *See, e.g.*, *U.S. v. Google LLC*, 778 F. Supp. 3d 797, 810 (E.D. Va. 2025) (15-day trial with 39 live witnesses and "hundreds of exhibits"); *FTC v. Kroger Co.*, 2024 WL 5053016, at *1 (D. Or. Dec. 10, 2024) (15-day hearing); *U.S. v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. 2024) (15-day trial with "dozens of live witnesses" and "over 3,500 exhibits").[12] The few where market definition was decided at summary judgment involved very different facts, like a defendant admitting key market definition allegations, *2311 Racing LLC v. NASCAR*, 809 F. Supp. 3d 371,

---

[11] Plaintiffs ask the Court to adopt their expert's hypothetical monopolist test (HMT). Mem. 24. But cross-examination and Dr. Gowrisankaran's testimony will show that HMT is unreliable and designed to produce a narrow market. Ex. U at ¶¶ 311–15; Ex. AZ at 18:2–19:19, 358:20–359:11; *FTC v. Tempur Sealy*, 768 F. Supp. 3d 787, 825–28 (S.D. Tex. 2025) (finding the FTC expert's HMT unpersuasive "given that the model's parameters and inputs appear designed to produce the outcome sought").

[12] *See also FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 341 (S.D.N.Y. 2024) (8-day hearing with 27 witnesses and "thousands of exhibits"); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 882 (E.D. Mo. 2020) (9-day hearing with "hundreds of exhibits and . . . dozens of witnesses"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 21 (D.D.C. 2015) (8-day hearing with 20 witnesses and over 3,500 exhibits).

377–79 (W.D.N.C. 2025), or one that presented no evidence of consumer substitution, *In re Zetia (Ezetimibe) Antitrust Litig.*, 587 F. Supp. 3d 356, 365 (E.D. Va. 2022); *see also FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 40 (D.D.C. 2023) (undisputed that analog prescription methods were "less desirable than e-prescribing on every major metric <u>and</u> more expensive").

Plaintiffs' effort to pass off a one-sided version of the facts as "undisputed" to obtain summary judgment on one of the most fact-intensive questions in antitrust law should be denied.

### ii.    *The relevance of the Partnership's effects on renters is a trial question.*

Plaintiffs ask the Court to exclude renters from the "market" and thus to ignore the Partnership's impacts on them at trial. Mem. 25–26. Plaintiffs' purported to bring this lawsuit on renters' behalf, *see supra* n. 2, but failed to develop any evidence of renter harm. And Plaintiffs cannot escape their failure of proof by relying on *Amex*. Plaintiffs previously recognized that *Amex* was a post-trial decision and stressed that multiple courts have resolved the applicability of *Amex* only after a full trial. MTD Opp. 19–20. But they now ask the Court to short-circuit that inquiry, and in doing so, get *Amex* wrong.

*Amex* involved the allocation of burdens in the rule of reason's three-step burden-shifting framework, where plaintiffs bear the initial burden to prove a substantial anticompetitive effect; if they do, the burden shifts to defendants to show a procompetitive rationale; then, if defendants succeed, the burden shifts back to plaintiffs. *Amex*, 585 U.S. at 541–42. The question in *Amex* was whether plaintiffs had to show harm to both sides of the market in the first step—as part of their *prima facie* case. *Id.* at 542 ("[T]he parties ask us to decide whether the plaintiffs have carried their initial burden of proving that Amex's antisteering provisions have an anticompetitive effect"); *id.* at 552 ("In sum, the plaintiffs have not satisfied the first step of the rule of reason").

24

The Court held that, for a two-sided transaction platform, plaintiffs bear the initial burden to show harm on both sides because indirect network effects are very strong. *Id.* at 545–46. [13]

But the Court did not hold that effects on both sides should be ignored in other two-sided markets or that defendants should be precluded from addressing those effects in the later stages of the burden-shifting analysis. To the contrary, the Court explained that where there are sufficiently strong network effects, failing to account for both sides "would lead to mistaken inferences of the kind that could chill the very conduct the antitrust laws are designed to protect." Id. at 546. The Court specifically pointed out that in two-sided platforms generally—not just transaction platforms—"[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Id*. at 544. But that is precisely the error into which Plaintiffs' argument would lead.

All this is why the Second Circuit recognized that "in many or most cases involving two-sided platforms, courts must include both sides of the platform in . . . the relevant market." *US Airways*, 938 F.3d at 56. Indeed, the *only* situation in which the Supreme Court held that the competitive effects on one side of a two-sided platform could be ignored were platforms like newspapers, where indirect network effects are near non-existent because readers do not care about advertisements. *Amex*, 585 U.S. at 544. That is far from the situation here, where indirect network effects are strong. ILSs facilitate matches—leads—between renters and PMCs that ultimately convert to leases, and they grow by providing a comprehensive inventory of properties and a large, high-intent audience. SAMF ¶¶ 1–2; RSUF ¶ 18. Indeed, the prices Zillow charges to PMCs are determined by evaluating renters' engagement with Zillow—a hallmark of strong indirect network

---

[13] Two-sided transaction platforms are a "subset of two-sided platforms that must *always* receive two-sided treatment," *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019), but they are not the *only* two-sided platforms that must receive two-sided treatment. *Id.* at 56.

effects.  SAMF ¶ 2.  *Amex*, 585 U.S. at 545 ("To optimize sales, the network must find the balance of pricing that encourages the greatest number of matches.").

Plaintiffs' contrary reading of *Amex*—which limits its holding to platforms facilitating only a "single simultaneous transaction," Mem. 25—is wrong, contradicting both the Supreme Court's own statements and subsequent explanations of *Amex* by the Second Circuit.  It is also wrong for at least two other reasons: First, it makes no economic sense; indirect network effects arise where platforms match users on each side—as is the case here—not only where a platform facilitates a commercial transaction; that's just where the effects are likely strongest.  *See Amex*, 585 U.S. at 545.  Second, at least one court since *Amex* has held that platforms need not exclusively facilitate transactions to qualify as transaction platforms.  *See US Airways*, 938 F.3d at 49, 58 (platform where customers could both "search for and book" airline tickets).

Separate from their misreading of *Amex*, Plaintiffs also cannot preclude evidence about renters because renter welfare cannot be untangled from PMC welfare.  Renters benefit from more listings on a site, and PMCs benefit when more renters are attracted to a site and generate more leads on Zillow and Redfin's platform.  Put simply: benefits to renters translate into benefits to PMCs and vice versa.  SAMF ¶¶ 21–22, 26; *see, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (holding that procompetitive justifications related to users of mobile applications "relate[d]" to the market for application transactions).  Even if not technically in the same "market," benefits to renters in an interrelated market should be considered.  *See, e.g.*, *id.* at 989 (recognizing that "the Supreme Court has considered cross-market rationales in Rule of Reason . . . cases"); *NCAA*, 468 U.S. at 104–08, 115–17 (evaluating procompetitive effects in market for college football tickets when relevant market was college football television); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889–92 (2007) (recognizing that

benefits to interbrand competition may be weighed against anticompetitive effects in intrabrand market); *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994) (supporting comparing effects in a market for NFL football against effects in the "closely related" market for NFL ownership). [14]

Plaintiffs' request to preclude analysis of effects on renters should be denied.

### iii. *Material disputes exist as to Plaintiffs' proposed geographic market.*

Plaintiffs argue it is indisputable that the geographic market is nationwide. But Plaintiffs ignore *It's My Party, Inc. v. Live Nation, Inc.*, where the Fourth Circuit rejected at summary judgment plaintiffs' proposed nationwide market for concert promotion services where "demand for concerts is local, [so] promoters need[ed] to target their advertising to the area surrounding a particular venue." 811 F.3d at 682; *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006). Even if ILSs operate nationally, PMCs make advertising decisions on a property basis, as rental competition is local. SAMF ¶ 4. Whether ILSs' national operations transform the geographic market from local to national is a dispute for trial.

### C.    The Partnership Is Not Presumptively Illegal Under Section 7 of the Clayton Act.

Plaintiffs ask the Court to hold they have "established a prima facie" case under Section 7 of the Clayton Act, which prohibits acquisitions that "substantially . . . lessen competition." Mem. 27 (quoting 15 U.S.C. § 18). They contend the Partnership is an "acquisition of assets" within Section 7, enabling a "presumption of illegality" based on statistics showing a threshold level of concentration in an alleged ILS advertising market. Mem. 15, 27–29.

The Court need not reach this issue if it rejects summary judgment on market definition: absent a defined market, Plaintiffs cannot claim a "presumption of illegality" under any test. But

---

[14] The FTC's 2010 merger guidelines, which the Fourth Circuit has cited, also support this approach. 2010 Guidelines at 30 n.14; *see Steves*, 988 F.3d at 704.

even if the Court does reach it, the argument should still be rejected for two primary reasons. *First*, structural presumptions based on market shares apply only to horizontal mergers combining two independent firms. The Partnership is not a merger, and treating it as one defies the law and ignores critical features of the Partnership. *Second*, Plaintiffs' motion is procedurally improper. Rule 56 allows motions for summary judgment on a "part of [a] claim or defense." Whether a presumption applies is not a "part" of a Section 7 claim. Plaintiffs fail to point to any decision in Section 7's 100-plus year history granting the relief they now seek.

### i. *A structural presumption based on market shares is not available.*

In a "typical horizontal merger case under Section 7," a plaintiff can establish a rebuttable structural "presumption" of harm by showing combined market shares reach a threshold percentage. *See Baker Hughes*, 908 F.2d at 982. But courts do not apply a one-size-fits-all approach to Section 7—as the FTC's own guidelines recognize. *See, e.g.*, 2023 Merger Guidelines § 2.9 (multi-sided platforms); *id*. § 2.11 (acquisitions involving partial ownership or minority interests). When a case does not involve a horizontal merger, the presumption of illegality is unavailable, and the plaintiff must "make a fact-specific showing that the proposed merger is likely to be anticompetitive." *U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (vertical merger); *see U.S. v. Penn-Olin Chem. Co.*, 378 U.S. 158, 172–74 (1964) (joint venture); *Texas v. BlackRock, Inc.*, 2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) (partial acquisition of stock).

Plaintiffs ignore this framework, instead assuming that the Partnership can be assessed as a merger so long as it constitutes an "acquisition" within the meaning of Section 7. *See* Mem. 30. But the Partnership is nothing like an ordinary merger. It affects only one side of a two-sided platform, meaning that Redfin continues to compete vigorously with Zillow and other advertisers for web traffic, the attention of renters, and the delivery of leads. SAMF ¶ 15; RSUF ¶ 4. The

28

Partnership is also time-limited, expiring as soon as 2030. SUF ¶ 4. Redfin will then have no relationship with Zillow, and can resume advertising sales or negotiate a new syndication with Zillow or any other firm that advertises apartment buildings. *Id.*

Defendants' expert explained why it is improper to assess the Partnership as a merger. Ex. U at ¶¶ 116–26. Despite calling the Partnership a "████████" merger, Plaintiffs' expert himself has not offered the opinion that, economically, the Partnership fully aligns Zillow's and Redfin's incentives as a merger would. Ex. G at 37:13–38:7, 44:5–12, 204:6–14. At a minimum, this battle of experts on this issue makes summary judgment improper.

Notably, Plaintiffs do not even attempt to explain why a structural presumption should apply to two-sided markets. As Defendants' expert explained, a structural presumption "was designed for traditional, one-sided markets" and cannot account for "the constraints imposed by the interdependence with the other side of the market." Ex. U at ¶ 307. Defendants are not aware of any court applying a structural presumption to two-sided platforms.[15]

>    ii.    ***Moving for partial summary judgment as to a rebuttable structural presumption is improper under Federal Rule of Civil Procedure 56(a).***

Plaintiffs' motion is also procedurally improper. Under Rule 56, a party can move for summary judgment on a claim or defense or "part of each claim or defense." But Plaintiffs' *prima facie* case is not "part of" a Section 7 "claim or defense"; it is simply a tool used by courts to apply a burden-shifting framework. *Cf. U.S. v. Archer-Daniels-Midland Co.*, 584 F. Supp. 1134, 1135

---

[15] Even if the Court assessed the Partnership as a merger, the HHI thresholds in the 2023 Merger Guidelines alone do not entitle Plaintiffs to a structural presumption. The Fourth Circuit has cited only the 2010 Guidelines, not the newer ones, and the Partnership would not be presumptively illegal under a share calculation based on leases generated under the 2010 Guidelines. *See* 2010 Merger Guidelines at 19. As Defendants' expert explains, lease attribution is the most probative measure of competitive dynamics because it reflects "what PMCs and renters ultimately care about"—whether an advertising channel actually fills vacancies by matching renters with apartments. Ex. U at ¶ 304.

(S.D. Iowa 1984) (partial summary judgment as to whether lease agreement was an "acquisition" under Section 7); *Eshelman v. Puma Biotech., Inc.*, 2018 WL 11411207, at *11 (E.D.N.C. Oct. 29, 2018) (partial summary judgment as to two of the elements of a libel claim).  Plaintiffs cite no case resolving the "presumption of illegality" at summary judgment, and this Court has recently denied an identical request.  Minute Sheet at 1, *Steves*, No. 3:16-cv-00545-REP (E.D. Va. Nov. 16, 2017), Dkt. No. 564 (denying Steves's Motion for Partial Summary Judgment, Dkt. No. 381).

That makes sense:  Market share "simply provides a convenient starting point for a broader inquiry into future competitiveness."  *Baker Hughes*, 908 F.2d at 984; *see Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981) ("[F]ocus on market share percentages can produce a distorted picture of market power.").  "[A] true picture emerges only from consideration of additional market characteristics, among them, the strength of the competition, the probable development of the industry, and consumer demand." *Id.* at 128.

But Plaintiffs' motion here points to no evidence besides a bare increase in market share. Mem. 29–30.  Accordingly, even if Plaintiffs are entitled to a presumption under Section 7, that presumption is a weak one and there is no dispute that Defendants will have the opportunity to rebut that presumption through evidence about "the particulars" of the relevant market, *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 158 (D.D.C. 2004), and the "real-world effects" of the Partnership.  *Steves*, 988 F.3d at 715–16.  Thus, Plaintiffs' instant request for a presumption will not narrow the trial in any meaningful sense.

## V.    CONCLUSION

For the foregoing reasons, Defendants request that Plaintiffs' Motion for Partial Summary Judgment be denied.

30

Dated:  June 24, 2026

/s/ Ryan A. Shores
Ryan A. Shores (VA 65934)
D. Bruce Hoffman (*pro hac vice*)
Blair W. Matthews (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1876
Email: rshores@cgsh.com
Email: bhoffman@cgsh.com
Email: bmatthews@cgsh.com

Heather Nyong'o (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
Email: hnyongo@cgsh.com

Beau W. Buffier (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (917) 412-6461
Email: bbuffier@wsgr.com

*Counsel for Defendants Zillow Group, Inc, and Zillow, Inc.*

/s/ Daniel J. Richardson
Daniel J. Richardson (VSB 94961)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7024
Facsimile: (202) 293-6330
Email: richardsond@sullcrom.com

Sharon L. Nelles (*pro hac vice*)
Jeffrey T. Scott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street

31

New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: nelless@sullcrom.com
Email: scottj@sullcrom.com

Kyle W. Mach (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700
Email: machk@sullcrom.com


*Counsel for Defendant*
*Redfin Corporation*

32

## CERTIFICATE OF SERVICE

I, Ryan A. Shores, certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.  In addition, the foregoing document was sent via e-mail to all counsel of record.

Dated:  June 24, 2026

*/s/ Ryan A. Shores*
Ryan A. Shores (VA 65934)