**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br>*Plaintiff*,<br>v.<br>**ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,**<br>*Defendants*. | Case No. 1:25-cv-1638 (AJT-WBP) |
| **COMMONWEALTH OF VIRGINIA, STATE OF ARIZONA, STATE OF CONNECTICUT, STATE OF NEW YORK, and STATE OF WASHINGTON,**<br>*Plaintiffs*,<br>v.<br>**ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,**<br>*Defendants*. | **PUBLIC REDACTED**<br><br>Case No. 1:25-cv-1647 (AJT-WBP) |

**PLAINTIFFS' PRETRIAL BRIEF**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

A. Internet Listing Services Are "Purpose Built" for Showing Rental Listings ........ 2

B. Zillow Is a Leading ILS Competitor ........ 3

C. Redfin Successfully Brought Its Rentals Business to Profitability and Was Valued by PMC Customers ........ 3

D. Redfin and Zillow Engaged in Robust Head-To-Head Competition ........ 5

E. Zillow Sought To Remold the Competitive Landscape ........ 6

F. The Agreements Send Redfin out of a "One-Way Door" ........ 9

G. The Agreements Harm Competition, PMCs, and Renters ........ 11

III. LEGAL FRAMEWORK ........ 13

A. The Agreements Are Illegal Under Section 1 of the Sherman Act ........ 13

B. The Agreements Are Illegal Under Section 7 of the Clayton Act ........ 15

IV. ARGUMENT ........ 17

A. Plaintiffs Have Properly Defined Relevant Markets ........ 17

1. ILS Advertising for Rental Properties Is a Relevant Product Market ........ 19

2. ILS Advertising for Multifamily Rental Properties Is a Relevant Product Market ........ 22

3. Defendants' Demand for a Two-Sided Market Definition Misreads *AmEx* and Would Artificially Constrain the Court's Competitive Analysis ........ 23

4. The United States Is a Relevant Geographic Market ........ 27

B. The Agreements Harm Competition in the Relevant Markets ........ 27

1. The Agreements Are Inherently Anticompetitive ........ 28

2. The Agreements Significantly Increase Concentration in a Highly Concentrated Market, Triggering a Presumption of Harm ........ 29

3. The Agreements Have Resulted in Substantial Anticompetitive Effects ........ 30

C. Defendants Cannot Meet Their Burden to Rebut the Likely Harms to Competition ........ 32

1. Additional Listings on Redfin Do Not Replace the Competition the Agreements Eliminated ........ 34

2. Contracting Convenience Does Not Justify Eliminating PMCs' Ability to Purchase Zillow and Redfin Services Independently ........ 35

3. Increased Exposure and Lead Counts Do Not Establish Improved Advertiser Value ... 35

4. Eliminating Redfin Cannot Be Justified on the Ground That It Makes Zillow a Stronger Competitor Against CoStar ... 36

5. The Claimed Benefits Could Be Achieved Without the Restrictions That Eliminated Redfin's Independent Competition ... 37

6. Defendants Cannot Establish the Failing Firm or Weakened Competitor Defenses ..... 38

D. Recission and Divestiture Are Required to Restore Competition to the Markets ............ 38

# TABLE OF AUTHORITIES

## Cases

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........ 17, 18

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999) ........ 14, 17, 18, 28

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) ........ 40

*Citizen Publ'g Co.v. United States*,
394 U.S. 131 (1969) ........ 38

*Compass, Inc. v. Zillow, Inc.*,
No. 25-CV-05201, 2026 WL 321084 (S.D.N.Y. Feb. 6, 2026) ........ 27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ........ 27, 29

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ........ 18

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969) ........ 13

*FTC v. Edwards Lifesciences Corp.*,
No. CV 25-2569 (RC), 2026 WL 228723 (D.D.C. Jan. 28, 2026) ........ 30, 31

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ........ 31, 33

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) ........ 33

*FTC v. Indiana Fed. of Dentists*,
476 U.S. 447 (1986) ........ 14, 24, 29, 30

*FTC v. IQVIA Holdings Inc.*,
710 F. Supp. 3d 329 (S.D.N.Y. 2024) ........ 22, 32

*FTC v. Kroger Co.*, No. 3:24-CV-00347,
2024 WL 5053016 (D. Or. Dec.10, 2024) ........ 21

*FTC v. Peabody Energy Corp.*,
492 F. Supp. 3d 865 (E.D. Mo. 2020) .......... 20, 21

*FTC v. Penn State Hershey Med*,
838 F.3d 327 (3rd Cir. 2016) .......... 33

*FTC v. Staples*,
970 F. Supp. 1066 (D.D.C. 1997) .......... 18, 19

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) .......... 21

*FTC v. Tapestry, Inc.,*
755 F. Supp. 3d 386 (S.D.N.Y. 2024) .......... 30

*FTC v. Wilhelm Wilhelmsen Holding ASA*,
341 F.Supp.3d 27 (D.D.C. 2018) .......... 22

*Impax Lab'ys, Inc. v. FTC*,
994 F.3d 484 (5th Cir. 2021) .......... 14, 28

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947) .......... 39

*Int'l Shoe Co. v. FTC*,
280 U.S. 291 (1930) .......... 38

*N. Tex. Specialty Physicians v. FTC*,
528 F.3d 346 (5th Cir. 2008) .......... 17

*N.C. State Bd. of Dental Exam'rs v. FTC*,
717 F.3d 359 (4th Cir. 2013) .......... 14, 28

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
468 U.S. 85 (1984) .......... 37

*Nat'l Soc'y of Prof'l Engineers v. United States*,
435 U.S. 679 (1978) .......... 2, 33, 34

*NCAA v. Alston*,
594 U.S. 69 (2021) .......... 14, 33

*Ohio v. American Express Co.* ("*AmEx*"),
585 U.S. 529 (2018) .......... *passim*

*PLS.com v. National Association of Realtors*,
32 F.4th 824 (9th Cir. 2022) .......... 34

*Polygram Holding, Inc. v. FTC*,
416 F.3d 29 (D.C. Cir. 2005)....................14, 28

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....................29

*Robinson v. Nat'l Collegiate Athletic Ass'n,*
172 F.4th 271 (4th Cir. 2026)....................14, 17

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021)....................15, 29, 38, 40

*Times-Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953)....................22

*U.S. Airways v. Sabre*,
938 F.3d 43 (2d Cir. 2019)....................24

*United States v. Aetna Inc.*,
240 F. Supp. 3d 1 (D.D.C. 2017)....................18, 19, 21

*United States v. Am. Airlines Grp. Inc.*,
No. 1:21-CV-11558, Dkt. No. 375 (D. Mass. July 28, 2023)....................39

*United States v. American Airlines Group Inc.*,
675 F. Supp. 3d 65 (D. Mass. 2023)....................30, 31, 36

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017)....................17, 31

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017)....................16

*United States v. Apple, Inc.*,
No. 1:12-CV-2826, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013)....................39

*United States v. Apple, Inc.*,
791 F.3d 290 (2d 2015)....................36

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990)....................17

*United States v. Columbia Pictures Corp*,
189 F. Supp. 153 (S.D.N.Y. 1960)....................16

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)....................18

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) .......... 39, 40

*United States v. Google LLC* ("*Google Ad Tech*"),
778 F. Supp. 3d 797 (E.D. Va. 2025) .......... 19, 20, 24

*United States v. Google LLC* ("*Google Search*"),
747 F. Supp. 3d 1 (D.D.C. 2024) .......... 22

*United States v. Grinnell Corp.*,
384 U.S 563 (1966) .......... 27

*United States v. ITT Cont'l Baking Co*.,
485 F.2d 16 (10th Cir. 1973). .......... 16

*United States v. Rockford Mem'l Corp.*,
898 F.2d 1278 (7th Cir. 1990) .......... 17, 27

*United States v. U. S. Gypsum Co.*,
340 U.S. 76 (1950) .......... 40

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .......... 33

*Washington v. Franciscan Health Sys.*,
No. C17-5690 BHS, 2019 WL 687830 (W.D. Wash. Feb. 19, 2019) .......... 38

**Statutes**

15 U.S.C. § 1 .......... 14
15 U.S.C. § 15 .......... 40
15 U.S.C. § 18 .......... *passim*
15 U.S.C. § 26 .......... 40

**Other Authorities**

2023 U.S. Dep't of Justice and Fed. Trade Comm'n Merger Guidelines .......... 18, 19, 22, 23, 27

## I. INTRODUCTION

More than 30 percent of Americans rent their homes, and finding a new home that fits all of their needs is a critically important process. Online rental internet listing services ("ILSs") serve as purpose-built platforms to help prospective renters find homes and property management companies ("PMCs") find renters. ILS providers compete with one another to offer renters innovative tools to search, filter, and explore available properties, and to entice PMCs to purchase the ability to place listings on their ILS platforms in hopes of attracting renters at a key stage in their search for housing. Over time, however, consolidation in the industry has resulted in fewer and fewer independent ILS providers.

By 2024, Zillow had invested heavily in growing its rentals business and become the most heavily trafficked ILS, and Redfin was one of its few remaining competitors. Redfin competed independently for multifamily advertising customers, acted as a competitive constraint on Zillow, and offered thousands of property managers a meaningful alternative. In other words, Zillow and Redfin independently decided which PMCs to pursue, what products to offer, how to price those products, and how to improve their platforms to better serve their customers. Renters and PMCs alike enjoyed the benefits of this competition.

No longer. In 2025, Zillow sought to "remold[] . . . the competitive landscape." ***Zillow paid Redfin $100 million to stop competing in the ILS market***. Under the challenged Agreements, Redfin exited the market for advertising sold to multifamily properties, transferred key competitive assets to Zillow, and agreed not to return as an independent competitor for up to nine years. Instead of continuing to grow its own competitive offering, Redfin now merely displays a copy of Zillow's multifamily listings. Copies are not competition. And even the immediate consequences of the lost competition are stark: prices went up, and PMCs who previously listed on Redfin removed thousands of properties from ILS websites entirely.

The antitrust laws recognize that competition spurs firms to improve their products, lower their prices, innovate, and respond to customer needs. They "reflect[] a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services," *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 695 (1978), and ensure that firms remain free to innovate and compete aggressively. They do not countenance paying an important rival to leave the market when competition becomes inconvenient.

At trial, Plaintiffs will show that the elimination of competition from Redfin has harmed PMCs and renters in exactly the ways that the antitrust laws predict. Advertising prices have increased, PMCs have removed listings from the market so that renters cannot view them, and Zillow is actively working to [redacted] in order to drive customers to higher priced products. The evidence leaves one clear conclusion: whether viewed as an agreement or an acquisition, the Agreements have reduced competition and harmed customers.

## II. BACKGROUND

### A. Internet Listing Services Are "Purpose Built" for Showing Rental Listings

ILSs help advertising customers fill vacant rental units by providing exposure to renters searching for a home. An ILS is purpose built for showing rental listings and provides an aggregated and centralized database containing listings for available units, along with user-friendly features and detailed property information that users can search and filter by price range, location, unit size, availability date, and other relevant features. ILSs are an indispensable tool for renters. Most potential renters conduct their search online, and they find ILSs to be the most influential online source for their search process.

For PMCs, ILSs provide exposure to a large pool of renters. Access to these renters allows PMCs to generate leads and fill their vacant units. PMCs will testify that ILSs are a key

source of leases and thus a necessary part of their advertising. PMCs will confirm that they cannot replace ILSs because no other form of advertising provides the same quantity and quality of leads that ILSs provide.

### B. Zillow Is a Leading ILS Competitor

By the time of the challenged Agreements, Zillow was already a large and rapidly growing competitor in ILS advertising. Zillow entered rental advertising in the early 2010s from a position of substantial strength in residential real estate and initially developed a particularly strong presence in "longtail" rentals—single-family homes and properties with fewer than 25 units. As reflected in its publicly filed documents with the Securities and Exchange Commission, Zillow over time increasingly focused its growth strategy on the multifamily segment, investing to add large apartment properties and grow multifamily advertising revenue.[1] Leading up to the Agreements, Zillow's investments were paying off—it was gaining listings and growing revenue. For example, in 2024, Zillow's rentals revenue increased 27%, from $357 million to $453 million. Zillow attributed that growth principally to its multifamily business, where revenue increased 42% year-over-year. Average monthly unique visitors to Zillow's rental listings also increased 11%, from approximately 28 million in 2023 to 31 million in 2024.[2] The number of multifamily listings on the Zillow Rentals Network grew from 37,200 in the last quarter of 2023 to 50,000 multifamily listings by September 2024.[3]

### C. Redfin Successfully Brought Its Rentals Business to Profitability and Was Valued by PMC Customers

Redfin entered the ILS advertising business in 2021 through its acquisition of RentPath, an established though struggling provider of rental advertising services and the owner of

---

1 PX1287-048–049.
2 PX1287-048–049.
3 PX1189-012; PX1180-034.

Rent.com, ApartmentGuide.com, and Rentals.com.[4] Over the next several years, Redfin grew and solidified the legacy RentPath business. Redfin integrated RentPath's finance, human resources, and marketing functions into Redfin and reinvested the savings into the rentals business. Redfin increased rental ILS advertising revenue from $156 million in 2022 to $204 million in 2024.[5] In 2024, Redfin's rental ILS advertising business experienced its first year of positive adjusted EBITDA since the 2021 acquisition and registered its ninth straight quarter of growth.[6]

Thousands of PMC customers valued and depended on Redfin's ILS advertising tools, resulting in over $200 million in rentals revenue for Redfin in 2024. [redacted] at the time that Redfin entered into the Agreements in February 2025, it had over [redacted] PMC customers, including more than [redacted] customers who had each paid more than [redacted] to Redfin in the prior year. PMCs will testify that prior to the Agreements, they valued their relationships with Redfin and felt that Redfin was working well for them, including by growing high quality leads. Redfin also served as the cheaper alternative to Zillow and CoStar's Apartments.com for some multifamily properties.

Between January and February of 2025, Rocket Companies, Inc. ("Rocket") made multiple offers to acquire Redfin's entire business. Rocket and Redfin ultimately agreed to Rocket's acquisition of Redfin for $1.75 billion on March 9, 2025.

---

[4] RentPath agreed to file for bankruptcy as a condition of a merger agreement it entered into with CoStar, the owner of multiple large ILSs including Apartments.com, on February 12, 2020. RentPath later terminated the merger agreement after the Federal Trade Commission sued to block the merger as unlawful under Section 7 of the Clayton Act.

[5] PX2060-036, -048.

[6] PX2060-046–048.

### D. Redfin and Zillow Engaged in Robust Head-To-Head Competition

Before the Agreements, Zillow and Redfin competed directly for the same PMC customers and treated each other as significant competitive threats. Within a year of Redfin's entry into the market through its acquisition of RentPath, Zillow identified Redfin as its second-largest ILS competitor by number of site visits behind only CoStar.[7] Zillow understood that it often competed with Redfin for the same customers, listings, and advertising dollars. A May 2023 Zillow analysis created to justify Zillow's initial outreach to Redfin for a rentals agreement observed that PMCs frequently "prioritize their marketing spend on [CoStar's] Apartments.com and then allocate their remaining budget across the landscape, leaving Redfin, Zillow and others to divide the remaining market."[8] In August 2024, a Zillow manager characterized Redfin as a "cheaper competitor trying to grow inventory nipping at our heels."[9]

Zillow's sales strategy reflected the reality of its rivalry with Redfin. In the period prior to the Agreements, Zillow developed for its salesforce a "target hit list" of accounts "currently active on Redfin BUT not on Zillow."[10] In March 2024, Zillow's CFO Jeremy Hofmann asked Senior Vice President of Sales, Michael Sherman, whether Zillow was "aggressively going after Redfin properties." Sherman answered, "Yes. Had already been targeting that as a prospect and Q1 promo."[11] Hofmann responded, "bang bang… [d]rive all these fools into the ground."[12]

---

[7] PX1363-017.
[8] PX1116-002.
[9] PX1194-004.
[10] PX1083-001; PX1086-010 (September 3, 2024) ("Sales Hit List" identifying multifamily properties and their advertising presence across Zillow and three principal competitors: Rent, Apartments.com, and Apartment List); PX1368 ("2024 Q1 Sales Blitz" included targeting active listings from Apartments.com and Redfin).
[11] PX1023-001.
[12] *Id*.

Zillow's ordinary-course documents treated Redfin as a top rival. A March 2024 Zillow "Competitive Battlecard" expressly considered "two top competitors"—Redfin's Rent.com and CoStar's Apartments.com—and provided Zillow sales personnel with talking points for competing against each.[13] Zillow also recognized that Rent's pricing was a competitive strength and could force Zillow to respond with lower prices in turn. In August 2024, members of Zillow's product team learned of Redfin's plans not to increase rates in 2025 and viewed this as an important consideration as Zillow focused on expanding its revenue because Redfin's cheaper pricing created a "tight rope" to walk.[14] And in December 2023, Zillow executives discussed that fear of losing listings was causing Zillow to give "screaming deal[s]," and that competing with Redfin entailed "pil[ing] on salespeople and max[ing] out property growth with uncertain marketing plans."[15]

Redfin was fighting back as well. Redfin employees expressly targeted Zillow accounts and lowered prices to compete for business. In July 2024, one employee reported: "I am targeting Zillow! I have been losing several deals to them due to their lower cost!"[16] Redfin sales leadership further noted in May 2024 that even in the face of Zillow undercutting Redfin pricing, "[w]e have weapons to battle against Zillow."[17] Redfin's strategy at the time was "focus[ed] on winning market share."[18]

**E. Zillow Sought to Remold the Competitive Landscape**

The Agreements arose against the backdrop of this vigorous rivalry, as Zillow sought a way other than competing on the merits to deal with a competitor that was proving costly and

[13] PX1024-007.
[14] PX1194-001, -004.
[15] PX1013-003.
[16] PX2271-007.
[17] PX2265-001.
[18] PX1194-002.

inconvenient to fight. Beginning in 2023, in the face of direct competition with Redfin, Zillow was simultaneously exploring another strategy: eliminating Redfin as an independent competitive constraint. Zillow's contemporaneous documents make its strategic objectives clear. Zillow had first started discussing a plan to "take over Redfin's [multifamily] sales-force efforts and start selling on behalf of both Zillow and Redfin to multi family companies" in February 2023.[19] In May 2023, Rich Barton, co-founder and then CEO of Zillow, sent Glenn Kelman, then CEO of Redfin, a term sheet that contemplated Zillow paying its then competitor Redfin $100 million upfront "for Zillow assumption of [Redfin] contracts" and for Zillow to become the exclusive provider of all multifamily listings to Redfin such that Redfin would no longer compete for multifamily advertising customers.[20]

Zillow's internal analysis touted that "partnering with Redfin" would benefit Zillow by "removing a competitor."[21] But this anticompetitive partnership was hardly Zillow's only option. A formal analysis that was provided to co-founders Lloyd Frink and Rich Barton explained clearly that Zillow did not need to enter an agreement with Redfin: it could already "add buildings at a pretty good pace;" continuing to build its own business would "offer a more controlled/predictable growth plan."[22] What actually drove the decision was just as clear: "a partnership with Redfin offers clear strategic benefits in terms of speed to realize and remolding of the competitive landscape."[23] Zillow also thought an agreement with Redfin would enable Zillow to increase prices. The same analysis reported that in modeling the deal "for [multifamily]

---

[19] PX1000-003.
[20] PX1002.
[21] PX1035-002.
[22] PX1116-006.
[23] *Id*. *See also id*. ("Whstruggle [sic] to compete in a zero sum game against A.com, RDFN, Realtor.com, etc.").

we assume that Zillow's tiered pricing increases to partially close the gap between our current [multifamily] package pricing and the premium rates that [Apartments.com] charges."[24] [redacted].[25]

But Redfin foiled those plans, at least initially, when it decided not to move forward when Zillow first proposed a deal in 2023. In a letter to the Redfin Board of Directors, then CEO Glenn Kelman explained that "Rent and Zillow have nearly the same levels of multi-family demand and supply" and that "it's a good bet that [Rent] can grow significantly" on its own.[26] He also expressed concern that a transaction with Zillow could spell the end of Redfin's rental ILS, stating that Redfin "wouldn't have been able to rebuild Rent if the deal had started to fall apart" and that it would be challenging "to keep Rent R&D together after a [Zillow] deal."[27]

When Redfin initially rejected Zillow's overtures, Zillow followed through competitively. From Redfin's perspective, Zillow "declared war in multifamily,"[28] continuing to compete aggressively against Redfin through 2024, investing to grow its multifamily business, targeting Redfin accounts, and using discounts and promotions to win customers.[29] Zillow also used its ongoing attempts to sign an exclusive syndication arrangement with another platform, Realtor, to pressure Redfin to resume deal negotiations Realtor was a third-party site which at the time had non-exclusive syndication agreements in place with several ILS players, including Redfin. After discussing whether to continue pursuing Redfin or turn back to Realtor, Zillow's Chief Financial

---

[24] *Id.* at 009.
[25] [redacted].
[26] PX2014-002.
[27] *Id.*
[28] PX2139.
[29] *See supra* Section II.D.

Officer Jeremy Hofmann laid out his strategy: if Redfin did not agree to a deal, Zillow should put itself in a position to take "[R]ealtor as close to exclusive as possible which then hurts [R]edfin and potentially brings [them] back to [the] table."[30]

This targeted initiative took its toll, and by the end of 2024, Redfin caved. In the words of former Redfin CEO Glenn Kelman, Redfin made the "near-impossible decision to give up our fight to recruit our own customers,"[31] even though he expected Redfin "to earn roughly the same profits" whether it continued to operate the rentals business on its own or entered a partnership with Zillow.[32] Everyone knew what this capitulation meant. As both Glenn Kelman and lead Zillow negotiator Katie Berroth explained to their respective teams, Redfin was exiting a "one way door" out of rental ILS advertising.[33]

### F. The Agreements Send Redfin Out of a "One-Way Door"

On February 6, 2025, Zillow and Redfin entered into two facially anticompetitive agreements: the Partnership Agreement and the Content License Agreement (collectively, the "Agreements"). Pursuant to the Partnership Agreement,[34] Zillow paid its competitor, Redfin, to terminate its contracts with multifamily rental advertising customers. The Partnership Agreement includes the following terms:

- **Section 1.1**: Requires Zillow to pay Redfin $100 million upfront.

[30] PX1025-002; see also PX1026-002-03 (discussing telling Redfin that it was prepared to be "really aggressive on growth in [multifamily] including doing [an] uneconomic deal w[ith] [R]ealtor to ensure we have exclusivity there" and then "decide from there how we want to play it [with] Redfin").
[31] PX2206-001.
[32] PX2019-007.
[33] PX1036-004 (reporting on call with Redfin negotiators: "Given this is a one way door they want the full commitment of $100M flat regardless of adoption (no earnout)"); PX2019-016 ("Signing a syndication deal is very nearly a one-way door….").
[34] PX1008.

- **Sections 2.2 and 2.3 and Appendix C**: Requires Redfin to use "reasonable best efforts" to help Zillow capture Redfin's former multifamily rental customers, including by introducing Redfin's customers to Zillow sales representatives and providing detailed and confidential customer information to Zillow.

- **Section 2.4**: Sets [redacted], as the "Hard Transition Date," the final deadline for Redfin to terminate its contracts with every multifamily rental customer, regardless of whether they signed up with Zillow.

- **Section 4.1**: Requires Redfin to use "commercially reasonable efforts" to assist Zillow in recruiting and hiring its pick of the Redfin sales employees and contractors who were terminated in connection with the Agreements, including by providing confidential information about employees and their customers.

The Partnership Agreement guaranteed Redfin's exit from the ILS advertising market for multifamily rental properties, and the Content License Agreement[35] foreclosed any opportunity for Redfin to reenter the market for a definite period. The Content License Agreement includes the following terms:

- **Section 1.1**: Prohibits Redfin from competing in ILS advertising for at least five years and up to nine years.

- **Section 3**: Bars Redfin from displaying any non-Zillow multifamily listings on its ILS, such that Redfin can no longer compete for multifamily ILS advertising customers and must end its syndication agreements with all other listings providers.

In connection with the Agreements Redfin terminated nearly 450 employees, including all of its multifamily advertising sales team, and Zillow hired at least [redacted] of these former employees. Through the Agreements, Zillow eliminated the competitive threat posed by Redfin. Redfin has not competed to provide ILS advertising to multifamily customers since the Agreements were executed in February 2025. Roughly eighteen months after entering into the Agreements, Zillow is touting the benefits of diminished competition. Zillow reported "an all-time high of 79,000 multifamily properties," which is "an increase of 15,000 properties, or 23%,

---

[35] PX1009.

from the end of Q2 2025."[36] Zillow's rental ILS advertising revenue increased 31% year over year with multifamily revenue up 42%.[37]

### G. The Agreements Harm Competition, PMCs, and Renters

Prior to the Agreements, Redfin was one of only a handful of meaningful ILS competitors. Zillow and Redfin competed directly on price and quality for many of the same customers. The Agreements destroyed this competition, leading to a loss of choice for PMC customers, higher prices for rental ILS advertising, a reduction in the number of listings, and a reduction in listing quality, which harmed both PMCs and renters alike.

***Redfin Is No Longer a Choice***: Redfin is no longer a competitive constraint on Zillow or a choice for PMC customers. Zillow's documents have dropped Rent.com as a competitor; instead, Zillow's marketing describes Redfin's ILSs as now part of a newly expanded "Zillow Rental Network."[38] PMC customers now have fewer ILS options in a market where choice was already limited. With that diminished choice, PMCs have less negotiating leverage with ILSs, leading to higher advertising costs.

***Prices Have Increased and Will Continue to Increase***: The elimination of competition has also left PMCs with higher prices for ILS advertising without a commensurate increase in quality. One of Zillow's primary goals in pursuing the Agreements was to be able to raise its prices to match the higher prices charged by CoStar on Apartments.com.[39] Zillow has implemented that plan and is achieving that goal. Zillow's Director of Rental Sales directed his team to consider how to "extract as much revenue as possible from Redfin partners."[40] And

---

[36] PX4169-016.
[37] PX4169-002.
[38] PX1140-002.
[39] *See supra* II.E.
[40] PX1219.

Zillow's new sales "playbook" instructed its sales team to take advantage of the "expanded marketshare" and "[u]pgrade, upsell, and sign new [a] contract combining spend" with overlapping Zillow and Redfin customers.[41]

Quantitative analysis also shows that prices went up. Plaintiffs' economic expert Dr. Jeremy Verlinda will testify regarding his findings that across the ILS market, PMCs paid an average of 5.7% more per listing following the Agreements, with per-listing spending on Zillow up 14.5%. This finding is consistent with [redacted][42] And modeling prices along with changes in quality actually makes the harm more pronounced, not less—the quality-adjusted price of ILS advertising across ILSs increased by 6.8%. That increase has occurred despite Plaintiffs' investigation and this litigation, where Zillow has the incentive to strategically delay full price increases to strengthen its litigation position. The worst may be yet to come.

While Defendants may tout that Zillow provided price concessions to incentivize Redfin's unique customers to move to Zillow, those deals were not provided to Zillow's existing customers, and prices rose even with those discounts. In fact, PMC testimony and Zillow documents show that Zillow is raising those promotional rates with each contract renegotiation. PMC customers worry that price increases will continue given the reduction in competition and the loss of leverage associated with a third ILS option.

***Listings Exited the Market After the Agreements:*** The evidence further shows a reduction of output (as measured by listings) after the Agreements, a harm that affects both PMCs and the prospective renters who use ILSs to look for a new rental home. Dr. Verlinda will

---

[41] PX1061-003, -005.

[42] [redacted].

describe how his analysis shows that some Redfin listings exited the ILS channel rather than transition to another ILS when they lost Redfin as an option. Renters no longer have access to these properties on any ILS platform. The share of advertisers' total budget spent on ILS advertising actually *declined* after the Agreements (from 41.1% to 39.8%). Fewer properties are now listed through ILSs, which further confirms that eliminating Redfin reduced advertiser and renter choice. And prices may increase further when Zillow is not under the shadow of litigation, which basic economic theory teaches would drive a further reduction in output as more PMCs decide not to advertise on higher cost ILSs. *See Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969) ("reduced output is the almost inevitable result of higher prices.").

***Reduction in Quality***: The evidence will also show that following the Agreements Zillow [redacted].[44] This diminution of quality harms PMCs who are paying more for less and renters who may not receive information about homes that they may want to rent.

## III. LEGAL FRAMEWORK

### A. The Agreements Are Illegal Under Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. 15 U.S.C. § 1. The ultimate inquiry under Section 1 is whether the challenged agreement harms the

---

[43] PX1209-003–004.
[44] PX1206-030.

competitive process, and courts evaluate that question under different analytical frameworks depending on the nature of the restraint. *See NCAA v. Alston*, 594 U.S. 69, 88–89 (2021); *Ohio v. American Express Co.* ("*AmEx*"), 585 U.S. 529, 540–41 (2018). Certain agreements are so inherently likely to harm competition that detailed market analysis is unnecessary. *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 35 (D.C. Cir. 2005); *see also Robinson v. Nat'l Collegiate Athletic Ass'n,* 172 F.4th 271, 290 (4th Cir. 2026). If "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets," courts may condemn the restraint under the quick-look framework. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *see also FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 459 (1986).

The rule of reason applies "if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market." *Robinson v. NCAA*, 172 F.4th at 291 (quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 374 (4th Cir. 2013)). Under this framework, Plaintiffs bear the initial burden to show that the challenged restraint has produced, or is likely to produce, substantial anticompetitive effects. *AmEx*, 585 U.S. at 541–542. Defendants may then attempt to establish offsetting, cognizable procompetitive justifications. *Id*. If they do so, Plaintiffs may then show that such benefits could be achieved through less restrictive alternatives or do not outweigh the anticompetitive harm. *Id.*; *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021). Under the rule of reason or quick look, the "essential inquiry remains the same—whether or not the challenged restraint enhances competition." *Cal. Dental,* 526 U.S. at 780 (quotation omitted).

Plaintiffs maintain that the quick-look framework is the appropriate standard to evaluate Defendants' Agreements, but the Agreements are illegal under either standard. The Agreements

are inherently anticompetitive because Zillow paid one of its most significant competitors to cease competing for advertising customers and to instead become a "syndicator" that merely shows a copy of Zillow's listings. The intent and effect of these Agreements was for Redfin to exit through a "one-way door" so that Zillow could assume its business and use the resulting increased market power to raise prices and otherwise harm competition.

In addition, Plaintiffs will establish through customer testimony, ordinary course business documents, and expert economic analysis that the Agreements have substantially harmed competition in the relevant markets, and Defendants cannot meet their burden to show cognizable procompetitive benefits sufficient to justify the restraints.

### B. The Agreements Are Illegal Under Section 7 of the Clayton Act

Section 7 of the Clayton Act prohibits acquisitions of assets where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Courts employ a three-step burden-shifting framework to assess whether an acquisition violates Section 7, where plaintiffs first "establish a presumption of anticompetitive effect" by proposing a proper relevant market and showing that the acquisition's effect "led to undue concentration." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021). The burden then shifts to defendants to rebut the prima facie case by either "discrediting [plaintiff's] market-concentration evidence" or showing that the evidence "inaccurately predicts the merger's probable effect on competition." *Id.* at 703–704. If defendants successfully rebut the prima facie case, "the burden of producing additional evidence of anticompetitive effect shifts to the plaintiff[s], and merges with the ultimate burden of persuasion, which remains with the plaintiff[s] at all times." *United States v. Anthem, Inc.*, 855 F.3d 345, 350 (D.C. Cir. 2017) (quotations omitted).

As a preliminary matter, and as Defendants did not dispute during summary judgment briefing, the Agreements constitute an acquisition within the meaning of Section 7. An acquisition of assets under Section 7 includes any transaction that is the "end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse 'effect.'" *United States v. Columbia Pictures Corp*, 189 F. Supp. 153, 182 (S.D.N.Y. 1960). The Agreements transferred Redfin assets to Zillow, and Zillow itself recognized the $100 million upfront payment as payment for intangible customer relationship assets in its quarterly filing with the Securities and Exchange Commission.[45] The exit and exclusivity requirements of the Agreements further demonstrate that the transaction at issue is an "acquisition" of "assets" under Section 7. *See, e.g.*, *Columbia Pictures Corp*, 189 F. Supp. at 183 (analyzing license-distribution agreement that made tv studio the "exclusive distributor" of certain studio films under Section 7); *United States v. ITT Cont'l Baking Co*., 485 F.2d 16, 18-20 (10th Cir. 1973) (agreement causing defendant to "cease production of [its own] bread" was an acquisition of assets), *rev'd on other grounds*, 420 U.S. 223 (1975).

Plaintiffs may show that an acquisition is likely to be anticompetitive either by showing that the acquisition significantly increases concentration in a highly concentrated market (invoking the "structural presumption" of harm) or through direct evidence that the transaction has produced or is likely to produce substantial anticompetitive effects. *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990); *United States v. Anthem, Inc*., 236 F. Supp. 3d 171, 191–92 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). Here, the evidence establishes both. Zillow's acquisition of Redfin's assets, and Redfin's resulting exit, significantly

[45] PX1010-003; PX4001-018.

increased concentration in a highly concentrated market, triggering the structural presumption. The Agreements have also produced substantial competitive harm by eliminating head-to-head competition, resulting in higher quality-adjusted prices, diminished competitive rivalry, and reduced customer choice.

* * *

Although Section 1 and Section 7 establish distinct causes of action, the competitive effects inquiries for both statutes substantially overlap: "both statutes as currently understood prevent transactions likely to reduce competition substantially." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990). For that reason, Plaintiffs address the governing legal standards under Sections 1 and 7 separately but present a unified discussion of market definition, competitive effects, and purported procompetitive justifications and defenses below.

## IV. ARGUMENT

### A. Plaintiffs Have Properly Defined Relevant Markets

A relevant market is the "area of effective competition" between products or services in a certain area. When the nature of an agreement itself reveals its likely competitive consequences, courts need not define a relevant market before condemning the restraint. As a result, if the challenged Agreements fall within the quick-look framework, market definition is not required. *Robinson*, 172 F.4th at 293 n. 12 (market definition is not required to evaluate horizontal agreements not to compete if the agreements have an "adverse effect on competition").[46]

A relevant antitrust market includes a product market and a geographic market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). A relevant product market consists

---

[46] *See also N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 360–63, 370 (5th Cir. 2008) (affirming the FTC's condemnation of restraint deemed "inherently suspect" even though FTC did not define relevant markets); *Cal. Dental*, 526 U.S. at 769–70.

of those products that are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont*, 351 U.S. 377, 395 (1956). The market is established by examining the substitutes that a consumer might employ and "the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 469 (1992). The question is not whether it is theoretically possible to substitute to an alternative product or if there are some special circumstances where substitution could occur. *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 23–24 (D.D.C. 2017). Instead, the relevant inquiry is whether alternative products impose sufficient competitive discipline to prevent anticompetitive harm in the affected area of commerce. *FTC v. Staples*, 970 F. Supp. 1066, 1072 (D.D.C. 1997); U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3.

The Supreme Court has instructed courts to employ a "pragmatic" approach that considers "commercial realities" rather than formal labels. *Brown Shoe*, 370 U.S. at 336. Those commercial realities are reflected in the practical indicia enumerated in *Brown Shoe*; the market does not need to feature every factor. *FTC v. Staples*, 970 F. Supp. at 1075. Courts also routinely consider quantitative analysis of market definition such as the Hypothetical Monopolist Test ("HMT"). The HMT evaluates a proposed market by testing whether a hypothetical monopolist controlling the proposed market could profitably impose a small but significant and non-transitory increase in price. If enough customers would substitute to products outside the proposed market to make that price increase unprofitable for the hypothetical monopolist, the

candidate market has been drawn too narrowly and should be expanded. *Staples*, 970 F. Supp. at 1072; *Merger Guidelines* § 4.3.[47]

### 1. ILS Advertising for Rental Properties Is a Relevant Product Market

ILS advertising for rental properties is a relevant product market because it is a differentiated service and other advertising channels such as search engine marketing, search engine optimization, and social media advertising do not sufficiently prevent harm to ILSs customers.

*Industry Recognition*: Courts pay particular attention to evidence from industry participants and ordinary-course documents when assessing the product market. *Aetna*, 240 F. Supp. 3d at 21, 24; *see United States. v. Google LLC,* 778 F. Supp. 3d 797, 834–35, 838–46 (E.D. Va. 2025) ("*Google Ad Tech*"). PMCs view ILS advertising as a unique channel, providing features, capabilities, and results that other forms of advertising do not, and believe that ILS advertising performs a distinct role in their advertising strategies that they cannot replace with other advertising channels. ILS advertising providers—including Defendants—also recognize that while PMCs advertise on search engines in addition to ILS advertising, it's a "different form of advertising fundamentally" with a "different use case."

*Specialized Vendors*: ILSs are "purpose built" for advertising and searching for rental properties. ILSs provide a centralized portal through which PMCs can list information about their vacant properties, including floor plans, photographs, real-time vacancy information, and building amenities. On the other side of the platform, ILSs offer a large inventory of available properties for rent and the ability for prospective renters to use filters and mapping tools to

[47] The documentary and testimonial support for the evidence below is listed in detail in Plaintiffs' Motion for Partial Summary Judgment, Memorandum in Support and Exhibits 1–59, ECF Nos. 170–71. Plaintiffs intend to submit this evidence through documents, deposition designations, and live testimony at trial.

customize search results. These features make it easier for prospective renters to find advertising customers' properties and ultimately enable ILSs to provide advertising customers with leads from high intent renters whose needs fit the property they are contacting—meaning they are more likely to convert to a lease. Search engines like Google and social media sites like Facebook and Instagram do not offer the same comprehensive listing information, search and filtering features, or integrated property comparison tools of ILSs that allow renters to easily search for and compare relevant rental properties.

*Distinct Customers*. ILSs serve a specific set of advertising customers: property managers who contract with ILSs to advertise their available rental units. Only entities that own or manage rental units can use ILS advertising, and only entities that own or manage multifamily apartment buildings can use ILS multifamily advertising products. *See FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 898–99 (E.D. Mo. 2020). Other forms of advertising are not designed for rental advertising and serve a broader customer set, including other ILSs.

*Peculiar Characteristics*. ILSs provide advertising customers with exposure to a large audience of potential renters and the ability to share detailed, easily searched information about units that are currently available for leasing. ILS advertising products determine a given listing's placement within search results, and in turn how much exposure a customer's listing will receive to prospective renters based on their search criteria. ILSs' ability to aggregate renter exposure and generate a higher number of leads is largely due to their unique functionality. PMCs view search and social media advertising as reaching different renters and serving different purposes.

*Distinct Pricing*. ILS advertising has distinct pricing structures that differ from other forms of advertising. *See Google Ad Tech*, 778 F. Supp. 3d at 834, 838 (relying on "distinct pricing structure" in defining advertising product markets). ILS providers principally sell

subscription plans, with monthly prices that vary by property size and service tier. They also offer pay-per-lease arrangements under which advertisers pay for leases attributed to the ILS. These industry-specific arrangements differ materially from the auction-based cost-per-click and cost-per-impression models used by search and social media platforms.

In addition, Dr. Verlinda will testify that his HMT confirms that rental ILS advertising is a relevant product market. Dr. Verlinda found that a hypothetical monopolist could profitably apply a 10% price increase—a more demanding standard for Plaintiffs than the commonly used 5% benchmark—demonstrating that substitution to non-ILS alternatives would be insufficient to protect customers from that price increase. The qualitative and quantitative evidence thus both support ILS advertising as a relevant product market.

The fact that PMCs use other forms of advertising besides ILSs and "cross shop" between those channels does not mean that ILS advertising (or ILS multifamily advertising as addressed below) are not relevant product markets. When defining a relevant antitrust product market, "[n]ot every competitor—not even every competitor with a functionally interchangeable product—must be included in the product market." *Aetna*, 240 F. Supp. at 23. Courts routinely find that a product may be sufficiently distinct and constitute a relevant antitrust product market even where it serves the same general purpose and is purchased by the same customers as products *excluded* from the market. *See, e.g.*, *Peabody Energy*, 492 F. Supp. 3d at 886. And evidence that customers "cross-shop" or spread their budgets around various options does not mean that all of those options must be in the same antitrust market. *FTC v. Kroger Co.*, No. 3:24-CV-00347, 2024 WL 5053016, at *9–10, 30, 39 (D. Or. Dec.10, 2024) (adopting a "supermarket" market, even though customers "cross-shop" among supermarkets and other types of stores); *accord FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 30–31 (D.D.C. 2015) (holding that "broadline

food distribution" was a relevant product market even though customers could and did move large amounts of their business between channels).

Courts have frequently drawn these distinctions specifically in advertising markets and have held that forms of advertising that are not close enough substitutes need not be included in the same product market. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n. 31 (1953) (holding that newspaper advertising was a product market in part because "[t]he advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in other mass media"); *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 354 (S.D.N.Y. 2024) (concluding that healthcare professional programmatic advertising is a relevant antitrust product market and excluding social media, Google, and other websites from the product market); *United States v. Google LLC* ("*Google Search*"), 747 F. Supp. 3d 1, 129–30 (D.D.C. 2024) ("The fact that advertisers may move money between [different advertising products] to achieve varying goals does not make them substitutes.").

**2. ILS Advertising for Multifamily Rental Properties Is a Relevant Product Market**

The *Brown Shoe* practical indicia further support a market for ILS advertising for multifamily rental properties. Both industry participants and Defendants view multifamily advertising customers as distinct from other rental property customers. Courts recognize targeted customer antitrust markets where a distinct group of customers such as multifamily advertising customers have specific needs, negotiate with sellers on an individual basis, and have been profitably targeted for price increases by Defendants. *See, e.g.*, *FTC v. Wilhelm Wilhelmsen Holding ASA*, 341 F.Supp.3d 27, 46–47, 56 (D.D.C. 2018); *see also* Merger Guidelines § 4.3.D.1. Unlike individual landlords or owners of small numbers of rental units, multifamily advertising customers often manage portfolios comprising hundreds or thousands of units across multiple

properties and geographies. Due to the potentially large number of available units in an individual multifamily property, multifamily advertising customers have greater lead, lease, and exposure requirements than do longtail customers, who have fewer rental units to fill per property. These customers will testify that the commercial needs materially distinguish multifamily advertising purchases from those by smaller property owners.

Defendants themselves recognize multifamily advertising as a distinct competitive market. Defendants developed products specifically for multifamily customers, negotiated enterprise agreements with multifamily customers, tracked competition in the multifamily space, and developed pricing and sales strategies targeting multifamily properties. Further, under the Agreements, Defendants targeted these customers for disparate treatment by requiring Redfin to terminate its contracts with only multifamily advertising customers and use "reasonable best efforts" to help Zillow sign contracts with them.

#### 3. Defendants' Demand for a Two-Sided Market Definition Misreads *AmEx* and Would Artificially Constrain the Court's Competitive Analysis

There is no dispute that ILSs are two-sided in that they provide advertising services to property managers and search tools to prospective renters. But this does not mean the *relevant antitrust market* must be two-sided, as well. *AmEx* expressly distinguished two-sided platforms from the narrower category of two-sided *transaction* platforms. 585 U.S. at 529. A two-sided platform generally "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Id*. at 534. A transaction platform, by contrast, facilitates "a single, simultaneous transaction" that customers on both sides "jointly consume." *Id*. at 545. Its defining feature is that the platform "cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id*. at 535. Because a credit-card network sells that single transaction to the cardholder and the merchant at the same time, the Court held

that the transaction itself constituted the relevant product and that competition had to be assessed in the transaction market "as a whole." *Id.* at 546–47. A one-sided market definition is appropriate here because ILS operators do not sell PMCs and renters a single, jointly consumed transaction. They sell PMCs advertising services that provide exposure to an audience of prospective renters, and they separately provide search tools to renters.

*AmEx's* requirement to define a two-sided antitrust market in the context of transaction platforms does not extend to every platform that exhibits indirect network effects. Indeed, *AmEx* expressly stated that "it is not always necessary to consider both sides of a two-sided platform" and distinguished transaction platforms because of their unusually pronounced interdependence in pricing and demand. *Id.* at 544–45. Judge Brinkema recently rejected an effort to stretch *AmEx* beyond that subset of platforms, emphasizing *AmEx*'s "explicit limitation . . . to two-sided transaction platforms, as opposed to two-sided platforms more broadly." *Google Ad Tech*, 778 F. Supp. at 843–46. She explained that courts must "avoid classifying products as part of two-sided transaction platforms merely because they help customers on one side of a transaction-facilitating industry to improve their capacity to transact." *Id.* at 846 (holding that a matching function did not transform distinct ad-tech services into a single transaction product under *AmEx*). And the Second Circuit has described transaction platforms as a "subset" of two-sided platforms in its narrow holding that "[i]n cases involving two-sided transaction platforms," the market must include both sides. *U.S. Airways v. Sabre*, 938 F.3d 43, 56–57 (2d Cir. 2019).

"[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." *Ind. Fed'n of Dentists*, 476 U.S. at 460. Here, there is no reason why the harm that PMCs face from the loss of an important independent competitor, Redfin, in a highly concentrated market cannot be

assessed directly, given that *AmEx*'s market definition rule for transaction platforms does not apply. That harm—which includes less leverage in pricing negotiations, one less choice of ILSs, and fewer listings on ILSs—is distinct from any effect of the Agreements on renters. Competition should determine the optimal set of ILS offerings to PMCs and renters—not a bilateral payment from Zillow to Redfin to exit the market.

Defendants' proposed expansion to the clear holding of *AmEx* has no limiting principle. Indirect network effects arise whenever participation by one group affects a platform's value to another—as the Supreme Court explained in the context of the relationship between newspaper readers and advertisers. *AmEx*, 585 U.S. at 534–35, 544. But indirect network effects describe an economic relationship; they do not themselves identify the product being sold or establish reasonable interchangeability. Defendants have identified no case that defines a single market encompassing both sides of a non-transaction platform, regardless of whether indirect network effects are present.

In addition, the logical conclusion of Defendants' theory is that renters would get the greatest "benefit" if there were only one ILS in total. If this theory holds, perhaps the next payment to exit will be from Zillow to CoStar. This absurd result demonstrates why Defendants' two-sided platform argument misapprehends the market dynamics in this case and the importance of free-market competition. It is the role of robust ILS competition—not courts, and certainly not Defendants—to determine the most attractive set of offerings, including prices, to both PMCs and renters.

Moreover, Defendants' needlessly formalistic argument rests on a false choice. The Court need not choose between defining a legally and economically coherent market for ILS advertising and considering how ILSs operate as two-sided platforms. And Plaintiffs make no

such request. Indeed, Plaintiffs will present evidence directed to both sides of the platforms. PMC testimony and ordinary-course business documents will explain how renter audience, renter engagement, lead quality, listing coverage, and platform features affect PMC's purchasing decisions. ILS witnesses will explain how platforms compete with each other to attract renters and advertisers and how participation on each side affects incentives to invest in the other. Dr. Verlinda will testify as to the existence and strength of indirect network effects and explain why they do not suggest that advertising and apartment search is a single jointly consumed product or that competition for ILS advertising cannot be analyzed as a distinct market. Plaintiffs will present evidence that the Agreements harm renters by removing listings from the market, reducing Redfin's incentives to attract and retain renters, and diminishing incentives for innovation.

Market definition identifies the product and customers among which competition is being assessed. A one-sided market does not tie the court's hands. It gives the court an economically coherent area of focus—competition among suppliers of ILS advertising to PMCs—while preserving the ability to evaluate the evidence illuminating that competition. Defendants' proposed rule would do the opposite. It would require the Court to define a single product where no single transaction, common price, common output measure, or jointly consumed service exists, and then attempt to "balance" incommensurable effects on PMCs and renters within that artificial construct. Plaintiffs' approach respects both *AmEx* and commercial reality by defining the market around the product actually sold and the competitive alternatives available to its purchasers, while also considering the evidence relevant to how competition in that market works.

#### 4. The United States Is a Relevant Geographic Market

A relevant geographic market is the "area within which the [defendants'] customers . . . can practicably turn to alternative supplies if the defendant[s] were to raise [their] prices." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Here, the relevant geographic market is the area within which advertising customers can find alternative ILS advertising channels if the Defendants were to increase their prices. A properly defined geographic market should correspond with commercial realities. *United States v. Grinnell Corp.*, 384 U.S 563, 572 (1966).

The United States is a proper relevant geographic market in which to analyze the effects of Defendants' Agreements on competition for ILS advertising for rental properties and multifamily rental properties. The four largest ILSs, including Zillow and Redfin, operate nationally. *See Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201, 2026 WL 321084, at *45 (S.D.N.Y. Feb. 6, 2026) (concluding that "online home search platforms operate on a national basis"). And Defendants' Agreements are national in scope. PMCs do not view local or regional ILSs as viable substitutes. ILSs build national brands that meet PMCs' preference for national advertising contracts. And, while Plaintiffs' expert Dr. Verlinda will explain why the United States is a relevant geographic market, Defendants' expert Dr. Gowrisankaran does not even try to rebut that opinion.

### B. The Agreements Harm Competition in the Relevant Markets

Section 1 of the Sherman Act and Section 7 of the Clayton Act both ultimately ask the same fundamental question: whether the challenged Agreements substantially harm competition. *Rockford Mem'l Corp.*, 898 F.2d at 1283. Plaintiffs' evidence satisfies both statutes. The Agreements are inherently anticompetitive; they significantly increased concentration in an

already highly concentrated market; they have already produced substantial competitive harm; and these harms are likely to persist.

### 1. The Agreements Are Inherently Anticompetitive

Where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets," quick-look analysis under the rule of reason is appropriate. *Cal. Dental*, 526 U.S. at 770. The Agreements fall comfortably within that category.

The Agreements are inherently anticompetitive because they eliminate the independent rivalry between Zillow and Redfin to provide ILS advertising to PMCs. Before the Agreements, Zillow and Redfin competed directly for advertiser relationships, pricing, product quality, and innovation. Redfin constrained Zillow's pricing and competitive behavior by offering an independent alternative. The evidence shows that Redfin was not merely a fringe participant; it exerted meaningful competitive pressure and was a close substitute for Zillow and CoStar. Through the Agreements, Zillow paid Redfin $100 million to stop competing against Zillow, terminate its customers and transition them to Zillow, transfer customer information, and cease competing for multifamily advertising relationships. This $100 million payment to Redfin to exit the market and stop competing is inherently suspect and should be presumed unlawful. *See N.C. State Bd. of Dental Exam'rs*, 717 F.3d at 374 (affirming that a horizonal agreement by dentists to force teeth whitening competitors from the market was inherently suspect), *aff'd*, 574 U.S. 494 (2015); *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36–37 (D.C. Cir. 2005) (affirming that a horizontal agreement by record companies to restrict discounting and advertising was inherently suspect); *Impax Lab'ys, Inc.*, 994 F.3d at 493 ("paying a potential competitor not to compete is so detrimental to competition that normally it is a per se violation of the antitrust laws").

The evidence underscores the competitive harm resulting from Zillow's payment to Redfin to exit the market. Zillow's documents show that it developed the idea to enter into rentals agreements precisely because it wanted to "remold[] . . . the competitive landscape" and disrupt the status quo where "Redfin, Zillow and others [] divide the remaining market."[48] Zillow's goal in entering in the Agreements was that by removing Redfin as a competitor it could "partially close the gap between our current [multifamily] package pricing and the premium rates that [CoStar] charges,"[49] which it reaffirmed when it [redacted].[50] Both Zillow and Redfin expected this exit to be permanent, describing it as a "one-way door."[51]

### 2. The Agreements Significantly Increased Concentration in a Highly Concentrated Market, Triggering a Presumption of Harm

The Agreements increased concentration in highly concentrated markets, triggering the structural presumption under Section 7 of the Clayton Act. *See Steves & Sons*, 988 F.3d at 703.[52] Concentration is commonly measured using the "Herfindahl-Hirschman Index" ("HHI"). *Steves & Sons*, 988 F.3d at 703–04. This calculation accounts for both "the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as

---

[48] PX1116-002, -006.

[49] *Id.* at -009.

[50] [redacted]

[51] PX1036-004; PX2019-016.

[52] The evidence also demonstrates that Zillow has market power under the rule of reason. Market power may be proven directly by evidence that the defendant has actually exercised the ability to raise prices above competitive levels, restrict output, reduce quality, or otherwise impose terms that a competitive market would not permit. *FTC v. Indiana Fed. Of Dentists*, 476 U.S. 447, 460 (1986). Market power may also be inferred from a firm's substantial share of a concentrated market when significant barriers to entry or expansion prevent new or existing rivals from defeating an exercise of that power. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also du Pont*, 637 F.3d at 450. Dr. Verlinda will also testify regarding the substantial barriers to entry and expansion, including the need to achieve a critical mass of both listings and renters, which can be difficult for small ILS platforms or entrants to overcome, as well as the costs of brand building, data integration, and developing proprietary search technology.

the disparity in size among those firms increases." *FTC v. Edwards Lifesciences Corp.*, No. CV 25-2569 (RC), 2026 WL 228723, at *22 (D.D.C. Jan. 28, 2026) (quotations omitted). Where, as here, an acquisition "creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly." *FTC v. Tapestry, Inc.,* 755 F. Supp. 3d 386, 459 (S.D.N.Y. 2024) (quoting 2023 Merger Guidelines § 2.1 and applying the structural presumption). "[M]arkets with an HHI greater than 1,800 are considered 'highly concentrated.'" *Id.* at 459 (quoting 2023 Merger Guidelines § 2.1); *see also Edwards*, 2026 WL 228723, at *22 (same).

Dr. Verlinda will testify that he found high market concentration across three dimensions of competitive significance: revenue, lead generation, and site visits. Looking at multiple dimensions of competition to confirm his results, Dr. Verlinda found that for each of these metrics and in each relevant market, the pre-Agreements HHIs were well over the 1,800-point threshold for a highly concentrated market and the changes in HHIs were well over the 100-point threshold for a significant increase in concentration. Defendants' expert calculated an alternate (though flawed) metric that also supports the presumption of illegality (with HHI of 3,200 and a change in HHI of 177 points).

**3. The Agreements Have Resulted in Substantial Anticompetitive Effects**

The Agreements have already produced substantial anticompetitive effects, and they will continue to do so. In assessing anticompetitive effects, courts have looked to direct evidence of harm such as higher prices, reduced output, diminished quality, or other observable deterioration in competitive conditions. *AmEx*, 585 U.S. at 542; *Ind. Fed'n of Dentists*, 476 U.S. at 459. Courts have also examined whether the arrangement changes the participants' incentives to compete. *See United States v. American Airlines Group Inc.*, 675 F. Supp. 3d 65 (D. Mass. 2023), *aff'd* 121 F.4th 209 (1st Cir. 2024). This may occur through the elimination of an independent

competitor—particularly where the firms had competed head-to-head for the same customers. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 717 (D.C. Cir. 2001).

Plaintiffs' evidence of actual and threatened harm easily meets the standards required by the rule of reason. As explained above,[53] Plaintiffs will present at trial evidence that the Agreements resulted in Redfin's exit from the market, higher prices, reduced output and reduced quality, and that all of these harms are likely to continue and worsen over time. This is the prototypical evidence found to establish harm under the rule of reason. For example, in *American Airlines*, the court enjoined the so-called "Northeast Alliance," under which American Airlines and JetBlue agreed to jointly serve certain airline service in Boston and New York. 675 F.Supp.3d at 116. The court found "direct evidence of actual harm" arising from the fact that Alliance "eliminated the once vigorous competition" between the two defendants, engaged in market allocation between them, and the Alliance resulted in "decreased capacity…or reduced consumer choices." *Id*. at. 92–93, 116.[54]

The evidence of harm from the Agreements is also sufficient to establish anticompetitive effects under the relevant Section 7 case law. Here, the Agreements' anticompetitive effects arise from the "elimination of competition between the two merging companies, which may alone constitute a substantial lessening of competition" under Section 7. *Anthem*, 236 F. Supp. 3d at 216; *see also Edwards Lifesciences*, 2026 WL 228723, at *29 (holding that the challenged transaction was "likely to lessen competition substantially" by "eliminating head-to-head competition" between the merging parties); *Heinz*, 246 F.3d at 717 (enjoining merger between

---

[53] *See supra* Section II.G.

[54] The court also stressed that the loss of an independent competitor was especially harmful because it occurred in an already concentrated market with significant barriers to entry. 675 F. Supp. 3d at 114.

second and third largest baby food companies in part because contemporaneous business documents showed that the merger will eliminate competition between the two merging parties at the wholesale level); *IQVIA Holdings*, 710 F. Supp. 3d at 329 (holding that merger would eliminate head-to-head competition where ordinary course documents "reveal evidence of fierce competition").

As in these cases, the record evidence overwhelmingly shows that Zillow and Redfin competed fiercely head-to-head for customers pre-Agreements and that competition ended with the Agreements.[55] Zillow recognized Redfin as a lower-priced competitor that hindered Zillow's efforts to raise prices toward CoStar's higher levels. Zillow likewise targeted Redfin's customers with promotions and discounts, while Redfin targeted Zillow accounts and competed to win market share.

### C. Defendants Cannot Meet Their Burden to Rebut the Likely Harms to Competition

The Agreements did not arise because Zillow needed Redfin's inventory or customers to compete effectively, as evidenced by Zillow's rapid growth before the Agreements. Rather, Zillow pursued the challenged Agreements with the goal of eliminating Redfin as an independent competitor and replacing the rivalry between Zillow and Redfin with a single Zillow-controlled offering. None of the purported procompetitive justifications posited by Defendants during this case justify the Agreements under either Section 1 of the Sherman Act or Section 7 of the Clayton Act.

Although the two statutes employ different doctrinal frameworks, both distinguish genuine competitive benefits from advantages obtained merely by eliminating rivalry. Under Section 1, a cognizable rationale must explain how the restraint enhances competition; it is not

[55] *See supra* Section II.D.

enough that the restraint benefits the parties or simplifies their operations. *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 695. And even if Defendants could establish some cognizable benefit (they cannot), Plaintiffs may show that the benefit could be achieved through less restrictive means. *Alston*, 594 U.S. at 100.

As to Section 7, the Supreme Court has never held that efficiencies can redeem a transaction that has been shown to otherwise substantially lessen competition. Even courts that are willing to entertain efficiencies at the rebuttal stage require defendants to establish that the claimed efficiencies are verifiable, transaction-specific, and sufficient to prevent the threatened competitive harm. *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176 (3d Cir. 2022); *Heinz*, 246 F.3d at 720; *Penn State Hershey Med*, 838 F.3d 327, 348 (3rd Cir. 2016). The necessary showing increases where, as here, the transaction substantially increases concentration and eliminates a close competitor. *Heinz*, 246 F.3d at 720.

At the outset, all of Defendants' purported procompetitive benefits fail because they are based on the long-rejected premise that eliminating competition can be better or more productive than ongoing competition in the market. As the Supreme Court has held, "The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services," and thus "the statutory policy precludes inquiry into the question of whether competition is good or bad." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 695. But here Defendants seek to upend this Congressional directive with their arguments that in this case, in this market, just this one time, *less* competition is better. This argument is both factually false and foreclosed by law. *Id*. at 696 ("[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable"); *see also Viamedia, Inc. v. Comcast Corp.*,

951 F.3d 429, 479 (7th Cir. 2020) (rejecting "procompetitive justifications" that are "simply the result of eliminating competition").

### 1. Additional Listings on Redfin Do Not Replace the Competition the Agreements Eliminated

Defendants contend that the Agreements benefit renters by allowing them to view more rental listings on the Redfin ILSs. This purported benefit is not legally cognizable and fails on the facts. The data shows that adding Zillow's listings to Rent.com and Apartmentguide.com did not result in a lasting increase in views to those ILSs. If more listings is always a benefit to renters, we would expect to see renters flocking to Redfin when the new listings were added. They did not—suggesting that renters do not meaningfully benefit from yet another set of copycat listings offered on Redfin's ILSs. Renters use ILSs to reduce the costs of searching for their next home, but beyond a certain point, additional listings (especially duplicative listings) provide diminishing value. This is especially true when the Agreements actually resulted in more listings exiting the market, thus reducing total output. The dubious benefits of adding yet another duplicative site for Zillow's inventory can hardly outweigh the harm associated with the wholesale destruction of competition that Defendants claim made it possible.

In fact, the Court of Appeals for the Ninth Circuit addressed and rejected an identical argument in *PLS.com v. National Association of Realtors*. 32 F.4th 824, 836 (9th Cir. 2022). There, the defendant sought to justify a group boycott against a competing company in a home sale "multiple listing services" market by arguing that the restraint created a "higher quality product" by allowing buyers' agents to see more listings on one MLS and avoid consulting competing services. *Id*. The court rejected the proposed justification as "nothing less than a frontal assault on the basic policy of the Sherman Act." *Id.* (*quoting Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 695; *see also Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 695 (rejecting "the argument

that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition.”).

**2. Contracting Convenience Does Not Justify Eliminating PMCs’ Ability to Purchase Zillow and Redfin Services Independently**

In another instance of dressing up a reduction of choice in the cloak of efficiency, Defendants also point to the consolidation of PMC’s contracting with Zillow as a single point of contact. However, separate contracts were not merely duplicative paperwork. They were the means by which Zillow and Redfin competed for advertisers. A PMC could compare prices, negotiate different terms, purchase different service tiers, test relative performance, and reallocate incremental spending toward whichever ILS best suited their needs. The Agreements eliminated those choices. PMCs can no longer purchase Redfin advertising without purchasing Zillow advertising or respond to a Zillow price increase by shifting spending to Redfin.

**3. Increased Exposure and Lead Counts Do Not Establish Improved Advertiser Value**

Defendants also claim that the Agreements increased exposure for Zillow customers and generated more leads. Again, this argument fails on the facts. As an initial matter, and as Defendants’ expert admits in his Report, [redacted]. In fact, Dr. Verlinda will testify that [redacted], including a more than [redacted] decrease in leads per listing for properties that were multihoming on Zillow and Redfin. This real-world outcome is consistent with ordinary course documents describing how a large increase in listings can dilute the number of leads each listing receives.[56]

[56] PX1308-002.

But even for the subset of PMC customers that saw increased leads, leads are not ends in themselves. As Dr. Verlinda has shown, spend-per-lead increased following the agreements, so even if leads could be understood as a proxy for quality, an increased cost-per-lead indicates an increased quality-adjusted price. PMCs had to pay more for leads following the Agreements. More significantly, an increase in leads does not necessarily translate to more leases. Differences in lead-to-lease conversion rates significantly influence the value PMCs receive from additional leads. Dr. Verlinda has shown that for the subset of Zillow listings where he had sufficient data to calculate lead-to-lease conversion rates, there was an [redacted] reduction in the number of leases generated per lead. This analysis is supported by Dr. Verlinda's finding that vacancy rates at Zillow-listed properties did not materially decrease following the Agreements. An increase in lower-converting leads is not costless—as ILS providers acknowledge, "leads are work."[57] They increase administrative burden as the PMCs must review and process the incoming leads, set up tours, and assign staff to meet with prospective renters during tours.

#### 4. Eliminating Redfin Cannot Be Justified on the Ground That It Makes Zillow a Stronger Competitor Against CoStar

Finally, Defendants have asserted that the Agreements allow Zillow to compete more effectively with CoStar. But firms "strengthening their own position against one or two rivals—is not a valid justification, and cannot render an unreasonable restraint on trade reasonable, under the Sherman Act." *American Airlines*, 675 F.Supp.3d at 120; *see also United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d 2015) ("[A] preference for collusion over dominance is wholly foreign to antitrust law.").

That is clearly true here. Before the Agreements, CoStar, Zillow, and Redfin vigorously competed to win PMC customers and generate traffic. Redfin's presence supplied an additional

[57] PX3052-003.

source of competition with respect to price, quality, service, and innovation. Eliminating that competitor did not enhance competition, it reduced the number of independent firms and concentrated additional listings, customers, and traffic under Zillow's control. And any claim that the Agreements have spurred competition with CoStar is false. Zillow is clear in its ordinary course documents that it entered into the Agreements so that it could *raise* its prices up to the CoStar level. And at most CoStar has competed opportunistically to pick up Redfin's abandoned PMC listings, ultimately resulting in a stronger CoStar. Zillow may prefer to confront CoStar without simultaneously competing with Redfin, but that is precisely the type of private advantage that is not cognizable as a legitimate procompetitive justification.

#### 5. The Claimed Benefits Could Be Achieved Without the Restrictions That Eliminated Redfin's Independent Competition

In addition to the specific critiques explained above, Defendants' asserted benefits share a common defect. Even if they constituted legitimate benefits, those benefits could be achieved through far less drastic means than Redfin's wholesale withdrawal from ILS advertising competition. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114 (1984). Defendants must establish that obtaining the purported benefits required Redfin to exit the ILS advertising market, transfer its customers and employees, terminate its advertiser contracts, and accept Zillow as its exclusive source of multifamily listings. Defendants will not be able to do so. Zillow and Redfin could have, for example, syndicated content while preserving separate advertiser contracts, independent pricing, and nonexclusive sourcing. The existence of such practical alternatives defeats Defendants' claim of reasonable necessity under Section 1 and transaction specificity under Section 7.

### 6. Defendants Cannot Establish the Failing Firm or Weakened Competitor Defenses

A central theme in Defendants' defense of this case is that at the time of the Agreements Redfin was suffering from severe financial strain, a "bleak reality" that featured stagnant inventory and a significant debt load. As detailed above, this is patently false.[58] Thus, to the extent that Defendants seek to use these claims to legally justify their unlawful Agreements, they cannot meet the legal requirements under either the failing firm or weakened competitor defenses to do so.[59] The failing firm defense may apply only if the acquired firm was on the verge imminent failure, *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 302 (1930), which is not justified by the facts here. Nor can Defendants show that Redfin was a "weakened competitor," which the Fourt Circuit has described as "the Hail-Mary pass of presumptively doomed mergers." *Steves & Sons* 988 F.3d at 714. Moreover, the fact that Redfin's now-parent company Rocket was of course a viable potential acquirer of Redfin's ILS multifamily rentals advertising assets, given that it had made multiple offers for the business prior to the Agreements and ultimately bought the remaining parts of Redfin, is fatal to both defenses.

## D. Recission and Divestiture Are Required to Restore Competition to the Markets

The trial evidence will also support the judicial remedies of recission of certain provisions in Defendants' Agreements and divestiture of certain of Defendants' assets. The relief in an antitrust case must be "effective to redress the violations" borne of the Agreements and "to

---

[58] *See supra* Section II.C.

[59] The failing firm defense is an affirmative defense under Section 7. *Citizen Publ'g Co.*, 394 U.S. 131, 138–39 (1969) ("The burden of proving that the conditions of the failing company doctrine have been satisfied is on those who seek refuge under it."). Defendants did not plead this defense in their answers and therefore waived it. These defenses are not available under the Sherman Act. *See, e.g.*, *Washington v. Franciscan Health Sys.*, No. C17-5690 BHS, 2019 WL 687830, at *4 (W.D. Wash. Feb. 19, 2019).

restore competition" in the ILS advertising markets. *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961). As the Supreme Court has explained, "[i]n an equity suit, the end to be served is not punishment of past transgressions, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947). Where the Government has established a violation of the antitrust laws, "all doubts as to the remedy are to be resolved in [the Government's] favor." *du Pont,* 366 U.S. at 334.

Here, the overwhelming evidence will show that the Agreements have destroyed competition in the markets by dismantling Redfin as a competitor and further consolidating these already highly concentrated markets. As such, the appropriate remedy for these harms must be actions that can "restore competition" to these markets, that is, to encourage additional, restorative provision of rental ILS advertising through new or existing competitors.

First, an appropriate remedy must rescind the anticompetitive provisions of the Agreements, including the exclusivity provisions and other anticompetitive provisions. Courts often remedy unlawful agreements by ordering defendants not to enforce certain contract terms. *See, e.g.*, *United States v. Apple, Inc.*, No. 1:12-CV-2826, 2013 WL 4774755, at *2–3 (S.D.N.Y. Sept. 5, 2013); *United States v. Am. Airlines Grp. Inc.*, No. 1:21-CV-11558, Dkt. No. 375, at 4–6 (D. Mass. July 28, 2023) (Final Judgment and Order Entering Permanent Injunction). This relief would allow Redfin to begin selling rental ILS advertising again in competition with Zillow.

Removing this impediment to competition is necessary but not sufficient to remedy the harm from the Agreements. To fully redress the competitive harm caused by these Agreements and Defendants' related conduct, divestiture of most of the remaining assets of Redfin's ILS

advertising business to a viable competitor is necessary. Divestiture is the "most effective [] of antitrust remedies." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 648 (E.D. Va. 2018) (quoting *du Pont*, 366 U.S. at 326). Particularly for government antitrust plaintiffs, "divestiture is the preferred remedy for an illegal merger or acquisition." *California v. Am. Stores Co.*, 495 U.S. 271, 280–81 (1990); *see also Steves & Sons*, 988 F.3d at 703 ("Divestiture is the customary form of relief in Clayton Act § 7 cases because (among other reasons) it's 'simple, relatively easy to administer, and sure.'" (quoting *Am. Stores*, 495 U.S. at 281)).

Plaintiffs request an order that would require Defendants to divest, at no minimum price, to a buyer approved by Plaintiffs, assets sufficient to reconstruct, at scale, Redfin's ILS advertising business prior to the Agreements. This includes, but is not limited to, the remaining assets of Redfin's ILS advertising business, specifically including the Rent.com, Rentals.com, and Apartmentguide.com websites and related mobile applications (but not including the Redfin.com website), and any such assets from Zillow's rental ILS business as may be necessary to replicate pre-Agreements competition. Divestiture would undo the dismantling of Redfin's ILS advertising business and reintroduce the competition—and all of the benefits that competition brings—that existed in the relevant markets prior to the illegal Agreements. *See United States v. U. S. Gypsum Co.*, 340 U.S. 76, 88–89 (1950) (remedies for antitrust violations need not be "limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal").

Finally, Plaintiff States are entitled to reasonable attorneys' fees and costs. 15 U.S.C. §§ 15, 26.

Date: August 19, 2026 Respectfully submitted,

TODD W. BLANCHE
UNITED STATES ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

/s/ *Dennis C. Barghaan, Jr.*
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

*Local Counsel for Plaintiff Federal Trade Commission*

**FOR PLAINTIFF FEDERAL TRADE COMMISSION:**

/s/ *Allyson M. Maltas*
ALLYSON M. MALTAS
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3646
Email: amaltas@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

JAY JONES
Attorney General of Virginia

*/s/ Tyler T. Henry*
TYLER T. HENRY (Virginia Bar No. 87621)
Senior Assistant Attorney General
DAVID C. SMITH (Virginia Bar No. 80944)
Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia

202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Email: thenry@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia and Local Counsel for Plaintiffs Arizona, Connecticut, New York, and Washington*

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES
Attorney General of Arizona

SARAH PELTON (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Email: Sarah.Pelton@azag.gov

*Counsel for Plaintiff State of Arizona*

**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General

JULIÁN A. QUIÑONES REYES (admitted *pro hac vice*)
FRANKLIN KANIN (admitted *pro hac vice*)
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Email: Franklin.Kanin@ct.gov

*Counsel for Plaintiff State of Connecticut*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General of New York

ELINOR R. HOFFMANN (admitted *pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (admitted *pro hac vice*)
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ (admitted *pro hac vice*)
Senior Enforcement Counsel
MARIA LUISA DI LAURO (admitted *pro hac vice*)
Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Counsel for Plaintiff State of New York*

**FOR PLAINTIFF STATE OF WASHINGTON:**

NICHOLAS W. BROWN
Attorney General of Washington

AMY N. L. HANSON (admitted *pro hac vice*)
Senior Managing Assistant Attorney General
TYLER W. ARNOLD (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division

Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419 (Hanson)
Telephone: (206) 464-7030 (Arnold)
Email: amy.hanson@atg.wa.gov
Email: tyler.arnold@atg.wa.gov

*Counsel for Plaintiff State of Washington*

**Certificate of Service**

I, Dennis C. Barghaan, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: August 19, 2026

/s/ *Dennis C. Barghaan, Jr.*

DENNIS C. BARGHAAN, JR.
Chief, Civil Division
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

*Local Counsel for Plaintiff Federal Trade Commission*