**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>*Plaintiff*,<br><br>v.<br><br>ZILLOW GROUP, INC., ZILLOW INC., AND REDFIN CORPORATION,<br><br>*Defendants*. | Civil Action No. 1:25-cv-1638 |
| COMMONWEALTH OF VIRGINIA,<br>STATE OF ARIZONA,<br>STATE OF CONNECTICUT,<br>STATE OF NEW YORK, and<br>STATE OF WASHINGTON,<br><br>*Plaintiffs*,<br><br>v.<br><br>ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,<br><br>*Defendants*. | Civil Action No. 1:25-cv-1647 |

**DEFENDANTS' PRE-TRIAL BRIEF**

# TABLE OF CONTENTS


I. Introduction ..... 1

II. Background ..... 3

- A. Renters ..... 3
- B. PMCs and Advertising Industry ..... 4
- C. Exclusive Syndication Is Commonplace. ..... 8
- D. Redfin Explores an Exclusive Syndication with Zillow and CoStar. ..... 10
- E. Zillow and Redfin Enter Into the Partnership. ..... 11
- F. The Partnership Has Been Highly Successful, Benefiting Renters and PMCs. ..... 13
- G. The Partnership Will Not Result in Anticompetitive Price Increases. ..... 16

III. Argument ..... 18

- A. Plaintiffs Are Not Entitled to Any Shortcuts Under Section 1 or Section 7. ..... 18
- B. Plaintiffs Cannot Prove Substantial Anticompetitive Effects. ..... 22
  - i. The Evidence Does Not Support Plaintiffs' ILS-Only Markets. ..... 23
    - 1. PMCs substitute ILS advertising with non-ILS advertising. ..... 23
    - 2. The relevant market is two-sided. ..... 27
    - 3. Plaintiffs cannot prove a nationwide geographic market. ..... 29
  - ii. The Evidence Shows the Partnership Is Benefiting Renters, PMCs, and Competition. ..... 29
    - 1. The Partnership has benefited renters. ..... 30
    - 2. The Partnership has benefited PMCs. ..... 32
    - 3. There is no less restrictive alternative. ..... 35
- C. Plaintiffs Have Not Proven That a Divestiture Would Benefit Competition. ..... 36

IV. Conclusion ..... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010)....31

*Berlyn Inc. v. Gazette Newspapers, Inc.*,
73 Fed. App'x 576 (4th Cir. 2003)....25

*Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1962)....25

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)....32

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002)....18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....23

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009)....26

*Ford Motor Co. v. U.S.*,
405 U.S. 562 (1972)....40

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006)....32,33

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004).... *passim*

*FTC v. Food Town Stores, Inc.*,
539 F.2d 1339 (4th Cir. 1976)....23

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)....23

*FTC v. Meta Platforms, Inc.*,
811 F. Supp. 3d 67 (D.D.C. 2025)....24,25,26

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ....................23,27

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006)....................29

*Int'l Salt Co. v. U.S.*,
332 U.S. 392 (1947)....................40

*It's My Party, Inc.*, *v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ....................24,29

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1994)....................34

*Jien v. Perdue Farms, Inc.*,
2020 WL 5544183 (D. Md. Sep. 16, 2020) ....................23

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
415 F. Supp. 3d 703 (E.D. Va. 2019) ....................19

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)....................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................32

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018)....................35

*NCAA v. Alston*,
594 U.S. 69 (2021)....................22,35

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)....................30

*Ohio v. Am. Express Co.* (*Amex*),
585 U.S. 529 (2018).................... *passim*

*Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) ....................20

*Procaps S.A. v. Patheon Inc.*,
141 F. Supp.3d 1246 (S.D. Fla. 2015) ....................32

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....................................................24

*Realcomp II, Ltd. v. FTC*,
635 F.3d 815 (6th Cir. 2011) ....................................................22

*Robinson v. NCAA*,
172 F.4th 271 (4th Cir. 2026) ....................................................18,20,23

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ....................................................22

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) .................................................... *passim*

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
305 F.3d 1124 (10th Cir. 2002) ....................................................25

*Texas v. BlackRock, Inc.*,
2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) ....................................................20

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) ....................................................25

*U.S. v. Am. Airlines Grp. Inc.*,
2023 WL 4766220 (D. Mass. July 26, 2023)....................................................36

*U.S. v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018)....................................................16,20

*U.S. v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019)....................................................20,30

*U.S. v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023) ....................................................18

*U.S. v. Cont'l Can Co.*,
378 U.S. 441 (1964)....................................................24

*U.S. v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025)....................................................37

*U.S. v. Google LLC*,
No. 1:23-cv-108, ECF No. 1810 (E.D. Va. 2025) ....................................................37

*U.S. v. JetBlue Airways Corp.*,
712 F. Supp. 3d 109 (D. Mass. 2024) ....................22

*U.S. v. Sabre Corp.*,
2020 WL 4915824 (3d Cir. July 20, 2020) ....................27

*U.S. v. Sabre Corp.*,
452 F. Supp. 3d 97 (D. Del.), *vacated*, 2020 WL 4915824 (3d Cir. July 20, 2020) ....................27

*U.S. v. Sungard Data Sys., Inc.*,
172 F. Supp. 2d 172 (D.D.C. 2001) ....................26

*U.S. v. U.S. Sugar Corp.*,
73 F.4th 197 (3d Cir. 2023) ....................23

*United States v. American Airlines Group*,
675 F. Supp. 3d 65 (D. Mass. 2023), *aff'd*, 121 F.4th 209 (1st Cir. 2024) ....................32

*US Airways Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019) ....................28

*Verizon Commc'ns Inc.*, *v. Law Offices of Curtis V. Trinko*,
540 U.S. 398 (2004) ....................40

**Rules and Statutes**

Section 7 of the Clayton Act .................... *passim*

Section 5 of the FTC Act, 15 U.S.C. § 45 ....................22

Section 1 of the Sherman Act ....................18,22,23,36

**Other Authorities**

Apartment List, *How Apartment List Helps Properties*, https://perma.cc/DQ3G-3CB2 ....................6

FTC, *A Guide for Potential Buyers: What to Expect During the Divestiture Process* at 2,
https://perma.cc/SW7J-DGSL, https://perma.cc/SW7J-DGSL ....................38

FTC, Bureau of Competition, *Statement on Negotiating Merger Remedies* at 7,
https://perma.cc/Y7GP-KX83 ....................38

FTC Press Release (Sep. 30, 2025), https://perma.cc/5QR7-4BXF ....................1

Remarks of Andrew Ferguson, Chairman, Fed. Trade Comm'n (Mar. 19, 2026), https://perma.cc/7UB7-L8LV; ........................................................................................................1

## I. Introduction

Plaintiffs filed this case as a referendum on exclusive syndication, calling it highly unusual and "inherently suspect." FTC Compl. ¶ 95; States Compl. ¶ 97; MTD Opp. 11, Dkt. No. 87 (exclusivity is "not commonplace"). Using this framing, Plaintiffs cast the Partnership as a ploy to eliminate a "clear market leader[]" and "key" competitor on the rise—Redfin. MTD Order 2 nn.2–3, Dkt. No. 154. Plaintiffs warned that property managers and "Americans who are looking for safe, affordable rentals" would suffer,[1] and continue to describe this case as protecting renters against rising "rental prices across the country."[2]

The evidence at trial will not support Plaintiffs' allegations. There is now no serious dispute that exclusive syndication agreements are common: they have been a feature of this industry for over a decade. *See infra* Section II.C. As with other exclusive syndications, Redfin entered this partnership with Zillow to resolve its persistent inability to grow property listings—its "Achilles Heel." Ex. BG at -013. Far from being a "key" competitor on the rise, Redfin was losing millions of dollars each year on its rentals business, and its challenges were well understood in the industry. *E.g.*, Ex. BG at -014; Ex. AR at -088 (internal Zillow analysis from November 2024 showing that Redfin was "fading," with monthly unique visitors falling to just "half [of] what they had [been] in 2022"). After the Partnership was announced, CoStar [redacted] Ex. BY at -001.

For Zillow, the Partnership represented an opportunity to display "[e]ven more listings for renters," which would "mak[e] it even easier for renters to find their next apartment," "increase[] exposure[,] and deliver[] more leads and leases to our multifamily partners." Ex. AQ at -015. That

---

[1] FTC Press Release (Sep. 30, 2025), https://perma.cc/5QR7-4BXF.

[2] Remarks of Andrew Ferguson, Chairman, Fed. Trade Comm'n (Mar. 19, 2026), https://perma.cc/7UB7-L8LV; see *also* Tr. 7:23–8:16, Dkt. No. 112.

is what happened. Because of the Partnership, the millions of prospective renters who prefer Redfin's websites now have more choices to meet their budgets and other needs. And there will be no evidence of higher rents caused by the Partnership: despite submitting over 200 pages of reports, Plaintiffs' expert economist [redacted] Ex. Q at 49:22–50:13.

The benefits to renters have led to benefits for PMCs. PMCs advertise to find renters to fill vacant units and evaluate each advertising service based on the cost to obtain leads that result in leases. After the Partnership, the amount PMCs pay on a per-lead and per-lease basis has fallen (**Figure 1**). PMCs are also benefiting from greater competition: CoStar—twice Zillow's size—[redacted]. *E.g.*, Ex. BY at -003; Ex. CM, ¶¶ 179–80.

**Figure 1: Percentage Change in Leads and Cost Per Lead After the Partnership**[3]




[3] Ex. CN.

The ultimate goal of antitrust law is to distinguish between agreements "harmful to the consumer" and those "in the consumer's best interest." *Ohio v. Am. Express Co.* (*Amex*), 585 U.S. 529, 541 (2018).[4] Here, the consumer benefits are overwhelmingly positive. And for that reason, this Court should reject Plaintiffs' attempt to condemn the Partnership (and other exclusive syndications) under the antitrust laws.

But even if this Court accepts Plaintiffs' theory of liability, the facts will not support their request to restructure the industry through a complex divestiture remedy. [redacted] Ex. BP at -003–05. But there is no evidence anyone wants to buy these websites—which Redfin itself acquired following a bankruptcy. Nor will Plaintiffs offer any expert evidence that this remedy would improve competition or help consumers—an unsurprising result given the procompetitive benefits of the Partnership for both renters and PMCs. *See* Ex. Q at 81:9–81:13 [redacted] The evidence will instead show that Plaintiffs' requested relief would harm consumers and competition, defeating the very purpose of the antitrust laws.

## II. <u>Background</u>

### A. Renters

Approximately 45 million American households rent their home. Rental prices are increasing: in Washington, D.C., the average monthly rent is approximately $2,500. The "#1 concern" for prospective renters is budget, and its importance has "ticked up over the past 3 years." Ex. AR at -048, -050.

[4] Unless otherwise noted, internal quotation marks, citations, and alterations are omitted from quotations throughout.

Finding an apartment is often stressful and challenging. There is no single "source" for rentals, so renters search multiple options, unsure if they will miss a match. *E.g.*, Ex. AU at -009. In economic terms, renters face significant "search costs." Ex. CM, ¶¶ 58–59. Zillow and Redfin have long shared the same core objectives: simplify the rental shopping experience, display comprehensive listings, and help renters find an apartment that meets their budget and needs. *E.g.*, Ex. AB at -005, -008.

**B. PMCs and Advertising Industry**

Rental properties are owned and operated by landlords and property managers (collectively, property management companies or "PMCs"). About half of the approximately 17 million rental units that turn over every year are in "multifamily" properties—those with at least 25 units—while the rest are smaller "longtail" properties such as single-family homes. Every month a rental sits empty typically represents thousands of dollars in foregone revenue. PMCs thus use various advertising services to fill vacancies.

PMCs allocate their advertising budgets to services that deliver renters who submit "leads" (*i.e.*, requests to learn more about a property) and ultimately sign a lease. PMCs employ sophisticated tools—including software and data science techniques—to judge the return on investment (ROI) for competing advertising sources, measuring ROI based on the volume and quality of leads and leases each source delivers and the cost per lead and cost per lease. *E.g.*, Ex. AC at -004.

The sources that generate leads and leases—and thus compete for PMCs' advertising dollars—include internet listing services, paid search, paid social media, PMCs' websites, and other tools.

**Internet Listing Services (ILSs).** ILSs allow prospective renters to search for vacant units as a list or on a map. ILSs are two-sided platforms connecting renters and PMCs, and they exhibit

strong indirect network effects. *See Amex*, 585 U.S. at 534. This is what Zillow refers to as the "Rentals 1.0 Marketplace": PMCs value an ILS that reaches more renters ("demand"), and renters value an ILS with more listings ("supply"). *See, e.g.*, **Figure 2**; Ex. AA at -026; Ex. AB at -008.

**Figure 2: Zillow Presentation**[5]




CoStar is *by far* the largest ILS by revenue. *See, e.g.*, Ex. Y. It operates eleven rental sites, the largest being Apartments.com. CoStar keeps growing. In January 2023, CoStar listed approximately [redacted] multifamily properties; by late 2024, nearly [redacted] Ex. G. PMCs have long viewed CoStar as the "[redacted]" player—the [redacted]" and "[redacted]" of the industry. Ex. BX at 90:11–13; Ex. BR at 88:2–8, 160:17–25. CoStar's prices are the highest in the industry by a substantial amount. *See, e.g.*, Ex. AM at -008 (2025 Zillow battlecard stating Apartments.com prices are [redacted]

[5] Ex. AB at -008.

Zillow is the second-largest ILS but far behind CoStar, with about [redacted] of CoStar's revenues. *See, e.g.,* Ex. Y. Zillow began as a home sales website and later expanded into rentals. Today, it operates five rentals websites, the largest being Zillow.com. In recent years, Zillow has spent massive resources to expand its multifamily inventory to offer renters a comprehensive marketplace and strengthen its competitor offering. In January 2023, Zillow listed approximately 27,000 multifamily properties; by late 2024, it listed nearly 46,000—healthy growth, but still far from CoStar's [redacted] Ex. G.

Other ILSs include, but are not limited to, Redfin, Apartment List, Zumper, Move, Inc. (also called Realtor.com), Rentable, Yardi (Rentcafe), Dwellsy, and Rentberry. Redfin entered rentals in 2021 by purchasing RentPath (which operated Rent.com and ApartmentGuide.com) following RentPath's bankruptcy. From 2021 to 2024, Redfin invested tens of millions of dollars annually in marketing Rent.com, pursued new growth strategies, and reorganized senior leadership. None of it worked. The business lost more than $200 million in four years. Despite significant investments, Redfin was losing PMC customers, and, due to the declining number of rentals listings, the number of visitors to its websites was in freefall. Redfin's "Achilles heel" was its inventory: while CoStar and Zillow were growing, Redfin's paid inventory declined from just over 23,000 in June 2021 to under 18,000 in January 2025. Ex. BG at -014. Its audience fell from approximately ten million monthly unique visitors in 2021 to approximately six million in 2024. Ex. M.

Meanwhile, Apartment List hosted approximately 29,000 multifamily listings at the end of 2024—more than Redfin's approximately 19,000—and reaches millions of renters a month. Ex. X. Apartment List uses a pay-per-lease model whereby customers pay for the leases delivered rather than purchase a monthly subscription. Apartment List, *How Apartment List Helps Properties*,

https://perma.cc/DQ3G-3CB2. Zumper hosted nearly [redacted] active multifamily listings across the United States at the end of 2024, reaching approximately [redacted] unique users per month. Ex. X, Ex. U. And Realtor currently syndicates multifamily listings from Zillow, displaying those listings to nearly four million monthly unique visitors. Ex. AV, Tab "Unique Visitors."

**Paid Search Engines.** Search engines such as Google enable PMCs to display vacant properties in search results through search engine marketing (SEM, or "pay per click") and search engine optimization (SEO). SEM allows a PMC to pay for preferred placement at or above organic results; SEO refers to efforts to improve a property's positioning within organic results. A renter who clicks on a paid search result is directed to the property's website, where the renter can submit a lead and sign a lease. PMCs frequently use paid search; CoStar found it is used more often than ILSs such as Rent.com. *See, e.g.*, Ex. CA at -009. Zillow's internal documents reflect that Google is "on par" with Zillow for delivering leads and that property managers are shifting money to Google and paid social media. Ex. AN at -009, -016. A CoStar survey found Google to be third-most effective—behind only Apartments.com and Zillow—at delivering high-quality leads with a high lead-to-lease conversion rate. Ex. CA at -010.

**Paid Social Media.** Social media platforms such as Meta (Facebook and Instagram) enable PMCs to advertise rentals on renters' feeds. Renters who click on these advertisements are directed to the property's website, where they can submit a lead and ultimately sign a lease. *See, e.g.*, Ex. BS at 120:10–19. PMCs frequently use paid social advertising. *See, e.g.*, Ex. CA at -009. PMCs usually pay on a per-impression or per-click basis.

**PMC Websites.** Many PMCs maintain robust company websites that allow renters to search and filter for vacant rentals, submit leads directly, and ultimately sign leases. Ex. CC at

82:8–15, 83:4–9; Ex. CH at 31:4–19. "Property management often finds that their most quality/qualified leads come from their website." Ex. BD at -010.

**Artificial Intelligence (AI).** AI platforms like Google Gemini and ChatGPT allow renters to search for rentals by way of sophisticated, tailored conversations about their particular budgetary and other needs. Ex. CJ at 85:2–17. AI is fundamentally changing how prospective renters find, vet, and lease apartments, and thus how PMCs advertise their properties. *See, e.g.*, Ex. AL at -005, -007, -015.

In short, at least 45% of a PMC's leases come from non-ILS sources, Ex. O, and approximately half of PMCs' advertising budgets go to non-ILS services, Ex. BB at -006 (45% of budget for non-ILS). Approximately 12% of PMCs do not use ILSs at all. *Id.*

Unsurprisingly, when an advertising source underperforms, PMCs shift spend toward more cost-efficient alternatives on a property-by-property basis. *E.g.*, Ex. AP at -038; Ex. CD at 103:18–25; Ex. CC at 212:9–18; Ex. CJ at 143:8–12. That reallocation runs in both directions, as PMCs shift between ILS and non-ILS sources. *E.g.*, Ex. CK at -002; Ex. N at -016. PMCs do not value a lease from an ILS more than one from a non-ILS—"[redacted]" Ex. CD at 238:22–24. ILSs recognize these dynamics: [redacted] acknowledged that PMCs recognize Google as a "[redacted]" lead generator for certain PMCs, Ex. D at 49:4–16; Ex. CA at -010, and CoStar called Google a "real threat." Ex. BO at -001.

### C. Exclusive Syndication Is Commonplace.

Rental advertising services face a "chicken-or-egg" problem caused by indirect network effects: to attract renters, they need broad inventory, and to attract properties, they need a large audience. *E.g.*, Ex. R, ¶ 24. Syndication agreements address this challenge. The syndicating party gains access to a new audience for leads and leases, while the recipient expands its inventory, making its platform more attractive to renters. *E.g.*, Ex. BU at 87:21–89:13. Syndication is

particularly important for smaller ILSs that lack the inventory breadth of larger competitors. *E.g.*, Ex. CG at 54:19–55:2.

Exclusivity has been a regular feature of syndication agreements for more than a decade, starting with an agreement between CoStar and Realtor in 2015 and continuing with agreements involving (i) Apartment List and Realtor.com, (ii) Apartment List and Homes.com, (iii) a second exclusive agreement between CoStar and Realtor, and (iv) Zillow and Realtor.com. Ex. CF at -003–04, Ex. CE at -002, Ex. BT at -001, Ex. AD at -009–10; *see also* Ex. BI at -004–05 ([redacted]). The ILSs with the most listings—CoStar and Zillow—have never agreed to syndicate their listings without an exclusivity commitment. The reason is simple: ILSs spend years and significant resources assembling listings inventory—the core of their value proposition. *E.g.*, Ex. CG at 55:3–8. Syndicating those listings to a competitor improves that competitor's brand and makes it more valuable. *E.g.*, *id.* at 60:2–61:1; Ex. D at 242:13–243:1; Ex. CM, ¶¶ 100–02.

Exclusivity has two key benefits. First, it prevents free-riding by prohibiting the receiving party from either using its stronger brand to compete for the same PMC customers—having "their cake and eat[ing] it too," *e.g.*, Ex. A at -001; *see also* Ex. D at 242:13–243:1—or from signing up another syndication provider to create a "superset" of listings. Ex. AH at -001. Second, it prevents PMCs from being confused by multiple sales forces selling access to the same ILS. *E.g.*, Ex. D at 110:8–11, 243:2–8 ("[redacted] Ex. CG at 70:19–71:10. Exclusivity is thus a

key part of the "[redacted]" for the syndicating partner. Ex. D at 96:7–16; *see also* Ex. BU at 181:12–22; Ex. CG at 70:1–18.

By definition, exclusivity means the party receiving the listings no longer sources its own listings (it receives them through syndication), so does not need a sales force. Thus, in 2015, when CoStar and Realtor entered into the first exclusive syndication, [redacted]. Ex. CF at -003–08; Ex. CG at 36:14–23, 161:15–162:14. That does not mean, however, that competition ends. Because competitors receiving syndicated listings are typically paid for every lead generated through their websites, they compete fiercely to attract renters and thus make revenue, including by marketing their brands to consumers and by making their websites more user friendly. *E.g.,* Ex. CG at 138:7–16.

There have been some non-exclusive syndications in the industry among smaller ILSs, where the concerns of free-riding and administrative complexity are less significant. Prior to its 2023 partnership with Zillow, Realtor [redacted]. *Id.* at 40:12–41:3. But as Realtor's CFO said, [redacted]." *Id.* That is why Realtor chose to syndicate with Zillow, which would only do so on an exclusive basis—[redacted] *Id.* at 60:7–61:8; *see also* Ex. D at 110:2–6; Ex. BU at 206:8–14.

**D. Redfin Explores an Exclusive Syndication with Zillow and CoStar.**

Against this backdrop, Redfin first explored a syndication agreement in 2023, negotiating with both CoStar and Zillow to assess whether an influx of listings could turn its rentals websites around. Although both were interested, Redfin decided instead to reorganize its business, hoping that structural changes would reverse its decline. Ex. BN at -003.

Those organizational changes failed. Materials shared with the Redfin Board described its declining inventory as the company's "Achilles heel," Ex. BG at -013, and explained that, because rentals is a "two-sided marketplace," Redfin feared its "decline" would soon "become[] hard to reverse." *Id.* at -013–14. Redfin also observed that Realtor's syndication deal with Zillow had significantly improved the performance of Realtor's websites. *Id.* at -013, -015. So Redfin re-engaged in negotiations with both CoStar and Zillow over potential terms. Ex. C; Ex. BF at -001.

Zillow also remained open to partnering with Redfin in late 2024. For Zillow, its Realtor syndication partnership, which began in 2024, had served as a proof of concept: despite Realtor's significantly smaller audience, Zillow observed that its PMC customers benefited from increased views and leads. *E.g.*, Ex. AR at -109. Zillow viewed a syndication partnership with Redfin as a way to deliver more leads and leases to its PMCs. Ex. AQ at -015–16. Zillow also recognized that Redfin was struggling under massive debt and that its flagship rentals website (Rent.com) was "[f]ading." Ex. AR at -088.

**E. Zillow and Redfin Enter Into the Partnership.**

In February 2025, the Parties signed the Partnership. Ex. AW; Ex. AI. The structure was modeled on the Zillow/Realtor agreement, which in turn drew from prior exclusive syndications. Specifically, Zillow agreed to share every multifamily listing (other than listings from its local ILSs, StreetEasy and Out East) with Redfin, and in turn, Redfin agreed to exclusively display those listings. Ex. AI at -006, -010. The Partnership required Redfin to terminate its ongoing customer relationships by July 31, 2025. As part of the Partnership, Redfin also agreed to use its best efforts to refer properties advertising with Redfin to Zillow by way of an email introduction. Ex. AW at -002.

In terms of compensation, Zillow agreed to pay Redfin $100 million upfront and an ongoing per-lead fee. Ex. AW at -001, -012; Ex. AI at -025. Although Plaintiffs have made the

up-front payment the fulcrum of this case, it reflects a small minority of the [redacted] *E.g.*, Ex. AK at -027 ([redacted]).

By structuring the Partnership with an upfront payment, Zillow and Redfin aimed to achieve two goals. First, the upfront payment would strengthen Redfin's balance sheet at a time when the company was cash poor. *E.g.*, Ex. AS at -005; Ex. BC at -002 ("The $100 million payment Redfin got via the partnership strengthens our balance sheet and partly funds a 38% increase in 2025 advertising."). That was important because the Partnership's value hinged on Redfin continuing to invest in its rentals websites and drive traffic—ultimately creating leads and leases for PMCs.[6] Second, Zillow recognized the opportunity to potentially add properties to its network. Ex. B at -004, -018 (Zillow accounting document explaining that the upfront payment provided "access to the [sic] Redfin's rentals customers," including "contact information and sales data" for Redfin's multifamily customers).

Redfin projected the syndication with Zillow would put it "back on track to overtake Realtor's traffic in 2026." Ex. BG at -013. Upon the announcement of the deal, other industry players recognized Redfin's optimism made sense. *See* Ex. BV at -002; Ex. BU at 138:22–139:7.

Under the Partnership, Zillow needed to persuade properties previously advertising with Redfin—but not Zillow—to join Zillow's network. To do so, Zillow competed aggressively: for properties advertising on Redfin but not Zillow, Zillow offered the equivalent package at the price they were paying Redfin. Ex. AG at -013. These properties could thus access a much larger rental audience—Redfin's *and* Zillow's—for the same cost. Zillow also offered properties advertising with both Zillow and Redfin the option to combine their expenditures for an upgraded package

[6] Zillow and Redfin's syndication agreement even obligates Redfin to deliver a minimum number of leads ([redacted]) each month. Ex. AI at -007–08.

tier, meaning much greater exposure and significantly more leads and leases for the same cost. In the end, [redacted] of [redacted] Redfin properties not on Zillow chose to advertise with Zillow. Others chose CoStar, Apartment List, Zumper, smaller ILSs, or non-ILS options.

The Partnership has an initial five-year term ending in June 2030, with two automatic two-year renewal terms unless either party terminates beforehand. Ex. AI at -002. If the Partnership is not renewed, a one-year "Wind-Down" period allows Redfin to rebuild its sales force and begin selling to PMCs. *Id.* at -005, -023. And when the Partnership ends (as soon as 2030), Redfin will have a much more powerful platform: within months of the Partnership, Redfin saw gains in web traffic, brand awareness, and lead conversion rates. *E.g.*, Ex. BH at -004, -013–14; Ex. BM at -008, -250.

### F. The Partnership Has Been Highly Successful, Benefiting Renters and PMCs.

Consistent with prior syndication agreements in this industry, the Partnership has benefited renters, PMCs, and competition as a whole.

**Renters.** The Partnership has created enormous benefits for renters in the form of more choice and heightened competition for their attention. Because of the Partnership, multifamily properties listed on Redfin's websites more than tripled, expanding from just fewer than 20,000 to over 64,000 by December 2025. Ex. CM, ¶ 159, Ex. I. Multifamily properties listed on Zillow's websites also increased, from nearly 46,000 to over 64,000. Ex. E. These increases provided immediate benefits to renters. Millions of prospective renters visited Rent.com but not Zillow before the Partnership, and even more visited Zillow but not Rent.com. Ex. L. Those renters previously could not see the listings on the other's website. Now they can.

This increase in property listings allows renters to make better choices and stay within budget. For example, as shown in **<u>Figure 3</u>**, before the Partnership, a renter searching on Redfin for a one-bedroom apartment in Arlington, Virginia, with a $2,000–$2,500 rent range could browse

fifteen properties. After the Partnership, that same renter can browse forty-five properties, twenty-six of which were previously available only on Zillow.[7] Ex. P. These benefits are not isolated: the Partnership increased multifamily listings available to renters on Redfin's websites in over [redacted] of local geographies and on Zillow's in 85%. Ex. J; Ex. K.

**<u>Figure 3: Example of Change in Listings on Redfin[8]</u>**




Prospective renters also benefit from increased competition for their attention. Redfin is strongly incentivized to improve its renter experience and drive traffic to its websites to earn per-lead revenue. Although Plaintiffs originally claimed that lead caps would disincentivize Redfin from investing, FTC Compl. ¶ 85; States Compl. ¶ 88, Defendants' expert found [redacted] Ex. CM at n.140. Moreover, Redfin now has a self-sustaining rentals business that runs at lower cost and can spend more on marketing and technology to attract and serve renters. *E.g.*, Ex. BJ. With more multifamily listings, that spending delivers results: paid traffic to Redfin's websites has increased

[7] Four properties meeting these specifications began advertising on Zillow and Redfin after the Partnership. Ex. P.

[8] *See* Ex. P.

significantly, and Redfin converts those renters into leads at a much higher rate. Ex. BL at -005; Ex. BM at -008.

Because the Partnership has been so successful, Zillow is paying [redacted]. *E.g.*, Ex. AT at -005–06. So Zillow has doubled down on efforts to drive more renters to its websites, investing in marketing and improving the shopping experience. *E.g.*, Ex. AE at -004–05.

**PMCs.** The benefits to renters have translated into benefits to PMCs. PMCs advertising with Zillow have received more of what they care about most: leads to fill vacancies. Properties that previously listed on only Zillow or Redfin have received approximately one-third more leads, reflecting the benefit of reaching a new audience. Ex. CN. Zillow's internal estimates confirm the Partnership increased leads per property overall. *E.g.*, Ex. AO at -029.

The Partnership has also generated more leases. An internal Zillow estimate of its ability to fill vacancies relative to CoStar found that, although Zillow lagged behind CoStar before the Partnership, it has since reached parity. Ex. AO at -013. Plaintiffs' own expert found that Zillow properties on a pay-per-lease package [redacted]. Ex. S; *see also* Ex. BR at 124:24–125:11 (PMC discussing increased leases).

Importantly, the Partnership makes advertising more cost effective. As discussed above, PMCs care most about cost per lead and cost per lease. As a result of the Partnership, cost per lead on Zillow properties has decreased by an average of approximately 26%—a decrease reflected in ordinary course documents of Zillow's customers. *See* **Figure 1**.

In addition, the Partnership has improved competition with CoStar—widely considered the "[redacted]," most expensive industry giant. Ex. BX at 90:11–13. Historically, Zillow had about

[redacted] fewer multifamily properties than CoStar; with the Partnership, that gap has narrowed to approximately [redacted] Ex. CM, ¶¶ 171–72. PMCs have noticed. Ex. CH at 213:5–9 (the Partnership made Zillow's network "[redacted]"); Ex. BX at 106:20–22 [redacted]

Further, in response to the Partnership, CoStar began offering additional discounts and promotions—including matching competitors' rates and offering free months—which other industry participants observed. *E.g.*, Ex. BS at 177:3–20; Ex. BR at 127:1–23; Ex. AJ at -001 ("[P]artners have shared that Apartments.com have begun [sic] price matching, offering free months, and discounting in an effort to sell more properties."); Ex. BY at -003 ("[redacted]"). After the Partnership, spend per property for [redacted]. Ex. H, ¶¶ 179–80.

Indeed, CoStar was so threatened by the Partnership that it sought the government's help. [redacted]. Ex. BZ. Of course, and importantly, CoStar would *benefit* from a Partnership that *raised* pricing to anticompetitive levels. Thus, CoStar's opposition can be explained only by its desire to avoid the procompetitive, competition-enhancing aspects of this Partnership. *U.S. v. AT&T Inc.*, 310 F. Supp. 3d 161, 214 (D.D.C. 2018).

**G. The Partnership Will Not Result in Anticompetitive Price Increases.**

Based on depositions and prior pleadings, Plaintiffs appear to argue that Zillow will harm PMCs through nominal price increases—*i.e.*, the top-line price of an advertising package. But the prices that matter to PMCs—cost per lead and per lease—have *decreased* after the Partnership. Plaintiffs will not be able to prove that these quality-adjusted prices are likely to exceed pre-

Partnership levels. [redacted] Otherwise, Zillow risks "churn" to competitive alternatives like other ILSs and Google, which would in turn lead to a less-engaged renter audience and a declining platform. *E.g.*, Ex. AI at -061; Ex. AF at -049. To be sure, Zillow generally raises the price of its subscription packages annually, like everyone else in the industry. But the evidence will show that those prices are based on the value Zillow delivers.

In any event, Zillow's model for the 2025 Partnership does not incorporate a nominal price increase. So Plaintiffs have pointed to discussions from 2023, which explain that a nominal price increase may be possible because the Partnership would result in an "increased audience" and greater value for PMCs. Ex. Z at -004. But in those same discussions, Zillow recognized that if Redfin did not successfully deliver leads, Zillow could lower prices "to keep $ / lead constant." *Id.* at -015.

Plaintiffs also appear to fault Zillow for expecting—and encouraging—PMCs to upgrade their packages as a result of the Partnership. Zillow believed PMCs would choose to upgrade because the Partnership would both improve the value of the Zillow network and result in cost savings. *E.g.*, *Id.* at -006. There is nothing wrong with that. PMCs derive significant value from higher product tiers—including greater visibility, additional data insights, and more leads and leases. So long as PMCs are getting a strong cost per lead, they are better off. And PMCs were not required to select any particular package and may change their tier with ease. A PMC's choice to upgrade is not evidence of harm.

## III. Argument

### A. Plaintiffs Are Not Entitled to Any Shortcuts Under Section 1 or Section 7.

Plaintiffs challenge the Partnership under Section 1 of the Sherman Act and Section 7 of the Clayton Act. For both claims, Plaintiffs typically carry their prima facie burden by proving a well-defined market and anticompetitive effects. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (Section 1); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021) (Section 7). Here, however, Plaintiffs seek to bypass their burden by proceeding under Section 1's quick-look or "inherently suspect" standard, MTD Opp. at 7–13, or by establishing a structural "presumption of illegality" based on Defendants' market shares. MSJ Mem. at 27–30, Dkt. No. 173. The evidence at trial will not support either argument.

**Section 1.** Quick-look review is reserved for rare circumstances where (i) courts have extensive experience with the agreement at issue and (ii) can be confident, without a full review of the record, that the agreement is so obviously anticompetitive. *Robinson v. NCAA*, 172 F.4th 271, 291 (4th Cir. 2026). On the first prong, Plaintiffs have not pointed to a single decision addressing (let alone condemning) an exclusive syndication agreement. That alone makes quick-look improper and means the "default" rule-of-reason framework should apply. *U.S. v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023).

On the second prong, as described more fully above, the record will show that exclusive syndication agreements are a pervasive and procompetitive feature of the rentals advertising industry—not something that is obviously anticompetitive or "inherently suspect." Exclusivity prevents the recipient of syndicated listings from free riding off Zillow's yearslong investments in growing its multifamily inventory and preserves the incentives to innovate and compete for renters. *E.g.*, Ex. CM, ¶¶ 89, 101–02; Ex. CL at 62:12–14. Courts recognize that restrictions aimed at preventing free-riding benefit competition. *See, e.g.*, *Amex*, 585 U.S. at 551 (describing anti-

steering restrictions that prevented free-riding and protected Amex's network). That is true even when they limit competition among horizontal rivals. *See, e.g.*, *Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 713 (E.D. Va. 2019) (restraints benefit competition when they "contribute to the success of a cooperative venture that promises greater productivity and output").

At summary judgment, Plaintiffs seemed to pivot to an argument that not *all* exclusivity agreements are unlawful, but *this one* is. For example, they suggested it was improper for Redfin to receive a syndication from Zillow because [redacted]. MSJ Reply at 19 n.11. They also asserted that syndications did not "require[] one party to terminate its PMC customer contracts, help transition its PMC customers and employees to a competitor, hand over competitively sensitive information, and stop competing in exchange for an upfront payment from a rival." MSJ Reply 19.

Plaintiffs' claims are not supported by the evidence. To start, prior exclusive syndications also required the party receiving listings to terminate or limit their PMC relationships as a function of exclusivity. *E.g.*, Ex. CF at -003–04 ([redacted]); Ex. AD at -007–08 ([redacted]); Ex BI at -004–05 ([redacted]). And CoStar and Realtor's 2015 agreement required [redacted]. Ex. CF at -008. Those requirements did not eliminate competition, as the facts here demonstrate: after the Partnership, [redacted] of customers choose to go to [redacted], instead of signing on with Zillow. Ex. W (finding [redacted] of revenues from properties advertising with Redfin before the Partnership shifted to CoStar or elsewhere after the Partnership).

Nor does the fact that some compensation was paid up front ($100 million out of an expected overall payment of over [redacted] make the Partnership inherently suspect. Surely

Plaintiffs are not claiming that the legality of an exclusive syndication turns on payment terms—whether compensation is paid up front, over time, or some mix of the two. An upfront payment made sense here, as evidenced by the fact that [redacted]. Redfin used that payment to invest in the renter experience—making renters better off. *See AT&T Inc.*, 310 F. Supp. 3d at 193 ("The principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively.").

At the very least, all this highlights why applying quick-look review is inappropriate: Under Plaintiffs' own arguments, any differences between the Partnership and other syndications turn on a detailed examination of the facts on the ground. And that means that a court must engage with the full record to understand the Partnership's effects under the rule of reason, rather than condemning the Partnership under the quick look standard. *Robinson*, 172 F.4th at 291.

***Section 7.*** Plaintiffs will also argue they are entitled to a presumption of harm under Section 7 based on Zillow and Redfin's shares in the alleged ILS advertising market. The Court need not reach that argument if it rejects Plaintiffs' proposed ILS-only market (discussed below). But even if Plaintiffs' proposed market were proper, the presumption is unavailable. Although Section 7 covers asset acquisitions, the structural presumption applies only to horizontal mergers—which this is not. Instead, the plaintiff must show through real-world evidence that the transaction is likely to substantially lessen competition. *See Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) (explaining that a "joint venture" is not "controlled by the same criteria as [a] merger or conglomeration" that "eliminates one of the participating corporations from the market"); *see also U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (vertical merger); *Texas v. BlackRock, Inc.*, 2025 WL 2201071, at *4–7 (E.D. Tex. Aug. 1, 2025) (partial acquisition of stock). The evidence will demonstrate the Partnership is not a horizontal merger for several reasons.

*First*, Zillow and Redfin are competing for renters and, specifically, for leads under the Partnership. That is why they are making investments to compete for web traffic. As a result of this competition, Zillow and Redfin are not incentivized to jointly maximize profits—which is the hallmark of any merger. Ex. CM, ¶¶ 116, 120. As this reflects, the Partnership operates in a two-sided market, and no court has ever applied the presumption based on shares on only one side of a two-sided market. Ex. CM, ¶ 307.

*Second*, although Defendants do not dispute "acquiring" customer information as an accounting matter and under Section 7's broad reach, Zillow did not acquire Redfin's PMC contracts and instead competed fiercely for them. In fact, CoStar hired more Redfin salespeople than did Zillow and used those salespeople's relationships to win a significant share of former Redfin PMCs. Overall, many PMCs decided not to transition to Zillow, instead switching to other advertising sources. *Id.* ¶ 118.

*Third*, the evidence will show that the Partnership may end as soon as 2030 and that Redfin has already begun considering how it might operate its rentals business without a Zillow syndication if the Partnership ends. The short-term nature of the Partnership amplifies the battle between Zillow and Redfin for web traffic because a strong website will allow Redfin to offer a more attractive advertising option to PMCs after the end of the current agreement. *Id.* ¶¶ 124–125.

Simply put, the evidence will show that the Partnership is not a merger and should not be assessed as such. But even if the Court accepts Plaintiffs' framing and applies a structural presumption, the outcome will not change. The burden of production—but not persuasion—shifts to Defendants to produce rebuttal evidence, and this burden is "relatively low." *U.S. v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 147 (D. Mass. 2024) (quoting *United States v. Anthem, Inc.*,

236 F. Supp. 3d 171, 213 (D.D.C. 2017)). Defendants can rebut the presumption through evidence about "the particulars" of the relevant market, *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 158 (D.D.C. 2004), and the "real-world effects" of the Partnership, *Steves*, 988 F.3d at 715–16. Plaintiffs' attempt to sidestep their burden will not allow them to avoid the extensive record showing that the Partnership benefits renters and PMCs alike.

**B. Plaintiffs Cannot Prove Substantial Anticompetitive Effects.**

Under Section 1 and Section 7, Plaintiffs must prove harm to competition in a properly defined market.[9] Under Section 1, Plaintiffs must prove "that the challenged restraint has a substantial anticompetitive effect." *NCAA v. Alston*, 594 U.S. 69, 96 (2021). If they do, "the burden then shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If "defendant[s] can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 96–97. Although Section 7 employs its own burden-shifting framework, Plaintiffs always bear the ultimate burden of persuasion of showing that the conduct is likely to "substantially lessen competition in a relevant market." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 791 (9th Cir. 2015).

Plaintiffs cannot prove a violation of Section 1 or Section 7 for two reasons. First, they cannot prove a properly defined relevant market: their proposed markets exclude reasonably interchangeable substitutes, fail to encompass both sides of a two-sided market, and overlook local

[9] The FTC also alleges the Partnership violates Section 5 of the FTC Act, 15 U.S.C. § 45. "Because 'the FTC Act's prohibition of unfair competition and deceptive acts or practices . . . overlaps the scope of § 1 of the Sherman Act . . . aimed at prohibiting restraint of trade,' [courts] rely upon Sherman Act jurisprudence in determining whether the challenged policies violated Section 5 of the FTC Act. *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 824 (6th Cir. 2011) (quoting to *Cal. Dental*, 526 U.S. at 762 n.3).

competition among ILSs. Second, the evidence shows that renters, PMCs, and competition as a whole are better off post-Partnership.

**i. The Evidence Does Not Support Plaintiffs' ILS-Only Markets.**

At the threshold, Plaintiffs must prove a well-defined relevant market.[10] *See, e.g.*, *Robinson*, 172 F.4th at 292–93 (Section 1); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344 (4th Cir. 1976) (Section 7). This burden to offer and prove a valid market definition is on the Plaintiffs alone, and Defendants need not offer an alternative. *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 815 (S.D. Tex. 2025). Plaintiffs' failure to prove the relevant market is dispositive. *See U.S. v. U.S. Sugar Corp.*, 73 F.4th 197, 208 (3d Cir. 2023). Plaintiffs will be unable to prove their relevant market on multiple grounds.

*1. <u>PMCs substitute ILS advertising with non-ILS advertising.</u>*

Relevant markets are defined by "commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). Those realities here are clear: PMCs substitute advertising spend between ILSs and non-ILS advertising in response to changes in price and quality, constraining ILS pricing. That means they are in the same market.

In arguing otherwise, Plaintiffs argue for an ILS-only market because (i) ILSs have a different form and functionality from other advertising options, (ii) the *Brown Shoe* factors support

---

[10] Plaintiffs may argue they can forego a well-defined relevant market if they offer "direct" evidence of anticompetitive effects in the form of higher prices, reduced output, or lower quality. S*ee, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986). But *Amex* makes clear that direct evidence of anticompetitive effects still requires proof of these effects "*in the relevant market*." 585 U.S. at 542 (emphasis added). Courts in this Circuit agree. *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *9 (D. Md. Sep. 16, 2020) (rejecting a similar argument). In short, under the "full rule of reason analysis, including definition of the relevant market[] is required." *Id.*

that result, and (iii) Dr. Verlinda opined that a single owner of the five largest ILSs could profitably raise prices. Each of these arguments misunderstands the law or misstates the evidence.

**Form and function.** For purposes of market definition, the critical question is the "extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.,* the cross-elasticity of demand." *It's My Party, Inc.*, *v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016); *Arch Coal*, 329 F. Supp. 2d at 121; *see, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) ("Interchangeability implies that one product is roughly equivalent to another for the use to which it is put").

The evidence at trial will show that PMCs make advertising decisions based on the volume of leads and leases an advertising tool delivers and the cost to generate them—regardless whether it is an "ILS." Ex. CJ at 143:8–12; Ex. CC at 212:9–18; Ex. CD at 105:8–106:14. Defendants' expert confirms that PMCs vary the share of their budgets spent on ILSs year to year, and some PMCs avoid ILS advertising entirely. Ex. N. This existing substitution indicates that PMCs would turn to non-ILS services if ILSs increased prices. *See, e.g.*, *Arch Coal*, 329 F. Supp. 2d at 121–22 (rejecting submarket for 8800 Btu coal where "virtually all" customers "acknowledged that they can and do purchase and consume" multiple types of coal despite some customers preferring one type over the other); *U.S. v. Cont'l Can Co.*, 378 U.S. 441, 452–53 (1964).

Plaintiffs have characterized this substitution as mere "cross-shopping," which they claim is not enough to put different advertising channels in the same market. *See* MSJ Reply 4. But if substitution is not enough to put products in the same antitrust market, it is unclear what is: market-definition analysis is all about substitution in response to a price increase. *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 98 (D.D.C. 2025). Indeed, by Plaintiffs' logic, substitution between two ILSs would not be enough to put them in the same market either because that would just be "cross-

shopping." That is wrong. As the Fourth Circuit held in *Berlyn Inc. v. Gazette Newspapers, Inc.*, "all of [the alternatives] are within the same product market, to the extent that they are competing for the same limited pool of advertisers' dollars." 73 Fed. App'x 576, 583 (4th Cir. 2003).

Plaintiffs are likely to observe that some PMCs may not fully switch away from ILSs in response to a price increase. But the presence of some non-switching customers is not the critical question: it is whether *some* customers would switch *enough* of their spend to discipline a price increase. *See, e.g.*, *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131–32 (10th Cir. 2002) (plaintiffs must show enough non-switching customers "to render the market as a whole non-cross-elastic"); *Arch Coal*, 329 F. Supp. 2d at 122. Here, the evidence will show customers already are switching between ILS and non-ILS options.

***Brown Shoe* factors.** The Supreme Court in *Brown Shoe Co. v. United States* made clear "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. 294, 325 (1962). The factors identified by the Court are "evidentiary proxies" for that inquiry, not replacements for it. *Meta*, 811 F. Supp. 3d at 109. *See, e.g.*, *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) (*Brown Shoe* factors "revealed little about the actual field of competition"). In any event, the *Brown Shoe* factors relied on by Plaintiffs[11] will not support a narrow, ILS-only market at trial.

*(i)* *Industry or public recognition.* Plaintiffs previously argued that PMCs view ILS and non-ILS tools as reaching different audiences with different features. But the "[t]he balance of the persuasive evidence" will show that, although "industry participants recognize that [ILSs] differ from [non-ILSs] in important ways," "the [tools] compete." *Meta*, 811 F. Supp. 3d at 115;

[11] These are the *Brown Shoe* factors cited in Plaintiffs' summary judgment briefing.

*see also U.S. v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 183 (D.D.C. 2001) (rejecting proposed market where there was "conflicting evidence relating to customer perceptions and practices" of competition within the proposed market). Multiple PMCs and ILSs will testify to that effect, and ordinary-course documents confirm ILSs and non-ILSs are competing for the same advertising dollars that are doled out based on the same metric: cost per lead and cost per lease.

*(ii)* *Specialized vendors/peculiar characteristics.* Defendants do not dispute that there are some differing characteristics between ILSs and non-ILSs. But multifamily rental advertising is equally available through ILSs, social media platforms, and search engines. And the existence of specialized vendors alone is insufficient to prove market definition. *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 359 (S.D.N.Y. 2009).

*(iii)* *Distinct customers.* ILS and non-ILS tools do not have distinct customers: both sell advertising to PMCs. PMCs allocate [redacted] of their marketing budgets to non-ILS sources such as Google, social media, and their own websites. *E.g.*, Ex. V; Ex. CM, ¶ 294. *See Meta*, 811 F. Supp. 3d at 116.

*(iv)* *Distinct pricing.* PMCs purchase both ILS and non-ILS advertising via performance-based payments: some ILSs charge on a per-lease basis, and some non-ILSs charge on a per-impression or per-click basis. More importantly, PMCs view cost per lead or cost per lease as the relevant metric for both non-ILS tools and ILS tools. *E.g.*, Ex. BR at 34:5–14 ("[redacted]"); Ex. CI at -001.

**Dr. Verlinda's analysis.** That leaves the analysis of Plaintiffs' expert, Dr. Verlinda, who conducts a "hypothetical monopolist test" purporting to find that a 10% price increase by a hypothetical owner of all ILSs would be profitable. But Defendants will show that the test uses inputs and assumptions that are, by design, gerrymandered to manufacture a narrow market rather

than reflecting commercial realities. *See Tempur Sealy*, 768 F. Supp. 3d at 825–28 (finding the FTC expert's HMT unpersuasive where "the model's parameters and inputs appear designed to produce the outcome sought"); *U.S. v. Sabre Corp.*, 452 F. Supp. 3d 97 (D. Del.), *vacated*, 2020 WL 4915824 (3d Cir. July 20, 2020).[12]

In sum, the real-world evidence shows that non-ILS advertising is reasonably interchangeable with ILS advertising, in turn imposing meaningful competitive constraints on ILSs. Plaintiffs' ILS-only markets are therefore too narrow.

2. *The relevant market is two-sided.*

Separate from whether an ILS-only market is too narrow from a competitor perspective, the Court must decide whether it is also too narrow from a customer perspective—*i.e.*, whether the relevant product market includes both PMCs and renters. To be clear, all Parties agree the Court may consider the Partnership's effects on renters alongside its effects on PMCs when assessing competitive effects. Hr'g Tr. 12:21–13:18; 21:1–6, July 8, 2026. But Plaintiffs nevertheless claim that the Court can ignore renters altogether when defining the relevant market. That is wrong.

Whether the market should be defined as two-sided depends on whether ILSs exhibit strong indirect network effects, such that failing to account for both sides "would lead to mistaken inferences of the kind that could chill the very conduct the antitrust laws are designed to protect." *Amex*, 585 U.S. at 546. That standard is not limited to *transaction* platforms and instead turns on the particular facts: when indirect network effects are weak—as with a newspaper, *Amex*, 585 U.S. at 544—the market is not two-sided; but when those effects are strong, both sides must be included

[12] Although the district court's decision was vacated for mootness, the Third Circuit "express[ed] no opinion on the merits of the parties' dispute before the District Court," meaning that the "Order should not be construed as detracting from the persuasive force of the District Court's decision." *U.S. v. Sabre Corp.*, 2020 WL 4915824, at *1 (3d Cir. July 20, 2020).

in the relevant market. That is why "in many or most cases involving two-sided *platforms*, courts must include both sides of the platform in . . . the relevant market." *US Airways Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56 (2d Cir. 2019) (emphasis added).

Here, the evidence will show that ILS platforms have strong indirect network effects: renters are more likely to submit leads when inventory improves; PMCs are more likely to advertise with a service that delivers more and better leads at a lower cost. As a Zillow internal presentation says, this is "Rentals 1.0 Marketplace." *See* **Figure 2**. And ILSs tout this reality to their investors. *E.g.*, Ex. AA at -026, -028; Ex. BW at -008. Plaintiffs' expert acknowledges as much:

> [redacted]

Ex. Q, ¶ 38.

These indirect network effects drive Zillow's pricing. [redacted]. *See supra* Section II.G. Pricing to one side—PMCs—is thus constrained by participation on the other—renters. *Amex*, 585 U.S. at 545 ("To optimize sales, the network must find the balance of pricing that encourages the greatest number of matches").

In claiming that indirect network effects are weak, Plaintiffs are fighting against the fundamental tenet—the "1.0"—of a rentals marketplace. Plaintiffs rely on expert analysis

purporting to show that the Partnership's increase in listings did not increase renter participation. But those analyses ignore direct evidence that PMCs received more leads and leases post-Partnership, as described below. Those analyses also show that more renters visited Redfin and viewed more listings after the Partnership. Ex. T. Far from undermining strong indirect network effects, Plaintiffs' own evidence confirms them.[13]

3. *Plaintiffs cannot prove a nationwide geographic market.*

Plaintiffs argue the geographic market is nationwide. But the Fourth Circuit rejected Plaintiffs' approach in *It's My Party, Inc. v. Live Nation, Inc.*, where it held at summary judgment that a proposed nationwide market for concert promotion services failed because "demand for concerts is local, [so] promoters need[ed] to target their advertising to the area surrounding a particular venue." 811 F.3d at 682; *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006). The same is true here. Even if ILSs operate nationally, Defendants will show that PMCs make advertising decisions on a property basis because rental competition is local. These local market conditions are reflected in Zillow's value-based pricing, which varies based on, among other inputs, renters' engagement with the Zillow platform in a particular city. *See supra* Section II.B. As a result, a nationwide market is not appropriate.

**ii. The Evidence Shows the Partnership Is Benefiting Renters, PMCs, and Competition.**

Because Plaintiffs have failed to prove a relevant market, the Court should reject their claims at the outset. But even assuming a valid market, Plaintiffs cannot show the Partnership

[13] Plaintiffs' expert, Dr. Verlinda, concludes indirect network effects are weak [redacted] But as Defendants' expert and fact witnesses will explain, it is hardly surprising that renters do not immediately respond to increases in listings, as it can take time for renters to learn and discover these changes. *E.g.*, Ex. CM, ¶¶ 263–65.

caused substantial anticompetitive effects—"actual harm to consumers." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016); *see also Steves*, 988 F.3d at 715–16; *AT&T, Inc.*, 916 F.3d at 1032 (without presumption of illegality, plaintiff must "make a fact-specific showing that the proposed merger is likely to be anticompetitive."). The evidence will show the Partnership has benefited renters, PMCs, and competition.

*1.* <u>*The Partnership has benefited renters.*</u>

The Parties agree that, regardless of whether the evidence shows that rental marketplaces are two-sided platforms, the Court must consider the Partnership's effects on renters. Hr'g Tr. 12:21–13:18, July 8, 2026. The trial evidence will show that the Partnership generated tangible and immediate benefits for renters looking for an apartment on Zillow's or Redfin's websites.

First, as discussed above, the Partnership has increased multifamily listings on both Zillow and Redfin, enabling renters to select from a broader inventory. That translates to [redacted]. *See* Ex. Q at 22:1–23:9; *see also NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 102 (1984) (actions that "widen consumer choice" are procompetitive).

Second, renters benefit from competition for their leads. Redfin's business had consistently lost money after purchasing the RentPath ILSs in 2021. As Redfin struggled to maintain its multifamily inventory and audience, Zillow and CoStar grew, and Redfin's share of ILS revenues was cut in half. Ex. M. Redfin was unable to compete with Zillow and CoStar even after pouring hundreds of millions of dollars into the business, and renters were fleeing its platform. Ex. BG at -013; Ex. BE at -077. Redfin's traffic stabilized post-Partnership. *See supra* Section II.F. The Partnership solved Redfin's "Achilles heel" by tripling its multifamily listings and enabling Redfin to invest in generating a larger audience through increased advertising and user-experience improvements. Redfin's success—and incentive to generate more leads—has in turn spurred

Zillow to redouble its own marketing and product efforts. *Id.* The overall result is more competition for renters—a marked improvement over the counterfactual, in which Redfin would have continued to cut costs and lose prospective renters. *See, e.g.*, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203 n.10 (2010) (quoting *Bd. of Trade of Chi. v. U.S.*, 246 U.S. 231, 238 (1918)) (considering "condition[s] before and after the restraint is imposed"); *Arch Coal*, 329 F. Supp. 2d at 157 (holding that evidence of a defendant's "weak competitive status remains relevant to an examination of whether substantial anticompetitive effects are likely from the transactions.").

Plaintiffs will have no meaningful response to this evidence of renter benefits. Although they have claimed repeatedly that renters *might* pay higher rents because the Partnership increased advertising costs, *see supra* at note 2, Plaintiffs' expert admits he has done no analysis of that and is "[redacted]." Ex. Q at 49:22–50:13.

Nor will Plaintiffs be able to show the other supposed renter harm they pled in their Complaint: that lead caps disincentivize Redfin from investing in its renter-facing websites. FTC Compl. ¶ 86; States Compl. ¶ 88. To the contrary, the [redacted] and trial will show Redfin is competing aggressively to drive renters to its websites.[14]

[14] Plaintiffs' expert, Dr. Verlinda, claims [redacted]. As Defendants' expert will explain, that analysis tells you nothing: renters visiting Redfin today see *far more* properties than before the Partnership—including all properties previously on Zillow, plus thousands of new properties that joined Zillow post-Partnership. Ex. CM, ¶¶ 316–321. Moreover, Dr. Verlinda's analysis of the supposed "exit" of former Redfin properties does not adjust for properties that would have left Redfin in the ordinary course. Ex. F.

2. *The Partnership has benefited PMCs.*

PMCs also have benefited from the Partnership. *See Procaps S.A. v. Patheon Inc.*, 141 F. Supp.3d 1246, 1287 (S.D. Fla. 2015) ("Procompetitive benefits include . . . increased output, reduced costs, and other . . . efficiencies"). The Partnership has expanded output while decreasing prices: Zillow properties are receiving more leads and the available evidence, as described in Section II.E, indicates those increases translate to more leases. Meanwhile, PMCs are paying less per lead than before the Partnership. And because that is what matters to PMCs most, it is also what matters under the antitrust laws. *See*, *e.g.*, *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 149 (S.D.N.Y. 2006) ("An analysis of price change in a product must account for changes in the product over time so that only real price changes will be measured.").

PMCs also have benefited from the increased competition spurred by the Partnership. PMCs have testified that Zillow is now a more credible ILS for multifamily advertising, and that CoStar is offering more price concessions than before the Partnership. Dr. Gowrisankaran found that [redacted]. That is competition at work. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business . . . is the very essence of competition."); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Other combinations . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively.").[15]

[15] Plaintiffs may cite *United States v. American Airlines Group*, 675 F. Supp. 3d 65, 124 (D. Mass. 2023), *aff'd*, 121 F.4th 209 (1st Cir. 2024). But in that case, the defendants lacked any evidence of procompetitive effects: for example, the supposed competitive responses from the defendants' rivals were "milquetoast, at best." *Id.* at 124. The opposite is true here, where property managers will testify and data show that spend per property on CoStar decreased in response to the Partnership. *See supra* Section II.F. *American Airlines* also involved in an unprecedented

Plaintiffs attempt to contradict this evidence of real-world benefits to PMCs through a scattershot of expert analyses, including analyses of Zillow's nominal prices, a model of "quality-adjusted" prices, and attempts to estimate the quality of Zillow leads. All of those are unreliable.

**Nominal price evidence.** Plaintiffs argue the Partnership has already increased the price of Zillow's subscription packages, and enables Zillow to increase nominal prices in the future or force PMCs into unwanted package upgrades. Those arguments are irrelevant and wrong.

As discussed above, what matters to PMCs is the cost per lead or lease—and the evidence shows that cost per lead decreased. *See Freeland*, 238 F.R.D. at 149. Moreover, Plaintiffs' focus on nominal prices repeats the error the Supreme Court addressed in *Amex*: focusing on pricing on one side of the market while ignoring overall prices and output. "Where . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." *Amex*, 585 U.S. at 549; *id*. at 546 (warning that failing to account for both sides "would lead to mistaken inferences of the kind that could chill the very conduct the antitrust laws are designed to protect"). The evidence will show that any higher nominal prices for advertising packages reflect better value delivered to PMCs.

Plaintiffs' assertions about nominal prices are also unsupported. Plaintiffs' expert purports to [redacted], which leads to skewed results.[16]

---

collaboration between airlines, whereas the practice being challenged here—exclusive syndication—has been a standard, procompetitive feature of the industry for over a decade.

[16] Dr. Verlinda asserts that his findings of [redacted]. But Zillow's 2025 model for the Partnership did not assume any price increases beyond those that occur in the ordinary course. *See, e.g.*, Ex. AS at -004.

**Expert analysis of quality-adjusted price.** Plaintiffs' expert will also purport to show that "quality-adjusted" prices increased after the Partnership using a Constant Elasticity of Demand (CES) model. The CES model is unreliable. It treats any shift of advertising spend away from ILSs after the Partnership as harm, regardless of the reason. For example, the CES model would conclude that a property advertising on both Zillow and Redfin before the Partnership was harmed if it spent *less* advertising with Zillow only and spent those dollars on paid search instead. In other words, that model cannot distinguish procompetitive cost-savings from anticompetitive harm.

**Expert analysis of output.** Plaintiffs will assert the Partnership reduced output because some properties that had advertised with Redfin but not Zillow stopped advertising with ILSs altogether. That assertion is wrong: (i) the proper metric of output—leads and leases—shows output increased, *see Amex*, 585 U.S. at 549; (ii) the analysis focuses on one subset of properties, ignoring the influx of new properties after the Partnership; (iii) PMCs view non-ILS services as effective alternatives, so the choice to stop advertising with ILSs (and shift money to non-ILS sources) does not indicate harm, and (iv) the reduction in ILS advertising claimed by Plaintiffs' expert is wrong because it does not adjust for the fact that properties on Redfin routinely stopped advertising with ILSs (churned off) even before the Partnership.[17]

Plaintiffs will be unable to show that the Partnership has resulted in any anticompetitive effects. Rather, the evidence will show that renters and PMCs are both better off as a result of the Partnership, and Zillow and Redfin are now stronger competitive constraints. Plaintiffs' claims should be rejected. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1994) ("Without

[17] In addition, Plaintiffs' expert will claim that increased leads did not translate to increased leases. But his own analysis shows [redacted]—a finding corroborated by Zillow documents and party testimony. Ex. S.

a showing of actual adverse effect on competition, [Plaintiffs] cannot make out a case under the antitrust laws[.]").

3. *There is no less restrictive alternative.*

Even assuming the Court concludes the Partnership results in anticompetitive effects and that Defendants have not shown a procompetitive justification for the Partnership, Plaintiffs cannot show, as they must, that the procompetitive effects could be achieved through a substantially less restrictive alternative. *Alston*, 594 U.S. at 97. To satisfy their burden, it is not enough for a plaintiff to speculate that some other alternative exists, as "[f]irms deserve substantial latitude to fashion agreements that serve legitimate business interests." *Id.* at 101. Plaintiffs "cannot just point to" a hypothetical alternative without demonstrating "equivalent viability of the alternative[] proffered." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 45 (2d Cir. 2018). Nor does antitrust law "require businesses to use anything like the least restrictive means of achieving legitimate business purposes." *Alston*, 594 U.S. at 98.

But that is what they apparently plan to do. In their summary judgment reply, Plaintiffs claimed: "[redacted]." MSJ Reply 20, Dkt. No. 200. That assertion misunderstood the facts: the document relied on by Plaintiffs, produced two years before the Partnership, was merely phrased as a question, and Zillow concluded that such an arrangement would *not* be viable. Ex. AX at -004. In fact, no syndication agreement involving a listings inventory of this size (50,000 plus properties listed) has ever required anything less than exclusivity. For good reason: exclusivity protects the syndicating party's significant investments into building inventory. *See supra* at Section II.C. There is no less restrictive alternative.

### C. Plaintiffs Have Not Proven That a Divestiture Would Benefit Competition.

If Plaintiffs prove their Section 1 or Section 7 claims at trial, this Court will need to decide the appropriate remedy. Although Plaintiffs' arguments have focused on specific concerns about the Partnership agreements—*e.g.*, the exclusivity provision preventing Redfin from sourcing its own listings—Plaintiffs do not seek a remedy aimed at those discrete issues. Instead, they ask the Court to initiate a years-long divestiture process requiring both the construction of a new rentals business from Zillow and Redfin assets and the identification of a buyer. The record is devoid of any facts supporting this extraordinary request.

Plaintiffs are seeking only injunctive relief in this case. "As a general rule, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Steves*, 988 F.3d at 720. Accordingly, a court in an antitrust case must "identify reasonable measures that will cure the ill effects of the defendants' illegal conduct and assure the public freedom from its continuance," without "implement[ing] harsh measures when less severe ones will do," or imposing "overly regulatory requirements which involve the judiciary in the intricacies of business management." *U.S. v. Am. Airlines Grp. Inc.*, 2023 WL 4766220, at *1 (D. Mass. July 26, 2023).

For a court-ordered divestiture, these principles require Plaintiffs to prove that the requested divestiture is "needed to restore competition"—*i.e.*, that the divestiture will succeed as a business and will improve the competitive landscape. *Steves*, 988 F.3d at 720. To determine whether a divestiture meets that standard, the Fourth Circuit has previously considered both (1) whether "multiple bidders would emerge" if divestiture were ordered and (2) whether the divested entity "can compete effectively," *i.e.*, whether it will be a "willing, independent competitor capable of effective production in the [relevant] market." *Id.* at 722–23; *see Arch Coal, Inc.*, 329 F. Supp. at 155 (examining the history and financial strength of the divestiture buyer).

As the evidence at trial will demonstrate, Plaintiffs' requested divestiture has none of the characteristics of a successful antitrust remedy.

At the outset, the evidence in this case differs markedly from others where Plaintiffs have sought a court-ordered divestiture or other structural remedy. Because of the complexity and high risk of divestitures, Plaintiffs typically develop an extensive record to show that the new business would succeed and compete effectively. In *Steves*, this Court approved divestiture of a single factory only after hearing three days of evidence on remedies, which included testimony from four expert witnesses and evidence of serious bidders for the divestiture package. 988 F.3d at 706, 722; *see also* Pls.' Post-Trial Br. at 5, *U.S. v. Google LLC*, No. 1:23-cv-108, ECF No. 1810 (E.D. Va. 2025) (11-day remedies hearing with nineteen fact and seven expert witnesses); *U.S. v. Google LLC*, 803 F. Supp. 3d 18, 41–42, 163 (D.D.C. 2025) (holding a 15-day trial on remedies alone). As the court explained, since judges "are neither economic nor industry experts," "when it comes to fashioning an antitrust remedy, . . . caution is key." *Id.* at 70.

Plaintiffs have nothing like that here. Their evidence will not include *any* expert testimony on the appropriate remedy—[redacted] Ex. Q at 72:2–6. Nor will Plaintiffs be able to offer testimony about (i) the assets that should be included in their divestiture, (ii) the viability of the proposed divestiture as a standalone business, (iii) the transition support needed from Zillow or Redfin, or (iv) the investments needed to compete effectively against CoStar, Google, and other significant advertisers. Most telling, Plaintiffs did not adduce any testimony suggesting even a single firm is interested in bidding on their proposed divestiture package. And because Plaintiffs did not seek bifurcated proceedings on remedies—typical in public antitrust suits—they must prevail on the record as it stands.

That failure of proof is no accident. If Plaintiffs were right about the Partnership's effect on competition, they would presumably have little trouble proving that a divestiture buyer would step forward to run a profitable and competitive business selling advertisements directly to PMCs. But Plaintiffs have been unable to make that showing here, and this Court can reject their remedy for that reason alone. *See Steves*, 988 F.3d at 720.

In fact, the evidence will show the divestiture here would fail the standards set by this Court and the FTC's own guidance. *See* FTC, Bureau of Competition, *Statement on Negotiating Merger Remedies* at 7, https://perma.cc/Y7GP-KX83 (explaining that the FTC disfavors "mix and match" remdies, which "tend[] to slow the negotiations down" and "require[] a more fact-specific, detailed, and time-consuming evaluation of each asset). Specifically, Plaintiffs hope that an unidentified third party will (i) purchase existing rentals websites from Redfin and/or Zillow (including Rent.com, Rentals.com, and ApartmentGuide.com); (ii) purchase a vague collection of "assets from Zillow's rental ILS business as may be necessary to replicate pre-Agreements competition"; (iii) receive "transitional services" from Zillow, including "a non-exclusive syndication of Zillow multifamily listings to the divestiture sites for an appropriate period of time"; and (iv) stand up a salesforce to sell advertising services directly to PMCs. Ex. BP at -003–04; Ex. BQ at -003–04. As the FTC has recognized, a divestiture combining assets from multiple parties is less likely to succeed than a divestiture of a standalone business. FTC, *A Guide for Potential Buyers: What to Expect During the Divestiture Process* at 2, https://perma.cc/SW7J-DGSL (June 2019) ("The Commission prefers the divestiture of an ongoing business because such a divestiture presents less risk of failure."). And because ILSs are two-sided marketplaces, any buyer would need to make long-term investments in both its PMC-facing advertising business and

its renter-facing websites. Unsurprisingly, no firm has expressed interest in such a complex and expensive undertaking.

Second, even if the divested business attracted buyers, Plaintiffs have no evidence that divestiture would benefit competition. Plaintiffs suggest divesting rentals-specific websites (*e.g.*, ApartmentGuide.com)—presumably on the view that a third party selling advertising packages for those websites would meaningfully constrain CoStar, Zillow, and other ILSs. But that is exactly what Redfin tried in 2021 when it acquired RentPath. Even after pouring hundreds of millions of dollars into the business, Redfin was unable to compete effectively with CoStar and Zillow. The business lost over $200 million in four years while inventory remained stagnant. Ex. BA at -042–44; Ex. BK at -023; Ex. AZ at -45. By January 2025, marketplace subscribers were down 22% since the acquisition and net bookings were down 76% year-over-year. Ex. BG at -014, -053. *See supra* Sections II.B and II.D. There is no reason to think an unidentified third party will do better today than Redfin did five years ago. *Cf. Steves & Sons, Inc.*, 345 F. Supp. 3d at 667 (E.D. Va. 2018) (concluding that a divested factory "is likely to be competitive and profitable" because of historic profitability and evidence that "a substantial profit can be made"). The evidence will show that Redfin was in a stronger position than any potential divestiture buyer because it also operated a large home sales business and the Redfin.com website.

Finally, even if the divestiture could one day compete effectively, Plaintiffs have no evidence that a years-long divestiture process would be better than the status quo. The Partnership may end as soon as 2030, at which point Redfin can decide whether to sell advertising packages to PMCs—and would do so with a more attractive platform than it ever had before. Against that backdrop, it makes little sense to search for a new buyer that would have to make the same investment decisions regarding assets it does not already own. Indeed, the Supreme Court has

cautioned against imposing antitrust remedies that require "judicial estimation of free-market forces." *Verizon Commc'ns Inc., v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 410 n.3 (2004).

Plaintiffs will likely rely on *Ford Motor* for the proposition that they have effectively no evidentiary burden to support their requested remedy. *Ford Motor Co. v. U.S.*, 405 U.S. 562, 575 (1972). They are wrong. *Ford Motor* acknowledged the undisputed proposition that the government has authority to seek relief on behalf of the public interest. *Id.* The government must still put forth evidence showing that their requested relief will in fact enhance competition and thus serve the public interest. *See Int'l Salt Co. v. U.S.*, 332 U.S. 392, 401 (1947).

## IV. Conclusion

Plaintiffs are unable to prove that the Partnership is anticompetitive. The Court should rule in Defendants' favor.

Dated: August 19, 2026

*/s/ Ryan A. Shores*
Ryan A. Shores (VA 65934)
D. Bruce Hoffman (*pro hac vice*)
Blair W. Matthews (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1876
Email: rshores@cgsh.com
Email: bhoffman@cgsh.com
Email: bmatthews@cgsh.com

Heather Nyong'o (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
Email: hnyongo@cgsh.com

Beau W. Buffier (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019

Telephone: (917) 412-6461
Email: bbuffier@wsgr.com

*Counsel for Defendants Zillow Group, Inc, and Zillow, Inc.*

*/s/ Daniel J. Richardson*
Daniel J. Richardson (VSB 94961)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7024
Facsimile: (202) 293-6330
Email: richardsond@sullcrom.com

Sharon L. Nelles (*pro hac vice*)
Jeffrey T. Scott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: nelless@sullcrom.com
Email: scottj@sullcrom.com

Kyle W. Mach (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700
Email: machk@sullcrom.com

*Counsel for Defendant Redfin Corporation*