# Stipulated Final Order for Equitable Relief

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>*Plaintiff*,<br><br>v.<br><br>ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,<br><br>*Defendants*. | Case No. 1:25-cv-1638-AJT-WBP |
| COMMONWEALTH OF VIRGINIA, STATE OF ARIZONA, STATE OF CONNECTICUT, STATE OF NEW YORK, and STATE OF WASHINGTON,<br><br>*Plaintiffs*,<br><br>v.<br><br>ZILLOW GROUP, INC., ZILLOW, INC., and REDFIN CORPORATION,<br><br>*Defendants*. | Case No. 1:25-cv-1647-AJT-WBP |

**STIPULATED FINAL ORDER FOR EQUITABLE RELIEF**

Plaintiff Federal Trade Commission ("Commission" or "FTC") filed its complaint ("FTC Complaint") in this matter pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, alleging violations of Section 5 of the Federal

Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiffs Commonwealth of Virginia, State of Arizona, State of Connecticut, State of New York, and State of Washington (collectively, "Plaintiff States;" collectively with the Commission, "Plaintiffs") also filed a complaint ("State Complaint;" together with the FTC Complaint, "Complaints") pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; the common law; Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 et seq; and Wash. Const. art. XII, § 22; alleging that Defendants Zillow Group, Inc. and Zillow, Inc. (collectively, "Zillow") and Redfin Corporation ("Redfin") (collectively, "Defendants") engaged in anticompetitive conduct. Plaintiffs and Defendants, by their respective attorneys, have reached an agreement to resolve this case through settlement, and without trial or final adjudication of any issue of fact or law, and stipulate to entry of this Stipulated Final Order for Equitable Relief ("Order") to resolve all matters in dispute in this action.

**THEREFORE, IT IS ORDERED** as follows:

## FINDINGS

1. The Court has jurisdiction over the subject matter and the parties to this action.

2. Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b). Each of the Defendants transacts business, resides, or is found in this district. Each Defendant operates Internet Listing Services ("ILSs") that allow prospective tenants to search for available rental properties located in the Commonwealth of Virginia generally and in the counties comprising the Alexandria Division. Defendants operate in each of the Plaintiff States. The Complaints allege that Defendants engaged in conduct that constitutes an unlawful agreement in restraint of trade in violation of Section

1 of the Sherman Act, 15 U.S.C. § 1, an unlawful acquisition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and an unfair method of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. Defendants deny the allegations in the Complaints.

3. Defendants' general business practices, and the unfair methods of competition alleged in the Complaints, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

4. Zillow and Redfin are, and at all relevant times have been, "corporations," as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

5. This Order does not constitute any evidence against Defendants, or an admission of liability or wrongdoing by Defendants in this case or in other litigation. This Order shall not be used in any way, as evidence or otherwise, in any other litigation or proceeding; *provided, however,* that nothing in this provision prevents Plaintiffs or Defendants from using this Order in any proceeding regarding enforcement or modification of this Order or as otherwise required by law.

6. Entry of this Order is in the public interest.

**STIPULATIONS**

1. Defendants and Plaintiffs, by and through their counsel, have agreed that entry of this Order fully and finally resolves all issues between them arising from the specific events giving rise to the allegations described in the Complaints and precludes further litigation between Plaintiffs and Defendants on the resolved issues except for the purposes of enforcing or modifying this Order. For the avoidance of doubt, the Office of the Arizona

Attorney General did not bring, and/or does not have authorization unilaterally to settle or release, claims that could have been but were not brought in this matter on behalf of any other state agency or political subdivision pursuant to Arizona Revised Statutes § 41-192(A)(5) or (B)(4).

2. Defendants admit the facts necessary to establish personal and subject matter jurisdiction of this Court in this matter.

3. Defendants stipulate that they shall comply with the provisions of this Order pending its entry by the Court.

4. Defendants stipulate that they will bear their own costs and pay Plaintiff States as provided in Section VII.

5. Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

6. Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order and agree to bear their own costs and attorneys' fees in this litigation.

## DEFINITIONS

For the purposes of this Order, the following definitions shall apply:

1. "Commission" or "FTC" means the United States Federal Trade Commission.

2. "Plaintiff States" means Plaintiffs Commonwealth of Virginia and States of Arizona, Connecticut, New York, and Washington for the claims brought through the respective attorneys general of Plaintiff States based upon the facts alleged in the State Complaint.

3. "Plaintiffs" means, collectively, the FTC and Plaintiff States.

4. "Plaintiffs' Representatives" means the contacts and individuals identified in Public Appendix C or another representative identified by each respective Plaintiff State at any time before the expiration of this Order.

5. "Zillow" means Zillow Group, Inc.; Zillow, Inc.; and any joint venture, subsidiary, division, group, or affiliate controlled currently or in the future by Zillow Group, Inc., Zillow, Inc., their successors and assigns, and the respective directors, officers, employees, agents, and representatives acting on behalf of each.

6. "Redfin" means Redfin Corporation, and any joint venture, subsidiary, division, group, or affiliate controlled currently or in the future by Redfin Corporation, their successors and assigns, and the respective directors, officers, employees, agents, and representatives acting on behalf of each.

7. "Business Information" means books, records, data, and information, wherever located and however stored, used in the operation of the ILS business, including documents, written information, graphic materials, and data and information in electronic format, along with the knowledge of employees, contractors, and representatives. Business Information includes books, records, information, and data relating to sales, marketing, logistics, products and SKUs, pricing, promotions, advertising, personnel, accounting, business strategy, information technology systems, customers, suppliers, vendors, research and development, equipment, operations, and all other information used in the operation of the ILS business.

8. "Defendants" means, individually and collectively, Zillow and Redfin.

9. "Employee Information" means the following, for each employee, and to the extent permitted by law:

a. The following information for each such employee:

(1) The date of hire and effective service date;

(2) Job title or position held;

(3) A specific job description of the employee's responsibilities; *provided, however,* in lieu of this description, Defendant Zillow may provide the employee's most recent performance appraisal;

(4) The base salary, current wage, and commissions;

(5) The most recent bonus paid, aggregate annual compensation for Defendant Zillow's last fiscal year, and current target or guaranteed bonus, if any;

(6) Employment status (i.e., active, on leave, on disability, and whether full- or part-time); and

(7) Any other material terms and conditions of employment that are not otherwise generally available to similarly situated employees; and

b. At Defendant Redfin's option (as is relevant), copies of all employee benefit plans and summary plan descriptions.

10. "Former Zillow Employees" means employees who worked in sales, marketing, or customer service roles for the Zillow ILS Business who either left Zillow on their own volition or were relieved of their duties since February 6, 2025.

11. "General Manager" means a Person hired (internally or externally, regardless of formal title) by Defendant Redfin to provide day-to-day leadership of the Redfin ILS Business independent of, and in competition with, Defendant Zillow's ILS Business.

12. "ILS" or "Internet Listing Service" means a provider of a digital platform that aggregates and displays Multifamily Rental Properties (*e.g.*, apartments, condos, and similar units) to prospective tenants. It does not include exclusively single-family, short-term, or vacation rental platforms; general real estate platforms where rentals are incidental to for-sale listings; or general search, generative AI, or social media platforms where rentals are incidental to other content provided.

13. "ILS Customer(s)" means a Property Management Company or other marketer of a Multifamily Rental Property displayed on an ILS.

14. "Multifamily Rental Property" means any property with 25 or more individual units available for rent to prospective tenants.

15. "Person" means any individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity, or governmental body.

16. "Property Management Company" or "PMC" means the Person handling management, leasing, and marketing tasks for a Multifamily Rental Property, including third-party property management companies and owners or investors in a rental property.

17. "Redfin Content License Agreement" means the Content License Agreement between Zillow, Inc. and Redfin Corporation dated February 6, 2025, and all amendments, exhibits, attachments, agreements, and schedules thereto. Attached Nonpublic Appendix

G includes an unredacted version of the Redfin Content License Agreement; Public Appendix G includes a redacted version of the Redfin Content License Agreement (both without amendments, including Appendix A, exhibits, agreements, and schedules thereto).

18. "Redfin ILS Business" means the direct sale or provision to ILS Customers of rental advertising products and services, including the display and promotion of rental listings on Redfin's ILS network (including the Redfin.com, Rent.com, Rentals.com, and Apartmentguide.com rentals websites and their related mobile applications).

19. "Relevant Employees" means any Person involved in sales, marketing, or customer service, for the Zillow ILS Business. Relevant Employees exclude Defendant Zillow's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Senior Vice President of the Zillow ILS Business, and Vice President of Sales for the Zillow ILS Business.

20. "Syndication Agreement" means an agreement to license listing content for the purpose of display and promotion of rental listings to an ILS.

21. "Zillow ILS Business" means the direct sale or provision to ILS Customers of rental advertising products and services, including the display and promotion of rental listings on Zillow's ILS network (including the Zillow.com, Hotpads.com, and Trulia.com rentals websites, Zillow's syndication partner sites, and their related mobile applications).

## ORDER

### I. DEFENDANTS' JOINT OBLIGATIONS TO ALLOW REDFIN TO COMPETE AGAINST ZILLOW

**IT IS ORDERED** that Defendants shall:

A. No later than the date the Court enters this Order, eliminate any provision in any agreement between Defendants Zillow and Redfin that would prohibit Defendant Redfin from owning and operating a rental advertising service for ILS Customers, including by modifying section 3 of the Redfin Content License Agreement consistent with the obligations of this Paragraph I.A;

B. Not enter into, directly or indirectly, any provision that prevents Defendant Redfin from owning and operating an ILS that offers rental advertising services to ILS Customers independent of and in competition with Defendant Zillow;

C. Not enter into, directly or indirectly, any exclusive Syndication Agreement between Defendant Zillow and Defendant Redfin providing for the display or promotion of rental listings with fewer than 25 units, without the prior approval of the Commission in consultation with the Plaintiff States prior to July 1, 2030;

D. Modify the Redfin Content License Agreement as provided in the Amendment to the Redfin Content License Agreement ("Amendment") attached as Appendix A. The Amendment addresses, among other things, each of the following: (i) removes restrictions on Defendant Redfin's ability to compete independently against Defendant Zillow in the display, marketing, and sale of advertising for Multifamily Rental Properties; (ii) eliminates any term requiring Redfin to divulge nonpublic or

competitively sensitive business information; (iii) removes any term that requires Defendant Redfin to disclose information to Defendant Zillow relating to Redfin-only properties, consistent with Appendix A; (iv) removes any limitations or restrictions on Defendant Redfin's discretion to display its own listings; (v) adjusts the minimum syndication and lead thresholds to accommodate Defendant Redfin's re-entry into the Redfin ILS Business as provided in Appendix A; and (vi) eliminates any noncompetition provision restricting Defendant Redfin's ability to sell advertising to PMCs or ILS Customers; and

E. To the extent any provision of the Amendment conflicts with any provision in this Order such that Defendants cannot fully comply with both, Defendants shall comply with this Order.

## II. DEFENDANT ZILLOW'S OBLIGATIONS

**IT IS FURTHER ORDERED** that Defendant Zillow shall:

A. Continue to provide Defendant Redfin with robust syndication of Multifamily Rental Property listings consistent with and according to the Redfin Content License Agreement as modified pursuant to this Order and attached as Appendix A;

B. Not further modify, directly or indirectly, in whole or in part, Defendant Zillow's obligation to syndicate Multifamily Rental Property listings to Defendant Redfin except as provided in Appendix A without prior written approval by the Commission in consultation with the Plaintiff States;

C. For a period of 9 months after the date Defendant Redfin meets the requirements of Paragraph IV.A, allow any ILS Customer whose contract cannot be cancelled within 3

months to exit or renegotiate its contract with Defendant Zillow in order to negotiate with or enter into an agreement with Defendant Redfin, without cost or penalty; and

D. Provide syndication services consistent with its existing Syndication Agreements with third parties but not engage in any other conduct aimed to prevent or impede any ILS Customer from entering into a contract with Defendant Redfin.

**III. EMPLOYEE TRANSFER**

**IT IS FURTHER ORDERED** that:

A. For one year after the date the Court enters this Order, Defendant Zillow shall cooperate with and assist Defendant Redfin, to evaluate independently and offer employment to any Relevant Employees, including, to the extent possible, any Former Zillow Employees.

B. For one year after the date the Court enters this Order, Defendant Zillow shall:

1. No later than 5 days after a request from Defendant Redfin, provide a complete and accurate list of the names of all of its Relevant Employees and provide Employee Information including, to the extent available to Defendant Zillow, information about Former Zillow Employees, for each;

2. No later than 5 days after a request from Defendant Redfin, provide Defendant Redfin an opportunity to privately interview any of the Relevant Employees outside the presence or hearing of any employee or agent of Defendant Zillow, and to make offers of employment to any of the Relevant Employees;

3. Remove any impediments within the control of Defendant Zillow that may deter Relevant Employees or Former Zillow Employees from interviewing with or accepting employment with Defendant Redfin, including removal of any noncompete, no-poach, no-solicitation, or confidentiality provision of any employment or other contract with Defendant Zillow that may affect the ability or incentive of those individuals to be employed by Defendant Redfin, including those provisions in the Redfin Content License Agreement, and shall not make any counteroffer to a Relevant Employee or Former Zillow Employee who receives an offer of employment from Defendant Redfin; *provided, however*, that nothing in this Order shall be construed to prohibit Defendant Zillow from protecting its trade secrets (other than customer lists) or competitively sensitive business information, or terminating the employment of any employee, or prevent Defendant Zillow from continuing the employment of any employee;

4. Not retaliate against any Relevant Employee for interviewing with or considering an offer from Defendant Redfin, and continue to provide Relevant Employees with compensation and benefits for 12 months from the entry of this Order as long as such Relevant Employee is employed by Defendant Zillow, including regularly scheduled or merit raises and bonuses and regularly scheduled vesting of benefits while they are employed by Defendant Zillow; *provided, however,* nothing herein will

prevent Defendant Zillow from terminating a Relevant Employee in accordance with Defendant Zillow's established HR policies and practices equally applicable to all employees;

5. Provide reasonable financial incentives for Relevant Employees to continue in their positions, and as may be necessary, to facilitate the employment of such Relevant Employees by Defendant Redfin including the immediate vesting of benefits, including any accrued commissions, bonuses or other compensation; and

6. Not interfere, directly or indirectly, with the hiring, recruiting, or employing by Defendant Redfin of any Relevant Employees, including not offering any incentive to such employees to decline employment with Defendant Redfin.

C. Defendant Zillow shall not, for a period of two years following the date of entry of this Order, directly or indirectly, solicit or otherwise attempt to induce any Person employed by Defendant Redfin to terminate his or her employment with Defendant Redfin; *provided however*, Defendant Zillow may: (1) hire any such Person whose employment has been terminated by Defendant Redfin; (2) advertise for employees in newspapers, trade publications, or other media, or engage recruiters to conduct general employee search activities, in either case not targeted specifically at one or more Person employed by Defendant Redfin; or (3) hire a Person who has applied for employment with Defendant Zillow, as long as such application was not solicited or induced in violation of

this Paragraph III.C. *Provided* that nothing herein prohibits Defendant Zillow from competing for any Person working outside of the Redfin ILS Business.

D. For any Relevant Employee who receives an offer of employment from Defendant Redfin, Defendant Redfin shall offer such Relevant Employee a reasonable financial incentive, including retention bonuses, if the Relevant Employee accepts employment with Defendant Redfin and completes one year of employment with Defendant Redfin.

## IV. DEFENDANT REDFIN'S OBLIGATIONS

**IT IS FURTHER ORDERED** that Defendant Redfin shall:

A. Re-enter the provision of sales and marketing services to ILS Customers by Redfin's ILS Business no later than 6 months after the date the Court enters this Order, and shall:

1. Build and deploy a working portal that allows ILS Customers to upload rental listings to be advertised across Defendant Redfin's portfolio of rental sites, including Redfin.com, Rent.com, and ApartmentGuide.com, and demonstrate usage of such portal by ILS Customers;
2. Establish a working billing system to invoice ILS Customers for advertising listings on Defendant Redfin's sites;
3. Hire (i) a General Manager; (ii) at least the number of salespeople as identified in Nonpublic Appendix E; and (iii) a customer support team that is sufficiently staffed and fully trained to acquire, support, and maintain ILS Customers; and
4. Run targeted advertisements to drive ILS Customers to its platform.

*Provided, however,* the General Manager may seek the prior written approval of the Commission in consultation with the Plaintiff States to modify the number of employees required in Paragraph IV.A.3.(ii);

*Provided further, however,* Defendant Redfin may seek an extension of the 6-month period to re-enter for good cause shown and with the prior approval of the Commission in consultation with the Plaintiff States.

B. Forfeit and pay to the Commission a penalty as enumerated in Public Appendix F if Defendant Redfin does not fully meet the requirements of Paragraph IV.A by the deadline contained in Paragraph IV.A, and pay additional penalties, as outlined in Public Appendix F for every month that Defendant Redfin remains in noncompliance with Paragraph IV.A for 6 months. Thereafter, Defendant Redfin shall be subject to contempt for failure to comply with the terms of Paragraph IV.A. Defendant Redfin shall give the Commission and Plaintiff States sufficient information to determine whether it has fully met the requirements of Paragraph IV.A at least 2 weeks before the end of the month to avoid paying the additional amounts required under this Paragraph IV.B. Within 10 days of receiving the information pursuant to this Paragraph IV.B, the Commission, in consultation with the Plaintiff States, will determine whether Defendant Redfin has fully complied with the requirements of Paragraph IV.A. Any delay beyond the 10 days will toll the monthly penalty payment.

C. Invest capital into the Redfin ILS Business as provided in Nonpublic Appendix D to accomplish the requirements of Paragraph IV.A and support Redfin's ILS Business. As

part of its compliance obligations, Defendant Redfin shall report, with supporting documents, the applicable investments pursuant to this Paragraph IV.C.

D. Continue to operate the Redfin ILS Business at least through the date specified in Nonpublic Appendix D.

## V. NOTIFICATION REQUIREMENT

**IT IS FURTHER ORDERED** that, within 20 days after the Commission notifies Defendant Zillow that Defendant Redfin has fully met the obligations of Paragraph IV.A, Defendant Zillow shall send notices to all of its ILS Customers describing the terms of the Order advising them of their rights under Paragraph II.C, as included in Public Appendix B. Defendant Redfin shall give the Commission and Plaintiff States sufficient information to determine whether it has fully met the requirements of Paragraph IV.A at least 2 weeks before the end of the 6-month period to avoid paying the required penalty under Paragraph IV.B. If Defendant Redfin has met the requirements of Paragraph IV.A, then the Commission will notify Defendant Zillow.

## VI. PRIOR NOTIFICATION REQUIREMENT

**IT IS FURTHER ORDERED** that:

A. Without providing advance written notification ("Notification") to Plaintiffs' Representatives, Defendants shall not execute any Syndication Agreement for Multifamily Rental Properties that contains any provision that restricts the ability of either party to compete for ILS Customers.

B. The Notification required by Paragraph VI.A shall include all information relating to the Syndication Agreement including the identity of the other party, a copy of the proposed

Syndication Agreement, and all analyses of the proposed Syndication Agreement. Notification is required only of Defendants and not of any other party to the Syndication Agreement.

C. Defendants shall provide the Notification required under Paragraph VI.A to the Plaintiffs at least 30 days prior to executing the Syndication Agreement (hereinafter referred to as the "First Waiting Period"). Further, if, within the First Waiting Period, representatives of the Commission, in consultation with the Plaintiff States, make a written request for additional information or documentary material, Defendants shall not execute the Syndication Agreement until 30 days after submitting such additional information or documentary material. Early termination of the waiting periods in this Section VI may be requested and, where appropriate, granted by letter from the Bureau of Competition of the Commission in consultation with the Plaintiff States.

*Provided, however,* this Paragraph VI.C does not apply to Defendant Zillow's existing Syndication Agreement with Move, Inc., or any renewal on substantially the same terms.

## VII. PAYMENT TO PLAINTIFF STATES

**IT IS FURTHER ORDERED** that Defendants shall within 30 calendar days after the date the Court enters this Order, pay the Plaintiff States collectively a monetary payment of $2 million which shall be used for any lawful purpose, including for reimbursement of the Plaintiff States' costs, expenses, and attorneys' fees, future monitoring and enforcement of this Order, defraying the expenses of each Plaintiff State's antitrust and consumer protection enforcement and for such other expenditures at the discretion of each Plaintiff State's Attorney General and consistent with State Law. Defendants will make this monetary payment 30 days after the date

the Court enters this Order via electronic deposit per instructions from the Plaintiff States to be provided by the State of Washington to Defendants. The monetary payment will be apportioned among the Plaintiff States at the sole discretion of the Plaintiff States as may be agreed upon among them. This payment is not a penalty.

*Provided, however,* that this Order shall have no effect upon claims or causes of action of any persons other than the FTC and the Plaintiff States' Attorneys General. Nothing in this Order shall be construed to create, waive, limit, settle, release, or resolve any private right of action.

## VIII. REPORTING REQUIREMENTS

**IT IS FURTHER ORDERED** that Defendants shall file verified written reports ("Compliance Reports") in accordance with the following:

A. Each Defendant shall submit:

1. Interim Compliance Reports 30 days after the date the Court enters this Order, and every 30 days thereafter until Defendant Redfin has fully complied with Paragraph IV.A of this Order;
2. Interim Compliance Reports every 90 days ("90-Day Interim Compliance Report") after the date Defendant Redfin has fully complied with Paragraph IV.A for 9 months;
3. Interim Compliance Reports every 120 days after the last 90-Day Interim Compliance Report until July 1, 2031, or the date when Defendant Zillow ceases to provide syndication services to Defendant Redfin, whichever is later;

4. Annual Compliance Reports one year after the date the Court enters this Order, and annually thereafter until the Order expires on the anniversary of that date; and

5. Additional Compliance Reports as staff of the Commission or the Plaintiffs' Representatives may request.

B. Each Compliance Report shall contain sufficient information and documentation to enable Plaintiffs to determine independently whether Defendants are in compliance with this Order. Conclusory statements that Defendants have complied with their obligations under this Order are insufficient. Defendants shall include in their Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance, a full description of the measures Defendants have implemented or plan to implement to ensure that they have complied or will comply with each Section of this Order.

C. For a period of 5 years after filing a Compliance Report, Defendants shall retain all material, written communications with each party identified in each Compliance Report and all non-privileged internal memoranda, reports, and recommendations concerning fulfillment of Defendants' obligations under this Order during the period covered by such Compliance Report. Defendants shall provide copies of these documents to Plaintiffs upon request.

D. Defendants shall verify each Compliance Report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. Defendants shall file their Compliance Reports with Plaintiffs' Representatives as identified in Public Appendix C.

## IX. CHANGE OF CORPORATE CONTROL

**IT IS FURTHER ORDERED** that Defendants shall notify, and substantially comply with all corresponding requests for information and documents requested by Plaintiffs' Representatives in response to that notification, at least 30 days prior to:

A. Any proposed dissolution of Zillow Group, Inc., Zillow, Inc., or Redfin Corporation;

B. Any proposed acquisition, merger, or consolidation of Zillow Group, Inc., Zillow, Inc., or Redfin Corporation; or

C. Any other change in Defendants, including assignment and the creation, sale or dissolution of subsidiaries or business lines, if such change might affect the compliance obligations arising out of this Order.

## X. ACCESS TO INFORMATION

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, subject to any legally recognized privilege, and upon written request and upon 5 days' notice to Defendants made to their principal United States offices, registered office of its United States subsidiary, or their headquarters address, Defendants shall, without restraint or interference, permit any duly authorized representative of Plaintiffs:

A. Access, during regular business hours of Defendants and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of the Defendants related to compliance with the Order, which copying services shall be provided by Defendants at the request of the requesting authorized representative(s) and at the expense of Defendants; and

B. To interview officers, directors, or employees of any Defendant, who may have counsel present, regarding such matters.

## XI. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

## XII. EXPIRATION OF THE ORDER

**IT IS FURTHER ORDERED** that this Order shall expire 10 years after the date the Court enters this Order.

## XIII. ENFORCEMENT OF ORDER

A. Plaintiffs retain and reserve all rights to enforce the provisions of this Order, including the right to seek an order of contempt from the Court. Defendants agree that in any civil contempt action, any motion to show cause, or any similar action brought by Plaintiffs regarding an alleged violation of this Order, Plaintiffs may establish a violation of this Order and the appropriateness of any remedy therefor by a preponderance of the evidence, and Defendants waives any argument that a different standard of proof should apply.

B. The Order should be interpreted to give full effect to the procompetitive purposes of the antitrust laws, including Section 7 of the Clayton Act, Section 1 of the Sherman Act, and Section 5 of the Federal Trade Commission Act. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Order that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is

clear and unambiguous on its face. In any such interpretation, the terms of this Order should not be construed against either party as the drafter.

C. In any enforcement proceeding in which the Court finds that Defendants have violated this Order, Plaintiffs may apply to the Court for an extension of this Order, together with such other relief as may be appropriate.

SO ORDERED this ________ day of ________, 2026.

______________________________
United States District Judge

SO STIPULATED AND AGREED this 22nd day of August, 2026:

**COUNSEL FOR PLAINTIFF FEDERAL TRADE COMMISSION**

/s/ *Allyson M. Maltas*
ALLYSON M. MALTAS
Deputy Chief Trial Counsel
JESSICA S. DRAKE
Deputy Assistant Director, Mergers III
Bureau of Competition
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3646
Email: amaltas@ftc.gov

**COUNSEL FOR PLAINTIFF COMMONWEALTH OF VIRGINIA**

JAY JONES
Attorney General of Virginia

*/s/ Tyler T. Henry*
TYLER T. HENRY
Senior Assistant Attorney General
DAVID C. SMITH
Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485 (Henry)
Telephone: (804) 692-0588 (Smith)
Email: thenry@oag.state.va.us
Email: dsmith@oag.state.va.us

**COUNSEL FOR DEFENDANTS ZILLOW GROUP, INC. AND ZILLOW, INC.**

*/s/ Ryan A. Shores*
Ryan A. Shores
D. Bruce Hoffman
Blair W. Matthews
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1876
Email: rshores@cgsh.com
Email: bhoffman@cgsh.com
Email: bmatthews@cgsh.com

Heather Nyong'o
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
Email: hnyongo@cgsh.com

Beau W. Buffier
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (917) 412-6461
Email: bbuffier@wsgr.com

**COUNSEL FOR PLAINTIFF STATE OF ARIZONA**

KRISTIN K. MAYES
Attorney General of Arizona

*/s/ Sarah Pelton*
SARAH PELTON
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Email: Sarah.Pelton@azag.gov

**COUNSEL FOR PLAINTIFF STATE OF CONNECTICUT**

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*
JULIÁN A. QUIÑONES REYES
FRANKLIN KANIN
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Email: Franklin.Kanin@ct.gov

*Counsel for Plaintiff State of Connecticut*

**COUNSEL FOR DEFENDANT REDFIN CORPORATION**

*/s/ Kyle W. Mach*
Kyle W. Mach
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700
Email: machk@sullcrom.com

Daniel J. Richardson
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7024
Facsimile: (202) 293-6330
Email: richardsond@sullcrom.com

Sharon L. Nelles
Jeffrey T. Scott
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: nelless@sullcrom.com
Email: scottj@sullcrom.com

**COUNSEL FOR PLAINTIFF STATE OF NEW YORK**

LETITIA JAMES
Attorney General of New York

*/s/ Elinor R. Hoffmann*
ELINOR R. HOFFMANN
Chief, Antitrust Bureau
AMY MCFARLANE
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ
Senior Enforcement Counsel
MARIA LUISA DI LAURO
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov
Email: Amy.McFarlane@ag.ny.gov
Email: Michael.Schwartz@ag.ny.gov
Email: Luisa.DiLauro@ag.ny.gov

**COUNSEL FOR PLAINTIFF STATE OF WASHINGTON**

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Tyler W. Arnold*
TYLER W. ARNOLD
Assistant Attorney General
AMY N. L. HANSON
Senior Managing Assistant Attorney General
Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419 (Hanson)

Telephone: (206) 464-7030 (Arnold)
Email: amy.hanson@atg.wa.gov
Email: tyler.arnold@atg.wa.gov
*Counsel for Plaintiff State of Washington*

**NONPUBLIC APPENDIX A**

**Modifications to the Redfin Content License Agreement**

[REDACTED]

**PUBLIC APPENDIX A**

**Redacted Modifications to the Redfin Content License Agreement**

# AMENDMENT TO CONTENT LICENSE AGREEMENT

This Amendment ("**Amendment**") is entered into as of August ___, 2026 ("**Amendment Effective Date**") by and between Redfin Corporation ("**Redfin**"), a Delaware corporation, and Zillow, Inc. ("**Zillow**"), a Washington corporation.

WHEREAS, Zillow and Redfin entered into that certain Content License Agreement, effective February 6, 2025 (the **"CLA"**);

WHEREAS, the parties entered into that certain First Addendum to Content License Agreement, effective July 31, 2025 (the **"First Addendum"**);

WHEREAS, the parties subsequently entered into that certain Amendment to the First Addendum Content License Agreement, effective November 21, 2025 (the **"First Addendum Amendment"**);

WHEREAS, the CLA, as supplemented and amended by the First Addendum and the First Addendum Amendment, is referred to herein as the **"Agreement"**; and

WHEREAS, the parties now desire to amend certain terms of the Agreement as set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1. Section 1.2.1 of the Agreement is hereby amended by replacing [redacted]

2. Section 2.1 Definitions is hereby amended and replaced in its entirety, as follows:

   "**Data Feed**" means the electronic mechanism as mutually agreed upon by the parties for the delivery of the Licensed Content.

   "**Enriched Content**" means content displayed on the Zillow Sites that is (i) licensed to Zillow by a third-party other than the advertiser for display on the Zillow Sites only, or (ii) proprietary to Zillow.

   **"Hard Transition Date"** means July 31, 2025 or such earlier date as the Parties may mutually agree.

   "**Licensed Content**" means all content then displayed on the Zillow Sites for each Zillow Property and any Zillow Only Property included in the Data Feed, excluding Enriched Content.

   **"Minimum Lead Threshold"** shall have the meaning provided in Section 4.1.1.

   "**Measurement Period**" shall have the meaning provided in Section 2.7.

   "**Minimum Property Threshold**" shall have the meaning provided in Section 2.7.

   **"Minimum Regional Threshold"** shall have the meaning provided in Section 2.9.

   **"Product Launch Date"** shall have the meaning provided in Section 2.13.

**AMENDMENT TO CONTENT LICENSE AGREEMENT**

**"Property Tier Mix Requirements"** shall have the meaning provided in Section 2.8.

"**Redfin Only Product**" means a Redfin advertising product offering through which managed multi-family rental properties of twenty-five (25) units or greater, other than Zillow Properties received via the Data Feed, may be displayed on the Redfin Sites. A property displayed under the Redfin Only Product is a "**Redfin Only Property**."

"**Redfin Sites**" means Redfin.com, Rent.com, Rentals.com, and Apartmentguide.com websites and their related mobile applications, and such additional websites and mobile applications as may be added during the term upon written consent from Zillow (email to suffice), which will not be unreasonably withheld.

"**Region**" means each of [redacted]

"**Tier 1 Property**," "**Tier 2 Property**," and "**Tier 3 Property**" mean, respectively, a Zillow Property to which the Tier 1, Tier 2, or Tier 3 Per-Lead Amount and Lead Cap set forth in Section 1 of Exhibit C and property Tier Mix Requirements in Section 2.8 apply, as those amounts may be amended from time to time by agreement of the parties.

"**Zillow Only Product"** means the offering through which Zillow markets or displays managed multi-family rental properties of twenty-five (25) units or greater on the Zillow Sites that Zillow is not required to make available to Redfin in the Data Feed (except as required by Sections 2.7 through 2.14). A property in the Zillow Only Product is a "**Zillow Only Property**."

"**Zillow Property**" means a managed multi-family rental property of twenty-five (25) units or greater that is displayed on the Zillow Sites subject to an active paid advertising agreement (collectively, "**Zillow Properties**"). Zillow Properties do not include (1) any managed multi-family rental property of twenty-five (25) units or greater displayed on the Zillow Sites which is not subject to an active paid advertising agreement, or (2) after the first Measurement Period, any Zillow Only Property.

"**Zillow Sites**" means Zillow.com, Hotpads.com, and Trulia and their related mobile applications.

3. Section 2.2 shall be amended and replaced in its entirety as follows:

Data Feed. Beginning as soon as possible following the Execution Date but in no event later than April 30, 2025, Zillow will provide the Licensed Content for all Zillow Properties to Redfin via the Data Feed. Redfin will perform such development work as is necessary to enable delivery of the Licensed Content via real-time API as more fully set forth in Exhibit F.

4. Section 2.4 is hereby deleted in its entirety.

5. Section 2.5 shall be amended to include the following:

**AMENDMENT TO CONTENT LICENSE AGREEMENT**

Redfin may use the Licensed Content to market the Redfin Only Product. For clarity, Redfin may not use Licensed Content obtained through the Data Feed to populate, provide, or fulfill the Redfin Only Product.

6. The following new Sections 2.7 through 2.14 are hereby added to the end of Section 2:

2.7. Minimum Property Threshold.

(a) During each Measurement Period, Zillow will include in the Data Feed the greater of (i) all Zillow Properties or (ii) the Minimum Property Threshold, in each case measured as set forth below. Zillow may include more than the Minimum Property Threshold at any time.

(b) The first Measurement Period will commence on the Product Launch Date and each Measurement Period shall run for [redacted] (each a "**Measurement Period**"). Redfin will use best efforts to comply with the Launch Date requirements set forth in the Order. If the Product Launch Date does not occur within [redacted] of the Amendment Effective Date, the first Measurement Period will commence [redacted] after the Amendment Effective Date..

(c) The "**Minimum Property Threshold**" shall mean: (i) for the first Measurement Period, [redacted], (ii) for the second Measurement Period, [redacted], and (iii) for the third Measurement Period through the end of the Term, [redacted].

(d) Zillow will determine compliance in its reasonable discretion by first totaling Zillow Properties in the Data Feed each day during the Measurement Period, expressly excluding any duplicate properties, fraudulent listings, and properties or listings that are otherwise inappropriate for display, and dividing that total by the total number of days in such Measurement Period to reach a daily average. The Minimum Property Threshold is met if that daily average equals or exceeds the Minimum Property Threshold, then in effect.

(e) If the total number of Zillow Properties and Zillow Only Properties on the Zillow Sites is less than the Minimum Property Threshold, then [redacted]

(f) Intentionally omitted.

(g) Upon the commencement of any Wind-Down Period, the wind-down provisions set forth in Exhibit B will supersede the requirements of Sections 2.7 through 2.9, and Zillow will no longer be subject to the Minimum Property Threshold, the Property Tier Mix Requirements in Section 2.8, or the Minimum Regional Threshold for the remainder of the Term.

2.8 Property Tier Mix Requirements. Zillow will maintain an average monthly mix of Zillow Properties in the Data Feed of (a) no more than [redacted] Tier 1 Properties and (b) no less than [redacted] Tier 3 Properties (the "**Property Tier Mix Requirements**"). For the avoidance of doubt, Zillow may deliver fewer than the Tier 1 maximum and more than the Tier 3 minimum.

**AMENDMENT TO CONTENT LICENSE AGREEMENT**

2.9 Minimum Properties per Region. For each Region, Zillow will maintain a minimum average monthly distribution of Zillow Properties included in the Data Feed and located in such Region ("**Minimum Regional Threshold**"), measured in the same manner as the Minimum Property Threshold under Section 2.7, equal to (a) for the first Measurement Period, all Zillow Properties and Zillow Only Properties on the Zillow Sites located in such Region; (b) for the second Measurement Period, an average of [redacted] Zillow Properties or Zillow Only Properties; and (c ) for the third Measurement Period through the end of the Term an average of [redacted] Zillow Properties or Zillow Only Properties. If the total number of Zillow Properties and Zillow Only Properties on the Zillow Sites in a specified Region is less than the Minimum Regional Threshold, then in effect for that Region, Zillow will be deemed to have met the requirements of this Section 2.9 if Zillow provides Redfin with all Zillow Properties on the Zillow Sites.

2.10 Redfin Only Product. Intentionally omitted.

2.11 Lead Quality Management. Any implementation Redfin adopts for spam management and fraud prevention for Redfin Only Properties, must be substantially the same as the implementation applied to any Zillow Properties. Nothing in this Section 2.11 shall prevent Redfin from managing the display of listings on Redfin Sites.

2.12 Treatment of Zillow Properties.

(a) Redfin will not take steps to disparage or degrade the Zillow Properties in any manner visible to the consumer. For the avoidance of doubt, Redfin is permitted to control the sort order on its own websites and to implement upgrades in connection with the Redfin Only Product.

(b) Notwithstanding Section 6.1, Redfin will display the Licensed Content for each Zillow Property included in the Data Feed, provided that Redfin may decline to display the Licensed Content for a particular Zillow Property solely where the same property is then actively displayed by Redfin as a Redfin Only Property. In each such case, the Zillow Property will continue to count toward Zillow's satisfaction of the Minimum Property Threshold under Section 2.7 and the Minimum Regional Threshold under Section 2.9, and will not reduce Redfin's Minimum Lead Threshold under Section 4.1.1.

2.13 Product Launch. The earliest date on which any property displayed under a Zillow Only Product or the Redfin Only Product may be displayed on either party's applicable site(s) is the **Product Launch Date** as defined in the Order. For the avoidance of doubt, a Redfin Only Product and a Zillow Only Product may be sold to the same customer.

2.14 Zillow Only Properties Included After the First Measurement Period. To the extent any Zillow Only Property is included in the Data Feed after the first Measurement Period (including pursuant to Sections 2.7 or 2.9), such Zillow Only Property will, for so long as it remains in the Data Feed, be treated as a Zillow Property for all purposes of this Agreement other than Sections 2.7 through 2.9.

7. Sectio**n 3 Exclusivity s**hall be amended and replaced in its entirety as follows:

**AMENDMENT TO CONTENT LICENSE AGREEMENT**

3. **Exclusivity**. Beginning on the Execution Date and continuing for the remainder of the Term (expressly excluding the Wind-Down Period), Redfin shall not, through any third party other than Zillow, sell, market, or make available to any property management company or other participants in the real estate industry, any product or service that provides for the display on Redfin Sites of data and content pertaining to managed multi-family rental properties of twenty-five (25) units or greater. For the avoidance of doubt, nothing in this Section 3 prohibits Redfin from selling or displaying Redfin Only Properties through the Redfin Only Product in accordance with Sections 2.11 through 2.13.

8. Section 4.1.1 *Minimum Lead Threshold* will be amended and replaced in its entirety, as follows:

4.1.1 Minimum Lead Threshold. "**Minimum Lead Threshold**" shall mean during (a) the first Measurement Period, Redfin will deliver no less than [redacted] Payable Leads per month, (b) the second Measurement Period, Redfin will deliver no less than [redacted] Payable Leads per month, and (c) the third Measurement Period through the end of the Term, Redfin will deliver no less than [redacted] Payable Leads per month; in each case, expressly including any Payable Leads delivered to Zillow in excess of the Lead Cap, as set forth in Exhibit C, provided that, if Zillow fails to meet the Minimum Property Threshold for each of [redacted] consecutive calendar months, the Minimum Lead Threshold will no longer apply for the remainder of the Term. Redfin's failure to meet the Minimum Lead Threshold for each of [redacted] consecutive months will constitute material breach of this Agreement, with the understanding that the Minimum Lead Threshold will be reduced pro rata for any technical outage of the Lead API lasting 6 hours or longer.

9. Section 4.2 is amended to remove the last sentence of such provision.

10. Section 4.4 is amended to include the following:

Redfin shall not be obligated to share any Up-Funnel Data in connection with the Redfin Only Product.

11. Section 6.1 is amended and replaced in its entirety, as follows:

Redfin will display on the Redfin Sites all Licensed Content for every Zillow Property included in the Data Feed, although Redfin has the discretion to not display a Zillow Property that is also advertising through the Redfin Only Product. Redfin may not require submission of a Lead to view any Licensed Content. Redfin may supplement display of the Zillow Properties on the Redfin Sites with content and information created by Redfin or provided by third parties, including information on schools, neighborhood profiles, available public transportation and the like, so long as such supplemental content and information is not duplicative of, or substantially similar to, any data field included within the Licensed Content for the applicable Zillow Property. For each Zillow Property displayed on the Redfin Sites, Redfin will provide a statement that such Zillow Property was "Provided by Zillow."

12. Section 7.1 is amended and replaced in its entirely, as follows:

As of the Execution Date, Zillow will be permitted to promote and market, at Zillow's sole expense, the relationship contemplated herein to property management companies and other participants in the real estate industry, provided that: (i) Zillow must comply with the guidelines set

forth in Exhibit E and any mutually agreed upon revisions thereof (the "**Guidelines")**; and (ii) Redfin will enable Zillow to promote and market as contemplated herein as set forth in Exhibit E. For any promotion or marketing which does not comply with, or is outside the scope of, the Guidelines, Zillow must obtain Redfin's prior written approval (email to suffice).Nothing in this provision shall prevent Redfin from promoting or marketing their ability to offer a Redfin Only Product as contemplated by this Agreement in connection with the Redfin Only Product.

13. Section 14.1 is amended and replaced in its entirety, as follows:

Nondisparagement. Commencing on the Execution Date and continuing for the duration of the Term, each Party shall use reasonable and good faith efforts to not, and shall cause its Affiliates to use reasonable and good faith efforts to not, directly or indirectly, (a) engage in any deceptive, misleading, illegal, or unethical practices with respect to the other Party, (b) intentionally make, publish or communicate on any Redfin Site or Zillow Site, as applicable, or in any public forum any comments or statements concerning the other Party's or any of its Affiliates' products, services or businesses that are untruthful or reckless, (c) disparage the other Party's or any of its Affiliates' rentals-related products or services if such disparagement would have a material detrimental impact on (i) Zillow's ability to provide Licensed Content to Redfin or (ii) Redfin's ability to provide Leads to Zillow or to market the Redfin Only Product, or (d) use the other Party's or its Affiliates' Proprietary Marks in a misleading manner

14. Section 2(a) of Exhibit B to the Agreement is hereby deleted in its entirety.

15. Section 4 of Exhibit B to the Agreement is amended and replaced in its entirety, as follows:

4. **Data Feed**. After the first [redacted] of the Wind-Down Period, Zillow may, in its sole discretion, remove Zillow Properties from the Data Feed, provided that Zillow does not (i) remove more than [redacted] of Tier 1 Properties, [redacted] of Tier 2 Properties, and [redacted] of Tier 3 Properties each calendar month, unless such reduction is due to discontinuation of the Data Feed in accordance with Section 5 of this Exhibit B.

Section 5 of Exhibit B to the Agreement is amended and replaced in its entirety, as follows:

5. **Display on the Redfin Sites.** If Redfin does not display on the Redfin Sites more than [redacted] of Zillow Properties in a calendar month, Zillow may discontinue the Data Feed upon immediate written notice (email to be sufficient). Whether Redfin has met such threshold will be calculated by [redacted]

16. Section 1 of Exhibit C to the Agreement is hereby amended and replaced in its entirety, as follows:

**AMENDMENT TO CONTENT LICENSE AGREEMENT**

1. The Per-Lead Amount is the amount Zillow will pay Redfin for each Payable Lead based on tier, subject to the Lead Cap. The Lead Cap is the maximum number of Payable Leads per Zillow Property or Zillow Only Property per calendar month.

| Tier | Per-Lead Amount | Lead Cap |
|---|---|---|
| **Tier 1 Property** | [redacted] | [redacted] |
| **Tier 2 Property** | [redacted] | [redacted] |
| **Tier 3 Property** | [redacted] | [redacted] |

17. Section II: Third Party Digital Marketing. Section 1 of the First Addendum is hereby revised to replace each reference to “Non-Base Property” with “Tier 3 Property.”

18. Capitalized terms used but not defined in this Amendment shall have the meanings given to them in the Agreement. Except as expressly modified by this Amendment, all terms and conditions of the Agreement shall remain in full force and effect.

19. This Amendment may be executed in counterparts. Each counterpart will be considered an original, and all of them, taken together, will constitute a single amendment. Facsimile signatures will be deemed original signatures for all purposes under this amendment. This Amendment may be delivered by facsimile or electronically, and any such delivery will have the same effect as physical delivery of a signed original.

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the Amendment Effective Date first written above.

| **Zillow** | | **Redfin** | |
|---|---|---|---|
| Signature | ____________ | Signature | ____________ |
| Name | ____________ | Name | ____________ |
| Title | ____________ | Title | ____________ |
| Date | ____________ | Date | ____________ |

# PUBLIC APPENDIX B

## Public Notification

**[Letter to ILS Customers pursuant to Section V]**
**[Zillow letterhead]**

[Name and address or email address of ILS Customer
VIA U.S. MAIL, EMAIL, or HAND DELIVERED

Re: Redfin ILS.

Dear Zillow customer:

You are receiving this letter because you are a customer of Zillow Inc.'s ("Zillow") ILS Business and may be affected by a consent order that we have entered into with the United States Federal Trade Commission ("Commission"), the Commonwealth of Virginia, the states of Arizona, Connecticut, New York, and Washington, acting by and through their respective Attorneys General (together, "Plaintiff States," and together with the Commission, "Plaintiffs").

In September and October of 2025, Plaintiffs filed lawsuits in the Federal District Court in the Eastern District of Virginia ("Federal District Court"), alleging that Zillow and Redfin Corporation ("Redfin") entered into an agreement whereby Zillow would syndicate its listings from ILS Customers to Redfin and Redfin would no longer enter into its own contracts for listings with ILS Customers, and that this violates Section 1 of the Sherman Act, 15 U.S.C. § 1 (illegal agreement); Section 7 of the Clayton Act, 15 U.S.C. § 18 (illegal acquisition); Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (unfair method of competition); and various state antitrust laws. To settle these subsequently consolidated lawsuits, Zillow and Redfin entered, without admitting any violation of the law, into a stipulated settlement agreement with Plaintiffs that the Federal District Court ordered on XXXX, 2026 ("Order").

### How the Order Affects You

Under the Order, Redfin must re-establish its ILS Business within 6 months of the entry of the Order. Once re-established, Redfin will compete to enter into contracts with ILS Customers independent of Zillow. For 9 months after Redfin has re-established its ILS Business, Zillow must allow any ILS Customer whose contract cannot be cancelled within 3 months to exit or

renegotiate its contract with Zillow, without cost or penalty. Zillow also cannot prevent or impede any ILS Customer from entering into a contract with Redfin.

The Order requires us to send you a notice when Redfin has re-established its ILS Business. As of [date] Redfin has done so, and this letter is the required customer notification.

**Where To Get More Information**

To learn more about this case, please read the attached Order or visit [URL that goes to the ftc.gov press release]. This letter summarizes the main points of the matter, but the only official source of information is the Order. This Order reflects an agreement between Plaintiffs and Zillow and Redfin that settles Plaintiffs' allegations. It does not constitute an admission by Zillow or Redfin that they have violated the law or that any of the facts alleged by Plaintiffs regarding Zillow's and Redfin's conduct are true.

If you have concerns about whether Zillow or Redfin are complying with their obligations under the Order – or questions about how the Order applies to you or your colleagues – contact Zillow's [contact information], or one of the Plaintiff representatives indicated below:

**Federal Trade Commission**
Add information from Public Appendix C

**Plaintiff States**
Add information from Public Appendix C

## PUBLIC APPENDIX C

### Plaintiffs' Notification Service List

Federal Trade Commission:
ElectronicFilings@ftc.gov
bccompliance@ftc.gov
Ken Libby: klibby@ftc.gov
Jen Lee: jlee@ftc.gov
Alpa Davis: adavis6@ftc.gov

Arizona:
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-5763
consumer@azag.gov

Connecticut:
Office of the Connecticut Attorney General
Antitrust Section
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5030
AG.AntitrustComplaints@ct.gov

New York:
Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street,
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov
Amy.McFarlane@ag.ny.gov
Michael.Schwartz@ag.ny.gov
Luisa.Dilauro@ag.ny.gov

Virginia:
Tyler T. Henry
Senior Assistant Attorney General
David C. Smith
Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
(804) 692-0485
THenry@oag.state.va.us
dsmith@oag.state.va.us

Washington:
Tyler Arnold, Assistant Attorney General
Amy N.L. Hanson, Senior Managing Assistant Attorney General
Jonathan Mark, Division Chief
Antitrust Division
Office of the Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-587-5510
Tyler.Arnold@atg.wa.gov
Amy.Hanson@atg.wa.gov
Jonathan.Mark@atg.wa.gov

**NONPUBLIC APPENDIX D**

[REDACTED]

**NONPUBLIC APPENDIX E**

[REDACTED]

**PUBLIC APPENDIX F**

**Financial Penalties for Redfin's Noncompliance with Paragraph IV.A**

If Defendant Redfin has not complied with Paragraph IV.A within 6 months of Order entry (subject to any extension granted), then it must pay a penalty of $1 million to the Commission.

After the initial $1 million penalty is assessed, Defendant Redfin shall pay an additional $100,000 for every month that Redfin remains in noncompliance of Paragraph IV.A.

The total financial penalties are capped at $1.6 million.

# NONPUBLIC APPENDIX G

## Nonpublic Redfin Content License Agreement

[REDACTED]

# PUBLIC APPENDIX G

## Redacted Redfin Content License Agreement

[redacted]

# CONTENT LICENSE AGREEMENT

Zillow, Inc. ("**Zillow**"), a Washington corporation, and Redfin Corporation ("**Redfin**"), a Delaware corporation, hereby enter into this Content License Agreement (this "**Agreement**") as of February 6, 2025 (the "**Execution Date**"). Zillow and Redfin may be referred to herein, collectively, as the "**Parties**" and, each individually, as a "**Party**."

WHEREAS, Zillow desires to grant to Redfin a license to, and Redfin desires to license from Zillow, certain content pertaining to multi-family rental properties; and

WHEREAS, the Parties desire to establish certain other agreements and understandings.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein, the Parties, intending to be legally bound, agree as follows:

**1. Term; Termination; Survival.**

1.1 Term. The initial term (the "**Initial Term**") of this Agreement will start on the date on which the Licensed Content (as defined in Section 2.1) can first be accessed, viewed, and used pursuant to the terms of this Agreement by end-users of the Redfin Sites (the "**Start Date**"), which the Parties will make best efforts to cause to occur as soon as reasonably possible but no later than April 30, 2025, and will continue until June 30, 2030 , unless earlier terminated in accordance herewith. Except for the first contract year, which will run from the Start Date to June 30, 2026 , each contract year will run from July 1 to June 30th of the applicable year(s). Upon the conclusion of the Initial Term, this Agreement will automatically renew on the same terms for up to two (2) successive renewal terms of two (2) years each unless either Party provides written notice of nonrenewal no less than twelve (12) months in advance of the expiration of the then-current term (each, a "**Renewal Term**"). The Initial Term, all Renewal Terms, if any, and the Wind-Down Period are referred to herein, collectively, as the "**Term**."

1.2 Termination. This Agreement may be terminated prior to the expiration of the Term as follows:

1.2.1 *Material Breach.* Either Party may immediately terminate this Agreement if the other Party commits a breach of this Agreement that results in a material adverse effect on the value of the Agreement to the other party and such material breach is either not capable of cure or is not cured within thirty (30) days of receipt of written notice thereof from the non-breaching Party, provided that, with respect to Redfin's failure to meet the Minimum Lead Threshold [redacted] as described in Section 4.1.1, Redfin will have ninety (90) days to cure after receipt of written notice thereof from Zillow.

1.2.2 *Insolvency.* Either Party may terminate this Agreement upon written notice to the other Party if the other Party makes an assignment for the benefit of creditors (other than in connection with granting a security interest), files a petition for bankruptcy, or otherwise becomes insolvent.

1.2.3 *Change in Control or Acquisition of Certain Identified Persons by Either Party.*

[redacted]

1.2.3.1 *Definitions.* As used herein:

"**Affiliate**" means any person, corporation, association, partnership or other entity that directly or indirectly controls or is controlled by, or is under the common control of a Party.

"**Group**" means any group of related Persons.

"**Person**" means any person, including any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, or unincorporated organization.

"**Redfin Change in Control**" means (a) the closing of the transactions contemplated by any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) directly or indirectly to any Person, or to any Group as determined under Section 13(d) of the Exchange Act of all or substantially all of (i) the assets of Redfin and its Affiliates , or (ii) the assets owned by Redfin and used in the operation of the Redfin rental business; (b) any Person or Group becoming the beneficial owner (as determined under Section 13(d) under the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the aggregate voting power represented by the issued and outstanding capital stock of Redfin (or its successor) entitled to vote generally or in the election of directors (or Persons performing similar functions).

"**Redfin Identified Person**" means an entity or Person, included on <u>Exhibit A-1</u>, attached hereto and incorporated herein by reference, as may be modified as provided therein.

"**Redfin Identified Person Acquisition**" means (a) Redfin or its Affiliates becoming the beneficial owner (as determined under Section 13(d) under the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the aggregate voting power represented by the issued and outstanding capital stock of a Zillow Identified Person entitled to vote generally or in the election of directors (or Persons performing similar functions); or (b) the closing of the transactions contemplated by any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) directly or indirectly to Redfin or its Affiliates, or to any Group as determined under Section 13(d) of the Exchange Act that is controlled by Redfin or its Affiliates, of all or substantially all of the assets of a Zillow Identified Person or used in the operation of a Zillow Identified Person.

"**Zillow Change in Control**" means (a) the closing of the transactions contemplated by any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) directly or indirectly to any Person or to any group of related Persons (a "**Group**") as determined under Section 13(d) of the Exchange Act of all or substantially all of (i) the assets of Zillow and its Affiliates , or (ii) the assets owned by Zillow and used in the operation of the Zillow rental business; (b) any Person or Group becoming the beneficial owner (as determined under Section 13(d) under the Exchange Act), directly or indirectly, of more than fifty percent

[redacted]

(50%) of the aggregate voting power represented by the issued and outstanding capital stock of Zillow Group, Inc. (or its successor) entitled to vote generally or in the election of directors (or Persons performing similar functions).

"**Zillow Identified Person**" means an entity or Person included on Exhibit A-2, attached hereto and incorporated herein by reference, as may be modified as provided therein.

"**Zillow Identified Person Acquisition**" means (a) Zillow or its Affiliates becoming the beneficial owner (as determined under Section 13(d) under the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the aggregate voting power represented by the issued and outstanding capital stock of a Redfin Identified Person entitled to vote generally or in the election of directors (or Persons performing similar functions); or (b) the closing of the transactions contemplated by any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) directly or indirectly to Zillow or its Affiliates, or to any Group as determined under Section 13(d) of the Exchange Act that is controlled by Zillow or its Affiliates, of all or substantially all of the assets of a Redfin Identified Person or used in the operation of a Redfin Identified Person.

1.2.3.2 *Termination by Redfin.* Redfin shall have the right to terminate this Agreement by giving written notice to Zillow within thirty (30) days after (1) the date on which Zillow provides written notice of a Zillow Identified Person Acquisition; (2) Zillow provides written notice of a Zillow Change in Control involving a Redfin Identified Person; or (3) a court or regulatory entity of competent authority requires termination of this Agreement as a condition of any Redfin Change in Control. Zillow must notify Redfin in writing within 30 days of the occurrence of a Zillow Identified Person Acquisition or a Zillow Change in Control involving a Redfin Identified Person.

1.2.3.3 *Termination by Zillow.* Zillow shall have the right to terminate this Agreement by giving written notice to Redfin within thirty (30) days after the date on which (1) Redfin provides written notice of a Redfin Identified Person Acquisition; (2) Redfin provides written notice of a Redfin Change in Control involving a Zillow Identified Person; or (3) a court or regulatory entity of competent authority requires termination of this Agreement as a condition of any Zillow Change in Control. In the event of a Redfin Change in Control other than to a financial sponsor acquirer occurs during the first three (3) years of the Initial Term (a "**Strategic Acquisition**"), Zillow may elect to shorten the Initial Term to three (3) years, provided that Zillow provides notice of such election within sixty (60) days after close of the Strategic Acquisition Redfin must notify Zillow in writing within 30 days of the occurrence of a Redfin Identified Person Acquisition, a Redfin Change in Control involving a Zillow Identified Person, or a Strategic Acquisition.

[redacted]

1.3 Effect of Termination.

1.3.1 *Wind-Down Period*. Except as otherwise provided, beginning on the effective date of any non-renewal or termination for any reason and ending one (1) year thereafter (the "**Wind-Down Period**"): (a) the Parties will use commercially reasonable efforts to cooperate in good faith to wind down all obligations under this Agreement in a timely fashion while minimizing any burdens or confusion for consumers and protecting the names and reputations of the Parties; and (b) all provisions of this Agreement will remain in full force and effect, except as expressly set forth on Exhibit B hereto. Notwithstanding the foregoing, (i) the Wind-Down Period will not apply in the event of a termination pursuant to Section 1.2.1, excluding termination by Zillow relating to Redfin's breach of Section 4.1.1, or 1.2.2; and (ii) if either Party terminates this Agreement pursuant to Section 1.2.3, this Agreement will terminate effective immediately upon the date of such notice, and, unless otherwise required by court order or regulatory authority of competent jurisdiction, a six (6)-month Wind-Down Period will apply thereafter, except in the event of a Redfin Identified Person Acquisition or a Redfin Change in Control involving a Zillow Identified Person, in which case the Wind-Down Period will be three (3) months. Upon the expiration of the Wind-Down Period, all licenses granted under this Agreement will cease unless expressly stated otherwise.

1.3.2. *Survival*. The provisions of this Section 1.3, Sections 4.3, 4.6, 5 (with respect to Leads delivered during the Term only), 8, 9 (for the period set forth therein), 10-13, 14.3, and any other provisions, which by their nature or context are intended to survive any termination or expiration of the Agreement, will survive any termination or expiration of this Agreement. In no event will any termination relieve a Party of the obligation to pay any fees payable to the other Party with respect to the period prior to the effective date of termination.

**2. Data Feed and Licensed Content.**

2.1 Definitions.

"**Base Property**" means those Zillow Properties advertising with the Base package or its successor should it be modified or discontinued.

"**Data Feed**" means the electronic mechanism as mutually agreed upon by the parties for delivery of the Licensed Content.

"**Enriched Content**" means content displayed on the Zillow Sites that is (i) licensed to Zillow by a third-party other than the advertiser for display on the Zillow Sites only, or (ii) proprietary to Zillow.

"**Licensed Content**" means all content then displayed on the Zillow Sites for each Zillow Property included in the Data Feed, excluding Enriched Content.

"**Non-Base Property**" means those Zillow Properties advertising with the Enhanced, Premium, Premium Plus, Signature, or LeaseUp packages or their successors should they be modified or discontinued.

"**Per Lease Property**" means those Zillow Properties advertising with Pay-Per-Lease attribution advertising or its successor should it be modified or discontinued.

[redacted]

"**Redfin Sites**" means the Redfin.com, Rent.com, Rentals.com, and Apartmentguide.com websites and their related mobile applications, and such additional websites and mobile applications as may be added during the term upon written consent from Zillow (email to suffice), which will not be unreasonably withheld.

"**Zillow Property**" means a managed multi-family rental property of twenty-five (25) units or greater that is displayed on the Zillow Sites subject to an active paid advertising agreement. Each Zillow Property is either a Base Property, Non-Base Property or Per Lease Property (collectively, "**Zillow Properties**"). Zillow Properties do not include any managed multi-family rental property of twenty-five (25) units or greater displayed on the Zillow Sites which is not subject to an active paid advertising agreement.

"**Zillow Sites**" means Zillow.com, Hotpads.com, and Trulia.com and their related mobile applications.

2.2 Data Feed. Beginning as soon as possible following the Execution Date but in no event later than April 30, 2025, Zillow will provide the Licensed Content for all Zillow Properties to Redfin via the Data Feed. Redfin will perform such development work as is necessary to enable delivery of the Licensed Content via real-time API as more fully set forth in Exhibit F. [redacted]

2.3 Licensed Content. Licensed Content will be: (i) of equivalent quality to the corresponding content displayed on the Zillow Sites; (ii) [redacted] and (ii) updated as soon as reasonably practicable upon Zillow's receipt of updates for the Zillow Properties, but in no event less than once per day.

2.4 Quarterly Business Reviews. Zillow and Redfin will meet (in-person or electronically) no less often than quarterly to share in good faith timely updates on product changes and other developments that could reasonably impact the Data Feed, Licensed Content, Leads (as defined in Section 4), or other aspects of this Agreement.

2.5 License. Subject to the other provisions hereof, Zillow hereby grants to Redfin a worldwide, non-sublicensable, non-transferable (except as set forth in Section 14.2), non-exclusive, royalty-free, fully paid-up license to use the Licensed Content solely to display the Licensed Content on and in the Redfin Sites in accordance with the provisions of this Agreement. In connection with displaying the Licensed Content on the Redfin Sites, Redfin and its Affiliates are allowed to use the Licensed Content to [redacted]

2.6 Removal from Data Feed; Updates to Licensed Content. Within twenty-four (24) hours of any Zillow Property being removed from the Data Feed, Redfin shall cease display of such Zillow Property and any related Licensed Content on the Redfin Sites. Within twenty-four (24) hours of Zillow updating any Licensed Content in the Data Feed, Redfin shall update the display of such Licensed Content on the Redfin Sites.

[redacted]

3. **Exclusivity.** Beginning on the Execution Date and continuing for the remainder of the Term (expressly excluding the Wind-Down Period), Redfin shall not, directly or through any third party other than Zillow, sell, market, or make available to any property management company or other participants in the real estate industry, any product or service that provides for the display on the Redfin Sites of data and content pertaining to managed multi-family rental properties of twenty-five (25) units or greater or that provides for enhancement or increased prominence on the Redfin Sites of data and content pertaining to managed multi-family rental properties of twenty-five (25) units or greater. If Redfin is engaged in discussions with any other third parties regarding the provision of multi-family rental properties of twenty-five (25) units or greater for display on the Redfin Sites, Redfin will cease all such discussions as of the Execution Date.

Notwithstanding the foregoing, with respect to any managed multi-family rental properties of twenty-five (25) units or greater that Redfin is already under contract to display on the Redfin Sites as of the Execution Date:

i. If the property is included in the Data Feed on the Start Date, Redfin will exercise its voluntary termination rights (to the extent available), to be effective as soon as is reasonably practicable at or after Start Date. If a property is included in the Data Feed after the Start Date, Redfin will exercise its voluntary termination rights (to the extent available), to be effective as soon as is reasonably practicable. For avoidance of doubt, no content related to any property included in the Data Feed may be displayed on the Redfin Sites after the Start Date other than via the Data Feed, with the exception of properties for which Redfin does not have voluntary termination rights, and Redfin will cease billing for such services accordingly.

ii. If the property is a Unique Property (as defined in Exhibit D) or could not be voluntarily terminated as provided above, Redfin is permitted to continue to display on the Redfin Sites data and content pertaining to such properties until the earlier of: (a) the natural expiration of such contracts (including any month-to-month renewals thereof); (b) the signing of a new or amended agreement with Zillow for display on the Zillow Sites of the properties subject to such contracts; or (c) July 31, 2025 or such earlier date as the Parties may mutually agree (the **"Hard Transition Date"**); so long as, unless contractually prohibited from doing so, any duplicate property provided in the Data Feed shall receive priority over the same property received from an alternate source. Within ten (10) business days of the Execution Date, Zillow and Redfin will use best efforts to plan a Limited Syndication as outlined in Exhibit D.

4. **Leads.**

4.1 General. Redfin will cause all Leads (as defined below) from the Zillow Properties displayed on the Redfin Sites beginning on the Start Date to be delivered to Zillow via API (the "**Lead API**") within twenty-four (24) hours after such Lead is submitted to Redfin. As used herein, "**Lead**" means each instance of a user: (a) clicking submit (or an equivalent call-to-action) on a contact form displayed within or alongside such Zillow Property on the Redfin Sites for the purpose of collecting inquiries with respect to renting or touring such Zillow Property (an "**Electronic Lead**"); or (b) placing a phone call to a Redfin-provided or Zillow-provided phone number that is displayed within or alongside a Zillow Property on the Redfin Sites for the purpose of encouraging phone calls with respect to renting or touring such Zillow Properties (a "**Phone Lead**"). Electronic Leads must be directed only to the Zillow Property from which the Lead originated.

4.1.1 *Minimum Lead Threshold.* Redfin will deliver no less than [redacted] Payable Leads per month ("**Minimum Lead Threshold**"), expressly *including* any

[redacted]

Payable Leads delivered to Zillow in excess of the Lead Cap, as set forth in Exhibit C, provided that the Minimum Lead Threshold will not apply for any calendar month in which the Data Feed did not include an average of [redacted] Zillow Properties per day. Redfin's failure to meet the Minimum Lead Threshold for [redacted] consecutive months will constitute material breach of this Agreement, with the understanding that the Minimum Lead Threshold will be reduced pro rata for any technical outage of the Lead API lasting 6 hours or longer.

4.2 Communication. As between Redfin and Zillow, Redfin shall have the sole right to send to each user of the Redfin Sites who submits a Lead an email confirming the Lead was received or delivered. Zillow shall not send any email or other communication to any user of the Redfin Sites who submits a Lead (provided that the foregoing is not intended to prohibit or otherwise restrict Zillow from sending emails or other communications to any individuals for whom Zillow has independently derived contact information). As between Redfin and Zillow, Zillow shall have the sole right to deliver all Leads to the Zillow Property contact. Redfin shall not send any email or other communication to any Zillow Property contact to attempt to attribute a Lead to Redfin or for any other purpose.

4.3 Ownership and Use of Lead Data. As between Redfin and Zillow, Redfin shall have and retain all ownership rights and other rights to the Leads and all information, content, and data included in or with such Leads (collectively, "**Lead Data**"). Redfin's provision of Leads to Zillow pursuant to this Agreement is for the sole purpose of permitting Zillow to provide each Lead to the applicable Zillow Property. Within a commercially reasonable period of time after receiving each Lead, Zillow shall provide each Lead to the applicable Zillow Property. At all times, Zillow shall ensure that it processes the Leads it receives under this Agreement at least as favorably as it processes leads generated from the Zillow Sites and that it does not grant priority to leads generated from the Zillow Sites. Except as expressly permitted in this Agreement, Zillow will not use the Leads or any Lead Data for any other purpose, including, without limitation, for the purposes of marketing other products or services or gathering competitive information. Notwithstanding the foregoing, Zillow may use Lead Data as provided in Section 4.5 below and for the limited internal purposes of (a) matching Leads to existing Zillow users in order to fulfill any obligations of Zillow to avoid overcharging advertisers for the same or similar Leads, and (b) establishing and complying with its obligations under this Agreement.

4.4 Up-Funnel Data. Redfin shall provide Zillow with impressions and page views, and other data as mutually agreed by the Parties, for each Zillow Property displayed on the Redfin Sites (collectively, "**Up-Funnel Data**"), as more fully set forth in Exhibit F. Redfin will implement commercially reasonable procedures to ensure the completeness and accuracy of the Up-Funnel Data and timely delivery. Zillow may use Up-Funnel Data solely to: (i) provide property-level data to the property management company associated with the applicable Zillow Property; (ii) calculate aggregate statistics with respect to Zillow Properties for internal and partnership business and performance management; and (iii) make general marketing claims for business-to-business sales purposes.

4.5 Communications Recording and Lead Follow-Up. Zillow will record the content of: 1) calls generated by Phone Leads; and 2) communications submitted by Electronic Leads (collectively, "**Lead Communication Data**"), which Zillow will use for internal business purposes and, with respect to Phone Leads, make available to the applicable Zillow Property. Zillow will also, as directed by Redfin, implement Zillow's lead connect feature in order to [redacted]

[redacted]

[redacted]. The caller ID name associated with the text will indicate a name to be reasonably specified by Redfin. Redfin is solely responsible for capturing all consents necessary under applicable law for communications recording and lead follow-up as described herein, provided that Zillow is responsible for providing Redfin notice and consent language sufficient for the communications recording and lead follow-up Zillow intends to conduct and will be responsible for the adequacy of the consent language under applicable law and regulations. Zillow will ensure that the format of such consent does not negatively impact user engagement (e.g., due to its length or complexity). In the event of any adverse effects on user engagement, Zillow and Redfin shall discuss in good faith modifications to the format of the consent, which shall constitute Redfin's sole remedy for such adverse effects on user engagement.

4.6 Deletion of Lead Data. Zillow shall permanently delete all Lead Data received from Redfin pursuant to this Agreement no later than the later of: (a) [redacted] after Redfin provides the Lead to which such Lead Data pertains to Zillow or such other retention period as Zillow may reasonably adopt from time-to-time to permit Zillow to achieve the business purpose for which the Lead Data is retained, provided that such business purpose is in compliance with all applicable provisions of this Agreement; and (b) the expiration or earlier termination of this Agreement. Any Lead Data retained in accordance with this Section may be used only in accordance with the limited purpose for which it was retained and in compliance with all applicable provisions of this Agreement.

**5. Compensation; Reporting.**

5.1 General. Zillow shall pay Redfin fees as set forth in Exhibit C attached hereto and incorporated by reference herein.

5.2 Payable Leads. "**Payable Lead**" means (a) each Electronic Lead delivered to Zillow hereunder, provided such Electronic Lead includes the following completed fields: first and last name, email address, and move-in date; and (b) each Phone Lead lasting at least [redacted] including Phone Leads connected to an answering machine, interactive voice response system, or similar automated system, provided in each case that a Lead that meets such requirements will not be considered a Payable Lead if [redacted] If an Electronic Lead submitter completes any optional fields within the lead form, Redfin will provide such completed fields to Zillow, but, subject to (t) above, such fields shall not be required to be completed in order for an Electronic Lead to qualify as a Payable Lead.

5.3 Reporting and Payment Schedule. Within twenty-one (21) days after the end of each calendar month, Zillow will provide Redfin a billing report (the "**Monthly Report**"), showing: (a) the number of Payable Leads provided to Zillow in such calendar month, which includes the number of Leads, any otherwise Payable Leads excluded pursuant to Section 5.2, and , the reason each such Lead is excluded; (b) a calculation of the total Per-Lead Amounts payable for all Payable Leads delivered in such month (the "**Monthly Lead Payment**"); and (c) such other data and metrics as Redfin may reasonably request from time to time to permit Redfin to verify payments. Redfin will provide to Zillow, via a mutually agreed mechanism, an invoice (the "**Monthly Invoice**") for the Monthly Lead Payment set forth in the Monthly Report no more than seven

[redacted]

(7) days after receiving the Monthly Report. Zillow will pay the Monthly Lead Payment set forth on the Monthly Invoice within forty-five (45) days after the date on which Redfin provides the Monthly Invoice. No additional terms in any invoice shall override or control over the terms of this Agreement.

5.4 Taxes. Each Party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that Party upon or with respect to the transactions and payments under this agreement. Redfin may charge and Zillow will pay applicable state or local sales or use taxes or other similar transaction taxes that Redfin is legally obligated to charge ("**Taxes**"), provided that such Taxes are stated on the original invoice that Redfin provides to Zillow and Redfin's invoices state such Taxes separately and meet the requirements for a valid tax invoice. Zillow may provide Redfin with an exemption certificate or equivalent information acceptable to the relevant taxing authority, in which case, Redfin will not charge and or collect the Taxes covered by such certificate. Throughout the Term, Redfin will provide Zillow with any forms, documents, or certifications as may be reasonably requested by Zillow to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

5.5 Disputes. If Redfin disputes the number of Payable Leads or any other amount or payment contained in any Monthly Report, Redfin must notify Zillow in writing (email to suffice) within thirty (30) days of receipt of the Monthly Report, and Zillow and Redfin will meet within ten (10) business days thereafter to attempt in good faith to resolve the dispute.

**6. Display of Zillow Properties on Redfin Sites.**

6.1 Redfin will display on the Redfin Sites all Licensed Content for every Zillow Property included in the Data Feed. Redfin may not require submission of a Lead to view any Licensed Content. Redfin may supplement display of the Zillow Properties on the Redfin Sites with content and information created by Redfin or provided by third parties, including information on schools, neighborhood profiles, available public transportation and the like, so long as such supplemental content and information is not duplicative of, or substantially similar to, any data field included within the Licensed Content for the applicable Zillow Property. For each Zillow Property displayed on the Redfin Sites, Redfin will provide a statement that such Zillow Property was "Provided by Zillow."

**7. Marketing; Traffic Credit; SEO Efforts.**

7.1 Marketing. Neither Party will promote or market the existence or terms of this Agreement, or the relationship contemplated herein, to consumers without the other Party's prior express written consent in each instance. As of the Execution Date, Zillow will be permitted to promote and market, at Zillow's sole expense, the relationship contemplated herein to property management companies and other participants in the real estate industry, provided that: (i) Zillow must comply with the guidelines set forth in Exhibit E and any mutually agreed upon revisions thereof (the "**Guidelines**"); and (ii) Redfin will enable Zillow to promote and market as contemplated herein as set forth in Exhibit E. Redfin and Zillow will meet (in-person or telephonically) no less often than one (1) time per contract year to review marketing and promotional messaging and collateral. For any promotion or marketing which does not comply with, or is outside the scope of, the Guidelines, Zillow must obtain Redfin's prior written approval (email to suffice).

[redacted]

7.2 Traffic Credit. During the Term: (a) Redfin shall remain entitled to receive credit from comScore and any other independent source of traffic measures or metrics for all rentals traffic to the Redfin Sites; and (b) at Zillow's request and sole expense, Redfin and Zillow shall use commercially reasonable efforts, as more fully set forth in Exhibit F, to create a comScore "Custom Entity" (or similar solution) for the purpose of enabling comScore to include the traffic credited to Redfin pursuant to the foregoing sentence that pertains specifically to any section of the Redfin Sites that is dedicated to the Zillow Properties in Zillow's aggregate traffic numbers, provided that such efforts shall not prevent Redfin from receiving credit for traffic to the Redfin Sites in accordance with this Section 7.2.

7.3 SEO Efforts. Beginning on the Start Date and continuing for the remainder of the Term, Redfin shall be free to use the Licensed Content for search engine optimization efforts related to the Redfin Sites in its reasonable discretion, provided, however, that: (a) such efforts must accurately represent the Zillow Properties as rental properties; and (b) each Party shall refrain from using the other Party's federally registered trademarks or trademarks for which a Party has filed a trademark application in its search engine optimization efforts without the other Party's prior written consent. Notwithstanding the foregoing, a Party will not violate this Section by using such other Party's marks in an article or other digital collateral for general distribution, such as a blog post that identifies Redfin as the provider of a service. For the purpose of enabling the Parties to comply with this Section 7.3, each Party shall provide the other Party with an up-to-date list of its federally registered trademarks and trademark applications promptly following the Execution Date and on an annual basis thereafter during the Term.

**8. Intellectual Property; Ownership.**

8.1.1 Ownership by Zillow. Between the Parties, Zillow will own all right, title and interest in and to the Data Feed, Licensed Content, and the Zillow Sites, including all intellectual property and other proprietary rights in and to the Data Feed, Licensed Content, and Zillow Sites in whole or in part. Subject to the limited license granted by Zillow in Section 2.5, Redfin acquires no right, title or interest in or to the Data Feed, Licensed Content, or Zillow Sites.

8.1.2 Ownership by Redfin. Between the Parties, Redfin will own all right, title and interest in and to the Redfin Sites, including all intellectual property and other proprietary rights in and to the Redfin Sites, in whole or in part. Zillow acquires no right, title or interest in or to the Redfin Sites.

**9. Audit Rights.**

If either Party believes in good faith that the other Party has materially breached its obligations under this Agreement, the auditing Party may engage a nationally recognized independent third party firm (**"Auditor"**) to, review, inspect and test the books and records of the other Party solely to the extent reasonably necessary to ascertain such Party's compliance with this Agreement (**"Audit"**) only: (i) upon providing 30 days prior written notice to the audited Party, (ii) during regular business hours and (iii) a maximum of one time per year. The Auditor will provide its final conclusions of the audit to both Parties simultaneously and within 30 days after the last day of the Audit. The auditing Party will pay the costs it incurs, and the out-of-pocket costs the audited Party incurs, as part of any Audit; the audited Party shall be liable, however, for all costs of any Audit that discloses that the audited Party has materially breached this Agreement. No Audit may occur more than one year after termination of this Agreement. Any information disclosed to or otherwise learned by the auditing Party or the Auditor in connection with an Audit conducted pursuant to this paragraph constitutes Confidential Information of the audited Party and is subject to the limitations on use set forth herein.

[redacted]

**10. Representations and Warranties.**

10.1 Redfin Representations and Warranties. Redfin represents and warrants that: (a) it is a corporation duly organized, validly existing, and in good standing under the laws of the state of its incorporation; (b) it has the corporate right, power and authority to enter into this Agreement and to perform all of its obligations hereunder; (c) the execution, delivery and performance of this Agreement will not conflict with, result in a breach of, or constitute a default under, any other agreement to which it is a party or by which it is bound; (d) it shall not represent itself as an agent, employee or affiliate of the other Party; (e) to the best of its knowledge, the Lead Data does not contain and will not expose Zillow's systems to any viruses, malware, Trojan horses, or otherwise harmful code; and (f) it will comply with all applicable laws and regulations in the performance of its duties and exercise of its rights under this Agreement, including, to the extent applicable, federal, state and local anti-discrimination laws (including the Fair Housing Act), the Telephone Consumer Protection Act, the CAN-SPAM Act, the CCPA, and laws relating to its collection and handling of Lead Data, data privacy, data security and intellectual property.

10.2 Zillow Representations and Warranties. Zillow represents and warrants that: (a) it is a corporation duly organized, validly existing, and in good standing under the laws of the state of its incorporation; (b) it has the corporate right, power and authority to enter into this Agreement and to perform all of its obligations hereunder; (c) the execution, delivery and performance of this Agreement will not conflict with, result in a breach of, or constitute a default under, any other agreement to which it is a party or by which it is bound; (d) it shall not represent itself as an agent, employee or affiliate of the other Party; (e) it has the right to grant the licenses granted by it hereunder; (f) to the best of its knowledge, the Data Feed and the Licensed Content do not contain or expose Redfin's systems to any viruses, malware, Trojan horses, or otherwise harmful code; (g) to the best of its knowledge the Licensed Content does not infringe on the intellectual property or other proprietary rights of any third party nor contain any content that is defamatory, offensive, or illegal; (h) it will only provide Licensed Content to Redfin for which it has permission from its advertiser or other rights owner to display or have displayed as provided in this Agreement; (i) it will not "sell" (as such term is defined in applicable privacy laws) or otherwise disclose Lead Data, Leads and Up-Funnel Data to third parties for monetary or other valuable consideration, or "share" Lead Data, Leads and Up-Funnel Data for "cross context behavioral advertising" (as such terms are defined in applicable privacy laws), unless such "sale" or "sharing" would be consistent with applicable privacy laws; and (j) it will, at all applicable times, comply with all applicable laws and regulations in connection with its performance of its duties and exercise of its rights under this Agreement, including as applicable to the Data Feed or Licensed Content Zillow provides to Redfin under this Agreement, including, without limitation, to the extent applicable, federal, state and local anti-discrimination laws (including the Fair Housing Act), the Telephone Consumer Protection Act ("**TCPA**"), the CAN-SPAM Act, the CCPA, and laws relating to its collection and handling of Lead Data, data privacy, data security and intellectual property.

10.3 DISCLAIMER OF WARRANTIES. (A) OTHER THAN AS EXPLICITLY SET FORTH HEREIN AND IN SECTIONS 10.1 AND 10.2 AND SUBJECT TO THE INDEMNIFICATION OBLIGATIONS IN SECTION 11, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO ITS BUSINESS, PRODUCTS, OR SERVICES PROVIDED UNDER THIS AGREEMENT AND EACH PARTY HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, WHETHER ALLEGED TO ARISE BY LAW, BY USAGE IN THE TRADE, BY

[redacted]

COURSE OF DEALING OR COURSE OF PERFORMANCE OR OTHERWISE; AND (B) EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, EACH PARTY ACKNOWLEDGES THAT THE OTHER PARTY'S PRODUCTS AND SERVICES, INCLUDING, WITHOUT LIMITATION, THE ZILLOW PROPERTIES AND LICENSED CONTENT, ARE PROVIDED "AS IS" AND THAT THE OTHER PARTY MAKES NO WARRANTY THAT THE FOREGOING ITEMS WILL BE ACCURATE, FREE FROM BUGS, FAULTS, DEFECTS, OR ERRORS. WITHOUT LIMITATION OF THE FOREGOING AND EXCEPT AS PROVIDED IN THIS AGREEMENT: (i) ZILLOW PROVIDES THE LICENSED CONTENT HEREUNDER "AS AVAILABLE"; (ii) ZILLOW DOES NOT WARRANT THAT THE LICENSED CONTENT OR THE USE THEREOF SHALL BE TIMELY, SECURE, ERROR-FREE, BE PROVIDED (OR BE AVAILABLE) WITHOUT INTERRUPTION, OR MEET REDFIN'S BUSINESS OR OPERATIONS PURPOSES; AND (iii) ZILLOW DOES NOT GUARANTEE OR WARRANT ANY LICENSED CONTENT'S ACCURACY, RELIABILITY, COMPLETENESS, INTEGRITY, VALIDITY, OR CURRENTNESS, OR THAT ANY ERRORS IN ANY LICENSED CONTENT WILL BE CORRECTED. EXCEPT AS SET FORTH IN THIS AGREEMENT, ZILLOW DISCLAIMS ALL LIABILITY AND RESPONSIBILITY ARISING OUT OF OR RESULTING FROM THE CONTENT OF, OR ANY ERRORS CONTAINED IN, ANY LICENSED CONTENT.

**11. Indemnification.**

11.1 Indemnification by Zillow. Zillow shall defend, indemnify and hold harmless Redfin, its Affiliates and their respective directors, officers, employees, and agents (collectively, the "**Redfin Parties**") from and against any claims, liabilities, losses, damages, costs, and expenses (including, but not limited to, reasonable attorneys' fees and costs) (collectively, "**Losses**") incurred by the Redfin Parties as the result of any third-party claim or third-party demand (a "**Claim**") to the extent arising out of: (a) any false representation or warranty, or material breach by Zillow of its representations and warranties contained in this Agreement, including violation by Zillow of the TCPA, the CAN-SPAM Act, the CCPA, and laws relating to its collection and handling of Lead Data, data privacy, and data security, and any allegation that the Licensed Content, (i) when used as authorized by this Agreement, infringes such third-party's intellectual property rights, excluding claims to the extent arising from the use of the Licensed Content in a modified, unauthorized, or unintended manner, the combination of the Licensed Content with materials not furnished by Zillow if there would not have been an infringement but for such combination, or the Redfin Sites themselves infringing such third party's intellectual property rights other than by virtue of the use or display of the Licensed Content on the Redfin Sites as permitted under this Agreement or (ii) contains any content that is defamatory, offensive, or illegal; (b) any violation of law by Zillow related to or arising from the performance of this Agreement, including arising from any administrative action, investigation, inquiry or demand from a governmental entity or other regulatory body with oversight or jurisdiction over Zillow's products, services and activities in relation to such violation of Law; (c) any fraud, gross negligence or willful misconduct of Zillow, its Affiliates and their respective directors, officers, employees, and agents; and (d) any services performed or actions taken by Zillow pursuant to Section 4.5 hereof, except to the extent arising out of any failure by Redfin to post any notice on the Redfin Sites or obtain any consent via the Redfin Sites that is required by applicable law with respect to the matters contemplated by Section 4.5. Zillow's indemnification obligations herein are subject to the condition that the Redfin Parties (i) promptly give Zillow written notice of the Claim and request for indemnification once the Redfin Parties become aware of the Claim; (ii) give Zillow sole control of the defense and settlement of the Claim (provided that Zillow may not settle any Claim unless the settlement unconditionally releases Redfin of all liability

[redacted]

for such Claim); and (iii) provide reasonable assistance in connection with the defense (at Zillow's reasonable expense). The failure to give notice to and request for indemnification from the Redfin Parties within a reasonable time of the commencement of any Claim under this Section will relieve Zillow of any liability to the Redfin Parties under this Section only to the extent that such failure materially prejudices Zillow's ability to defend such Claim.

11.2 Indemnification by Redfin. Redfin shall defend, indemnify and hold harmless Zillow, its Affiliates and their respective directors, officers, employees, and agents (collectively, the "**Zillow Parties**") from and against any Losses incurred by the Zillow Parties as the result of any Claim to the extent arising out of: (a) any allegation the Redfin Properties infringe or violate any right of a third party, including, without limitation, rights of publicity, rights of privacy, licenses, or other intellectual property rights other than by virtue of the use or display of the Licensed Content on the Redfin Sites as permitted under this Agreement; (b) any false representation or warranty, or material breach by Redfin of its representations and warranties contained in this Agreement; (c) any alleged violation of law related to or arising from the performance of this Agreement, including arising from any administrative action, investigation, inquiry or demand from a governmental entity or other regulatory body with oversight or jurisdiction over a Redfin's products, services and activities in relation to such violation of Law; (d) any fraud, gross negligence or willful misconduct of Redfin, its Affiliates and their respective directors, officers, employees, and agents; and (d) any failure by Redfin to post any user notice supplied by Zillow under Section 4.5 hereof. Redfin's indemnification obligations herein are subject to the condition that the Zillow Parties (x) promptly give Redfin written notice of the Claim; (y) give Redfin sole control of the defense and settlement of the Claim (provided that Redfin may not settle any Claim without the prior written consent of Zillow unless (i) the settlement involves only payment of money damages, (ii) the settlement does not impose any injunction or other equitable relief on, and contains no admission of wrongdoing by, the Zillow Parties; and (iii) the settlement contains a legally binding, unconditional and irrevocable release of the Zillow Parties of all liability with respect to such Claim); and (z) provide reasonable assistance in connection with the defense (at Redfin's reasonable expense).

11.3 Control of Defense. The indemnifying Party shall not be entitled to assume control of the defense of any Claim if (a) the Claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, allegation or investigation, (b) such Claim seeks an injunction or equitable relief against the indemnified Party, (c) a conflict of interest exists between the indemnifying Party and the indemnified Party in the Claim, or (d) the Claim relates to any review, investigation, audit, action, or proceeding initiated by any federal government agency or instrumentality, including the Consumer Financial Protection Bureau, the United States Department of Housing and Urban Development, the Federal Trade Commission, the Securities and Exchange Commission, or the Department of Justice, and/or by any government agency or instrumentality of any United States state or territory, including state attorneys general, or other agencies or regulatory bodies with oversight or jurisdiction over a Party's products, services and activities, except the indemnifying Party shall retain the right to participate in the defense of any Claim set forth in this Section at its own expense.

**12. Confidentiality.**

The Parties agree and acknowledge that, as a result of negotiating, entering into and performing this Agreement, each Party has and will have access to certain of the other Party's Confidential Information (as defined below). Each Party also understands and agrees that misuse and/or disclosure of that information could adversely affect the other Party's business. Accordingly, the parties agree that each Party shall use and reproduce the other Party's Confidential Information only for purposes of

[redacted]

exercising its rights and performing its obligations under this Agreement and only to the extent necessary for such purposes and shall restrict disclosure of the other Party's Confidential Information to its employees, consultants, advisors, investors, or independent contractors with a need to know and shall not disclose the other Party's Confidential Information to any third party without the prior written approval of the other Party. The foregoing obligations shall be satisfied by each Party through the exercise of at least the same degree of care used to restrict disclosure and use of its own information of like importance, but not less than reasonable care. Notwithstanding the foregoing, it shall not be a breach of this Agreement for either Party to (a) disclose the terms of this Agreement without notice to or consent of another Party as necessary to enforce any of that Party's rights or to perform their obligations as set forth in this Agreement; (b) if legal counsel for a Party is of the opinion that the terms or conditions of this Agreement or a public statement relating to this Agreement or the transactions contemplated hereby is required by applicable law or by the rules of any applicable stock exchange, then that Party may make a disclosure or public statement limited solely to the information that such legal counsel reasonably considers to be required by such law or rules (and shall seek to obtain confidential treatment, to the extent available, for any information disclosed), provided that, to the extent feasible, such disclosing Party shall provide prior written notice to the other Party; and (c) disclose Confidential Information of the other Party if compelled to do so under law, in a judicial or other governmental investigation or proceeding, provided that, to the extent permitted by law, the other Party has been given prompt notice of such request and provide reasonable assistance, at the disclosing Party's sole cost and expense, in objecting to the judicial or governmental requirement to disclosure or seeking a protective order or other limitations on disclosure. Without limiting the foregoing, if a Party determines that it is required to file this Agreement with the Securities and Exchange Commission, it shall provide prompt written notice to the other Party and shall cooperate with the other Party in the preparation, filing and pursuit of a request for confidential treatment of those provisions of this Agreement as may be reasonably requested by any Party. As used in this Agreement, "**Confidential Information**" means information about the disclosing Party's business or activities that is proprietary or confidential, which shall include (x) the terms of this Agreement, (y) all business, financial, technical and other information of a Party marked or designated by such Party as "confidential" or "proprietary"; and (z) any information which, by the nature of the circumstances surrounding the disclosure, ought in good faith to be treated as confidential. "Confidential Information" will not include information that (i) is in or enters the public domain or becomes publicly available other than as a result of, directly or indirectly, a breach of this Agreement by a Party or any of its Affiliates or any of its or their respective representatives, (ii) the receiving Party lawfully receives from a third party on a non-confidential basis without restriction on disclosure and without breach of a non-disclosure obligation, (iii) the receiving Party or its Affiliates or its or their respective representatives knew or was in possession of such information on a non-confidential basis prior to receiving such information from the disclosing Party, or (vi) the receiving Party or its Affiliates or its or their respective representatives acquires or develops independently without reference to or use of, in whole or in part, any of the other Party's Confidential Information. Each Party acknowledges that the other Party may already possess or have developed products, services or information similar to or competitive with those of the other Party disclosed in or by the Confidential Information. Nothing herein shall restrict either Party's right to develop, use or market any products or services as long as it shall not thereby breach this Agreement.

**13. Limitation of Liability.**

13.1 **WITH THE EXPRESS EXCEPTION OF A PARTY'S INDEMNIFICATION OR CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING**

[redacted]

**OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH LIABILITY SOUNDS IN CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY, WARRANTY, OR OTHERWISE. WITH THE EXPRESS EXCEPTION OF A PARTY'S INDEMNIFICATION OR CONFIDENTIALITY OBLIGATIONS, AND WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, IN NO EVENT SHALL EITHER PARTY'S LIABILITY FOR ANY SINGLE CLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, WHETHER SUCH LIABILITY SOUNDS IN CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY, WARRANTY, OR OTHERWISE, EXCEED THE AGGREGATE AMOUNT PAID, OR REQUIRED TO BE PAID,** [redacted]

**14. Miscellaneous.**

14.1 Nondisparagement. Commencing on the Execution Date and continuing for the duration of the Term, each Party shall use reasonable and good faith efforts to not, and shall cause its Affiliates to use reasonable and good faith efforts to not, directly or indirectly, (a) engage in any deceptive, misleading, illegal, or unethical practices with respect to the other Party, (b) intentionally make, publish or communicate on any Redfin Site or Zillow Site, as applicable, or in any public forum any comments or statements concerning the other Party's or any of its Affiliates' products, services or businesses that are untruthful or reckless, (c) disparage, dilute or diminish the other Party's or any of its Affiliates' rentals-related products or services if such disparagement, ridicule or diminishing would have a material detrimental impact on Zillow's ability to provide Licensed Content to Redfin or Redfin's ability to provide Leads to Zillow, or (c) use the other Party's or its Affiliates' Proprietary Marks in a misleading manner.

14.2 Assignment. Neither Party may assign, delegate or transfer this Agreement or any right, interest, or benefit under this Agreement, or allow this Agreement to be assumed by any third party without the prior written consent of the other Party. Any such assignment, delegation, transfer or assumption without prior consent shall be wholly void and invalid. Notwithstanding the foregoing, and without in any way limiting the provisions of Section 1.2.3 hereof, either Party may assign this Agreement without consent to an Acquiror (as defined below) of such Party or to an Affiliate, or allow this Agreement to be assumed by such Acquiror or Affiliate so long as (a) such Acquiror or Affiliate agrees to be fully bound by the terms and conditions set forth in this Agreement; and (b) this Section will not change the Acquiror or Affiliates' obligations and restrictions in connection with the Licensed Content or Redfin Sites, including, without limitation, the obligations and restrictions under Section 3 (Exclusivity) hereof. As used herein, "**Acquiror**" shall mean a third party that acquires a majority of the outstanding capital stock of a Party, a third party that acquires a Party in connection with a merger, or a third party that acquires all or substantially all of the assets and on-going business of a Party.

14.3 Law and Venue. This Agreement and all related documents, and all matters arising out of or related to this Agreement shall be governed by, and construed in accordance with, the laws of the State of Washington without regard to the conflict of law provisions thereof, and any claim under this Agreement shall be brought in the State of Washington.

14.4 Publicity; Use of Marks. The Parties shall issue a mutually agreeable joint press release after the mutual execution of this Agreement and at a time mutually agreed upon by the Parties.

[redacted]

Except as agreed by the Parties in writing (email to suffice) or as required by, or deemed necessary or appropriate to meet or comply with disclosure requirements of, applicable law or regulatory authority, neither Party shall publicize or disclose the terms of this Agreement or make any public statement or announcement regarding this Agreement or the terms hereof without obtaining the prior written approval of the other Party. In particular, neither Party will use the other Party's name, logos or trademarks in any publicity, advertising or marketing without the other Party's prior written consent. If a Party grants consent pursuant to this section, such Party will have the right to review and approve in advance, in its sole discretion, the use and the specific form and content of such use, and reserves the right to revoke such consent at any time. Any use of such granting Party's name, logos or trademarks must immediately cease upon request by the granting Party.

14.5 Force Majeure. Neither Party shall be deemed in default or otherwise liable under this Agreement to the extent it has a delay, failure, or inability to perform its obligations by reason of any fire, earthquake, flood, substantial storm, epidemic, accident, explosion, casualty, strike, lockout, labor controversy, riot, civil disturbance, act of public enemy, embargo, war, act of God, or any municipal, county, state or national ordinance or law, or any executive, administrative or judicial order (which order is not the result of any act or omission which would constitute a default hereunder), or similar cause beyond that Party's reasonable control. Each party acknowledges that services provided by third parties are beyond the other Party's reasonable control, and neither Party will be liable for a delay or failure caused by the failure of third-party software or hardware, an interruption, slow-down, or failure of telecommunication or digital transmission links, or other such transmission failure. If such event continues for more than twenty (20) days, either Party may terminate the Agreement upon written notice to the other Party.

14.6 Relationship of the Parties. The relationship between Zillow and Redfin under this Agreement, as well as the relationship between either Party's Affiliates, is that of independent contractors. Neither this Agreement nor the cooperation of the parties contemplated herein shall be deemed or construed to create any partnership, joint venture, employment or agency relationship between Redfin and Zillow. Neither Party is, nor shall either Party hold itself out to be, vested with any power or right to bind the other Party contractually or act on behalf of the other Party as a broker, agent or otherwise.

14.7 Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. In the event that any provision of this Agreement is determined to be invalid, unenforceable or otherwise illegal, such provision shall be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intentions of the parties, and the remainder of the Agreement shall be in full force and effect.

14.8 Complete Agreement. This Agreement, including all attachments, if any, contains the entire agreement and understanding between the parties with regard to the subject matter hereof, and supersedes all prior and contemporaneous oral or written agreements and representations. This Agreement may only be modified, or any rights under it waived, by a written agreement signed by both Parties.

14.9 No Third-Party Beneficiary. This Agreement is made and entered into for the sole protection and benefit of the Parties named in this Agreement and is not intended to convey any rights or benefits to any person or third party except as expressly provided in this Agreement.

[redacted]

14.10 Waiver. No delay or failure by either Party to exercise any right or remedy under this Agreement will constitute a waiver of such right or remedy. All waivers must be in writing and signed by an authorized representative of the Party waiving its rights. A waiver by any Party of any breach or covenant shall not be construed as a waiver of any succeeding breach of any other covenant.

14.11 Headings. The headings of the articles and paragraphs contained in this Agreement are inserted for convenience and for reference purposes only and are not intended to be part of or to affect the interpretation of this Agreement. The word "or" shall not be exclusive. The word "extent" in the phrase "to the extent" shall mean to the degree to which a subject or other thing extends, and such phase shall not mean simply "if." References to "written" or "in writing" include electronic form. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Exhibits hereto) and not to any particular provision of this Agreement, and all Section and Exhibit references are to this Agreement unless otherwise specified. Any capitalized terms used in any Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement. The words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein will be equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. All references to "dollars" or "$" will be deemed references to the lawful money of the United States of America.

14.12 Equitable Relief. Each Party agrees that a breach of the provisions of this Agreement relating to the use or disclosure of the other Party's Confidential Information or a breach of Section 14.1 may result in immediate and irreparable harm to the other Party and that money damages alone may be inadequate to compensate the non-breaching Party. Therefore, in the event of such a breach, the other Party will be entitled to seek equitable relief, including but not limited to a temporary restraining order, temporary injunction or permanent injunction, and the Parties waive any requirement for the securing or posting of any bond in connection with such Claim. The rights granted to the Parties under this provision are in addition to any other remedies available to the Parties under this Agreement, or common or statutory law.

14.13 Notices. Any notice required or permitted under this Agreement shall be sent to:

If to Redfin, all notices must include a copy sent via email:

Redfin Corporation
Attention: Chief Legal Officer
1099 Stewart St, Suite 600
Seattle, WA 98101
Email: legal@redfin.com

If to Zillow, all notices must include a copy sent via email:

Zillow, Inc.
Attention: General Counsel
1301 Second Avenue, Floor 36
Seattle, WA 98101
Email: legal@zillowgroup.com

[redacted]

14.14 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Agreement. The parties may sign facsimile copies of this Agreement, which shall each be deemed originals.

[SIGNATURES BEGIN ON NEXT PAGE]

[redacted]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and effective as of the Execution Date.

**REDFIN CORPORATION**

By: [redacted]

Name: Chris Nielsen

Title: CFO

**ZILLOW, INC.**

By: [redacted]

Name: Jeremy Hofmann

Title: CFO

[redacted]

**Exhibit A-1**
**Redfin Identified Persons**

[redacted]

[redacted]

**Exhibit A-2**
**Zillow Identified Persons**

[redacted]

[redacted]

**Exhibit B**
**Wind-Down Period**

Notwithstanding anything to the contrary in the Agreement, the following terms apply during the Wind Down Period:

1. **License.** The license granted in Section 2.5 of the Agreement shall be modified to permit Redfin to use the Licensed Content solely to display the Licensed Content on and in the Redfin Sites in accordance with the provisions of this Agreement. Redfin shall not, directly or via partnership, commingle Licensed Content with listing content from any other source within a Listing. For purposes of this Section, "Listing" means the property-level display of a managed multifamily property of 25 units or more.

2. **Non-Solicitation and Non-Disparagement.**

   a. Non-Solicitation. Redfin will not use any identifiable information provided in the Data Feed, including but not limited to property names, contact names, and contact information (such as phone number or email) for competitive purposes or to engage in any sales, marketing, solicitation or similar activities where such activities are developed, designed, conceived or constructed to specifically target Zillow customers to provide rental listings to Redfin.

   b. Non-Disparagement. Neither Party will, directly or indirectly: (i) urge or encourage property management companies or other participants in the real estate industry to not use the other Party's multi-family rentals-related products or services (provided however that, for clarity, neither Party shall be deemed to be in violation of this provision simply by virtue of encouraging a property management company or other participant in the real estate industry to use its own multi-family rentals-related products or services); or (ii) make disparaging statements about the other Party's audience size, lead volumes, property or listing count, coverage or quality.

3. **Communications**. The Parties may make a public announcement regarding the termination of the partnership, as follows:

   > "After years of a successful partnership, Zillow and Redfin have reached the planned conclusion of our agreement. We are committed to a smooth transition and ensuring continued support for our customers and stakeholders."

   Neither Party is permitted to make any public statement referencing any new partnership or updated strategy in the same communication.

4. **Data Feed**. After the first [redacted] of the Wind-Down Period, Zillow may, in its sole discretion, remove Zillow Properties from the Data Feed, provided that Zillow does not (i) remove more than [redacted] of Per Lease Properties, [redacted] of Base Properties, and [redacted] of Non-Base Properties each calendar month, unless such reduction is due to discontinuation of the Data Feed in accordance with Section 5 of this Exhibit B). Redfin will promptly notify Zillow of any Zillow Properties it receives from an alternate source.

5. **Display on the Redfin Sites**. If Redfin does not display on the Redfin Sites more than [redacted] of Zillow Properties in a calendar month, Zillow may discontinue the Data Feed upon immediate written notice (email to be sufficient). Whether Redfin has met such threshold will be calculated

[redacted]

by [redacted]

6. **Traffic**. The obligations of Section 7.2(b) of the Agreement do not apply.

[redacted]

**Exhibit C**
**Rate Card**

1. The Per-Lead Amount is the amount Zillow will pay Redfin for each Payable Lead based on property type, subject to the Lead Cap. The Lead Cap is the maximum number of Payable Leads per Zillow Property per calendar month.

| Property Type | Per-Lead Amount | Lead Cap |
|---|---|---|
| Base Property | [redacted] | |
| Per Lease Property | | |
| Non-Base Property | | |

2. Except as provided below, for the period [redacted] from the Hard Transition Date, if the total of all Monthly Lead Payments is less than seventy-five million dollars ($75,000,000) (the "**Minimum Payment**"), the difference will be added in a lump sum to the next Monthly Invoice. Notwithstanding the foregoing, if one of the following events occurs during the period [redacted] from the Hard Transition Date, the Minimum Payment will be modified as follows:

[redacted]

3. For each contract year starting after the second anniversary of the Agreement and in any Renewal Term, the Per-Lead Amounts above will automatically increase by [redacted]

4. The Per-Lead Amount in effect during the Wind-Down Period, if any, shall be the Per-Lead Amount in effect immediately prior to the expiration or earlier termination of the Term.

[redacted]

**Exhibit D**
**Limited Syndication**

[redacted]

[redacted]

[redacted]

[redacted]

## Exhibit E
## Marketing Guidelines

1. Marketing Guidelines. Zillow is permitted to use Redfin Marketing Content without the need for prior approval so long as Zillow complies with the provided brand or usage guidelines.

2. Redfin Enablement. Concurrent with the Execution Date, Redfin will provide all of the following to Zillow:

   a. Details regarding all events, assets, and marketing investments already planned for the Redfin rentals business, which the Parties mutually agree will be transferred to Zillow.

   b. All Redfin Marketing Content. As used herein, Redfin Marketing Content means (i) all relevant marketing, pitch, sales, and product collateral as editable files, (ii) approved logos for Redfin, Rent., Rentals.com, Apartmentguide.com, and any other Redfin Sites, (iii) all approved marketing claims relating to the Redfin rentals business, including the date the claims expire (as applicable), which Zillow shall be permitted to incorporate into its marketing collateral, and (iv) product experience images with all property identifying information and visuals removed or, if not available, editable product shots (e.g., Figmas or similar) of the current rentals experiences on the Redfin Sites, which Zillow shall be permitted to incorporate into its marketing collateral.

   c. Any applicable brand or usage guidelines pertaining to use of the Redfin Marketing Content.

[redacted]

**Exhibit F**
**Technical Commitments**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]